UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANOMALOUS PRODUCTIONS, LLC; DANNY ABOSCH; AND JOHN MACLAY<br><br>Plaintiffs,<br><br>v.<br><br>SCHOLASTIC ENTERTAINMENT INC.; AND SCHOLASTIC INC.<br><br>Defendant. | Case No. ⸺⸺⸺⸺24-cv-08041<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiffs Danomalous Productions, LLC, Danny Abosch ("Abosch") and John Maclay ("Maclay") (collectively the "Authors" unless otherwise stated), by and through their attorneys, Klaris Law PLLC, for their First Amended Complaint, bring this action against Defendant Scholastic Inc., and its media division, Scholastic Entertainment Inc. ("SEI" or "Scholastic"), hereby alleging as follows:

## INTRODUCTION

1.      Authors bring this action against SEI for breach of contract, declaratory judgment, fraudulent inducement, copyright infringement, breach of contract, negligent and fraudulent misrepresentation, fraud,and breach of fiduciary duty, and . Specifically, Authors seek a declaration from the Court that (1) the musical play adaptation of the book "GOOSEBUMPS: Phantom of the Auditorium" (the "Book") titled "Goosebumps The Musical: Phantom of the Auditorium" (the "Play") is incapable of constituting a work-for-hire[1] under federal copyright law; and (2) Authors are. Authors also seek rescission of the Parties' 2017 Agreement in light of SEI's

---

[1] The phrases "work for hire" and "work made for hire" (as well as their respective hyphenated versions) are all used interchangeably herein to mean the statutory phrase, "work made for hire."

fraudulent inducement of that agreement.  Authors further seek a declaration that at all relevant times they have been the sole and exclusive owners of all copyrights in and to the Play's cast album ("Cast Album") and sheet music ("Sheet Music"), and all copyrightable elements thereof, including without limitation the musical compositions ("Compositions") and the artwork ("Artwork"). In the alternative, Authors seek a declaration that the ownership provisions of the 2017 Agreement (as defined hereinbelow) are unenforceable as a whole and should be reformed in favor of Authors. Further, Authors seek a declaration that SEI must use reasonable, good-faith efforts to exploit the Play for Authors' benefit, or, in the alternative, that the 2017 Agreement as a whole is a nullity because it binds only one side to unconditionally perform.

2.    This dispute is a cautionary tale regarding the perils faced by individual creators seeking to license rights from large entertainment companies to author new works adapted from an existing brand. Here, the Authors were sought out to create a brand-new musical play based on the popular Scholastic-owned "*Goosebumps*" book series. With SEI's full authorization, the Play had its world premiere in 2016 in two simultaneous productions at the Todd Wehr Theater in Milwaukee, Wisconsin and the Newmark Theatre in Portland, Oregon, and it has subsequently been staged at other theaters around the United States. The Play has been well-received by critics, audiences, and SEI itself, and by all accounts has been a success that has added significant value to the "*Goosebumps*" property as a whole.

3.    This success, however, came at a price. SEI effected a classic bait-and-switch on Authors, making promises regarding the Play that – once the Authors had completed the work and could therefore no longer walk away – SEI then reneged upon, forcing inducing and/or causing Authors to enter a less favorable arrangement that has undermined or damaged Authors' rights and financial rewards to this day, some of which has only recently become apparent.

4.     In late 2015, Susan Gurman, Authors' agent, reached out to Abosch and Maclay in her apparent dual capacity as the representative of the *Goosebumps* property on behalf of SEI, with an opportunity for Authors to develop the Play.

5.     As ~~Ms.~~ Gurman and SEI well knew, it has been the longstanding custom and practice in the theater industry for authors (also known as "dramatists") to retain ownership and control of their work, even when such work is based on underlying material, subject only to the underlying material licensor's right to receive payment (either up front, through ongoing royalty participation, or both.) This custom has developed in part because the industry operates on a freelance model where dramatists' only potential for income comes from licensing the use of their intellectual property for a royalty (as they are not employees and do not receive a salary), and in part because the Copyright Act does not recognize dramatic works as a category capable of transferring *ab initio* authorship and initial ownership from non-employees to commissioning parties as works-made-for-hire.

6.     Despite this standard, and notwithstanding the legal ineffectiveness of such language (of which it was well aware), SEI made clear that it would not proceed without ineffective work-for-hire language in ~~this case (notwithstanding the legal ineffectiveness of such language) and would not be offering~~ any ~~additional monetary consideration to induce Authors to accept such an unusual departure from standard industry custom and practice.~~contracts for creation of a musical play based on the *Goosebumps* property. It did, however, represent that ~~the~~ Authors could at least rely on additional revenue streams by way of retention of ownership of the orchestrations from the Play (which are often licensed separately); the right to produce and sell a cast album; and the non-exclusive right to license the Play themselves. Notwithstanding that Authors would have been entitled to most of these rights anyway under the traditional

3

model.[2] Authors reluctantly agreed to the arrangement in reliance on these promises and proceeded to enter into an agreement not with SEI, but at SEI's direction with the two independent production theaters operating on SEI's behalf. Notably, Authors were able to strike language providing an assignment of rights in the Play to SEI that SEI and the theaters originally sought to include. As a result, under the 2016 agreement binding both SEI and Authors, Authors were the authors *ab initio* and the owners of all copyright interests in the Play.

6.7.    Despite the initial insistence of SEI itself that no further contract was necessary, Authors believed their rights would be best protected by establishing direct contractual privity with SEI, because they understood that SEI was taking the position that it was not bound by the theater agreement because it was not a signatory thereto. For this reason, Authors insisted on enteringsought to enter into a concurrentan agreement directly with SEI to memorialize the already-agreed-upon terms, and were then told by Ms. Gurman that SEI had agreed to do so in the form of a simple "side agreement".."

7.8.    Over the next year, Authors continued to insist on receipt of the side agreement with SEI given that it refused to be a signatory to the theater agreement, and were continuously assured that it was forthcoming. In the meantime, Authors completed and delivered the Play to unanimous praise and approval. When they finally received the "side agreement" from SEI in 2017, long after the Play was completed, it was in the form of a brand-new agreement that significantly and unilaterally rewrote the 2016 Agreement terms entirely in SEI's favor by subsuming the orchestrations into the definition of the "Play", which SEI purported to own in its entirety;adding an alternative assignment provision for rights in the "Play"; eliminating Authors' right to license to third parties; inserting a "non-exploitation" provision purportedly eliminating

---

[2] https://www.dramatistsguild.com/rights

any obligation by SEI to exploit the Play; and omitting any mention of the cast album. The latter point was addressed only at the last minute by the parties agreeing to defer negotiations of the cast album to a later, unspecified date. At this point, with the work already completed and under threat that it would be rendered unusable forever unless Authors accepted SEI's demands by its arbitrarily-imposed deadline, Authors were effectively held hostage to sign away rights in exchange for no financial or other benefit to them whatsoever. Authors learned only much later, in 2024, that SEI never actually believed that it was not bound by the 2016 Agreement, but failed to disclose this to Authors at the time in order to induce them to enter the side agreement with its highly unfavorable provisions.

8.9.    To add insult to injury, instead of SEI using those rights to license and exploit the Play as widely and aggressively as possible – which could have, at the very least, made Authors' work financially worthwhile on the backend – it instead proceeded to, among other bad faith behaviors, obscure competing contractual obligations; withhold revenue; take unlawful and ineffective positions with respect to its copyright and trademark rights, including those for which the parties had contractually agreed to transfer and/or license to Authors; misrepresent its position with respect to third party rights in order to induce Authors to spend more of their own money on a promotional cast album; and sit on its remaining rights by all but ceasing to exploit the Play at all (and entirely, overseas), thereby paralyzing the content and making it virtually impossible for Authors to benefit from the bargain they had intended to make.

9.10.    As a result, Authors have suffered damages from breach of contract, breach of the implied covenant of good faith and fair dealing, copyright infringement, negligent misrepresentation and fraud, and seek a declaration from this Court as to their rights in and to the Play.

**PARTIES**

~~10.~~11.  Danomalous Productions, LLC is a single-member LLC solely-owned by Danny Abosch. Formed in 2016, it is party to the 2017 and later (but not earlier) agreements at issue herein;

~~11.~~12.  Danny Abosch is a professional composer, lyricist, orchestrator, arranger, and producer currently residing in New York, New York; and

~~12.~~13.  John Maclay is a professional playwright, book writer, librettist, and lyricist currently residing in Lake Zurich, Illinois.

~~13.~~14.  Upon information and belief, Scholastic, Inc. is a corporation incorporated under the laws of New York with its principal place of business at 557 Broadway, New York, NY 10012. At all relevant times, Scholastic, Inc. was a global publisher and distributor of children's media.

~~14.~~15.  Upon information and belief, Scholastic Entertainment, Inc. is the media division of Scholastic, Inc. with its principal place of business at 557 Broadway, New York, NY 10012. At all relevant times, Scholastic Entertainment, Inc. was a licensor and producer of children's entertainment content.

**JURISDICTION AND VENUE**

~~15.~~16.  This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the United States Copyright Act, 17 U.S.C. §§ 101 *et seq*. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1338(a).

~~16.~~17.  This Court has personal jurisdiction over Defendant because it has its principal place of business in New York, New York.

~~17.~~18.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because this District has personal jurisdiction over Defendant.

## FACTS COMMON TO ALL CLAIMS

### The Authors and Their Creation of the Play

~~18.~~19.  Danny Abosch and John Maclay are seasoned dramatists with over 47 years of collective experience in the theater industry, and both hold terminal degrees in their highly-specialized disciplines. Abosch and Maclay are members of the Dramatists Guild of America and regular creators of, and contributors to, dramatico-musical and other works, including: (for Abosch) *Fancy Nancy The Musical* (multiple Off-Broadway runs, National Tours, over 100 productions worldwide, cast recording available on Ghostlight Records), *Off The Wall* (First Prize winner of NMI's Search for New Musicals), *Placebo* (winner of the PMTP Development Award, fully produced workshop at the Pasadena Playhouse directed by Ryan Scott Oliver, additional productions in the U.K. and Italy (in Italian)), and other stage musicals, film musicals, and music featured in well-known TV shows; and (for Maclay) *Arthur & Friends Make a Musical!*, *Nate The Great*, *Little Piggie Gets a Sister* (with Brett Ryback), *The Legend of Rock Paper Scissors* (with Eric Nordin), *The Quest for Solomon's Treasure*, *Geronimo Stilton: Mouse in Space*, *Hopper*, *Nancy Drew And Her Biggest Case Ever* (with Jeff Frank), *Anatole* (with Lee Becker and James Valcq), three plays with collaborator Joe Foust: *The Revolting Teens of Sherwood*, *Romeo and Juliet Walk Into a Bar*, *Apollo and the Trials of Hercules,* and others. Abosch holds a B.M. in Music Education from the University of Michigan, and an M.F.A. in Musical Theatre Writing from NYU's Graduate Musical Theatre Writing Program. Maclay holds a B.A. in Theatre from Lawrence University, an M.F.A. in Theatre from the University of Illinois Urbana-Champaign, and an M.F.A. in Writing with a Playwriting Specialization from Spalding

University.

19.20.  *Goosebumps* is a series of children's horror novels conceived by best-selling author R.L. Stine and is, to date, the second-best-selling book series of all time (behind only *Harry Potter*). Since the first book was published in 1992, Scholastic has published more than two-hundred books under the *Goosebumps* umbrella (including the sixty-two comprising the "original series") and the title has spawned two television series, a comic book series, a video game, and two feature films.

20.21.  Abosch and Maclay have each been separately represented by the theater agent Susan Gurman since 2012 and 2014, respectively. As their representative, Gurman has negotiated a number of deals on their behalf. Abosch and Maclay were aware of each other's work before collaborating on the Play but had not previously met.

21.22.  On December 1, 2015, Gurman reached out to Abosch asking to introduce him to Maclay for the purpose of partnering on the development of a new project, describing it as follows: "GOOSEBUMPS – 400 million books in print. I rep it on behalf of Scholastic so if it moves forward, I'll negotiate but not commission it. I worked hard to get it out there and would also like to see a Broadway show which I'm also working on at the same time." A true and correct copy of this correspondence is attached hereto as Exhibit A.

22.23.  Abosch agreed and, on December 11, 2015, Ms. Gurman confirmed that she had been authorized to prepare an agreement for Abosch and Maclay to write and compose a musical play based on *Goosebumps*.

23.24.  At all times when working with Authors in connection with the *Goosebumps* property, Ms. Gurman was acting in a dual role as Authors' agent but also as agent for SEI. Ms. Gurman nevertheless assured Authors that, despite her status as a literal double-agent, she could

be trusted to fairly negotiate and advocate for her clients on both sides of the same deal.

**The Industry Standard for Ownership of Theatrical Plays**

~~24.~~25.  Unlike film and television writers, theater writers are not employees and cannot collectively bargain[3]. Rather, they are *property owners* who license the use of their intellectual property, typically in exchange for a royalty.

~~25.~~26.  In the theater industry, when an author acquires the rights to adapt an underlying work for the stage, the long-established standard is that the author/adaptor retains ownership of the adaptation and thereafter merely licenses certain rights as necessary for the limited purpose of performing the work.[4] In addition, such author/adaptor will typically account to the licensor of the underlying work for any share of proceeds owed to such licensor. Even where the underlying source material involves a famous book series, and the licensor of such source material is a large entertainment company, it is generally understood that such licensor shall not have any ownership or control over the resulting adaptation, and the authors of such adaptation shall have sole decision-making authority over its future exploitation.[5] Just as novelists rarely retain "final cut" approval over film adaptations of their novels, content licensors rarely retain any creative approval over stage adaptations of their content. With few exceptions, the licensor's approval is limited to the selection of the adaptors, before the work is created.[6]

~~26.~~27.  It is not uncommon for a licensor to contract with a theatrical producer, instead of with the dramatists directly. Even in such case, the necessary adaptation rights granted to the producer are customarily assigned by the producer to the dramatists, once those dramatists are

---

[3] https://www.dramatistsguild.com/union
[4] *See, e.g.,* Charles Grippo, The Stage Producer's Business and Legal Guide 42–43 (2002).
[5] *See, e.g.,* Carol M. Kaplan, Once More unto the Breach, Dear Friends: Broadway Dramatists, Hollywood Producers, and the Challenge of Conflicting Copyright Norms, 16 *Vanderbilt Journal of Entertainment and Technology Law* 297, 301-302 (2020). Available at: https://scholarship.law.vanderbilt.edu/jetlaw/vol16/iss2/3
[6] John Weidman, *THE SEVENTH ANNUAL MEDIA & SOCIETY LECTURE: Protecting the American Playwright*, 72 Brook. L. Rev. (2007). Available at: https://brooklynworks.brooklaw.edu/blr/vol72/iss2/5

selected (usually by producer, sometimes with approval from licensor[7]). This is to ensure that the dramatists own the rights in their adaptation free and clear, and avoid the unthinkable risk of ending up with an unusable copyright.

27.28.  This standard has persisted in part because of the longstanding understanding, as acknowledged by the Dramatists Guild and others, that the work-for-hire doctrine is largely inapplicable to plays under federal copyright law, as "playscript", "dramatico-musical work", and other like terms are excluded from the nine enumerated categories contemplated by §101(2), and the theater industry's independent contractor model precludes the only other option, §101(1) ("a work prepared by an employee within the scope of his or her employment"). As such, it is standard in the theater industry for commissioning parties to request only a limited option to present a commissioned work, and not ownership of it – even as an assignment of copyright, let alone as a purported "work-for-hire". *See*, *e.g.*, Letter to Abosch from Deborah Murad, Esq., then-Director of Business Affairs at the Dramatists Guild of America attached hereto as Exhibit B, stating that "[w]ork-for-hire agreements are not the norm (nor do not truly exist) in the theater industry. This limitation is a function of federal law."; and that "the theater industry generally— and the Dramatists Guild in particular—does not endorse copyright assignments", which would be "[t]he only other option," to achieve a similar result, given the ineligibility for work-for-hire.

28.29.  Accordingly, Abosch and Maclay adhere to this standard in the vast majority of their written agreements. Indeed, for all the other plays Abosch has authored in his career (including another musical adapted from an internationally-famous brand of children's books from a "Big Five" publisher), Abosch has never signed a contract containing a purported work-for-hire clause (or even, for that matter, a copyright assignment of his rights in such play.)

---

[7] John Breglio, *I Wanna Be a Producer: How to Make a Killing on Broadway...or Get Killed* 35-36 (2016).

29.30.  In sharp contrast to the theater industry, the film and television industries adopt the opposite custom and practice. Writers for film and television are commonly union employees, and even when they are not, their work can still (under certain conditions) qualify as work-for-hire, as "a part of a motion picture or other audiovisual work" §101(2). Part of the reason for the difference is a practical one – a theater play may have thousands of different productions over the life of its copyright, while a film screenplay (with rare exception) is produced only once.

**The 2016 Agreement**

30.31.  When ~~Ms.~~ Gurman reached out in December 2015 on behalf of SEI for the Authors to develop the Play, she noted that – contrary to the industry norm – SEI insisted on the inclusion of *(ineffective)* work-for-hire language in its contracts. The Authors balked at this work-for-hire provision in light of its legal ineffectiveness and the commensurate industry standard not to include such language, but ~~Ms.~~ Gurman waved away these concerns and made explicitly clear that, if SEI were to proceed, it was contingent on Authors accepting the non-negotiable "company policy" that the agreement contain such language purporting to grant SEI "ownership" of certain work produced (subject to some limitations, such as the Orchestrations, which ~~Ms.~~ Gurman repeatedly noted would be excluded). ~~Ms.~~ Gurman was unequivocal that such "work-for-hire" language ~~had to~~*must* be included in ~~the~~*any* agreement *relating to the Play*, *even if Authors believed it to be legally ineffective*.

31.32.  ~~Ms.~~ Gurman further relayed that SEI did not intend to be a party to the commissioning agreement and that any such agreement would be entered into between Authors and the two theaters, First Stage Milwaukee and Oregon Children's Theater (collectively, the "Commissioning Theaters"), that would be co-commissioning the work and co-producing the world premiere productions.

32.33.  Over the course of several months, Authors and the Commissioning Theaters participated in several rounds of contract negotiations, all facilitated by ~~Ms.~~ Gurman, who also drafted portions of the language. While some earlier drafts contained a so-called "alternative assignment" clause, contemplating the idea of a transfer of rights as a backup to the invalid work-for-hire clause, Abosch specifically and successfully negotiated to *strike* this clause. ~~It~~This language is therefore absent from the final, signed agreement~~., and thus under that Agreement Authors were to hold the copyright interest in the Play.~~

33.34.  Despite Authors' numerous and vocal misgivings about leaving the unusual and invalid work-for-hire language in the agreement, and the fact that SEI refused to be a signatory, Authors eventually reluctantly agreed to sign the agreement with the Commissioning Theaters ~~including the required but ineffective work-for-hire language~~ provided that, among other things, the agreement also explicitly reserved the Authors certain rights and beneficial interests they had specifically bargained for, including the right to (1) own the orchestrations as separate and distinct from the Play; (2) create and own a cast album comprised of the Compositions; and (3) license the Play to third parties. Before signing, however, Abosch made clear to ~~Ms.~~ Gurman that he and Maclay were uncomfortable entering into a rights deal with the Commissioning Theaters for SEI's benefit if SEI itself was not also ~~a party to that agreement. As a compromise, Ms.~~bound by that agreement. Gurman withheld from Authors the fact that SEI understood that it was in fact bound by the agreement, including in email correspondence in February 2016. Instead, Gurman – after backchanneling with SEI – confirmed that SEI would be willing to enter into a contemporaneous side agreement directly with Authors mirroring the rights and obligations in the Authors/Theaters agreement in lieu of being added as a signatory.

34.35.  On multiple occasions, Authors also expressed to ~~Ms.~~ Gurman their desire and

intent to exploit the first- and/or second-class rights in the Play, which ~~Ms.~~ Gurman repeatedly represented were unencumbered. Accordingly, Authors specifically negotiated, as a material term of the agreement, the right to independently license the Play "in any territory", subject only to a five-year restriction on licensing within a certain radius of Milwaukee, WI and Portland, OR. No similar restriction was negotiated for New York City (nor would Authors have agreed to one.)

~~35.~~36.  Thereafter, on March 17, 2016, Abosch and Maclay entered into an agreement with the Commissioning Theaters to write and develop the Play (the "2016 Agreement"). Paragraph 1 of that Agreement purports to characterize the Play as a work-for-hire ~~and further~~to be "convey[ed] for the benefit of" SEI but (1) explicitly reserved the right to Authors to own and control the "Orchestrations", defined as "the adaptation or re-adaptation of existing Music for the purpose of use at any theatres licensed or otherwise referenced herein, or any subsequent theatres, or for any subsequent performances"; (2) granted Authors the right to produce and sell a "Cast Album" of original music from the Play; and (3) granted Authors the right to "license or cause the licensing of the Play to third-parties ('Adaptors Third-Party Licenses'), in any territory, and in perpetuity, irrespective of any provision of Paragraph 1 [which] may be arguably construed or interpreted to the contrary". Although the advance payments they received from the Commissioning Theaters were far below industry standard and, standing alone, financially untenable for a project of this magnitude, Authors also relied on SEI's promises through Gurman that the Play would be widely and aggressively licensed around the world, for the life of the copyright, (or at the very least, that Authors would be able to do so themselves), and accordingly also agreed to accept 50% of backend royalties from such efforts in lieu of a higher upfront advance on performance royalties from the Commissioning Theaters, and in lieu of *any* upfront payment whatsoever from SEI. A true and correct copy of the 2016 Agreement is attached hereto

as Exhibit C.

~~36.~~37.  Eliminating any doubt about whether the parties actually intended an effective work-for-hire, the parties also agreed to include the following language, in the Representations and Warranties clause, which entirely negates the concept of work-for-hire by providing that the legal authors of the Play were the Authors:

> "Furthermore, **neither Producer shall** permit any person or entity in their employ or otherwise under their direction to **represent, imply, or agree**, privately or publicly, directly or indirectly, that the Play is a "Joint Work" as defined in the U.S. Copyright Act (17 United States Code) Section 101, or **that the authorship of the Play** or other materials delivered hereunder **is claimed or held by any person or entity other than Adaptors.** Producers both understand, acknowledge, and agree that any and **all copyright filings** and other filings of an intellectual property nature ("I.P. Filings"), in any territory, **will identify** the full names of both of **the Adaptors as the "Authors" of the Play**, and shall fairly and accurately cite **Adaptors' authorship of the Play**." §11(c)(iii) (emphasis added)

~~37.~~38.  As contemplated by the 2016 Agreement, on April 26, 2016, Abosch entered an additional agreement (the "2016 Orchestrator Agreement") with the Commissioning Theaters to memorialize the terms by which Abosch would create the Play's Orchestrations and Arrangements. This 2016 Orchestrator Agreement devoted no fewer than six entire paragraphs (§11–16) to Abosch's sole ownership of all copyrights in and to the Orchestrations and Arrangements, spelling out (in excruciating detail) terms including, *inter alia,* Abosch's exclusive right to file numerous registrations with the U.S. Copyright Office and otherwise, as he may elect. A true and correct copy of the 2016 Orchestrator Agreement is attached hereto as Exhibit D.

### The 2017 Agreement with SEI

~~38.~~39.  Over the next twelve months, Authors repeatedly asked ~~Ms.~~ Gurman about the status of the side agreement with SEI, with Abosch even at one point offering that his own counsel take the laboring oar of providing a draft (a suggestion flatly rejected by Gurman on

SEI's behalf). Authors were repeatedly told that the agreement would be arriving "soon"; that such paperwork would in any event be a mere formality and not change the status quo; and that production should continue as usual. With no reason to doubt ~~Ms.~~ Gurman, Authors spent the entire year continuing to create and deliver copies of the Play to the Commissioning Theaters and SEI, to unanimous praise (including from SEI itself), and began outreach to third party licensees to produce the Play as permitted under the 2016 Agreement. They met their tight deadlines, and the Play premiered and ran as scheduled from October to November 2016.

40.     However, SEI's position that it was not bound by the 2016 Agreement at the same time that it delayed preparing a side agreement caused the parties to miss opportunities with one or more theaters, because Authors erroneously believed they could not grant the necessary rights without a new license to the theaters from SEI on each occasion. In several instances, Abosch communicated to Gurman that Authors believed a side agreement with SEI was a necessity because Authors did not hold the necessary rights under the 2016 Agreement, given that SEI took the position that it was not bound by that contract. Gurman, on behalf of SEI, never corrected or contradicted this understanding on the part of Authors.

~~39.~~41.  Finally, in March 2017 – an entire year after Authors had entered into the 2016 Agreement and well after they had delivered their end of the bargain – SEI provided a draft of an agreement, astonishingly followed soon thereafter by repeated threats that it needed to be signed immediately. *See* Exhibit E (email from Susan Gurman stating agreement needed to be signed "ASAP or idk what will happen"). Despite ~~Ms.~~ Gurman's promises that the agreement would retain the status quo, in fact the draft effectively re-wrote the terms of the 2016 Agreement by, among other aggressive and inequitable changes, inserting an alternative assignment clause, eliminating *any* holdback, orchestration and/or licensing rights previously granted to Authors,

and providing for SEI to have the "exclusive right", but "no obligation" to exploit the Play (or not, in its sole discretion), and/or to unilaterally elect to prepare and exploit a wholly new adaptation at its election. In SEI's apparent view, this was a bargain where one party (the Authors) had to give up something of great value (their Play), and the other party (SEI) did not have to do anything at all.

40.42.  Despite SEI having authorized the Play's creation in 2016, and despite SEI's own enjoyment of financial benefits flowing from the two World Premiere productions produced under the 2016 Agreement, SEI now asserted that this same 2016 Agreement was insufficient to authorize any use of the Play, and that therefore, Authors could not move forward to exploit the Play on which they had labored tirelessly for over a year to complete, in reliance on the promises contained in the 2016 Agreement (including, without limitation, ownership of the Orchestrations, the right to create a Cast Album and license to third parties, and the expectation of ample worldwide licensing by SEI) and which they had long expected to be effectively mirrored in SEI's long-awaited "side agreement." Now, they found themselves forced into the untenable position of either accepting terms far less favorable than they would have otherwise ever considered, or risk seeing the work they invested over a year into, and any potential upside therefrom, go up in flames.

41.43.  Again, and despite the fact that the Play had already been completed prior to the 2017 Agreement, that the Play had already been (ineffectively) characterized as work-for-hire commissioned by the Commissioning Theaters, that work-for-hire language in any event has no legal validity in the context of musical plays (when authored by independent contractors, which Section 9 of the 2017 Agreement makes explicitly clear applied in this instance), *and* that the work-for-hire language in the 2016 Agreement was directly contradicted by the Representations

and Warranties clause, SEI nevertheless required the Authors under duress to retroactively include language purporting to "acknowledge and agree that the Play was created as and constitutes a work-for-hire on behalf of SEI as such term is defined under the copyright laws of the United States", ~~and further that~~even though all parties, including SEI, were aware that such language was ineffective, and further that, had this language been effective, "SEI shall be entitled to all copyright [in and to] the Play (including without limitation the Script, Libretto, Lyrics, Compositions, Arrangements, Orchestrations, and Orchestral Tracks)". Separately, the 2017 Agreement states that "[t]o the extent that the Play" – with no mention of the specific components listed under the ineffective work-for-hire language (or any other indication those components were transferred to SEI) – "or any portion thereof, may not qualify as a work-for-hire, [Authors], individually and collectively, hereby grant, transfer, and assign all right, title, and interest in and to the Play to SEI."

~~42.~~44.  ~~Faced with~~Authors had little choice in the face of SEI's power~~.~~, and virtually no leverage now that the Play had already been completed~~, and.~~ They also harbored the false belief that a new agreement was needed because SEI was not bound by the 2016 Agreement, and thus that they were in total reliance on SEI to exclusively license the Play for backend profits to compensate for the low upfront advance they had agreed to. In light of this belief, Authors reluctantly agreed to sign, even though it was their understanding (and such understanding was repeatedly communicated to ~~Ms. Gurman~~SEI) that dramatic works could not be deemed work-for-hire in any event. As a sole nod to the original understanding of the parties, SEI did finally agree to include a provision that the "[t]erms for exploitation of the Play's Cast Album and Sheet Music will be negotiated in good faith and memorialized in a separate agreement, it being understood that Adapters shall solely bear the cost of producing the Cast Album and Sheet Music."

A true and correct copy of the 2017 Agreement is attached hereto as Exhibit F.

43.45.  At no point prior to signing the 2017 Agreement did SEI or Ms. Gurman ever suggest that any third-party had a claim to first- or second-class theatrical rights in either the Play or the Book, or ever attempt to walk back the prior affirmative representations that such rights were unencumbered. Accordingly, Authors naturally believed that, if nothing else, they could *at least* count on the guarantee of 50% of the lucrative Broadway and Off-Broadway royalties, should the quality of their work succeed in attracting Broadway producers and investors.

### SEI's Accounting "Error"

44.46.  Pursuant to the 2017 Agreement, Authors remain entitled to 50% of net revenue from any exploitation of the Play, with net revenue defined as "gross revenues received and not refundable less any out of pocket third party costs, including without limitation any agency commissions, sales taxes, VAT or similar taxes."

45.47.  However, when Authors finally received their first royalty statement several months later, they noted that out of a total of $33,400 received by SEI in revenue, SEI allocated 50% of that – $16,700 – to undefined "SEI 3rd Party Obligations" and only $6,900 to Abosch and Maclay collectively. When confronted with this discrepancy, SEI admitted that the mysterious "SEI 3rd Party Obligations" recipient was Sony Pictures ("Sony"), which SEI then further admitted was somehow *also* entitled to 50% of royalties from the Play, despite the 2017 Agreement stipulating that such royalties were to be split "50/50" as between Authors and SEI. In an apparent attempt to retroactively cover its tracks for committing to two competing contractual obligations, SEI claimed that the 50% paid out to Sony had been construed as an "out of pocket third party cost" for purposes of calculating the remaining royalty splits to Authors.

46.48.  Electing to proceed on the belief that such error was merely a good faith mistake,

Authors spent the next several months insisting on reimbursement for their agreed-upon royalty percentage. In response, SEI threatened to cease all licensing of the Play – reasoning that this option was preferable to the alternative (which required, in SEI's view, SEI to take a loss on each license of the Play – given that it promised 50% to each of Sony, Authors, and itself.) Finally, on July 16, 2018, after a series of particularly acrimonious exchanges between the parties, ~~Ms.~~ Gurman confirmed to Authors (quoting verbatim from an email from Anthony Kosiewska, who, at the time, was SEI's Director of Business Development and Content Distribution) that "[t]he good news is we just finalized (on Friday) our new agreement with Sony and Sony agreed to carve out this show," and further, per a July 19, 2018 email, that the term "third-party expenses" would be removed from the definition of net proceeds "since Sony is no longer a party to the GOOSEBUMPS stage musical." A true and correct copy of this correspondence is attached hereto as Exhibit G.

~~47.~~49.  Despite SEI's admission of its mistakes, it would take an additional six months for Authors to finally receive the "third party true-up adjustment" payment, amounting to $20,045.72, on January 9, 2019. To date, and despite numerous requests and demands by Authors, SEI has failed to pay any outstanding interest to account for the egregious delay.

**The 2018 Cast Album Addendum**

~~48.~~50.  Once the so-called "good news" about the Sony deal was relayed to Authors in July 2018, and it was therefore clear to Authors that the Play was no longer encumbered by any agreements with Sony, Authors sought to proceed with memorializing their right to produce a cast album (which, although contemplated by the 2017 Agreement as an agreement to negotiate in good faith at some later unspecified date, still remained unexecuted more than 14 months later). Accordingly, on August 8, 2018, Authors and SEI entered into an addendum (the "Cast Album

Addendum", or "2018 Addendum"), pursuant to which Authors would have the right to produce, at their own expense but with the possibility of recoupment from SEI of up to $50,000, the Cast Album and Sheet Music and to "advertise, market, publicize, and otherwise promote the Cast Album and Sheet Music [by] referencing and using the "Goosebumps" name, logo, logotype, font, trademark, and service mark owned by Scholastic, and/or referencing and using the name of the Book and/or the Play as may be elected by Adaptors (collectively the "Marks"), and in each case, in all territories, using all means […]". (the "Marketing License").

49.51.  The Cast Album Addendum also provides that "[t]he all "copyrights in and to the Cast Album and Sheet Music shall be and remain solely-owned by Adaptors for the life of the copyright in the Cast Album",": and that such agreement prevails over anything to the contrary in the 2017 Agreement, or any other agreements executed prior to August 8, 2018 (*see* sections §13(a) and §13(c): "in the event of any conflict [...], the terms of the Addendum shall prevail"). A true and correct copy of the Cast Album Addendum (and 2021 extension thereof) is attached hereto as Exhibit H.

52.    As ownership of the Compositions had been retained by Authors pursuant to the 2017 Agreement, the Cast Album Addendum merely confirmed Authors' ownership of the Compositions as constituent elements of the Cast album and Sheet Music. Alternatively, even if the Compositions had been assigned under an earlier agreement, the "solely-owned" language referring to the Sheet Music and Cast Album in 2018 constitutes a transfer back of such rights.

50.53.  In accordance therewithwith the above, the Cast Album Addendum also provides a pre-negotiated "Copyright and Trademark Notice" in the form of:

"Recording © 2018 John Maclay and Danny Abosch
Goosebumps ™ & © Scholastic Inc. SCHOLASTIC, GOOSEBUMPS and associated logos are trademarks and/or registered marks of Scholastic, Inc.
Based on Goosebumps® Phantom of the Auditorium. All Rights Reserved."

~~51.~~54.  Accordingly, in 2018, Abosch and Maclay duly registered the Sheet Music (PA0002224062), and following the completion and release of the Cast Album in 2021, registered the Cast Album's sound recordings ("Sound Recordings"), Compositions, Orchestrations, and other elements (SR0000927857) for copyright with the U.S. Copyright Office. Subsequently, Abosch also registered the Cast Album's artwork (VA0002335146) (the "Artwork") and synopsis (TX0009209789) (the "Synopsis").

~~52.~~55.  Releasing cast albums for musicals ahead of a high-profile production to generate fanfare and encourage a Broadway run has a long history in theater,[8] and Authors' motivation here was no different: raise the musical's brand recognition and, by extension, audience demand for the Play by releasing the Cast Album and seeding the music into the wider listening community, then leverage the popularity of the album into Broadway, Off-Broadway and other high-profile commercial exploitation opportunities. Upon information and belief, SEI understood this and encouraged the creation of a high-quality Cast Album for precisely this reason. Authors knew that creating the highest possible caliber album would require a substantial upfront investment, but that the market had continuously proven that such investment often leads to substantial and long-lasting returns. Believing the first- and second-class rights to be unencumbered based on SEI's prior representations, Authors set upon creating the best possible cast album they could, which included an expenditure of far more than the $50,000 reimbursement threshold SEI had agreed to cover – an investment easily justified given the potential lucrative returns from a Broadway run, but not otherwise.

~~53.~~56.  By the first half of 2022 (the accounting period during which the first hints of SEI's fraudulent conduct were revealed), Authors had incurred over $199,412.92 in costs (an

---

[8] https://www.americantheatre.org/2021/12/10/first-the-album-then-the-show/

amount well beyond the typical range for a nonprofit regional theatre, but still quite reasonable compared to a Broadway cast album, which can cost upwards of $500,000[9]). In the theater industry, it is generally understood that Cast Albums rarely ever recoup their investment and generate a profit in and of themselves; the *real* return on investment comes in the form of box office and licensing revenue, as a Cast Album is a powerful tool for marketing the corresponding show to potential licensees.[10]

~~54.~~57.  At all times, Authors firmly believed that such investment was made – and would therefore pay off – by serving the underlying promotional purpose of using the Cast Album as a route to Broadway and Off-Broadway opportunities.

~~55.~~58.  Unfortunately, this expectation was also dashed by SEI. First, despite the Cast Album Addendum explicitly (1) stating that Authors owned the copyright in and to the Cast Album; and (2) providing pre-agreed credit and notice language evidencing that ownership (as meticulously negotiated by the parties in 2018 and memorialized in an exhibit to the addendum), in an October 20, 2021, email to Abosch, SEI attempted to claw back certain rights and claim that SEI, not Authors, retained ownership of Compositions – a position Authors immediately disputed and have continued to dispute based on the plain reading of the Cast Album Addendum. A copy of SEI's email taking this position is attached hereto as Exhibit I.

~~56.~~59.  Second, to Authors' utter disbelief and dismay, in 2022 SEI revealed to Authors that, in direct contravention of its 2018 statements that Sony "agreed to carve out this show" and was "no longer a party to the GOOSEBUMPS stage musical," SEI had in fact at some point granted to Sony (and/or agreed to "hold back" for Sony's benefit) *all* rights to present a "first class or second class production as said terms are understood in the live stage industry (including

---

[9] https://playbill.com/article/ask-playbillcom-cast-albums-com-149570
[10] https://www.wsj.com/articles/BL-SEB-79362

but not limited to Broadway and Off-Broadway theaters respectively)", and that SEI accordingly had no right to pursue, or authorize others to pursue, those licensing opportunities on its behalf. Not only did SEI fail – and has continued to fail – to account to Authors for any remuneration received from this putative grant of rights as required under the 2017 Agreement, this putative grant also entirely denies Authors any possibility of Broadway or Off-Broadway productions, and the significant royalties they would be due therefrom, rendering it virtually impossible for them to recoup their upfront investment in the Cast Album. Yet again, Authors had naïvely relied on SEI's statements, promises and representations – and the express language of the Cast Album Addendum – before embarking on the project, and yet again, such reliance ended up being solely to their detriment.

57.60.  Despite numerous requests to SEI from Authors and their counsel, SEI has to date refused to provide a copy of any Sony agreements relating to the Play. Authors have therefore been unable to verify either the unpaid royalty amount or the scope of Sony's exploitation rights. Authors have likewise been unable to verify the date that such rights were granted (including the dates of any amendments that may have altered the original arrangement.)

58.61.  Had SEI not misrepresented to Authors that Sony was "no longer a party to the GOOSEBUMPS stage musical," and had Authors been made aware of SEI's conveyance of such rights to Sony, there is no question that Authors would have limited their spend on the Cast Album to the $50,000 SEI had committed to reimbursing, instead of investing an additional $150,000 under the false belief that Broadway and Off-Broadway opportunities were on the table. Instead, they were fraudulently and intentionally led to believe that Sony was no longer a party to the Play in any capacity and that such rights were therefore unencumbered, and relied on that promise by investing far more than they otherwise would have to create the Cast Album, to their

great financial detriment. —In short, SEI intentionally deceived Plaintiffs so that they would expend significant financial resources on a cast album that redounded to SEI's benefit, at no cost to SEI.

59.62.  Meanwhile, and despite numerous occasions in which Abosch and/or his counsel have alerted SEI to certain failures to accord proper credit and billing to Authors when licensing the Play, SEI has – in addition to the issues above – repeatedly failed to accord, either pre or prospectively, such credit under §17 and §18 of the 2017 Agreement (one of the most material terms for Authors in the entire agreement), and/or to attach a Cast Album order form as required under §7 of the Cast Album Addendum that provides written notice to licensees of the availability of the Cast Album for sale. Incredibly, SEI has even allowed licensees to use copies of the Artwork, which is solely owned by Abosch, without seeking his permission. An example of such infringing use is attached hereto as Exhibit J.

60.63.  Moreover, upon information and belief, SEI has all but entirely ceased to license the Play, in violation of the implied covenant of good faith and fair dealing contained in the 2017 Agreement, including by refusing to entertain countless requests from foreign markets to license the Play overseas, repeatedly rejecting offers from top-tier theatrical licensing agencies to license the Play, and provided no independent right to Authors to license the Play themselves, such that Authors have virtually no opportunity to see a return on the fruits of their labor in the Play or investment in the Cast Album as previously promised.

64.    At times, SEI has sought to hold the Play hostage to extract concessions from Authors, abusing its fiduciary duty and position of trust as licensor of the Play. For example, even though discovery has not yet begun in this proceeding, on November 20, 2024, SEI made a

24

demand for "any and all information you possess" regarding Authors' copyright infringement claims against SEI, and expressly threatened (under the flimsy pretense of "avoid[ing] additional copyright infringement allegations") that "Scholastic will not continue to license the Play at least until we receive detailed specific information about the alleged infringement." Two days later, SEI doubled down on this demand, adding that "Scholastic cannot and will not continue to license the Play until it receives the requested information." A true and correct copy of this correspondence is attached hereto as Exhibits K and L.

### SEI's Shifting Positions on Work for Hire

65.    SEI has been utterly inconsistent in its treatment of the "work-for-hire" doctrine. As discussed above, Authors had informed SEI, through its agent, Gurman, that the Copyright Act does not recognize dramatic works as a category capable of being works-made-for-hire. Without disputing this fact, SEI nevertheless insisted that its corporate policy required the inclusion of "work-for-hire" language into the 2016 and 2017 Agreements purporting to unlawfully "transfer" authorship of the Play and Compositions from Authors to SEI *ab initio*. Once satisfied that it had paid the necessary lip service to its own (ineffectual) corporate rules, SEI then also agreed to include a Representations and Warranties clause in the 2016 Agreement providing that *Authors* are legal authors of the Play, which directly undermines the statutory work-for-hire definition in which authorship arises *ab initio* to the benefit of the commissioning party. *See infra* 37.

66.    SEI's work-for-hire language was a mere corporate token as opposed to a legitimate legal position (which it cannot be under the law). Given this position, Authors have been operating under the understanding that, under the law, as reflected by SEI itself in the Representations and Warranties in the 2016 Agreement and despite SEI's legally ineffective

corporate policy, Authors were and remain the Play's legal authors.

67.     In October 2021, on a phone call between the parties' respective counsel, SEI expressly took the position for the first time that it actually believed the 2017 Agreement's work-for-hire language to be effective, and that *SEI* is in fact the legal owner *and* author of the Play.

68.     In a May 1, 2023 letter from SEI in response to Authors' rejection of SEI's argument that SEI somehow authored the Play, SEI disputed Authors' explanations as to the ineffectiveness of the work-for-hire provision and reiterated its position that it owns the Play in its entirety as a work for hire.

69.     In an effort to avoid this very litigation and reach a resolution on the matter, the parties executed two tolling agreements extending any possible statute of limitations from July 24, 2024 to October 24, 2024. Unfortunately, these discussions were unsuccessful.

70.     In response to SEI's stated position, Authors then filed the present action requesting, amongst other things, a declaration that Authors are the authors of the Play *ab initio,* and, by extension, that the work-for-hire provisions in the 2016 and 2017 Agreements are ineffectual as a matter of law.

71.     In a letter pursuant to the Court's rules addressing an anticipated partial motion to dismiss,[11] counsel for SEI argued that such declaratory judgement claim should be dismissed not because of the purported efficacy of the work-for-hire language, but *on mootness grounds* because "Defendants agree that Abosch and Maclay are the authors of the Play". In the same letter, SEI took the position for the first time that the 2016 Agreement was effective and that SEI claims benefits thereunder, laying bare its lie by omission back in 2016 that it was not bound by the 2016 Agreement, causing Authors to enter the 2017 Agreement.

---

[11] Pursuant to Section III(B)(ii) of Judge Torres' Individual Practices

72.    In follow up email correspondence, SEI stated that "Defendants do not and will not dispute that Plaintiffs are the authors of the Play under the Copyright Act." Exhibits M and N. However, SEI refused to stipulate to its newly-declared position, but went so far as to say, through its counsel, that "[y]ou and I both know what does and does not constitute a 'work made for hire' under the Copyright Act. [...] I now have Scholastic's approval, **and I am confident that its position will not change**." (emphasis added).

73.    In response, on November 21, 2024 Authors noted SEI's inconsistent positions and further asserted:

> In 2016-17, as alleged in the Complaint, Defendants expressly took the position that they were not bound by the 2016 Agreement between the Authors and Theaters, necessitating the 2017 Agreement. You now argue that our clients were indeed the authors and owners of the Play *ab initio*, but that Authors then transferred ownership to Defendants under the 2016 Agreement. It is hornbook law that a party may not lay claim to the purported benefits of an agreement and simultaneously disclaim being bound by same, thus your position leads inevitably to the conclusion that Defendants made fraudulent misrepresentations to Authors at the time. In any event, the alleged transfer language in the 2016 Agreement is premised on the work-for-hire provision, which, as you now concede, is ineffective.

Exhibit O.

74.    After receiving this response, in an about-face and notwithstanding the professed "confidence" that SEI's position would not change again, SEI followed up with a new letter[12] on December 6, 2024 "withdraw[ing] all statements in the November 11 letter regarding Plaintiffs' authorship claim, including without limitation the statements that 'there is no 'actual controversy'' as to Count I, that 'Abosch and Maclay are the authors of the Play,' and that Plaintiffs are 'the authors and original owners of the Play'", and claiming (for the first time) that Authors' claims (which SEI previously conceded on the merits) are time-barred. A true and

---

[12] Notwithstanding SEI's characterization of this letter as a "supplement" "[p]ursuant to Section III(B)(ii) of Judge Torres' Individual Practices", the cited rule contains no such provision allowing a defendant to "supplement" its three-page letter with another two-page letter after the adversary has responded.

correct copy of this correspondence is attached hereto as Exhibit P.

75.    Notably, despite SEI's attempt to walk back the statements in its prior letter, it did not attempt to "withdraw" SEI's concession that it always understood that the 2016 Agreement was binding on SEI.

76.    Thus, it is clear that as of at least November 11, 2024, SEI believed that Authors were the authors of the Play (even if SEI later repudiated this on December 6, 2024 by "withdraw[ing] all statements" to that effect.)

**SEI's Trademark Infringement Allegations**

61.77.  On May 1, 2023, SEI sent a letter to Authors' counsel in response to correspondence from Authors taking a position on ownership of the Compositions (the "May 1, 2023 Letter"). In addition to denying Authors' position on ownership, on the final pages of the seven page letter, SEI also took the position, for the first time, that Authors had been using the *Goosebumps* mark in a number of unauthorized ways, including, as alleged, "(i) in the domain name goosebumpsthemusical.com; (ii) on the website at the above domain; (iii) on a variety of merchandise, including, but not limited to stickers, magnets, pens, blankets, mugs, coasters, puzzles, phone cases, tote bags and numerous types of clothing; (iv) on his personal website at dannyabosch.com to market merchandise branded with the GOOSEBUMPS Marks; (v) on a variety of merchandise for sale at a myshopify.com site and (vi) on social media platforms, including Facebook, Twitter, Instagram and TikTok", and demanded that Abosch cease any and all such uses except for those that have been "explicitly authorized by Scholastic or SEI in writing".

62.78.  In a May 9, 2023, response to the May 1, 2023 Letter, Authors' counsel addressed these flimsy allegations by citing to the language of the Cast Album Addendum granting Authors

a license to use the Goosebumps marks for the very purposes listed above (*see* Ex. H §2(b)) and denying that any such cited uses constituted a violation of SEI's trademark rights. SEI did not substantively respond to this rebuttal, but continues to take the position that Authors are infringing SEI's trademark rights.

63.79.  In fact, to date, SEI has never actually articulated (despite multiple requests from Authors to do so) any actual concerns about Authors' marketing efforts other than a vague, general allegation that such marketing is "unauthorized" (despite that it is plainly authorized by the Marketing License SEI granted in 2018.)

64.80.  Moreover, SEI's positions and behavior are that much more perplexing in light of the fact that the Cast Album (and its related marketing) has been, by all accounts, a critical[13], artistic[14], and marketing[15] success, adding value to Scholastic's Marks (not to mention the Book and Play), and increasing licensing requests by orders of magnitude. The Album, featuring a first-rate cast of Broadway stars and Emmy Award® winners, a cameo by R.L. Stine, and cover art by original *Goosebumps* illustrator Tim Jacobus, defied all odds by landing at #12 on the Billboard charts for cast albums[16] – even as the only album on that chart without a Broadway production. It additionally hit #1 on Amazon's "Hot New Releases" chart, and has garnered millions of streams across Spotify, Apple Music, and other platforms. In short, Authors' hard work (undertaken at Authors' sole expense to their great financial detriment) has overwhelmingly redounded to SEI's benefit – even as SEI refuses to leverage it (or is contractually restricted from leveraging it by Sony) for Broadway and other top-tier licensing opportunities.

---

[13] https://web.archive.org/web/20211109132018/https://musicaltheatrereview.com/cd-review-goosebumps-the-phantom-of-the-auditorium/
[14] https://www.wbur.org/endlessthread/2022/12/23/goosebumps-the-musical
[15] https://horrorfuel.com/2022/06/15/goosebumps-the-musical-soundtrack-coming-to-amazon/
[16] https://web.archive.org/web/20220707101913/https://www.billboard.com/charts/cast-albums/2022-07-09/

**CAUSES OF ACTION**
**COUNT I – DECLARATORY JUDGMENT AS TO COPYRIGHT AUTHORSHIP**

65.81.  Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

66.82.  By reason of the foregoing facts, an actual controversy has arisen between the parties as to whether the Play constitutes a "work made for hire" as defined under the Copyright Act, which affects, *inter alia*, which party or parties are considered its "author" for copyright purposes, and whether any subsequent grants are eligible for statutory termination under § 203. Accordingly, Plaintiffs hereby request a declaration of this Court that:

  a. Notwithstanding any language in the 2016 or 2017 Agreements purporting to grant and/or transfer the Play as a "work-made-for-hire", the Play, "including without limitation the Script, Libretto, Lyrics, Compositions, Arrangements, Orchestrations, and Orchestral Tracks", as listed in Section 5(a) of the 2017 Agreement, is (as a matter of law) incapable of being a "work made for hire" under §101 of the Copyright Act because it is neither (1) "a work prepared by an employee in the scope of his or her employment" or (2) "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." (17 U.S.C. § 101); and

  b. Even if the Play and its components could somehow be considered works made for hire under §101(2), such materials are nevertheless precluded because (1) the

Play was created *before* any writing between the parties came into existence in the form of the 2017 Agreement; (2) a substantial portion of the Play also pre-dates the signing of the 2016 Agreement; and (3) at the very least, the Orchestrations were expressly excluded from the definition of the Play under the 2016 Agreement, such that Abosch was indisputably the author *ab initio* and could not have subsequently transferred such authorship as a work-for-hire or otherwise.

83.    The declaratory relief sought herein would serve a useful purpose in clarifying and settling the legal issues involved, would finalize the controversy, and would offer relief from uncertainty. Despite SEI's claim that the issue "will have no practical impact until in or around 2051[17]" (Exhibit N), it is useful and necessary to resolve the issue sooner because, *inter alia*:

a.  SEI's competing claims of authorship, along with its apparent inclination to exploit the Play to the absolute minimum extent required, have clouded Authors' ability to anticipate their future royalty income, and make plans for the disposition of their future rights;

b.  SEI's claims have placed a public cloud on the title, such that theatrical producers are uncertain as to who will own the Play in the future, which limits its marketability;

c.  Authors will be substantially prejudiced if required to wait to litigate this issue until 2052, when memories will have faded, witnesses may be unavailable, and evidence may be lost;

[17] 2051 is based on SEI's incorrect theory that the 2016 (not 2017) Agreement effected an assignment to SEI.

d. Authors seek to assert their rights, sooner than 2052, to sue infringers as "beneficial owner[s]"[18] of the Play under 17 U.S.C. § 501(b), and courts have found that standing to do so may be precluded by a finding that a work is a "work made for hire";

e. The parties herein may be more likely to reach an agreeable resolution to the litigation as a whole if it is declared by the Court that the Authors here retain their unalienable termination rights, as Congress intended, notwithstanding SEI's attempts to end-run around this by muscling Authors into contracts that purport otherwise (such power imbalance being, of course, *precisely* the reason Congress made this right unwaivable by contract in §203(a)(5))[19];

f. SEI's current argument (at least as of the moment) is not that Authors brought this claim too early, but rather that they brought it *too late*. Therefore, by SEI's own logic, Authors cannot simply wait until 2052 to resolve this.

**COUNT II – FRAUDULENT INDUCEMENT**

84.     Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

85.     SEI fraudulently induced the 2017 Agreement by materially misrepresenting to Authors through its agent either expressly or through omission that it was not bound by the 2016 Agreement, when SEI in fact knew it was bound by that agreement. To the extent it made material omissions through its agent, it did so where it had a duty to disclose, given its fiduciary

---

[18] The legislative history accompanying the Copyright Act states: "A 'beneficial owner' for this purpose would include, for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 159.

[19] Congress enacted §203 with the express purpose of "safeguarding authors against unremunerative transfers." The legislative history notes, rather presciently, "A provision of this sort is needed because of the unequal bargaining position of authors". H.R.Rep. No. 1476, 94th Cong., 2d Sess. 124.

relationship with Authors.

86.    As set forth above, in 2016, SEI's agent, on behalf of SEI, facilitated the negotiation and execution of the 2016 Agreement, including by drafting portions of the language herself, insisting on the inclusion of certain language that was allegedly deemed mandatory by SEI, and striking any language deemed not acceptable by SEI.

87.    Through its agent, the knowledge of exactly what Authors were promised in order to secure their participation is imputed to SEI.

88.    SEI fraudulently misrepresented to Authors that the 2016 Agreement was not binding on SEI, due to its lack of signature on the document, even though SEI knew full well that the agreement was binding on SEI even without that signature, due to SEI's acceptance of the benefits procured by its agent's promises.

89.    SEI made this fraudulent misrepresentation to Authors to induce them to surrender their rights by entering the 2017 Agreement with terms much more favorable to SEI. SEI knew that Authors would never have entered the 2017 Agreement if Authors were aware that SEI was in fact bound by the 2016 Agreement, with terms much more favorable to Authors. Therefore, to trick Authors into signing away additional rights, SEI misrepresented the 2016 Agreement as being non-binding on SEI, with the intent that Authors would rely on such misrepresentation to their detriment.

90.    It was reasonable for Authors, who are not attorneys, to rely on the representations of SEI, because of SEI's superior knowledge on the subject, and Authors' confidential and trust relationship with SEI and Gurman.

91.    Authors did not know, at the time, that the representations (whether express or by omission) were false.

92.    Only on November 11, 2024, after the commencement of this lawsuit, did SEI finally reveal, for the first time, that it knew that the 2016 Agreement was valid and binding on SEI. Specifically, SEI admitted this by citing the 2016 Agreement in its attempts to claim that the 2016 Agreement somehow "transferred all rights to Defendants". Inherent in that (erroneous) assertion is the premise that the 2016 Agreement must have been valid and binding on both Authors and SEI, as a party may not lay claim to the purported benefits of an agreement and simultaneously disclaim being bound by same.

93.    As a result of SEI's fraudulent inducement, and Authors' reasonable reliance, Authors have sustained damages including (but not limited to) the loss of their right to independently license their Play, the loss of ownership of their Play, the loss of licensing royalties, and the loss of all other rights that were surrendered to SEI under the 2017 Agreement.

## COUNT III – DECLARATORY JUDGMENT AS TO COPYRIGHT OWNERSHIP
### (CAST ALBUM AND SHEET MUSIC)

67.94.  Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

68.95.  ByIf this Court finds that Plaintiffs do not own the Play, by reason of the foregoing facts, an actual controversy has arisen between the parties as to whether Plaintiffs own a copyright interest in and to the Cast Album and Sheet Music, and all copyrightable elements thereof, including without limitation the Compositions, Orchestrations, Arrangements, Sound Recordings, Artwork, and Synopsis. Accordingly, Plaintiffs hereby request a declaration of this Court that:

a. Given that the Play is not a work made for hire, at most, therefore, the Play was assigned to SEI under the 2017 Agreement;

b. Even if the Compositions, Orchestrations, and Arrangements were assigned to

Defendant under the 2017 Agreement, they were subsequently transferred back to Plaintiffs under the Cast Album Addendum; and

c. Plaintiffs are therefore the sole and exclusive owners of all copyrights in and to the Play's Cast Album, Sheet Music, and all copyrightable elements thereof, and are entitled to exploit the copyrights therein and thereto throughout the entirety of the copyright term.

~~69.~~96. In the alternative, if the Court finds that the work-for-hire and assignment language in the 2017 Agreement is so contradictory and vague as to be unenforceable, Plaintiffs hereby request that the Court reform Section 5(a) of the 2017 Agreement to reflect the industry standard and grant Plaintiffs ownership and control of the Play and all components thereof, subject to a non-exclusive license to SEI to exploit the Play, with the remainder of the 2017 Agreement and the Cast Album Addendum remaining in full force and effect.

**COUNT ~~III~~IV – DECLARATORY JUDGMENT AS TO TRADEMARK CLAIMS**

~~70.~~97. Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

~~71.~~98. By reason of the foregoing facts, an actual controversy has arisen between the parties as to whether Plaintiffs have the right to use the Marks to promote the Cast Album and the Sheet Music. Accordingly, Plaintiffs hereby requests a declaration of this Court that:

a. Plaintiffs are permitted to use the Marks, as contemplated by and pursuant to §2(b) of the Cast Album Addendum, "(i) in the domain name goosebumpsthemusical.com; (ii) on the website at the above domain; (iii) on a variety of merchandise, including, but not limited to stickers, magnets, pens, blankets, mugs, coasters, puzzles, phone cases, tote bags and numerous types of

clothing; (iv) on [Abosch's] personal website at dannyabosch.com to market merchandise branded with the GOOSEBUMPS Marks; (v) on a variety of merchandise for sale at a myshopify.com site and (vi) on social media platforms, including Facebook, Twitter, Instagram and TikTok"; and

b. Such use does not constitute trademark infringement as a matter of law or contract.

## COUNT IVV – DIRECT AND SECONDARY COPYRIGHT INFRINGEMENT

72.99.  Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

73.100.      Defendant has infringed on Authors' copyright by, upon information and belief, distributing the Cast Album's Artwork, Sound Recordings, and certain post-2017 Compositions from the Cast Album in connection with the Play without Plaintiffs' authorization; and

74.101.      Defendant has materially contributed to, induced, and/or received a direct financial benefit from infringement by third parties by, upon information and belief, providing (or, at minimum, failing to prevent the infringing use of) the Cast Album's Artwork, Sound Recordings, and certain post-2017 Compositions to third parties for and in connection with the Play; informing such third parties that Defendant had the right to grant such rights in and to the Cast Album's Artwork, Sound Recordings, and certain post-2017 Compositions; and assisting such third parties in the production of the Play (and related marketing) incorporating and/or publicly performing or displaying the Cast Album's Artwork, Sound Recordings, and certain post-2017 Compositions, without Plaintiffs' authorization, even after Plaintiffs specifically put Defendant on written notice of such recurring patterns of infringement (including by its licensees).

~~75.~~102.        As a direct and proximate result of Defendant's copyright infringement, Plaintiffs are entitled to recover from Defendant the damages, including attorneys' fees, they will and have sustained, and any gains, profits and advantages obtained by Defendant as a result of its acts of infringement as alleged above. At present, the amount of such damages, gains and profits cannot be fully ascertained but will be established according to proof at trial. Plaintiffs will also be entitled to recover, in the alternative, statutory damages for Defendant's infringement, and Plaintiffs reserve the right to elect statutory damages as to each work for which Plaintiffs' rights were infringed upon.

**COUNT ~~V~~VI – BREACH OF CONTRACT**

~~76.~~103.        Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

~~77.~~104.        As set forth in detail above, upon information and belief, Defendant exploited and/or otherwise monetized or conveyed the first- and second-class rights to Sony for an unknown fee, and such fee has to date remained unpaid and unaccounted for to Plaintiffs.

~~78.~~105.        Pursuant to §17 and §18 of the 2017 Agreement, Defendant also has repeatedly and consistently failed to accord proper credit and billing to Plaintiffs in marketing materials, and to attach an album order form to all of its licensing agreements that provides written notice to licensees of the availability of the Cast Album for sale pursuant to §7 of the Cast Album Addendum. Defendant has also consistently and repeatedly unnecessarily delayed negotiations, and exceeded or entirely disregarded its contractual deadlines for approval, thus preventing or significantly impeding Authors' ability to exercise their contractual rights.

~~79.~~106.        Further, and despite that SEI claims it has "no obligation to exploit" the Play under the 2017 Agreement, there was and remains at all times relevant herein, an implied

covenant read in the 2017 Agreement that Defendant would act in good faith and deal fairly with Plaintiffs in all aspects of their contractual relationship, including at the very least making reasonable efforts to license the Play, in accordance with industry custom and practice, for the benefit of all parties to the agreement, which Defendant has failed to do. For the reasons set forth above, Defendant has also breached the covenant of good faith and fair dealing implied in the 2017 Agreement by failing to pay interest on late payments, unreasonably delaying exploitation of the Play, and unreasonably refusing numerous license requests entirely, thus depriving Authors of the benefits for which they bargained.

80.107.    As a direct and proximate result of Defendant's acts of material breach, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT VIVII – NEGLIGENT MISREPRESENTATION

81.108.    Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

109.    Ms. Plaintiffs and Defendants were not arms-length actors. The parties' relationship inherently involved a special relationship of confidence and trust, given Gurman's dual role as agent to both parties and the disparate strength and sophistication of the parties.

82.110.    Gurman, on behalf of Defendant, was in a special position of confidence and trust with Plaintiffs, to accurately represent the status of Defendant's rights and other obligations that might interfere with or otherwise impact Plaintiffs' rights. Plaintiffs placed their trust and confidence in a shared agent based on the belief that their interests would be protected.

83.111.    Because of this special relationship of confidence and trust, Defendant owed Plaintiffs a duty to impart correct information regarding Defendant's obligations to Sony

38

~~or other third parties with an interest in the Play~~(including to Sony or other third parties with an interest in the Play). Instead, Defendant benefited from dual agency in implicitly accepting Gurman's role as a fiduciary for both parties. While Defendant could have ensured Gurman's role in balancing the parties' competing interests, it instead exploited its superior position and undue influence over her to disadvantage Plaintiffs, knowing that Plaintiffs were relying on Gurman's expertise and professed neutrality.

112.    Even were it not for the unique situation presented by Gurman's dual agency, the relationship between an author and a publisher is a special relationship that differs from an ordinary arm's-length business relationship.

~~84.~~113.    On behalf of Defendant's Director of Business Development and Content Distribution,~~ Ms.~~ Gurman misrepresented to Authors that Sony was no longer a party to the *Goosebumps* stage musical when she knew, or should have known, that Defendant had granted or had intended to grant all first-and-second class rights in and to the Play to Sony, and when she knew, or should have known, that the information relating to Sony's involvement was critical to Authors' decision to invest as much as they did in the Cast Album.

114.    Contrary to SEI's recent assertions, Gurman's misrepresentations (on behalf of SEI) that "Sony is no longer a party to the GOOSEBUMPS stage musical" did not concern *only* "whether Sony had a right to receive royalties". Rather, they concerned whether Sony was a party *in any capacity* to the GOOSEBUMPS stage musical – including, *inter alia*, whether Sony had any further control over first- and second-class rights, and whether it had any other rights that would in any way prevent or limit the Play's licensing.

115.    The 2017 Agreement does not give SEI unfettered discretion to refuse all licensing opportunities in first- and second-class venues.

85.116.     Authors reasonably relied on Defendant's false representations and proceeded to invest $150,000 over the reimbursement threshold on reliance of those representations.

86.117.     As a result, Authors have suffered damages in the minimum amount of $150,000, in addition to lost licensing costs in an amount to be proven at trial.

### COUNT VIIVIII – FRAUDULENT MISREPRESENTATION

87.118.     Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

88.119.     As set forth above, Defendant misrepresented that Sony was no longer a party to the *Goosebumps* stage musical despite, upon information and belief, having full knowledge that it already had granted or intended to grant first-and-second class rights in and to the Play to Sony. Defendant knew or should have known that Plaintiffs would rely on that misrepresentation to incur substantial costs in producing the highest-caliber Cast Album possible to use as promotional leverage for Play to reach Broadway and Off-Broadway productions, and Plaintiffs did, in fact, rely on such misrepresentation to that result.

89.120.     As a direct and proximate cause of Defendant's fraudulent misrepresentations, Plaintiffs have suffered damages in the minimum amount of $150,000, in addition to lost licensing costs in an amount to be proven at trial.

### COUNT VIIIIX – BREACH OF FIDUCIARY DUTY

90.121.     Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

122.     Defendant was entrusted with sole and complete control over generating, collecting, reporting and paying to Plaintiffs their share of revenues, such that in addition to its

express and implied contractual obligations, Defendant was in a fiduciary relationship with Plaintiffs, with a duty to account fully and fairly to them, to maximize the revenues from exploitation, to avoid self-dealing, and to place the interests of Plaintiffs at least equal to, if not ahead of, its own interests.

91.123.    Thus, Plaintiffs are informed and believedbelieve that Defendant has breached its fiduciary duty to Plaintiffs by, *inter alia*:

      a.  failing to make reasonable efforts to license or otherwise exploit the Play domestically or internationally;

      b.  failing to account for and pay Plaintiffs their share of monies received from the disposition of rights in and to the Play to Sony;

      c.  failing to pay interest on delayed payments; and

      d.  failing to exercise reasonable business judgment in licensing the Play; and

      d.e.engaging in self-dealing in order to maximize the value of the Play to Defendants and minimize the amounts owing to Plaintiffs.

92.124.    As a direct and proximate cause of Defendant's breaches of fiduciary duty, Plaintiffs have suffered damages in amount to be proven at trial.

### COUNT IXX – DECLARATORY JUDGMENT AS TO SEI'S OBLIGATIONS

93.125.    Plaintiffs repeat and reallege, and incorporate herein by reference, the above allegations as though fully set forth herein.

94.126.    New York law requires mutuality as a precondition to form a valid contract, and does not permit one party to be placed at the mercy of another, for any length of time. In the absence of mutuality, a contract is *void ab initio* (and not merely *voidable*).

95.127.    Although the 2017 Agreement purportedly required the Authors to

irrevocably transfer rights in their Play to SEI, pursuant to Section 5(a) of that Agreement "SEI shall have no obligation to exploit the Play, it being understood that the only obligation is for SEI to make the payments and provide for credit to be accorded as set forth under this Agreement."

96.128.    Although the 2017 Agreement recites the existence of "good and valuable consideration", there is in fact no consideration due to Authors under the 2017 Agreement that is *unconditional* (i.e. *not* subject to a condition in SEI's own control). Upon information and belief, SEI interpretsSEI has interpreted the foregoing language to mean that SEI's "only obligation" (payment and credit) is subject to a condition entirely within SEI's own control (choosing to exploit the Play, which SEI "shall have no obligation" to do.) SEI further takes the position that exploiting the Play is SEI's *right*, not its *obligation*, and that it is entitled at any time to cease exploiting the Play, in its sole discretion, and shall thereafter have no obligation to exploit the Play going forward.

97.129.    By reason of the foregoing facts, an actual controversy has arisen between the parties as to what SEI's obligations are (if any) under the 2017 Agreement, and, moreover, whether the 2017 Agreement was validly formed and whether and to what extent SEI has an obligation to exploit the Play notwithstanding the aforementioned "no obligation" language. Accordingly, in order to render the agreement valid and enforceable, Plaintiffs hereby request a declaration of this Court that:

a. SEI has an ongoing duty, for the life of the copyright, to use reasonable, good faith efforts to exploit the Play for Authors' benefit, in accordance with industry custom and practice. Plaintiffs, and, further request, that any language to the Court reform the contract as necessary to give meaning and effect to the foregoingcontrary is unenforceable.

b. In the alternative~~, if the agreement cannot be reformed~~, Plaintiffs hereby request a declaration of this Court that the 2017 Agreement is illusory for lack of mutuality, and therefore void *ab initio.* The terms of the 2016 Agreement shall control and be binding on both parties unless and until the parties mutually agree, in a signed writing, to enter into a new agreement.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs claim relief as follows:

1. On Count I:

   a. For a declaration that:

      ~~i.~~a.  The Play cannot (as a matter of law) constitute a work-for-hire pursuant to 17 U.S.C. §101(2); and

      ~~ii.~~b.  Abosch and Maclay are the authors of the Play.

~~2.  On Count II:~~

2. On Count II, for rescission of the 2017 Agreement, or in the alternative, for actual damages in an amount to be determined at trial.

3. On Count III:

   a. For a declaration that:

      i.  Given that the Play is not a work made for hire, it was, at most, assigned to Defendant pursuant to Section 5(a) of the 2017 Agreement;

      ii. Even if the Compositions, Orchestrations, and Arrangements were assigned to Defendant under the 2017 Agreement, they were subsequently transferred back to Plaintiffs under the Cast Album Addendum;

      iii. The Cast Album and Sheet Music, and all copyrightable elements thereof,

including without limitation the Compositions, Orchestrations, Arrangements, Sound Recordings, and Artwork, are owned and controlled by Plaintiffs pursuant to the Cast Album Addendum, and Plaintiffs are therefore entitled to continue to exclusively exploit the copyright therein and thereto throughout the world for the entirety of the copyright term; and,

iv. In the alternative, that Section 5(a) of the 2017 Agreement be reformed such that Authors own the Play in its entirety.

3.1.On Count IV, forOn Count III:

a.4.For a declaration that Plaintiffs' use of the Marks does not constitute trademark infringement pursuant to the Cast Album Addendum.

4.5.On Count IVV, for actual damages or, if elected, statutory damages in an amount to be determined, as well as Plaintiffs' costs for prosecuting this action, including, as appropriate, reasonable attorneys' fees pursuant to 17 U.S.C. § 505;

5.6.On Counts V, VI, (if the 2017 Agreement is not rescinded), VII, and VIII, and IX, for actual damages in an amount to be determined at trial; *and*

6.7.On Count IXX:

    i.a. ForIf the 2017 Agreement is not rescinded, for a declaration that SEI has an ongoing duty, for the life of the copyright, to use reasonable, good faith efforts to exploit the Play to Authors' benefit, in accordance with industry custom and practice, notwithstanding any contractual language to the contrary; and for reformation of the contract as necessary to give meaning and effect to the foregoing;

    ii.b. In the alternative, for a declaration that the 2017 Agreement is illusory for lack of mutuality, and is therefore void *ab initio*, and that the terms of the 2016 Agreement

shall control and be binding on both parties unless and until the parties mutually

agree, in a signed writing, to enter into a new agreement; *and*.

7.8. Awarding Plaintiffs such other and further relief as this Court deems just, proper and

equitable.


## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues in this action so triable. This demand

is without prejudice to, or waiver of, Plaintiff's right to move for judgment on all issues that may

be decided by the Court.


Dated:  New York, New York
            October 22, 2024January 7, 2025


                                        Respectfully submitted,
                                        **KLARIS LAW, PLLC**


                                        By: _____

                                        By: /s/ Lacy ("Lance") H. Koonce, III

                                                Lacy ("Lance") H. Koonce, III
                                                Gili Karev
                                        161 Water Street, Suite 904
                                        New York, NY 10038
                                        (646) 779-4882
                                        Lance.Koonce@klarislaw.com
                                        Gili.Karev@klarislaw.com

                                        *Attorneys for Plaintiffs Danomolous*
                                        *Productions, LLC; Danny Abosch;*
                                        *and John Maclay*