UNITED STATES DISTRICT COURT
<u>SOUTHERN DISTRICT OF NEW YORK</u>

DANOMALOUS PRODUCTIONS, LLC; DANNY
ABOSCH; and JOHN MACLAY,

                Plaintiffs,

    vs.

SCHOLASTIC ENTERTAINMENT INC.; and
SCHOLASTIC INC.,

                Defendants.

Civil Case No. 1:24-cv-08041

Hon. Analisa Torres

## **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**DAVIS+GILBERT LLP**
Guy Cohen
Jacklyn M. Siegel
William S. Kukin
1675 Broadway
New York, New York 10019
(212) 468-4800
gcohen@dglaw.com
jseigel@dglaw.com
wkukin@dglaw.com

*Attorneys for Defendants Scholastic Inc. and
Scholastic Entertainment Inc.*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 3

    A.    Scholastic Licenses the Creation of the Play ...................................................... 3

    B.    Adaptors Agree to Develop the Play as a Work-for-Hire ................................. 5

    C.    The 2017 Agreement Confirms Scholastic's Ownership and Control of the Play .................................................................................................................... 5

    D.    The Cast Album Addendum Reaffirms the Prior Apportionment of Rights ..... 7

    E.    Adaptors Repeatedly Seek to Expand Their Rights .......................................... 7

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

I.    ADAPTORS' COPYRIGHT AUTHORSHIP CLAIM IS TIME-BARRED .............. 8

    A.    The Statute of Limitations Began to Run by 2017 ............................................ 8

    B.    Adaptors' Counterarguments Fail ..................................................................... 9

II.    ADAPTORS' COPYRIGHT OWNERSHIP CLAIM FAILS ................................... 11

    A.    The Play's Work-for-Hire Status Forecloses The Ownership Claim ............... 11

    B.    The Ownership Claim Is Time-Barred ............................................................. 11

    C.    Scholastic Owns the Compositions .................................................................. 12

III.    THE 2017 AGREEMENT IS ENFORCEABLE .................................................... 15

    A.    Adaptors Cannot Rescind the 2017 Agreement ............................................... 15

        1.    The Fraudulent Inducement Claim is Untimely ..................................... 15

        2.    Adaptors Fail to Plead the Alleged Fraud with Particularity ................ 16

        3.    Adaptors Fail to State a Claim for Fraudulent Inducement ................... 17

    B.    Adaptors Cannot Rewrite the 2017 Agreement ............................................... 19

    C.    Adaptors Cannot Obtain a Declaration that the Agreement is Void ............... 21

        1.    The Declaratory Judgment Claim Is Time-Barred ................................ 21

        2.    The 2017 Agreement Is Not "Illusory" .................................. 22

IV.    THE MISREPRESENTATION CLAIMS FAIL ......................................... 23

    A.    Adaptors Fail to Allege Reasonable Reliance ................................... 23

    B.    The FAC Fails to Allege Scienter ..................................... 24

    C.    The Misrepresentation Claims Are Time-Barred ............................ 26

    D.    Adaptors Fail to Allege a "Special Relationship" ........................... 26

V.    THERE IS NO FIDUCIARY RELATIONSHIP BETWEEN THE PARTIES ......... 26

CONCLUSION ................................................................................................ 27

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*100 & 130 Biscayne, LLC v. EE NWT OM, LLC*, 211 A.D.3d 451 (1st Dep't 2022) .................. 26

*A.N.R. Inv. Co. Ltd. v. HSBC Private Bank*, 135 A.D.3d 632 (1st Dep't 2016) .......................... 20

*Aday v. Sony Music Entm't, Inc.*, 1997 U.S. Dist. LEXIS 14545 (S.D.N.Y. Sep. 24, 1997) ......... 9

*Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329 (S.D.N.Y. 2018) ............. 18

*Aquavit Pharms., Inc v. U-Bio Med, Inc*, 2020 U.S. Dist. LEXIS 28639 (S.D.N.Y. Feb. 19, 2020) ....................................................................................................................................... 22, 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................... 7, 8

*Austin v. Fordham Univ.*, 2022 U.S. Dist. LEXIS 179170 (S.D.N.Y. Sep. 30, 2022) ................ 26

*Aviles v. S&P Glob., Inc.*, 380 F. Supp. 3d 221 (S.D.N.Y. 2019) ............................................. 24

*Busher v. Barry*, No. 20-3587-cv, 2021 U.S. App. LEXIS 32561 (2d Cir. Nov. 2, 2021) ........... 21

*Charles v. Seinfeld*, 803 F. App'x 550 (2d Cir. 2020) ........................................................... 8, 10

*Columbus Park Corp. v. Dep't of Hous. Pres. & Dev.*, 80 N.Y.2d 19 (1992) .............................. 14

*Consumer Health Info. Corp. v. Amylin Pharms., Inc.*, 819 F.3d 992 (7th Cir. 2016) ................ 12

*Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013 (10th Cir. 2013) .................................................... 12

*Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*, 80 A.D.3d 485 (1st Dep't 2011) .................. 22

*Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183 (2d Cir. 2020) .............................................. 8

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010) .................................................. 4

*Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553 (2009) .................................. 23

*Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470 (S.D.N.Y. 2009) .................................... 27

*First Hill Partners, LLC v. Bluecrest Capital Mgmt.*, 52 F. Supp. 3d 625 (S.D.N.Y. 2014) . 18, 19

*Galli v. Metz*, 973 F.2d 145 (2d Cir. 1992) ........................................................................... 13, 14

*Goureau v. Lemonis*, 2021 U.S. Dist. LEXIS 199321 (S.D.N.Y. Oct. 15, 2021) .................. 20, 21

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562 (2002) ........................................................ 23

*Heller v. Pope*, 250 N.Y. 132 (1928) .......................................................................................... 23

*HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158 (2d Cir. 2012) .......................... 10

*Horror Inc. v. Miller*, 15 F.4th 232 (2d Cir. 2021) ..................................................... 8

*In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56 (S.D.N.Y. 2009)...................................... 17

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ......................................................... 25

*Kassab v. Kassab*, 137 A.D.3d 1135 (2d Dep't 2016)...................................................... 21

*Krys v. Aaron (In re Refco Inc. Sec. Litig.),* 890 F. Supp. 2d 332 (S.D.N.Y. 2012)..................... 17

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005) ...... 11, 16

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173 (2011) .................................................. 18

*Mardones v. Spirit Two Music, Inc.*, 2019 U.S. Dist. LEXIS 99501 (S.D.N.Y. June 11, 2019).. 27

*McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*, 2022 U.S. Dist. LEXIS 233796 (S.D.N.
     Dec. 30, 2022).......................................................................................... 27

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884 (2d Cir. 1990) ...................................... 12

*Moran v. Erk*, 11 N.Y.3d 452 (N.Y. 2008) ................................................................... 20, 21

*Mun. Metallic Bed Mfg. Corp. v. Dobbs*, 253 N.Y. 313 (1930) ................................................. 18

*Olson v. Major League Baseball*, 29 F.4th 59 (2d Cir. 2022) .................................................. 18

*Ortho-Clinical Diagnostics Berm. Co. v. FCM, LLC*, 2017 U.S. Dist. LEXIS 105418
     (S.D.N.Y. July 6, 2017) ................................................................................ 19

*Perrotti v. Becker, Glynn, Melamed & Muffly LLP,* 82 A.D.3d 495 (1st Dep't 2011)................ 23

*Phx. Cos. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568 (S.D.N.Y. 2021)  23, 25, 26

*President Container Grp. 11, LLC v. Systec Corp.*, 467 F. Supp. 3d 158 (S.D.N.Y. 2020) ........ 17

*Prichard v. 164 Ludlow Corp.,* 49 A.D.3d 408 (1st Dep't 2008).................................................. 15

*RDF Agent, LLC v. Elec. Red Ventures, LLC*, 227 A.D.3d 424 (1st Dep't 2024)....................... 22

*Roberts v. Weight Watchers Int'l, Inc.*, 712 F. App'x 57 (2d Cir. 2017)................................ 22, 23

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .................................................... 16, 17

*S&L Metro Prop., LLC v. Clear Channel Outdoor, Inc.*, 2011 NY Slip Op 33841(U) (Sup.
     Ct., N.Y. Cty., Jul, 27, 2011) ........................................................................ 18

*Silony Med. Int'l, AG v. SWK Funding LLC*, 2024 U.S. Dist. LEXIS 29094 (S.D.N.Y. Feb. 20, 2024) ............................................................................................................ 20, 21

*SSA Holdings LLC v. Kaplan,* 120 A.D.3d 1111 (1st Dep't 2014) .............................................. 18

*Stanacard, LLC v. Rubard, LLC*, 2016 U.S. Dist. LEXIS 15721 (S.D.N.Y. Feb. 3, 2016) ......... 14

*Stein Hall & Co. v. S.S. Concordia Viking*, 494 F.2d 287 (2d Cir. 1974) .................................... 17

Universal Instruments Corp. v. Micro Sys. Eng'g, Inc., 924 F.3d 32 (2d Cir. 2019).................. 15

*Vendome v. Oldenburg,* 198 A.D.3d 450 (1st Dep't 2021) .......................................................... 20

*Walker v. Thompson*, 404 F. Supp. 3d 819 (S.D.N.Y. 2019) ........................................... 12, 13, 14

*Watson v. Riptide Worldwide, Inc.*, 2013 U.S. Dist. LEXIS 14465 (S.D.N.Y. Feb. 4, 2013)...... 23

*Weiner v. McGraw-Hill*, 57 N.Y.2d 458 (1982) ......................................................................... 22

*Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112 (2d Cir. 2018)........................................... 8, 11, 12

*Womack v. Capital Stack, LLC*, 2019 U.S. Dist. LEXIS 148644 (S.D.N.Y. Aug. 30, 2019)....... 27

**Statutes**

17 U.S.C. § 201(b) ..................................................................................................................... 11

17 U.S.C. § 507(b) ....................................................................................................................... 8

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................................................ 1, 7

Fed. R. Civ. P. 9(b) .................................................................................................................... 16

Scholastic Inc. and Scholastic Entertainment Inc. ("SEI," and together, "Scholastic") submit this brief in support of their motion to dismiss, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6), Counts I, II, III, VI, VII, VIII, IX and X of the First Amended Complaint ("FAC," ECF No. 28) of Danomolous Productions LLC, Danny Abosch, and John Maclay (collectively, "Adaptors").

## PRELIMINARY STATEMENT

Scholastic owns *Goosebumps,* the second-best-selling children's book series in history. In 2016, shortly after the release of a major *Goosebumps* movie, SEI authorized two children's theaters to produce a Theater for Young Audiences ("TYA") musical based on *Goosebumps* (the "Play"), provided that SEI would own the copyright; the Play could be performed for a limited time at children's theaters, schools and camps; and the Play's adaptors would receive 50% of licensee fees but have no right to exploit the Play. The theaters, in turn, contracted with Adaptors Abosch and Maclay to write the Play ("2016 Agreement"). Adaptors knew that Scholastic insisted on owning and controlling the Play and would never have ceded critical *Goosebumps* rights to them. Thrilled to be associated with this famous horror series, they went in with their eyes open.

The parties' 2016 understandings are documented in an April 2017 contract ("2017 Agreement" or "Agreement"). The Agreement provides that the Play was created as a work-for-hire and that "SEI shall be the sole and unlimited owner [of the Play] and of all rights therein," but if the Play does not qualify as a work-for-hire, Adaptors "grant, transfer, and assign all right, title, and interest in and to the Play," including "all copyright," to SEI. The Agreement also provides that Adaptors would receive 50% of the revenues from Scholastic's licensing of the Play, but "under no circumstances shall Adaptors have the right to license and/or exploit the Play." Finally, the Agreement expressly provides that "SEI shall have no obligation to exploit the Play." In short—just as with Scholastic's original license to the commissioning theaters—the parties agreed

that Scholastic would retain full ownership and control of the Play.

Adaptors have for years misinterpreted the Agreement in an effort to stretch it to match their aspirations. But Adaptors cannot escape the unambiguous terms of the bargain they struck:

Adaptors first challenge the validity of work-for-hire provisions in the Agreement, pursuant to which SEI is deemed the author and owner of the Play (Count I). But the Copyright Act's (the "Act") three-year statute of limitations ("SOL") bars Adaptors' claim for a declaration of copyright authorship. Under Second Circuit law, this claim had to have been brought within three years of when the contracts with work-for-hire language were executed. The authorship claim seeks to invalidate provisions of a 2017 contract. It is therefore time-barred.

Adaptors next attempt to usurp ownership of the Play's underlying materials through a claim for a declaration of copyright ownership (Count III). But the ownership claim is likewise time-barred under the Act's SOL because the claim accrued no later than when they assigned all rights in the Play to Scholastic in the 2017 Agreement—far more than three years before Adaptors filed suit. Moreover, Adaptors' ownership claim fails under the plain language of the Agreement: Adaptors unequivocally agreed that SEI owns all copyrights in the Play and its components.

Because the Agreement forecloses nearly all their claims, Adaptors next seek to rescind it, rewrite it, or else declare it void entirely. These efforts fail. Adaptors cannot rescind the Agreement based on their bizarre theory that SEI fraudulently induced them to enter into it by misrepresenting that SEI was "not bound" by the 2016 Agreement (Count II). This claim is time-barred. Adaptors also cannot plead required elements. For example, the alleged statement was not false because SEI was not, in fact, bound by an agreement to which it was not even a party.

Nor can Adaptors rewrite the terms of the Agreement via a breach of contract claim (Count VI). Adaptors argue that the covenant of good faith and fair dealing obligates Scholastic to make

reasonable efforts to license the Play, but the Agreement states that SEI "shall have no obligation to exploit the Play." The covenant cannot negate this express contractual provision.

Adaptors likewise cannot obtain a declaration that the Agreement is void. Count X—seemingly premised on the notion that the no-obligation-to-exploit provision renders the Agreement "unenforceable" for lack of consideration—is barred by the SOL. Furthermore, there was ample consideration for the Agreement; Adaptors received, among other things, Scholastic's agreement to negotiate in good faith a license for Adaptors to produce and sell a cast album and sheet music adapted from the Play's musical compositions. Moreover, parties may cure a lack of consideration at the outset of an agreement through subsequent performance. Adaptors concede both that Scholastic has been licensing the Play for years and that they received a license to produce and sell a cast album and sheet music. Such performance cures any previous lack of consideration.

Adaptors' claims for negligent and fraudulent misrepresentation, and breach of fiduciary duty, are also baseless. The misrepresentation claims—premised on a statement that Sony was "no longer a party" to the Play somehow opening the door to a potential Broadway run—are barred by the SOL and fail on the merits because Adaptors could not reasonably rely on statements that were negated by the 2017 Agreement. And Adaptors' last-ditch effort to recast their claims as breaches of fiduciary duty lacks merit. There is no fiduciary relationship; it is purely contractual.[1]

## BACKGROUND

### A. Scholastic Licenses the Creation of the Play

Scholastic owns *Goosebumps,* the beloved children's horror stories. (FAC ¶20.) Under

---

[1] The FAC also contains ancillary claims seeking a declaration that they have not infringed Scholastic's trademarks and asserting that Scholastic has permitted licensees to infringe Adaptors' copyrights and failed to accord proper credit to Adaptors in marketing materials (Count IV-VI). Scholastic does not seek to dismiss these claims on this motion.

Scholastic's stewardship, the *Goosebumps* brand has expanded to include, among other things, two feature films, a video game series, and a television series currently in its second season. (*See id.*) In 2016, shortly after release of the first *Goosebumps* movie, SEI authorized two theater companies (the "Theaters") to produce the Play as a TYA musical. SEI and the Theaters entered into an agreement in April 2016 (the "License Agreement").[2]

Because of *Goosebumps*' significant value, Scholastic strictly limited the Theaters' rights. For example, the License Agreement: (1) required the Play to be "in good taste and suitable for families and children" in a manner "consistent with the look, feel, tenor and spirit" of the *Goosebumps* brand; (2) precluded the Theaters from presenting the Play "as a 'first class or second class production' as said terms are understood in the live stage industry (including but not limited to Broadway and Off-Broadway theaters, respectively)"; and (3) limited the performance rights to a specified term and territory. (License Agreement §§1(a), 5(a).)

The parties contemplated that the Theaters would engage Adaptors to create the Play. (License Agreement, §3(d); *see* FAC ¶27 ("It is not uncommon for a licensor to contract with a theatrical producer, instead of with the dramatists directly.").) Crucially, Scholastic required the Theaters to agree that neither they, nor Adaptors, would retain any ownership of or control over the Play. (*See* License Agreement, §5(b).) The License Agreement further provided: "It is the essence of this Agreement that the Play created, written and/or produced hereunder is created as a

---

[2] The License Agreement, Exhibit 1 to the Declaration of Guy Cohen, is referenced in the FAC and its exhibits. (*See* FAC ¶27; FAC Ex. C, ECF No. 28-1 at 11 (discussing the "signed written contract" where "SEI grants and licenses to" the Theaters the "right to adapt" a *Goosebumps* book); FAC Ex. F, ECF No. 28-1 at 39 (Play was commissioned via a "Play License" between SEI and the Theaters).) The Court therefore may consider the License Agreement on this motion. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (court may consider "documents incorporated by reference in the complaint" and documents that are "integral" because the complaint "relies heavily upon [their] terms and effect.").

'work-for-hire' with [Scholastic] holding the copyright therein." (*Id.* §1(c).) Adaptors would receive 50% of license fees but would have no right to exploit the Play themselves. (*See id.* §3(d).)

In short, Scholastic commissioned the creation of a Play ***only*** on the condition that it would be a work-for-hire with Scholastic owning and controlling the Play and all underlying materials.

### B. Adaptors Agree to Develop the Play as a Work-for-Hire

Adaptors were contacted about creating the Play in late 2015. (FAC ¶31.) Susan Gurman, a theater agent who represented both Adaptors and Scholastic, explained at the outset that Scholastic required the Play to be a work-for-hire, meaning that SEI would own the Play and all underlying materials. (*Id.* ¶¶24, 31.) With full knowledge of SEI's ownership requirement, Adaptors negotiated a contract with the Theaters (the "2016 Agreement," FAC Ex. C, ECF No. 28-1 at 10). (*Id.* ¶32.) SEI was not a party to the 2016 Agreement. (*Id.*) Consistent with the License Agreement, however, the 2016 Agreement provided:

> Adaptors further acknowledge and agree that the Play shall be considered a "work-for-hire" and "work-made-for-hire" as such phrases are defined under the copyright laws of the United States, it being understood and acknowledged by Adaptors that Producers hereby convey and otherwise transfer any and all of such work-for-hire and work-made-for-hire rights to and for the benefit of Producers' licensor SEI.

(FAC Ex. C, §1(a).) Adaptors also agreed that all "approved, final material which actually appears in the Play . . . shall be deemed to be owned by SEI." (*Id.* §1(b).) And Adaptors represented and warranted that SEI could seek copyright protection in and to the Play:

> <u>Copyright</u>. Adaptors are aware of no reason why SEI cannot claim and seek copyright protection in and to the Play in the United States and Canada, and Adaptors shall make no challenges to such copyright or copyrights during the pendency of this Agreement or thereafter.

(*Id.* §11(a)(ii).)

### C. The 2017 Agreement Confirms Scholastic's Ownership and Control of the Play

Following the Play's initial run, Adaptors sought to contract directly with Scholastic. (FAC

¶40.)  The parties executed that contract in 2017 (the "2017 Agreement," FAC Ex. F, ECF No. 28-1 at 38).  Adaptors agreed that the 2017 Agreement "supersede[s] and replace[s]" the 2016 Agreement, and that the terms of the 2017 Agreement "govern [Adaptors'] rights in the Play in lieu of any rights" the Theaters purported to grant in the 2016 Agreement.  (FAC Ex. F, §2.)  Consistent with the original grant of rights in the License Agreement, the 2017 Agreement states:

> Adaptors...agree that the Play was created as and constitutes a work-for-hire on behalf of SEI…under the copyright laws of the United States.  SEI shall be the sole and unlimited owner thereof and of all rights therein throughout the world forever, and SEI shall be entitled to the copyright therein, including statutory copyright and all renewals, extensions and revivals thereof, in and to the Play (including without limitation the Script, Libretto, Lyrics, Compositions, Arrangements, Orchestrations, and Orchestral Tracks) and all components of the foregoing....SEI shall have the sole and absolute right to copyright the Play as copyright author….

(*Id.* §5(a.).)  As is common in copyright-related agreements, the 2017 Agreement also contained an assignment provision (the "Assignment Clause"):

> To the extent that the Play, or any portion thereof, may not qualify as a work-for-hire, Adaptors, individually and collectively, hereby grant, transfer, and assign all right, title and interest in and to the Play to SEI, including, without limitation, all copyright and any and all other proprietary rights therein, throughout the world and in perpetuity for use in any and all media now known or hereinafter developed.

(*Id.*)

The 2017 Agreement also confirmed SEI's control over whether and to what extent to exploit the Play: "[U]nder no circumstances shall Adaptors have the right to license and/or exploit the Play, all such rights remaining in SEI."  (*Id.* §6.)  The parties agreed that "SEI shall have no obligation to exploit the Play, it being understood that the only obligation is for SEI to make the payments and provide for credit to be accorded as set forth under this Agreement."  (*Id.*, §5(a.).)

The parties agreed to a 50/50 split of royalties from licensing the Script, Libretto and Compositions, and a "25/75" split of royalties (in Adaptors' favor) from licensing the Orchestrations, Arrangements and Orchestral Tracks.  (*Id.* §7.)  Finally, the parties agreed to

negotiate the terms for Adaptors to produce and sell a cast album and sheet music. (*Id.*)

### D. The Cast Album Addendum Reaffirms the Prior Apportionment of Rights

In 2018, the parties executed an addendum to the Agreement (the "2018 Addendum," FAC Ex. H, ECF No. 28-1 at 54). Scholastic licensed the Play and its underlying materials to Adaptors to produce and sell a "Cast Album," defined as an "original studio sound recording of the original music from the Play." (FAC Ex. H, §2.) The license was exclusive for three years, with a potential extension, after which it would become non-exclusive—meaning Scholastic could grant others cast album licenses. (*Id.*) Adaptors also received the exclusive right to "produce and sell sheet music of original music from the Play," which license would later become non-exclusive. (*Id.*)

The parties also reaffirmed Scholastic's ownership of the Play and its components, while acknowledging Adaptors' ownership of solely the Cast Album and Sheet Music:

> <u>Copyright Ownership</u>. The copyrights in and to the Cast Album and Sheet Music shall be and remain solely-owned by Adaptors for the life of the copyright in the Cast Album. The parties to this Addendum ***do not intend to modify, in any manner, the apportionment of rights as set forth in the [2017] Agreement with respect to the Book or the Play*** (as defined therein).

(*Id.*, §3 (emphasis added).)

### E. Adaptors Repeatedly Seek to Expand Their Rights

Over the years, Scholastic has consistently licensed the Play to children's theaters, schools and camps. (*E.g.*, FAC ¶¶ 2, 47, 62.) But Adaptors have consistently harbored the unfounded expectation that Scholastic would take steps to bring the Play to Broadway. (*E.g.*, *id.* ¶¶57-59.) Adaptors have for years sought to expand their rights, culminating in this litigation.

## <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining a complaint's adequacy, a court must disregard conclusory

allegations and legal conclusions, which are not entitled to the assumption of truth, and determine whether the remaining "well-pleaded factual allegations" suggest the plaintiff has a plausible—as opposed to merely conceivable—claim for relief. *Id.* at 679. The court is "not required to credit conclusory allegations or legal conclusions couched as factual...allegations." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020).

## ARGUMENT

## I.    ADAPTORS' COPYRIGHT AUTHORSHIP CLAIM IS TIME-BARRED

### A.  The Statute of Limitations Began to Run by 2017

Count I seeks a declaration that Adaptors are the authors of the Play under the Act. This claim is time-barred. The Act provides that all civil actions must be commenced "within three years after the claim accrued." 17 U.S.C. §507(b). "[A]uthorship claims accrue when plain and express repudiation of authorship is communicated to the claimant, and are barred three years from the time of repudiation." *Horror Inc. v. Miller*, 15 F.4th 232, 257 (2d Cir. 2021). Repudiation of authorship occurs "when the defendant first communicates to the plaintiff that the defendant considers the work to be a work-for-hire." *Charles v. Seinfeld*, 803 F. App'x 550, 552 (2d Cir. 2020); *see also Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 119 (2d Cir. 2018) ("[A]sserting ownership as a work for hire would effectively repudiate Plaintiffs' claim...").

Adaptors learned that Scholastic considered the Play a work-for-hire—thus repudiating Adaptors' alleged authorship—far beyond the limitations period. Adaptors themselves allege they learned in December 2015 that SEI "insisted" on including work-for-hire language in its contracts. (FAC ¶ 31.) The 2016 Agreement states that the Play was a work-for-hire. (FAC Ex. C, §1(a).) And Scholastic again asserted sole authorship in the 2017 Agreement, which provides that "the Play was created as and constitutes a[ ] work-for-hire on behalf of SEI" and SEI is the "sole and unlimited owner" of all rights. These events each constitute repudiation of Adaptors' authorship

and trigger accrual of the authorship claim, which is untimely even if the limitations period runs from the last event—execution of the 2017 Agreement.

*Aday v. Sony Music Entm't, Inc.*, 1997 U.S. Dist. LEXIS 14545 (S.D.N.Y. Sep. 24, 1997), is directly on point. The plaintiff in that case—the singer known as Meat Loaf—sought a declaration that the work-for-hire provision in a 1977 agreement with a record company was unenforceable. *Id.* at *9-10. The Court dismissed the claim, holding that a declaratory judgment claim seeking to invalidate a work-for-hire provision must be brought within three years of when "the contracts containing the allegedly invalid 'work for hire' provisions[ ] were entered into." *Id.* at *11-12. The Court explained:

> Meat Loaf's role in the creation of the recordings and the disputed "work for hire" provisions of the contracts were never uncertain. The terms of the [Agreements] clearly set forth that the rights to the sound recordings belong to [Defendants], not Enterprises or Meat Loaf. Therefore, plaintiffs had reason to know in 1977 about any of the problems with the "work for hire" provision that they now contend violates the Copyright Act.

*Id.*

The same reasoning applies here. Nothing about the Play's work-for-hire status was uncertain. Adaptors admit they were aware of Scholastic's work-for-hire requirement from the outset. The work-for-hire provision in the 2017 Agreement is clear. Thus, Adaptors' authorship claim accrued no later than April 2017 and was time-barred years before they filed suit.

## B.  Adaptors' Counterarguments Fail

The FAC nonsensically alleges that repudiation did not occur until October 2021. (FAC ¶67.) The Court should not credit this legal conclusion, which ignores numerous factual allegations showing that repudiation occurred years earlier. *First*, although Adaptors claim they informed Scholastic that a work-for-hire provision would be ineffective after first learning of Scholastic's requirement, the next sentence of the FAC concedes that "SEI ***nevertheless insisted***"

on "the inclusion of 'work-for-hire' language." (*Id.* ¶¶65-66 (emphasis added).)  Thus, by their

own admission, Adaptors' challenge to Scholastic's initial repudiation of their authorship failed.

These communications establish repudiation as a matter of law.  *See Charles*, 803 F. App'x at 552

(repudiation occurs when defendant "made it clear that [plaintiff's] involvement would be limited

to a work-for-hire basis").

 *Second*, Adaptors allege that Scholastic recognized their authorship in 2016 because it

supposedly "agreed to include a Representations and Warranties clause in the 2016 Agreement

providing that [Adaptors] are the legal authors."  (FAC ¶65.)  Scholastic didn't agree to anything.

***Scholastic wasn't a party to the 2016 Agreement***, which the FAC concedes: "SEI did not intend

to be a party to the" 2016 Agreement.  (FAC ¶32.)  The 2016 Agreement bound the Theaters.  The

referenced clause applied to the Theaters, not to Scholastic, and Adaptors' allegation is

contradicted by the 2016 Agreement itself, which contains a work-for-hire provision.

 *Third*, even if these pre-2017 matters did not constitute repudiation, the work-for-hire

provision in the 2017 Agreement forecloses Adaptors' claim.  The Agreement is crystal-clear that

"Adaptors…acknowledge and agree that the Play was created as and constitutes a work-for-hire

on behalf of SEI."  (FAC Ex. F, §5(a).)  Adaptors also agreed that the 2017 Agreement "will

supersede and replace any prior agreements and/or understandings regarding any and all rights in

the Book and/or the Play."  (*Id.*, §2.)

 Adaptors argue that the work-for-hire provision in the 2017 Agreement was a "mere

corporate token" and that Adaptors "have been operating under the understanding" that they "were

and remain the Play's legal authors."  (FAC ¶66.)  But "a court must give full effect to

unambiguous contract terms," and "a party's subjective intent and understanding of the terms is

irrelevant."  *HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012).

Adaptors' alleged "understanding" that they were the legal authors cannot change their acknowledgement that they created the Play as a work-for-hire for Scholastic.

*Finally*, Adaptors recount at length Scholastic's counsel's statements in ***2024***, but those statements have no bearing on interpretation of the Agreement. Scholastic's counsel's "subjective interpretation of [the] contract, which was not communicated to [Adaptors] until litigation commenced, cannot be used to establish that [the parties] had such intent and understanding when they entered into the contract." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 207 n.10 (2d Cir. 2005).

## II.  ADAPTORS' COPYRIGHT OWNERSHIP CLAIM FAILS

Count III purportedly seeks a declaratory judgment as to copyright ownership of the Cast Album and Sheet Music. (FAC ¶¶94-96.) But Adaptors actually seek to ***usurp*** ownership of the Play's underlying materials, including its musical compositions. According to Adaptors, ownership of the compositions was "retained by [Adaptors] pursuant to the 2017 Agreement," or, alternatively, the compositions were "transfer[red] back" via the 2018 Addendum. (FAC ¶ 52.) Count III lacks merit.

### A.  The Play's Work-for-Hire Status Forecloses The Ownership Claim

Adaptors developed the Play and all underlying materials—including the compositions— as a work-for-hire, which they are now time-barred from challenging. *Supra* §I. SEI is thus "considered the author" and "owns all of the rights comprised in the copyright" of the Play and all underlying materials. 17 U.S.C. §201(b).

### B.  The Ownership Claim Is Time-Barred

Even if Adaptors had timely challenged the work-for-hire status of the Play, their ownership claim would separately be time-barred. The Act's SOL applies to claims seeking a declaration of copyright ownership. *See, e.g., Wilson,* 892 F.3d at 118. "A copyright ownership

claim accrues only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Id.*

Adaptors' ownership claim accrued (at the latest) upon execution of the 2017 Agreement. The Agreement not only repudiated Adaptors' alleged authorship, but it also contained the Assignment Clause, pursuant to which Adaptors assigned "all right, title and interest in and to the Play," including "all copyright," to Scholastic. Copyright ownership claims accrue when the plaintiff executes an agreement containing such an "express assignment" of "all right, title, and interest in and to" a copyright. *Consumer Health Info. Corp. v. Amylin Pharms., Inc.*, 819 F.3d 992, 997 (7th Cir. 2016); *see also, e.g.*, *Cooper v. NCS Pearson, Inc.,* 733 F.3d 1013, 1016 (10th Cir. 2013) (plaintiff's execution of a contract transferring "all intellectual property rights" put her "on notice that her ostensible copyright co-ownership claim was in jeopardy and thereby started the statute of limitations running"). The ownership claim was therefore barred three years after execution of the 2017 Agreement.

Nothing in the 2018 Addendum alters this conclusion. Indeed, that agreement expressly reaffirmed the "apportionment of rights as set forth in the [2017] Agreement." (FAC Ex. H, §3.) And even if the 2018 Addendum had restarted the limitations period, the claim would still be time-barred because the Addendum was executed more than three years before Adaptors filed suit.

### C. Scholastic Owns the Compositions

Count III also fails under the plain language of the agreements. "On a motion to dismiss, the Court may resolve issues of contract interpretation" when the contractual language is unambiguous. *Walker v. Thompson*, 404 F. Supp. 3d 819, 823 (S.D.N.Y. 2019) (Torres, J.). "[T]he mere fact that the parties disagree on the proper interpretation of the contract does not render the contractual language ambiguous." *Id.* (citing *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)). The 2017 Agreement provides that Adaptors assigned "all right, title

and interest in and to the Play" to Scholastic. "Play" is defined to include "all components" of the Play and expressly incorporates the musical compositions, along with the script, libretto, lyrics, arrangements, orchestrations, and orchestral tracks. (FAC Ex. F, §5(a).)

Adaptors incorrectly argue that the assignment of "all right, title and interest in and to the Play" did not include the compositions because the term "Play" in the Assignment Clause does not expressly list each component of the Play. (*E.g.*, *id.* ¶43.) Nonsense. "Play" is defined in the same section as the Assignment Clause. There was no need to list each component in the Assignment Clause because those components were expressly included in the definition of "Play" several sentences earlier. Moreover, the sentence that lists the Play's components states that SEI is the "sole and unlimited owner" of "all rights" in and to the Play and "all components." (FAC Ex. F, §5(a).) Adaptors' interpretation would have "the effect of rendering [that] clause superfluous or meaningless," which is highly disfavored in New York. *Walker*, 404 F. Supp. 3d at 825 (citing *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992)).

Adaptors next argue incorrectly that the compositions were "transfer[red] back" to them in the 2018 Addendum. But Section 3, titled "Copyright Ownership," states that "[t]he parties to this Addendum do not intend to modify, ***in any manner***, the apportionment of rights as set forth in the [2017] Agreement with respect to the… Play." (FAC Ex. H, §3 (emphasis added).) Accordingly, the Addendum reaffirmed the prior assignment of all rights to the Play and its components to SEI.

Nevertheless, Adaptors baselessly argue that copyrights to the compositions were transferred via an Addendum provision stating that "[t]he copyrights in and to the Cast Album and Sheet Music shall be and remain solely owned by Adaptors." (*Id.*) "Cast Album" is defined to mean "Adaptors' production of original studio ***sound recording*** of the original music from the Play." (*Id.* §2 (emphasis added).) And "Sheet Music" is defined as "sheet music of original music

from the Play." (*Id.*)  The parties simply agreed that Adaptors would own the copyrights in the *sound recording*—not the compositions—of the Cast Album and in the *sheet music* itself. Nothing in the Addendum suggests that the parties transferred any of the Play's underlying material.

The remainder of the Addendum further confirms that the parties did not intend to transfer copyrights in the Play to Adaptors.  SEI granted Adaptors a "license . . . to the Play and the rights underlying the Play" to produce and sell a cast album and sheet music.  (*Id.*)  These licenses would have been meaningless if SEI had transferred the compositions to Adaptors.  Furthermore, the Addendum provides that the licenses to Adaptors become *non-exclusive* after a period, meaning Scholastic could grant others cast album licenses.  Scholastic would not have possessed any such right had the compositions been transferred.  "[W]hen interpreting a contract, a court must consider the entire contract and choose the interpretation [ ] which best accords with the sense of the remainder of the contract."  *Walker*, 404 F. Supp. 3d at 825 (citing *Galli*, 973 F.2d at 149. Adaptors' interpretation is "contrary to basic principles of contract interpretation" because it renders Section 2 of the contract meaningless.  *Id.* (quoting *Columbus Park Corp. v. Dep't of Hous. Pres. & Dev.*, 80 N.Y.2d 19, 31 (1992)).

Finally, to validly transfer a copyright, the Act requires a writing that "explicitly convey[s] a party's intention to sign away his or her copyright interests."  *Stanacard, LLC v. Rubard, LLC*, 2016 U.S. Dist. LEXIS 15721, at *27 (S.D.N.Y. Feb. 3, 2016).  The "terms of any writing purporting to transfer copyright interests[ ] must be clear."  *Id.*  The Addendum does not explicitly convey an intention to sign away any copyrights; rather, it says that the parties did *not* intend to modify the prior apportionment of rights.  Scholastic owns copyrights in the Play and its components, including the compositions.

14

## III.  THE 2017 AGREEMENT IS ENFORCEABLE

Recognizing that the 2017 Agreement forecloses their key claims, Adaptors use this litigation to try to escape the bargain they struck.  They variously seek to rescind the Agreement (Count II), rewrite its key terms (Count VI), or else declare it void (Count X).  These efforts fail. The contract is valid and enforceable.

### A.  Adaptors Cannot Rescind the 2017 Agreement

Adaptors launch a "Hail Mary" attempt to rescind the contract.  They claim Scholastic induced them to enter into the Agreement by misrepresenting either expressly or through omission—the FAC does not say which—that SEI was not bound by the 2016 Agreement.  In fact, so the story goes, SEI "knew it was bound," and Adaptors relied on SEI's misrepresentation to enter into the 2017 Agreement, which must therefore be rescinded to remedy this supposedly grave injustice.  Count II suffers from multiple deficiencies.[3]

#### 1.   The Fraudulent Inducement Claim is Untimely

A claim for fraudulent inducement must be brought within six years of "complet[ing] the act that the alleged fraudulent statements had induced."  *Prichard v. 164 Ludlow Corp.,* 49 A.D.3d 408, 408 (1st Dep't 2008).  Adaptors, however, executed the 2017 Agreement more than ***seven years*** before filing suit.  The claim is therefore time-barred.

Adaptors claim they didn't discover the fraud until November 2024, but this contrived "discovery" cannot salvage their claim.  It's based on Scholastic's counsel's statement ***in 2024*** that Adaptors "transferred all rights to Defendants" in the 2016 Agreement, which Adaptors spin

---

[3]   As Scholastic's licensee, the Theaters could not grant rights beyond what Scholastic authorized. *See Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 44 (2d Cir. 2019) ("[A] licensee infringes the owner's copyright if its use exceeds the scope of its license.").  Thus, if the Agreement and its Addendum were rescinded, Adaptors rights would be limited to what Scholastic authorized in the License Agreement: creation of the Play and 50% of license fees.  Nothing else.

as an admission that Scholastic "knew" it was bound by the 2016 Agreement *in 2016* (FAC ¶92.)
But a litigator's 2024 analysis says nothing about what the ***former*** Scholastic employees who
negotiated the 2017 Agreement "knew" in 2016.  *Cf. LaSalle*, 424 F.3d at 207 n.10 (a party's
"subjective interpretation" communicated after litigation commenced has no bearing on the party's
previous "intent and understanding").  Furthermore, the statement that Adaptors "transferred all
rights to Defendants" does not indicate that SEI takes the position ***now*** that it is "bound by" the
2016 Agreement; Scholastic denies that it is so bound.  There is no basis to apply any discovery-
based extension of the SOL.

      2. <u>Adaptors Fail to Plead the Alleged Fraud with Particularity</u>

  Count II should be also dismissed for failure to "state with particularity the circumstances
constituting" the fraud.  Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b), the complaint must "(1) specify
the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where
and when the statements were made, and (4) explain why the statements were fraudulent."
*Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

  *First*, the FAC does not identify the supposedly fraudulent statements.  The FAC alleges
that Adaptors merely "understood" or "harbored [a] belief" that SEI was not bound by the 2016
Agreement, assertions that are incompatible with any allegation that Scholastic made a specific
misstatement.  (*Id.* ¶¶7, 44.)  Elsewhere, the FAC suggests—without explanation—that the alleged
misstatements are actually omissions.  Even so, the FAC is impermissibly vague, alleging that the
misrepresentations were made "***either*** expressly ***or*** through omission."  (FAC ¶85) (emphasis
added).)

  *Second*, the FAC fails to allege where and when the misstatements were made, merely
implying they were made at some point during a period spanning "twelve months."  (*Id.* ¶¶40-41.)
But a "time range of several months is insufficient to plead fraud with particularity."  *President*

*Container Grp. 11, LLC v. Systec Corp.*, 467 F. Supp. 3d 158, 165 (S.D.N.Y. 2020).  And the FAC nowhere alleges the "location[] or method of communication" of the misstatements, which is a separate basis upon which to dismiss the claim.  *Id.*

*Third*, the FAC fails to explain why the alleged misstatements were fraudulent.  The complaint must "state with particularity the specific facts in support of plaintiffs' belief that defendants' statements were false ***when made***."  *Rombach*, 355 F.3d at 172 (emphasis added).  As explained, the FAC does not—because it cannot—plead specific facts to support the allegation that Scholastic believed ***in 2016 or 2017*** that it was bound by the 2016 Agreement.

### 3. Adaptors Fail to State a Claim for Fraudulent Inducement

The FAC also fails to state a claim for fraudulent inducement.

*First*, Adaptors cannot plead falsity—a required element of a fraudulent inducement claim, *see President Contain Grp.*, 467 F. Supp. 3d at 165—because, in fact, SEI was ***not*** bound by the 2016 Agreement.  SEI was not a party to that agreement.  At most, SEI was a third-party beneficiary of certain provisions, such as Adaptors' acknowledgement that the Play was created as a work-for-hire.  But a "third-party beneficiary does not, by that status, become a party to the contract or take on any of the obligations of any party to that contract." *Krys v. Aaron (In re Refco Inc. Sec. Litig.),* 890 F. Supp. 2d 332, 351 n.21 (S.D.N.Y. 2012).

Adaptors urge that "a party may not lay claim to the purported benefits of an agreement and simultaneously disclaim being bound by same," but this simply misstates the law.  (FAC ¶92.) A third-party beneficiary may enforce contract terms in its favor if it qualifies as an intended beneficiary, but "qualifying as an intended beneficiary in no way ***creates*** contractual obligations on the part of the intended beneficiary."  *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 72 (S.D.N.Y. 2009) (citing *Stein Hall & Co. v. S.S. Concordia Viking*, 494 F.2d 287, 291 (2d Cir. 1974)) (emphasis in original); *see also, e.g.*, *Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328

F. Supp. 3d 329, 338 (S.D.N.Y. 2018). Thus, the alleged statement that SEI was not bound by the 2016 Agreement was not false.

*Second*, statements of opinion are "nonactionable" and "provide[] no basis for a fraud claim." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011). Adaptors' claim concerns what SEI allegedly "believed" or "understood" about the legal effect of the 2016 Agreement (FAC ¶¶ 8, 34), which are "expressions of opinion about the law" that "cannot sustain an action for fraud." *S&L Metro Prop., LLC v. Clear Channel Outdoor, Inc.*, 2011 NY Slip Op 33841(U), ¶ 8 (Sup. Ct., N.Y. Cty., Jul, 27, 2011) (citing *Mun. Metallic Bed Mfg. Corp. v. Dobbs*, 253 N.Y. 313, 317 (1930)); *cf., e.g.*, *Olson v. Major League Baseball*, 29 F.4th 59, 74 (2d Cir. 2022) ("[M]isrepresentations involving a point of law or the legal effect of a document will not support an action for fraud.").

*Third*, to the extent Adaptors seek to plead fraud by omission, such a claim "hinges on whether [Scholastic] had a duty to disclose" the allegedly concealed information. *First Hill Partners, LLC v. Bluecrest Capital Mgmt.*, 52 F. Supp. 3d 625, 638 (S.D.N.Y. 2014). Such a duty arises only if (1) the parties are in a fiduciary relationship; (2) under the "special facts doctrine;" or (3) where a party has made a partial or ambiguous statement that requires "complete disclosure" to clarify its meaning. *Id.* There is no fiduciary relationship here, *see infra* §V, and Adaptors do not allege any partial or ambiguous statement requiring further disclosure.

Adaptors are left with the special facts doctrine, under which a duty to disclose may arise where "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Id.* But Adaptors do not allege SEI possessed special facts, just its opinion about the legal effect of the 2016 Agreement. This is insufficient. *See, e.g., SSA Holdings LLC v. Kaplan,* 120 A.D.3d 1111, 1111 (1st Dep't 2014)

("[T]here was no concealment of the facts upon which [defendants'] opinions were based and defendants were not bound to volunteer their opinions."); *cf. First Hill Partners, LLC*, 52 F. Supp. 3d at 638 ("[K]nowledge of intention is not knowledge of ***facts***, and certainly not the kind of facts required under the special facts doctrine.").  Further, the FAC does not allege that Scholastic knew Adaptors were acting on the "mistaken knowledge."  *See First Hill Partners, LLC*, 52 F. Supp. 3d at 638.  Instead, the FAC alleges that Adaptors merely "harbored [a] belief" that SEI was not bound by the 2016 Agreement, fatally undermining any allegation that Scholastic acted knowingly.  (FAC ¶¶7, 44.)  Moreover, the special facts doctrine does not apply to information that could have been discovered "through the exercise of ordinary diligence."  *First Hill Partners, LLC*, 52 F. Supp. 3d at 638.  Adaptors could have discovered what SEI believed by simply asking.

*Fourth*, for the same reasons, Adaptors have not pleaded reasonable reliance on any alleged omission because they failed to discharge their duty to inquire.  Where there are circumstances that "would normally arouse suspicion...a duty arises on the part of the plaintiff to inquire further."  *Ortho-Clinical Diagnostics Berm. Co. v. FCM, LLC*, 2017 U.S. Dist. LEXIS 105418, at *12 (S.D.N.Y. July 6, 2017) (citations omitted).  Adaptors assert that SEI "delayed preparing" the 2017 Agreement despite Adaptors urging the "necessity" of such agreement because "SEI took the position that it was not bound by that contract."  (FAC ¶ 40.)  These circumstances gave rise to a duty to inquire, which Adaptors didn't discharge.  Adaptors could have simply asked SEI whether it believed itself to be bound by the 2016 Agreement.  *See Ortho-Clinical Diagnostics*, 2017 U.S. Dist. LEXIS 105418, at *13 ("[A] simple inquiry is the barest of precautions.").  Having failed to do so, Adaptors cannot establish reliance.  *Id.*

### B.  Adaptors Cannot Rewrite the 2017 Agreement

Count VI alleges that Scholastic breached the covenant of good faith and fair dealing (the "covenant") by failing to "make reasonable efforts to license the Play."  In fact, however, the FAC

makes clear that Adaptors think "reasonable efforts" means that Scholastic should bring the Play to Broadway.  (*E.g.*, *id.* ¶¶ 57-59.)  But Scholastic has no such obligation, and the Court should not rewrite the Agreement to match Adaptors' aspirations.

The Agreement provides that: (1) "***SEI shall have no obligation to exploit the Play***"; (2) "***SEI shall have the exclusive right***...[to] license the Play...and/or otherwise exploit the Play," and "Adaptors...will not have any right of approval or consultation in connection with SEI's exercise of its rights hereunder"; and (3) "***[U]nder no circumstances shall Adaptors have the right to license and/or exploit the Play, all such rights remaining in SEI***."  (FAC Ex. F, §§5(a), 5(b), 6 (emphases added).)  These provisions—collectively and individually—establish Scholastic's absolute discretion over whether, and to what extent, to exploit the Play.

The "covenant of good faith and fair dealing cannot negate express provisions of the agreement."  *Vendome v. Oldenburg,* 198 A.D.3d 450, 451 (1st Dep't 2021); *see A.N.R. Inv. Co. Ltd. v. HSBC Private Bank*, 135 A.D.3d 632, 634 (1st Dep't 2016) ("The covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights.").  As this Court recognized, "New York courts 'do not ordinarily read implied limitations into unambiguously worded contractual provisions designed to protect contracting parties.'"  *Silony Med. Int'l, AG v. SWK Funding LLC*, 2024 U.S. Dist. LEXIS 29094, at *5-6 (S.D.N.Y. Feb. 20, 2024) (Torres, J.) (citing *Moran v. Erk*, 11 N.Y.3d 452 (N.Y. 2008)).  "[I]f the contract includes an expressly bargained-for clause that allows a party to exercise its discretion with no limits, the covenant cannot negate that clause."  *Id.*

Adaptors' claim appears to be based on outdated cases holding that the covenant could impose limitations on a party's contractually permitted discretion.  *See generally Goureau v. Lemonis*, 2021 U.S. Dist. LEXIS 199321, at *18 (S.D.N.Y. Oct. 15, 2021) (collecting cases).  But

as the *Goureau* court noted, "the New York Court of Appeals in *Moran v. Erk* provided further guidance." *Id.* In *Moran*, the Court of Appeals held that the covenant could not negate a contingent approval clause in a real estate contract that contained "no explicit limitations" on the approval contingency. 11 N.Y.3d at 459. After *Moran*, courts have consistently "refused to recognize a claim for breach of the implied covenant…where the contract entitles one party to exercise complete and sole discretion." *Goureau*, 2021 U.S. Dist. LEXIS 199321, at *18-20.

In *Silony*, this Court followed *Moran* in holding that the covenant of good faith and fair dealing cannot negate a contractual provision that "allows a party to exercise its discretion with no limits." *Silony*, 2024 U.S. Dist. LEXIS 29094, at *5. The 2017 Agreement "does not limit [Scholastic's] discretion" over exploitation of the Play. *Id.* at *8. The covenant cannot negate these expressly bargained-for provisions. *Id.* at *5-9.

## C. Adaptors Cannot Obtain a Declaration that the Agreement is Void

Count X seeks a declaration that the 2017 Agreement is void because the no-obligation-to-exploit provision renders the Agreement "illusory for lack of mutuality." (FAC ¶ 129.) Count X fails.

### 1. The Declaratory Judgment Claim Is Time-Barred

An action for a declaratory judgment involving contractual rights is generally governed by a six-year limitations period. *Busher v. Barry*, No. 20-3587-cv, 2021 U.S. App. LEXIS 32561, at *10-11 (2d Cir. Nov. 2, 2021) (citation omitted). This rule applies to claims seeking a declaration that a contract is void. For example, "a claim seeking a judgment declaring an option agreement void was governed by a six-year limitations period." *Id.* (citing *Kassab v. Kassab*, 137 A.D.3d 1135 (2d Dep't 2016)). The same rule applies here. The no-obligation-to-exploit provision is plain on the contract's face. Adaptors thus had to bring their declaratory judgment claim within six years of that contract's execution in 2017. They failed to do so, waiting more than a year after

the SOL expired in 2023.

### 2. The 2017 Agreement Is Not "Illusory"

Even if the declaratory judgment claim were timely, it nevertheless fails under basic principles of contract interpretation. New York law strongly disfavors an interpretation of a contract that renders it "illusory and therefore unenforceable." *Roberts v. Weight Watchers Int'l, Inc.*, 712 F. App'x 57, 60 (2d Cir. 2017). "[E]nforcement of a bargain is preferred[,] particularly where, as here, the parties have expressed their intent to be contractually bound in a writing." *Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*, 80 A.D.3d 485, 489 (1st Dep't 2011). The 2017 Agreement is valid and enforceable.

Consideration is required to form a valid contract—not mutuality. *See Weiner v. McGraw-Hill*, 57 N.Y.2d 458, 464 (1982). Adaptors ignore the substantial consideration they received in the Agreement, including Scholastic's promise to negotiate in good faith Adaptors' right to produce and sell a cast album and sheet music—which the parties ultimately memorialized in the 2018 Addendum. Standing alone, this consideration is far more valuable than the "proverbial peppercorn" that courts routinely find sufficient. *Id.* Indeed, courts will not inquire into the "value or measurability" of consideration "so long as it is acceptable to the promisee" when the contract is executed, which is the case here. *Id.; see RDF Agent, LLC v. Elec. Red Ventures, LLC*, 227 A.D.3d 424, 426 (1st Dep't 2024) ("Absent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny.").

Moreover, "a lack of mutuality of consideration at inception may be cured by subsequent performance of the parties." *Aquavit Pharms., Inc v. U-Bio Med, Inc*, 2020 U.S. Dist. LEXIS 28639, at *7 (S.D.N.Y. Feb. 19, 2020). Adaptors in fact received a license to market the Cast Album and Sheet Music. Adaptors also concede that Scholastic has licensed the Play for years and that Adaptors have received royalties. (*E.g.*, FAC ¶¶ 2, 47, 62.) Thus, "any previous lack of

mutuality was cured" by Scholastic's subsequent performance. *Aquavit*, 2020 U.S. Dist. LEXIS 28639, at *7.

*     *     *

Adaptors "take issue with the unambiguous terms of the bargain struck," but "courts are 'not free to alter the contract to reflect [their] personal notions of fairness and equity.'" *Roberts*, 712 F. App'x at 60 (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562 (2002)). The Court should "not make a new contract for the parties under the guise of interpreting the writing." *Id.* (citing *Heller v. Pope*, 250 N.Y. 132 (1928)). Counts II, VI and X fail.

## IV.  THE MISREPRESENTATION CLAIMS FAIL

Adaptors assert negligent and fraudulent misrepresentation claims (Counts VII and VIII) based on Scholastic's statement that Sony, which developed the *Goosebumps* television series, was "no longer a party" to the Play. (FAC ¶61.) Adaptors allegedly relied on this statement to spend $150,000 more than Scholastic authorized on the Cast Album in hopes that "Broadway and Off-Broadway opportunities were on the table." (*Id.*) These claims suffer from fatal deficiencies.

### A.  Adaptors Fail to Allege Reasonable Reliance

Adaptors cannot allege reasonable reliance, an essential element of both misrepresentation claims. *See Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009) (fraud); *Watson v. Riptide Worldwide, Inc.*, 2013 U.S. Dist. LEXIS 14465, at *10-11 (S.D.N.Y. Feb. 4, 2013) (negligent misrepresentation).

A party "cannot be said to have justifiably relied on a representation when that representation is negated by the terms of a contract executed by the allegedly defrauded party." *Perrotti v. Becker, Glynn, Melamed & Muffly LLP*, 82 A.D.3d 495, 498 (1st Dep't 2011); *see Phx. Cos. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 595 (S.D.N.Y. 2021) ("[A] party's reliance is unreasonable where the alleged misrepresentation is explicitly contradicted by the

23

written agreement.").  Yet that is precisely what the FAC alleges.  The 2017 Agreement provides that Scholastic has no obligation to exploit the Play *at all*, let alone take it to Broadway.  Thus, Adaptors cannot establish that they reasonably relied on the alleged misstatement to spend an additional $150,000 on the Cast Album "under the false belief that Broadway and Off-Broadway opportunities were on the table."  (FAC ¶61.)

Furthermore, the statement at issue—that "Sony is no longer a party" to the Play—was allegedly made in the context of a dispute over Scholastic apportioning royalties to Sony.  (FAC ¶¶47-49.)  Thus, the alleged statement concerned Sony's right to receive royalties—not whether Broadway or Off-Broadway opportunities were "on the table."  It was unreasonable for Adaptors to infer that such opportunities were available.

The timing of the alleged misrepresentation further undermines any purported reasonable reliance.  The alleged misstatements were made on July 16 and July 19, 2018.  (*Id.*)  Two weeks later—July 30, 2018—the parties signed the 2018 Addendum and agreed to a "$50,000 cap for the Cast Album production costs."  (FAC Ex. H, §4(a)(ii).)  Yet the FAC alleges that "Broadway cast album[s ] can cost upwards of $500,000."  (FAC ¶56.)  Adaptors cannot have reasonably believed that Broadway opportunities were on the table given their agreement—two weeks after the alleged fraud—to a monetary cap *one tenth* of what a Broadway cast album would likely cost.

### B.  The FAC Fails to Allege Scienter

Both claims should also be dismissed because the FAC fails to adequately allege scienter. Rule 9(b) "requires a complaint raising a common-law fraud claim to allege facts that create not just a plausible inference, but a *strong* inference of scienter."  *Aviles v. S&P Glob., Inc.*, 380 F. Supp. 3d 221, 282 (S.D.N.Y. 2019).  The same heightened pleading requirements apply to a negligent misrepresentation claim that, as here, "is based on the same set of facts as those upon which a fraud claim is grounded."  *Phx. Cos. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp.

3d 568, 599 (S.D.N.Y. 2021). Thus, both misrepresentation claims should be dismissed unless the FAC "specifically plead[s] facts that give rise to a strong inference" of scienter, which may be shown by "(a) alleging facts to show that [Scholastic] had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 601 (citation omitted).

The FAC alleges neither. The FAC does not even allege that Scholastic knew that Adaptors intended to spend more than $50,000, much less that the expenditure depended on whether Sony was a "party." Additionally, motive allegations suffice only if they "entail concrete benefits" that a defendant can realize through its false statements. *Id.* (citations omitted). The FAC contains the conclusion that SEI "intentionally deceived" Adaptors to spend more money on the Cast Album that—somehow—"redounded to SEI's benefit." (FAC ¶ 61.) But the FAC does not include facts supporting the speculative allegation that SEI benefitted from the additional $150,000 Adaptors chose to spend. Adaptors "have not pointed to any specific benefit that would inure" to SEI through the alleged misrepresentation. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). The motive allegations are thus "too conclusory to support scienter." *Id.*

Nor does the FAC allege "strong circumstantial evidence of conscious misbehavior or recklessness." *Phx. Cos.*, 554 F. Supp. 3d at 601. Adaptors allege that Scholastic misrepresented Sony's status while knowing that "Sony's involvement was critical to [Adaptors'] decision to invest as much as they did in the Cast Album." (FAC ¶ 113.) But this allegation is undermined by the 2018 Addendum, through which the parties negotiated a $50,000 cap on Cast Album expenditures. Moreover, Adaptors nowhere allege they told Scholastic that they were investing an additional $150,000 over the $50,000 cap. Adaptors are therefore left with "only conclusory and speculative allegations that [Scholastic] acted knowingly," which cannot suffice. *Phx. Cos.*,

554 F. Supp. 3d at 601.

### C. The Misrepresentation Claims Are Time-Barred

Both misrepresentation claims have a six-year SOL.  *See Austin v. Fordham Univ.*, 2022 U.S. Dist. LEXIS 179170, at *19 (S.D.N.Y. Sep. 30, 2022).  The alleged misstatements were made on July 16 and July 19, 2018.  (FAC ¶48.)  The parties' tolling agreement became effective on July 24, 2024—more than six years after both statements.  (*Id.* ¶69.)  Adaptors have argued previously that the claims did not accrue until Adaptors spent money on the Cast Album in 2019, but the FAC nowhere alleges when Adaptors first spent any such money.  The claims are untimely.

### D. Adaptors Fail to Allege a "Special Relationship"

The negligent misrepresentation claim separately fails because Adaptors have not alleged the requisite "special relationship of trust and confidence among the parties."  *100 & 130 Biscayne, LLC v. EE NWT OM, LLC*, 211 A.D.3d 451, 453 (1st Dep't 2022).  The parties executed an "arm's length business transaction, which precludes a claim that the parties had a relationship of trust and confidence."  *Id.*  Adaptors theorize that such a "special relationship" exists based on Gurman's "dual role as agent to both parties."  (FAC ¶109.)  But Adaptors have *no* authority for this proposition.  *Gurman's* status as Adaptors' agent cannot create a special relationship between Adaptors and Scholastic.  Moreover, "a cause of action for negligent misrepresentation requires that the special relationship exist *before* the relevant transaction, not as a result of it."  *100 & 130 Biscayne, LLC*, 211 A.D.3d at 453 (emphasis added).  Scholastic had no prior relationship with Adaptors, let alone the required special relationship.

### V. <u>THERE IS NO FIDUCIARY RELATIONSHIP BETWEEN THE PARTIES</u>

Adaptors' last-ditch attempt to recast their claims as breaches of fiduciary duty fail.  The FAC insufficiently pleads the existence of a fiduciary relationship.  "Absent extraordinary circumstances,[ ] parties dealing at arm's length in a commercial transaction lack the requisite

level of trust or confidence between them necessary to give rise to a fiduciary obligation." *Womack v. Capital Stack, LLC*, 2019 U.S. Dist. LEXIS 148644, at *24 (S.D.N.Y. Aug. 30, 2019).  For that reason, "courts have routinely held that 'no fiduciary relationship exists between a music publisher and composer as a matter of law.'"  *McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*, 2022 U.S. Dist. LEXIS 233796, at *30-31 (S.D.N.Y. Dec. 30, 2022) (quoting *Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009)).

Adaptors allege a fiduciary relationship based on Scholastic's control over "generating, collecting, reporting" and disbursing revenues.  (FAC ¶122.)  Courts routinely reject this sort of conclusory allegation.  Adaptors have alleged no facts in the FAC "that suggest that the relationship between Plaintiffs and [Scholastic] was substantially different from the one they bargained for in the Agreement."  *Mardones v. Spirit Two Music, Inc.*, 2019 U.S. Dist. LEXIS 99501, at *12 (S.D.N.Y. June 11, 2019).  Indeed, the fact that Scholastic is "contractually responsible for collecting royalties and passing them to [Adaptors] does not, in itself, create a fiduciary relationship between the parties."  *Id.* (citing *Faulkner*, 602 F. Supp. 2d at 482.)  The parties' relationship is purely contractual; the breach of fiduciary duty claim fails.

## CONCLUSION

Scholastic's motion should be granted.

27

Dated: New York, New York
       March 20, 2025

By: _/s/ Guy Cohen_

**DAVIS+GILBERT LLP**
Guy Cohen
Jacklyn M. Siegel
William S. Kukin
1675 Broadway
New York, New York 10019
(212) 468-4800
gcohen@dglaw.com
jseigel@dglaw.com
wkukin@dglaw.com

*Attorneys for Defendants Scholastic Inc. and*
*Scholastic Entertainment Inc.*

## <u>CERTIFICATION OF WORD COUNT</u>

I, Guy Cohen, an attorney duly admitted to practice law before the courts of the State of New York, hereby certify that this Memorandum of Law complies with the word count limit set forth in Section III(D) of the Court's Individual Practices in Civil Cases and Local Civil Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, because it contains 8,748 words, excluding the parts exempted by Section III(D) of the Court's Individual Practices in Civil Cases and Local Civil Rule 7.1(c).  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this Memorandum.

Dated: New York, New York
       March 20, 2025

By: */s/ Guy Cohen*
_____

**DAVIS+GILBERT LLP**
Guy Cohen
Jacklyn M. Siegel
William S. Kukin
1675 Broadway
New York, New York 10019
(212) 468-4800
gcohen@dglaw.com
jseigel@dglaw.com
wkukin@dglaw.com

*Attorneys for Defendants Scholastic Inc. and*
*Scholastic Entertainment Inc.*