UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANOMALOUS    PRODUCTION,    LLC;
DANNY ABOSCH; and JOHN MACLAY

                    Plaintiffs,

v.

SCHOLASTIC ENTERTAINMENT INC.; and
SCHOLASTIC INC.,

                    Defendants.

No. 1:24-cv-08041

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## Table of Contents

INTRODUCTION ................................................................................................................ 1

**I.    AUTHORS HAVE PLAUSIBLY PLED THEY ARE AUTHORS OF THE PLAY** ..... 3

    **A.    The Play is Not Capable of Being a Work-For-Hire** ............................................. 3

    **B.    The Statute of Limitations Has Not Run** ............................................................... 4

        **1.    The Contracts were not "Adverse" to Authors' Authorship** ................. 5

        **2.    Any Purported "Repudiation" was "Withdrawn"** ................................. 8

        **3.    Scholastic's "Authorities" are Not to the Contrary** .............................. 8

**II.    AUTHORS HAVE PLAUSIBLY PLED FRAUDULENT INDUCEMENT** ............ 10

    **A.    The Inducement Claim is Not Time-Barred** ........................................................ 10

    **B.    Authors Have Sufficiently Alleged Fraudulent Inducement** ............................... 10

    **C.    Authors Have Plausibly Pled Falsity** .................................................................. 12

**III.    AUTHORS' COPYRIGHT OWNERSHIP CLAIMS ARE PLAUSIBLY PLED** .... 15

    **A.    Neither "Work-For-Hire" Nor Statute of Limitations Foreclose the Claim** ............ 15

    **B.    Authors Have Sufficiently Pled Ownership of the Cast Album and Sheet Music** .... 16

    **C.    50/50 is "Apportionment"; 100/0 is Not** ........................................................... 17

**IV.    AUTHORS HAVE PLAUSIBLY PLED BREACH OF CONTRACT** ..................... 19

    **A.    Authors Do Not Attempt to "Re-Write" the 2017 Agreement** ............................... 19

    **B.    The 2017 Agreement Lacks Consideration** .......................................................... 21

    **C.    The Lack of Mutuality was Not "Cured"** ........................................................... 22

    **D.    The Declaratory Judgment Claim Is Not Time-Barred** ....................................... 23

**V.    AUTHORS HAVE PLAUSIBLY PLED A CLAIM FOR MISREPRESENTATION.** 23

    **B.    Authors Plausibly Allege Reasonable Reliance** ................................................... 23

    **C.    Authors Plausibly Allege Scienter** ..................................................................... 24

    **D.    Authors Plausibly Allege a "Special Relationship"** ............................................. 25

**VI.    AUTHORS HAVE PLAUSIBLY PLED BREACH OF FIDUCIARY DUTY** .......... 27

**Table of Authorities**

*Abraham v. Leigh*, No. 17 Civ. 5429 (KPF), 2019 WL 4256369 (S.D.N.Y. Sept. 9, 2019) ........ 28

*Ackoff-Ortega v. Windswept Pac. Ent. Co. (Inc.),* 120 F. Supp. 2d 273 (S.D.N.Y. 2000) ... 8, 9, 16

*Aday v. Sony Music Entm't, Inc.,* 1997 U.S. Dist. LEXIS 14545 (S.D.N.Y. Sep. 24, 1997) ..... 8, 9

*Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313 (S.D.N.Y. 2020) . 19, 21, 22

*Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329 (S.D.N.Y. 2018) ............. 13

*Aquavit Pharms., Inc v. U-Bio Med, Inc*, 2020 U.S. Dist. LEXIS 28639 (S.D.N.Y. Feb. 19, 2020) ....................................................................................................................................... 22

*Aviles v. S&P Glob., Inc.*, 380 F. Supp. 3d 221 (S.D.N.Y. 2019) ................................................ 24

*Bennett v. Judson*, 21 N.Y. 238 (1860) ....................................................................................... 14

*Berry v. Am. Cent. Ins. Co. of St. Louis*, 132 N.Y. 49 (1892) .............................................. 13, 14

*Big Cola Corp. v. World Bottling Co., Ltd.*, 134 F.2d 718 (6th Cir. 1943) ................................. 22

*Blue Planet Software, Inc. v. Games Int'l, LLC*, 334 F. Supp. 2d 425 (S.D.N.Y. 2004)............... 6

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ...................................................... 3

*Charles v. Seinfeld*, 803 F. App'x 550 (2d Cir. 2020) .................................................................. 8

*Clancy v. Jack Ryan Enters., Ltd.*, No. 17 Civ. 3371 (ELH), 2021 WL 488683 (D. Md. Feb. 10, 2021) ........................................................................................................................................ 9

*Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)........................................... 1, 3, 8

*Cortner v. Israel*, 732 F.2d 267 (2d Cir. 1984) .......................................................................... 25

*Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560 (S.D.N.Y. 2018) ................................. 24

*Est. of Kauffmann v. Rochester Inst. of Tech.*, 932 F.3d 74 (2d Cir. 2019). ................................ 5

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004) .................................................................................................................................................. 25

*Evans v. Famous Music Corp.*, 1 N.Y.3d 452 (2004)................................................................... 18

*Everly v. Everly*, 958 F.3d 442 (6th Cir. 2020).................................................................... 5, 10

*Faison v. Lewis*, 25 N.Y.3d 220 (2015).................................................................................... 23

*Fonar Corp. v. Domenick*, 105 F.3d 99 (2d Cir. 1997) ............................................................. 15

*Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322 (S.D.N.Y. 2023). .................................................................................................................................................. 27

*Horror Inc. v. Miller*, 15 F.4th 232 (2d Cir. 2021) ................................................................ 5, 6

*Inside Out Prods., Inc. v. Scholastic Inc.*, No. 90 Civ. 7233 (JSM), 1995 WL 375927 (S.D.N.Y. June 23, 1995) ........................................................................................................................ 21

*Kimmell v. Schaeffer*, 89 N.Y.2d 257 (1996)...................................................................... 25, 26

*Krasemann v. Scholastic Inc.*, No. 18 Civ. 08313 (PCT) (DWL), 2019 WL 3220535 (D. Ariz. July 17, 2019)............................................................................................................................ 13

*Lebedev v. Blavatnik*, 142 N.Y.S.3d 511 (2d Dep't 2021) ....................................................... 21

*Licette Music Corp. v. A.A. Recs., Inc.*, 196 A.D.2d 467 (1st Dep't 1993) .............................. 27

*Liggett v. Lew Realty LLC*, 42 N.Y.3d 415 (2024)................................................................... 23

*Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872 (5th Cir. 1997).......................... 4

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) ............................................... 1

*Matter of Friedman*, 64 A.D.2d 70 (2d Dep't. 1978) ............................................................... 24

*May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y. 260 (1943) .......................................... 21

*Mayer v. Dean*, 115 N.Y. 556 (N.Y. 1889) ............................................................................. 14

*Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144 (2d Cir. 2024)............................ 4

*Nelson v. Mills Music, Inc.*, 278 A.D. 311 (App. Div. 1951) .................................................. 28

*Pennolino v. Cent. Prods. LLC*, No. 22 Civ 5051 (LJL), 2023 WL 3383034 (S.D.N.Y. May 11, 2023) ...................................................................................................................................... 21

*Pentacon BV v. Vanderhaegen*, 725 F. Supp. 3d 350 (S.D.N.Y. 2024) ....................................... 10

*Phx. Cos. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568 (S.D.N.Y. 2021) ........... 25

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123 (S.D.N.Y. 2019) .................................................................................................................................................... 24

*PK Music Performance, Inc. v. Timberlake*, No. 16 Civ. 1215 (VSB), 2018 WL 4759737 (S.D.N.Y. Sept. 30, 2018) ........................................................................................................... 4

*Protex Indus. (H.K.) Ltd. v. Vince Holding Corp.*, 748 F. Supp. 3d 234 (S.D.N.Y. 2024) .......... 12

*Riverside Syndicate, Inc. v. Munroe*, 10 N.Y.3d 18 (2008) ......................................................... 23

*S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497 (S.D.N.Y. 2021) ............ 20

*Schisgall v. Fairchild Publications*, 207 Misc. 224 (N.Y. Sup. Ct. 1955) .................................. 26

*Scholastic Ent., Inc. v. Fox Ent. Grp., Inc.*, 336 F.3d 982 (9th Cir. 2003) .................................. 27

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940) ................................................ 18

*Silony Med. Int'l, AG v. SWK Funding LLC*, No. 23 Civ. 1784 (AT), 2024 WL 708773 (S.D.N.Y. Feb. 20, 2024) ........................................................................................................................... 21

*Sohm v. Scholastic, Inc.*, No. 16 Civ. 003777 (SVW), 2016 WL 11893034 (C.D. Cal. Sept. 6, 2016) ........................................................................................................................................... 13

*Steinmetz v. Scholastic Inc.*, No. 16 Civ. 3583 KSHCLW, 2017 WL 4082681 (D.N.J. Sept. 15, 2017) ........................................................................................................................................... 13

*Stewart v. Abend*, 495 U.S. 207 (1990) ......................................................................................... 1

*Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992) ......................................................................... 5

*Swan v. EMI Music Pub. Inc.*, No. 99 Civ. 9693 (SHS), 2000 WL 1528261 (S.D.N.Y. Oct. 16, 2000) ................................................................................................................................. 6, 9, 27

*Third Story Music, Inc. v. Waits*, 41 Cal.App.4th 798 (Cal. Ct. App. 1995) ............................... 20

*Tolliver v. McCants,* No. 05 Civ. 10840 (JFK), 2009 WL 804114 (S.D.N.Y. Mar. 25, 2009) ...... 8

*Universal-MCA Music Publ'g v. Bad Boy Ent., Inc.*, No. 601935/02, 2003 WL 21497318 (N.Y. Sup. Ct. June 18, 2003) ............................................................................................................... 27

*Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430 (S.D.N.Y. 2020) ........................................ 9

*Wen v. New York City Reg'l Ctr.*, LLC, 22 Civ. 7383 (LJL), 2023 WL 6317995 (S.D.N.Y. Sept. 28, 2023) .................................................................................................................................... 23

*Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917) ........................................................ 19, 22

*Wynn v. AC Rochester*, 273 F.3d 153 (2d Cir. 2001) .................................................................. 11

*Yamashita v. Scholastic Inc.*, No. 16 Civ. 3839 (SRC), 2016 WL 6897781 (D.N.J. Nov. 21, 2016) ........................................................................................................................................... 13

*Young v. New York State Elec. Gas Corp.*, 184 Misc. 1013 (N.Y. Sup. Ct. 1945) ................. 13, 14

**Statutes**

17 U.S.C. § 201(a) ........................................................................................................................... 3

17 U.S.C. § 203(a) ........................................................................................................................... 3

17 U.S.C. § 302(c) ........................................................................................................................... 3

**Other Authorities**

Restatement (Third) of Agency §5.03 ........................................................................................... 13

**Treatises**

1 Nimmer on Copyright .......................................................................................................... 6, 7, 18

2 Patry on Copyright ................................................................................................................... 4, 7

6 Nimmer on Copyright § 25.02 ............................................................................................... 4

Plaintiffs Danomalous Productions, LLC, Danny Abosch, and John Maclay (collectively, "Authors") respectfully submit this brief in opposition to the motion of Scholastic Entertainment Inc. and Scholastic Inc. (collectively, "Scholastic") to partially dismiss Authors' First Amended Complaint ("FAC").

## INTRODUCTION

Congress has long recognized that freelance playwrights and composers "are among the most vulnerable and poorly protected of all the beneficiaries [of] copyright law" and that, absent statutory protections, publishers would "use their superior bargaining position to force authors to sign work for hire agreements, thereby relinquishing all copyright rights as a condition of getting their [works] published." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 745–46 (1989). To counter this inequitable result, Congress gave authors two safeguards: (1) a "termination" right to recapture their work after 35 years; and (2) a provision limiting work-for-hire status in commission situations to nine intensely-negotiated categories.

But there was still a problem: "[i]f an agreement between an author and publisher that a work was created for hire" could make it one, "litigation-savvy publishers would be able to utilize their superior bargaining position" to "effectively eliminate an author's termination right." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 290–91 (2d Cir. 2002)*.* "[P]recisely to avoid such a result", Congress made both protections *unwaivable* by contract – indeed, "inalienable." *Stewart v. Abend*, 495 U.S. 207, 230 (1990).

Unfortunately, that hasn't stopped "litigation-savvy publishers" from looking for end-runs around Congress's clear intent.

While Scholastic now argues disingenuously that Authors "have for years misinterpreted the Agreement in an effort to stretch it to match their aspirations" (Mot. at 2), this statement

perfectly describes *Scholastic*'s conduct. It is *Scholastic* that does not hold the rights it claims, and has for a decade advanced a narrative unsupported by the language of the Parties' agreements or the law.

Scholastic also spins a false, self-serving version of the factual history in which it speculates, for example, that Authors "knew" Scholastic "insisted on owning and controlling the Play and would never have ceded critical *Goosebumps* rights to them" (Mot. at 1), when what the FAC *actually* says is that *early drafts* of the 2016 Agreement had an assignment clause, which the parties *later negotiated out*, bringing it closer to theater industry standards. (FAC ¶33). Nor does the FAC (or any of the contracts) ever limit the Play to "children's theaters, schools and camps". (Mot. at 1, 7.)

For nearly ten years, Scholastic has engaged in deception regarding its contractual obligations, withheld revenues, and induced Authors to spend their own money in the hopes of giving their show a shot at success – while little did Authors know, that was always impossible, because the company entrusted with stewarding the rights instead sold them to a third party without telling Authors (much less paying them) – all while refusing to meaningfully exploit the remaining rights (the one and only way Authors could possibly benefit from this "bargain").

But even that was not enough for Scholastic. Unsatisfied with owning the Play for 35 years while claiming "no obligation" to use it, and after coercing such ownership by dominating Authors' compromised agent (the sole person trusted with looking out for their interests), Scholastic decided that it needed *the entire copyright term*, guaranteeing that Authors will never in their lifetimes get to enjoy the art they made as they wish – even foreclosing any possibility of leaving this legacy to their children.

Now, when Authors stand up for themselves, asserting their legal rights to the one thing Scholastic can't take from them (because Congress, foreseeing this problem, specifically made it so), Scholastic concocts a plan to take that too.

Scholastic, it turns out, is lousy at exploiting Plays – but great at exploiting *Playwrights*.

## I.    AUTHORS HAVE PLAUSIBLY PLED THEY ARE AUTHORS OF THE PLAY

### A.  The Play is Not Capable of Being a Work-For-Hire

Scholastic's arguments on its Rule 12(b)(6) motion[1] largely rely on an erroneous premise: that the Play constitutes a "work-for-hire" under the Copyright Act, and that Scholastic "is thus 'considered the author'". (Mot. at 11.) But based on clear statutory language, the Play *cannot* constitute a "work-for-hire". Thus, the *Authors* – not Scholastic – are its authors, and, at least "initially" (17 U.S.C. § 201(a)), its owners.

"The contours of the work for hire doctrine [carry] profound significance for freelance creators". *Reid*, 490 U.S. at 737. It determines not only authorship, but also copyright duration, and the author's termination rights. *See* §§ 302(c); 203(a). The Act thus provides that a work may only be "for hire" if prepared by an employee (a context not at issue here, *see* FAC ¶43), or if (among other requirements) it falls under one of nine categories.

These nine categories are exhaustive, and followed with "[s]trict adherence", arising from a "historic compromise" between publishers and authors. *Reid*, 490 U.S. at 745–46. Examples of works that do *not* fit the categories are "sculptures" (*Reid*, 490 U.S. at 738), "purely audio works"

---

[1] Scholastic attempts to introduce a "License Agreement" that Authors had never seen in 2016-17 to spin a misleading narrative about the parties' intent in contracting at that time. (Mot. at 4 n.2) While a court may consider documents "integral" to or "incorporated by reference" in a complaint, "mere notice or possession is not enough" as "*reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Here, Authors could not have *relied* on it, because they lacked possession of it, despite asking for it many times. It also apparently was signed *after* the 2016 Agreement.

(*Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 878 (5th Cir. 1997)), "novels", and – critically here – "other unified literary works such as biographies, histories, **and plays**". 2 <u>Patry on Copyright</u> § 5:75 (emphasis added).

The "Approved Production Contract" is "the *de facto* standard for contracts governing dramatic works" in the United States. 6 <u>Nimmer on Copyright</u> § 25.02. Its "central distinguishing feature" is "the term providing that individual authors […]  retain the copyright in their individual contributing work and merely license the producer to use that work in the play. This retention of the copyright by the authors is not subject to negotiation." *Id.* As noted the FAC notes, "[t]his standard theatrical arrangement regarding copyright ownership" applies "even when the producer has commissioned the work, and even when the commissioned work is to be based on an existing work". <u>Nimmer</u>, § 25.01. It stands "in marked contrast to the motion picture context, in which a corporate production entity invariably owns the copyright [and] is deemed the 'author'". *Id.*

Scholastic does not dispute the unequivocal statutory language, nor can it. Scholastic also makes no attempt to argue that a dramatic work is capable of being a work-for-hire under §101(2). Indeed, as recently as November 2024, Scholastic itself conceded that Authors "are the authors of the Play". FAC ¶¶71, 73. Instead, Scholastic's only apparent argument is that the Authors are "now time-barred from challenging" the Play's work-for-hire status. (Mot. at 11.)

### B.  The Statute of Limitations Has Not Run[2]

Scholastic argues that there is a *third* way for a work to become a work-for-hire: a publisher can contract with an author, leverage its bargaining power to insert routine, invalid work-for-hire

---

[2] If there is "even 'some doubt' as to whether dismissal is warranted", a court should not dismiss on SOL grounds. *PK Music Performance, Inc. v. Timberlake*, No. 16 Civ. 1215 (VSB), 2018 WL 4759737, at *7 (S.D.N.Y. Sept. 30, 2018) (citations omitted). A plaintiff is "under *no obligation* to plead facts supporting or negating" SOL. *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 154 (2d Cir. 2024).

language, and hope the author does not timely sue. The mere presence of such language – the theory goes – *requires* the author to sue the publisher within three years of contract execution, or else lose authorship status forever. Scholastic further contends that, should the author not bring suit, this preempts all other concerns; a court need not (indeed *must not*) question whether the work even qualifies as work-for-hire under the statute – it *magically* becomes one regardless, with the publisher as its "author", through the mere passage of time. Through this crafty workaround, an author's "inalienable" termination right can, in fact, be alienated.

This fatally-flawed argument compels an entirely nonsensical result. Essentially, Scholastic asks this Court to "endors[e] a fiction of two separate authors," the Authors from 2015-2020, and Scholastic thereafter. *Est. of Kauffmann v. Rochester Inst. of Tech.*, 932 F.3d 74, 78 (2d Cir. 2019).

### 1. The Contracts Were Not "Adverse" to Authors' Authorship

Although some courts have held that, for statute of limitation purposes, authorship claims accrue "when plain and express repudiation of authorship is communicated to the claimant" (Mot. at 8) (citing *Horror Inc. v. Miller*, 15 F.4th 232, 257 (2d Cir. 2021)), even assuming *arguendo* that the "express repudiation" rule controls here,[3] not just *any* alleged repudiation will do; it must be (a) plain; and (b) express – that is, clearly communicated to the party. It also "must *actually be adverse* to the plaintiff's authorship status." *Everly v. Everly*, 958 F.3d 442, 453 (6th Cir. 2020) (emphasis added). Ignoring this last requirement, Scholastic argues that the presence of work-for-

---

[3] The fundamental problem with the "express repudiation" doctrine (a "rule" invented by courts in the 1990s and not found in the Copyright Act or Supreme Court jurisprudence) is that it "treats copyright ownership or authorship as a complete 'claim,' not as a legal element of a separate claim." *Everly*, 958 F.3d at 460 (Murphy, J., concurring). But "ownership" is not a claim; it is an element of an "infringement" claim. "[S]tatutes of limitations bar remedies, not the assertion of rights." *Stone v. Williams*, 970 F.2d 1043, 1051 (2d Cir. 1992).

hire language in *any* contract, at *any* time, ends the inquiry. In Scholastic's view, it does not matter (1) why the language was inserted; (2) what the parties understood it to mean; (3) whether other contracts indicated otherwise; or (4) whether either party was aware its rights were disputed.

In *Horror*, the court explained that "a copyright notice cannot serve as express repudiation of authorship because the notice [can be] entirely consistent with another's authorship". 15 F.4th at 257. Also insufficient was a copyright registration form "identif[ying] the Film itself as a work for hire." *Id.* at 258. The Second Circuit thus concluded "without difficulty" that the authorship claim was timely. *Id.* at 259. Similarly, courts have held that words in a contract are not alone sufficient "repudiation," if it is not clear the other party disputes their meaning. *See, e.g., Swan v. EMI Music Pub. Inc.*, No. 99 Civ. 9693 (SHS), 2000 WL 1528261, at *3 (S.D.N.Y. Oct. 16, 2000) (claim regarding disputed work-for-hire agreement survived dismissal); *Blue Planet Software, Inc. v. Games Int'l, LLC*, 334 F. Supp. 2d 425, 440 (S.D.N.Y. 2004) (ownership claim based on old ambiguous contracts not untimely).

Here, the language in question is not "adverse", given the context. Authors made crystal clear to Scholastic they believed the provision was ineffective; Scholastic did not challenge this, indicating only that the language was "company policy." (FAC ¶¶31; 65-66; Ex. B.) Although Scholastic now attempts to spin this into a "repudiation" (Mot. at 10), it cannot constitute a repudiation (much less a "plain and express" one), as both parties understood that it was ineffective on its face.

While Scholastic is far from the first company to demand this kind of clause – publishers have been trying it for decades – it is nevertheless axiomatic to copyright law that calling something work-for-hire does not make it so, if the work cannot qualify. Thus, including such language is not "adverse" to a playwright's authorship rights – it is a mere nullity. *See, e.g.,* 1

Nimmer on Copyright § 5.03 n.121.68 (recording artists sign because they "believe work for hire provisions of their contracts to be unenforceable"); 2 Patry on Copyright § 5:77 ("equally plausible" signature indicates only "artist's belief that the endorsements were invalid and thus signing [could] not result in a surrendering of his rights"; therefore "any ambiguity of intent […] should be construed in favor of the creator").

Scholastic points to similarly ineffective language in the 2016 Agreement – a position which requires it to overlook the same agreement's express provision stating that "all copyright filings" must "accurately cite Adaptors' authorship of the Play." (FAC ¶37.) While Scholastic now insists it was not a party to that agreement, Scholastic cannot have this both ways – either the 2016 Agreement repudiated *nothing*, or it repudiated *Scholastic's* purported "authorship" as much (or more) than anyone's. (Scholastic fails to address how the Orchestrations *ever* could be work-for-hire, as they were expressly carved out of the definition under the 2016 Agreement and completed before the 2017 Agreement existed. (FAC ¶ 36.).)

Scholastic tries its hardest to manufacture a conclusion that Authors somehow "learned that Scholastic considered the Play a work-for-hire" in 2015 (Mot. at 8, 5.) But nowhere does the FAC say this – nor is it plausible that a leading book publisher could so fundamentally misunderstand basic copyright law. At most, the cited FAC paragraphs say that Scholastic "insisted on the inclusion of (ineffective) work-for-hire language in its contracts" (FAC ¶¶31; 65), which is *entirely different* from the notion that Scholastic *actually believed the Play to be* a work-for-hire.

In short, there was no reason for any of these events to suggest to Authors there was an "actual controversy" over their authorship that they needed to run to the courthouse to resolve within three years. Despite Scholastic's efforts to coerce by contract what it could not obtain by

statute, the inescapable fact is that authorship is determined by "the actual relationship between the parties, rather than the language of their agreements." *Simon,* at 291.

## 2. Any Purported "Repudiation" Was "Withdrawn"

Even assuming *arguendo* there were any effective "repudiations" prior to 2021, Scholastic withdrew them in November 2024 by making the unequivocal statement that "Defendants agree that Abosch and Maclay are the authors of the Play." FAC ¶¶71-72. Scholastic's counsel emphasized this by stating that "[y]ou and I both know what does and does not constitute a 'work made for hire' under the Copyright Act. [...] I now have Scholastic's approval, and I am confident that its position will not change." FAC ¶72. *See Ackoff-Ortega v. Windswept Pac. Ent. Co. (Inc.),* 120 F. Supp. 2d 273, 280 (S.D.N.Y. 2000), *aff'd* 46 F. App'x 663 (2d Cir. 2002) (authorship claim regarding 1967 work-for-hire agreement timely in 1999 where publishing company "subsequently withdrew its purported repudiation" by making inconsistent statement); *see also Tolliver v. McCants,* No. 05 Civ. 10840 (JFK), 2009 WL 804114, at *12 (S.D.N.Y. Mar. 25, 2009), aff'd, 486 F. App'x 902 (2d Cir. 2012).

## 3. Scholastic's "Authorities" are Not to the Contrary

Scholastic's reliance on *Charles v. Seinfeld*, 803 F. App'x 550, 552 (2d Cir. 2020) is misplaced. *Charles* involved a plaintiff who was not paid or credited, but still did not sue for years. *Charles* does not stand for the proposition that executing a purported work-for-hire contract triggers the statute of limitations, because (among other reasons) *there was no contract*.

Scholastic ultimately cites *Aday v. Sony Music Entm't, Inc.,* 1997 U.S. Dist. LEXIS 14545 (S.D.N.Y. Sep. 24, 1997), as "directly on point". But it is easily distinguishable, and had nothing to do with statutory termination. The issue in *Aday* was whether Meat Loaf was an "employee" under the more lenient 1909 Act (*see Reid*, at 744) – a question not categorically impossible (unlike

8

here). The case concerned ownership more than authorship, and turned on an argument the complaint apparently "fail[ed] to explain." *Id.* at *4. *Aday* is an anomalous decision, never appealed, which many subsequent cases have not followed. *See Clancy v. Jack Ryan Enters., Ltd.*, No. 17 Civ. 3371 (ELH), 2021 WL 488683, at *5 (D. Md. Feb. 10, 2021) (SOL not triggered when author signed agreements stating "I also unconditionally guarantee that the Work is a work made for hire"); *Swan* (disputed work-for-hire agreement not repudiation); *Ackoff-Ortega* (claim timely decades after work-for-hire agreement).

Moreover, *Aday* was distinguished by *Waite v. UMG Recordings, Inc.,* 450 F. Supp. 3d 430, 438 (S.D.N.Y. 2020), which did involve statutory termination and the §101(2) categories:

> That the statute of limitations would begin to run against an artist the day the contract is signed would be incongruent with a termination right that does not vest for at least thirty-five years from that date. The explicit purpose of Section 203 reinforces the conclusion that plaintiffs' copyright claims could not have accrued upon the signing of their contracts. … To restrict the termination right based on the artist's failure to bring a claim within three years of signing a recording agreement – a time during which the artist and recording company may still have disparate levels of bargaining power – would thwart Congress's intent and eviscerate the right itself.

And in direct parallel to the case at hand:

> Defendant's argument is weakened further by the music industry's practice of frequently inserting "work made for hire" language into recording contracts. Its position requires that many artists, often early in their careers, would confront a choice when presented with a "works made for hire" provision. They could refuse to sign the contract and jeopardize their chance for the record company to record or distribute the artist's music. Or the artist could sign the contract and then bring a claim within three years to dispute the effect of the "work made for hire" provision in order to protect the copyright. Either outcome would be inconsistent with Section 203.

*Id.*

Congress's intent was to give Authors an inalienable termination right; it could not have intended that right to be "thwarted" by the statute of limitations. That Scholastic now attempts to

leverage its corporate dominance to assert authorship by relying on language—that all parties understood to be meaningless—while claiming it is too late for Authors to challenge it, is a profoundly bad faith attempt to capture rights that it never had.[4]

## II.   AUTHORS HAVE PLAUSIBLY PLED FRAUDULENT INDUCEMENT

### A.  The Inducement Claim is Not Time-Barred

The statute of limitations is the greater of (a) six years from accrual or (b) two years from the time the plaintiff discovered or could have with reasonable diligence discovered the fraud. CPLR § 213(8). Scholastic's counsel's statement in November 2024 that Scholastic's purported ownership of the Play arose from the 2016 Agreement – which Scholastic previously claimed did not bind it – was the first time Scholastic gave any indication to Authors that it had made fraudulent statements when negotiating and executing the 2017 Agreement. (FAC ¶¶65-76.)

Contrary to Scholastic's assertions (Mot. at 16), the triggering of the discovery rule has nothing to do with what "former" employees "knew." What is required is something indicating that further inquiry is necessary, and Scholastic's 2024 statement through counsel was sufficient.

### B.  Authors Have Sufficiently Alleged Fraudulent Inducement

An inducement claim need only plausibly allege that defendant (i) made a material false representation,  (ii) intended to defraud plaintiff thereby, (iii) plaintiff reasonably relied upon the representation, and (iv) plaintiff suffered damage as a result . *Pentacon BV v. Vanderhaegen*, 725 F. Supp. 3d 350, 375 (S.D.N.Y. 2024). A false representation may be either by affirmative

---

[4] Scholastic assumes that if Authors' authorship claim were somehow time-barred, the Play is automatically deemed a work-for-hire and Scholastic becomes its "author" (Mot. at 11),  but authorship is a *factual* question, and even when courts have found declaratory claims untimely, the defendant does not implicitly win a mirror-image claim never  brought. *See Carell v. Shubert Org., Inc*., 104 F. Supp. 2d 236, 254 (S.D.N.Y. 2000); *Everly v. Everly*, 536 F. Supp. 3d 276, 293 (M.D. Tenn. 2021)

statement or omission of a material fact. *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001). Although Authors believe some of Gurman's statements constituted affirmative misrepresentations, they focus here on her omission of key facts.

Authors plausibly allege that (1) Susan Gurman, in her capacity as Scholastic's agent, falsely represented that Scholastic was not bound by the 2016 Agreement, despite its knowledge of it and acceptance of benefits therefrom, and would instead be entering into a "side agreement" directly with Authors that mirrored the same rights and obligations (FAC ¶34); Scholastic did so to induce Authors to create the Play and then surrender their rights by forcing upon them a much less favorable agreement once the work was completed, providing them little choice but to sign away their rights or forego any future for the Play (FAC ¶4, 34; 85, 89);  Authors reasonably relied on these representations because of Scholastic's "superior knowledge on the subject, and Authors' confidential and trust relationship" with Scholastic and Gurman. (FAC ¶90); Authors have suffered damage because the representations induced them to relinquish "their right to independently license" the Play; "ownership of" the Play; "licensing royalties"; and "all other rights that were surrendered to [Scholastic] under the 2017 Agreement" (FAC ¶93).

Scholastic claims the FAC does not identify the misrepresentations; this is untrue. Authors "made clear to Gurman that [they] were uncomfortable entering into a rights deal […] for [Scholastic's] benefit if [Scholastic] itself was not bound by that agreement" (FAC ¶34), and rather than correcting this assumption, Scholastic strung Authors along for a year under the false belief it would send an identical side agreement, only to pull a bait-and-switch. The FAC also clearly alleges that the misrepresentations occurred "in email correspondence in February 2016" (*id.*), and not, as wrongly alleged by Scholastic, over a twelve-month span without the "location and method

of communication." (Mot. at 16). The FAC clearly identifies the "speaker" as Susan Gurman. (FAC ¶34.)

In the case of fraud by omission, "[w]here one party possesses superior knowledge, not readily available to other, and knows that the other is acting on the basis of mistaken knowledge," such party has a duty to disclose. *Protex Indus. (H.K.) Ltd. v. Vince Holding Corp.*, 748 F. Supp. 3d 234, 253 (S.D.N.Y. 2024). In "the context of business negotiations where parties are entering a contract […] such a duty usually arises." *Id.* Gurman (who had duties and interests on both sides of the deal) knew Authors were acting on mistaken knowledge in the context of an (unequal) business negotiation and withheld the fact that Scholastic was already bound to honor the terms of the 2016 Agreement. Had she not done so, Authors would never have agreed to a subsequent contract severely curtailing rights they had heavily negotiated for. FAC ¶35.

Lastly, Scholastic's attempt to defeat Authors' reliance on its omission because they "failed to discharge their duty to inquire" (Mot. at 19) is baffling. The paragraph Scholastic cites for the proposition that Scholastic's behavior should have triggered further inquiry explicitly states that Authors *did* raise the issue of Scholastic being bound by the 2016 Agreement in the run-up to the 2017 Agreement, and Gurman lied about it by omission. (¶40 ("Gurman, on behalf of SEI, never corrected or contradicted this understanding on the part of Authors.").)

### C.  Authors Have Plausibly Pled Falsity

While Scholastic argues (inconsistently) that Authors have not pled falsity because "in fact, SEI was ***not*** bound by the 2016 Agreement", that any statements or omissions were mere "opinions" about the legal effect of the agreement, that "[a]t most, SEI was a third-party beneficiary of certain provisions", and that it may cherry-pick those benefits without being bound to other provisions (Mot. at 17), the law is to the contrary. Scholastic itself routinely argues the

opposite when advantageous. *See, e.g., Krasemann v. Scholastic Inc.*, No. 18 Civ. 08313 (PCT) (DWL), 2019 WL 3220535, at *5 (D. Ariz. July 17, 2019) ("Scholastic also argues Photographer Plaintiffs are required to arbitrate because they were intended beneficiaries of the [agreements]. By receiving a percentage of the fees from the invoices, Scholastic argues, Photographer Plaintiffs 'must be bound to [the agreements'] terms.'"); *Sohm v. Scholastic, Inc.*, No. 16 Civ. 003777 (SVW), 2016 WL 11893034, *3 (C.D. Cal. Sept. 6, 2016). Scholastic ignores its own on-point case law in favor of an odd handful of "bill of lading" cases (Mot. at 17) to argue that it can reap the benefits of an agreement without being bound. But Scholastic omits the crucial caveat in those cases: that beneficiaries *are* bound if they "exhibited acceptance" or consented "through an agency relationship with one of the contracting parties." *Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329, 338 (S.D.N.Y. 2018).

Here, Susan Gurman was Scholastic's agent. (Mot. at 5.) Gurman was the driving force behind the 2016 Agreement, which secured financial benefits for Scholastic in exchange for promises to Authors. (FAC ¶¶31-38.) As Scholastic is aware, "[a] principal is bound by the actions taken by its agent." *Sohm*, 2016 WL 11893034, at *2. "For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal." *Yamashita v. Scholastic Inc.*, No. 16 Civ. 3839 (SRC), 2016 WL 6897781, at *2 (D.N.J. Nov. 21, 2016) (quoting Restatement (Third) of Agency §5.03); *Steinmetz v. Scholastic Inc.*, No. 16 Civ. 3583 KSHCLW, 2017 WL 4082681, at *2 (D.N.J. Sept. 15, 2017) ("widely accepted that non-signatory third-parties who are closely related to [a] contractual relationship are bound").

Instructive here is *Berry v. Am. Cent. Ins. Co. of St. Louis*, 132 N.Y. 49, 53–54 (1892), which "has been frequently cited with approval." *Young v. New York State Elec. Gas Corp.*, 184

Misc. 1013, 1016 (N.Y. Sup. Ct. 1945). In *Berry*, plaintiff was misled by an insurance company's agent to believe that his "policy was void, when in fact it was valid", and settled the policy for less than it was worth. Even if this was a misrepresentation of law, innocently made, it still "emanat[ed] from the [principal]" and "any knowledge or information which any of the [principal's] agents received during the transaction with the plaintiff is by law imputed to it". The Court of Appeals held:

> there was here more than a mistake. There was a surrender of legal rights intentionally induced and procured by a false representation as to the law governing the case. The defendant must be presumed to have known that it was liable for the whole loss and by falsely representing that under the law applicable to the case the policy was void, when in fact it was valid, it induced the plaintiff to rely upon the superior knowledge that it possessed upon the subject and to surrender to it his claim. This clearly constituted fraud ….

*Id.*

Likewise, it matters not whether Scholastic had "actual" knowledge of what Authors had been promised, nor whether it was a "mistake of law" that led the Authors to surrender their legal rights by entering the 2017 Agreement. It does not even require any individual Scholastic employee or agent to have acted in bad faith. Scholastic "must be presumed to have known" that it was bound by the 2016 Agreement, and "by falsely representing that under the law applicable to the case the [agreement] was void, when in fact it was valid," Scholastic fraudulently induced the 2017 Agreement.

Scholastic had a choice when it learned what Gurman had promised. It could have rescinded upon "complete restitution" (*Bennett v. Judson*, 21 N.Y. 238, 239–40 (1860)) or accepted the (entire) bargain. But what it *could not* do was "retain the benefits of a contract obtained through the misrepresentations of [its] agent." *Mayer v. Dean*, 115 N.Y. 556, 561 (N.Y.

14

1889). Scholastic elected to retain the benefits rather than rescind. Thus, it was bound. That it now denies this (Mot. at 16) does not change a thing.

## III.    AUTHORS' COPYRIGHT OWNERSHIP CLAIMS ARE PLAUSIBLY PLED

First, "[a] certificate of copyright registration is prima facie evidence that the copyright is valid. 17 U.S.C. § 410(c)" *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997). Authors registered their work (FAC ¶54). Scholastic has not rebutted the presumption.

### A.  Neither "Work-For-Hire" Nor Statute of Limitations Foreclose the Claim

First, as discussed, neither the Play, nor Compositions, were created on a work-for-hire basis – nor could they have been. Thus, the ownership claims are not "foreclose[d]". Mot. at 11.

Second, the 2018 Addendum clarified not only that "all copyrights in and to the Cast Album and Sheet Music shall be and remain solely-owned" by Authors, but that such ownership status prevails over anything to the contrary in any prior agreements. FAC ¶50, Ex. H. As alleged (FAC ¶95), the Compositions, Orchestrations and Arrangements comprise such "copyrights in and to" the Cast Album – a position Authors believed to be undisputed until October 2021, when Scholastic first took the position that it nevertheless believed it owned the Compositions. FAC ¶58. "Express repudiation" would have occurred, if at all, only at that time.

Scholastic continues to misunderstand that Authors' ownership does not arise from contract; it arises under §201(a) of the Copyright Act. Therefore, there is no reason for contracts to have triggered anything. Obviously, a copyright owner does not need to sue every time they enter a contract, especially one not "adverse" to their rights. Scholastic's *real* argument is that because *Scholastic itself* supposedly harbored an alternate interpretation of those contracts, Authors should have intuited that they needed to sue over a dispute nobody had yet communicated. But a repudiation is hardly "express" if it is not communicated *at all.*

Lastly, even assuming *arguendo* that Authors' ownership in the compositions was somehow "repudiated" prior to 2021, Scholastic "withdrew" this repudiation when it stated, in an October 6, 2021, email, that "the copyright and ownership of the music is yours." FAC Ex. I (ECF 28-1, p. 73.) *See Ackoff-Ortega*, 120 F.Supp 2d at 280.

**B.  Authors Have Sufficiently Pled Ownership of the Cast Album and Sheet Music**

It is undisputed that Authors solely-own "all copyrights in and to" the Cast Album and Sheet Music. FAC Ex. H, Mot. at 7. The dispute concerns the meaning of those terms. Scholastic argues that "Cast Album" is somehow limited to "sound recording", a conclusion it reaches by pointing to the words "sound recording" but ignoring the words "original music" in the same sentence (Mot. at 7), as well as the fact that "artwork" is not a "sound recording. As for "Sheet Music", Scholastic never explains what this term includes, if not compositions.

Importantly, Scholastic also obfuscates the definition of "Play", claiming that it "is defined to include 'all components' of the Play and expressly incorporates the musical compositions". (Mot. at 13.) But this is the definition of "Rights", not "Play". FAC Ex. F, §5(a). "Play" as a capitalized term is not defined in §5(a), it is defined in the agreement's preamble (unhelpfully) as "a musical play". Undoubtedly, Scholastic now wishes it had used "Rights" in the alternate assignment clause instead of "Play" – but it didn't.

Admittedly, the definitions in this agreement are not a paragon of clarity. For example, "Compositions" is defined as "songs and [] lyrics", but songs *contain* lyrics, and later, "Lyrics" and "Compositions" appear separately in the same list (but "Music" does not). The drafting has understandably led to confusion. However, that is all the more reason that dismissal is inappropriate.

Further, even under Scholastic's reading, Authors would *still* own the components of the Cast Album and Sheet Music at present. Even if language that did not mention "compositions" could somehow have transferred them in 2017, the "solely-owned" language in 2018 can only be interpreted as having transferred back such rights. FAC ¶¶52, 95. Moreover, if "Play" is read to include unenumerated components, the same construction must apply to "Cast Album" and "Sheet Music".

Scholastic plainly disagrees, but disagreement does not provide a basis for dismissal; it is indeed why the parties are before the Court. Mot. at 14. While Authors believe their interpretation is correct, to the extent the Court finds that Scholastic has proffered a plausible alternative reading, the contractual language is therefore clearly ambiguous, requiring extrinsic evidence.

Finally, Scholastic misunderstands ¶2 of the 2018 Addendum. Plays often have more than one Cast Album. The Copyright Act provides for "compulsory" licenses for making and distributing phonorecords (§115). A third-party could therefore obtain a compulsory mechanical license to the *Compositions*, in order to make a subsequent Cast Album, but would still need a license to any elements of the *Play* desired to be used on the album (compulsory licenses apply only to "nondramatic" musical works). Once the Exclusive Period expires, Scholastic can grant such licenses (non-exclusively). The language is not "meaningless" – it is just a situation that hasn't yet occurred.

### C. 50/50 is "Apportionment"; 100/0 is Not

The Parties hotly dispute the term "apportionment" in ¶3 of the 2018 Addendum. Mot. at 13-14. Scholastic urges a reading requiring the Parties to have intended the second sentence as rendering the first sentence entirely meaningless. It apparently reads that sentence as saying the parties "do not intend to modify, in any manner, *Scholastic's ownership of the Book, Play, and*

*Compositions*." But if the parties had meant that, they could have said so. The parties clearly intended *something* to be "solely-owned by Adaptors", but Scholastic struggles to identify what it could be. "Sheet Music" for example, excludes "Compositions" (according to Scholastic), and includes … "the ***sheet music*** itself". (Mot. at 14) What is that? Scholastic won't say.

However, "apportionment" *does* have a specific meaning as a term of art in copyright law. It means the division of money, such as profits or royalties from use of a work. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 396 (1940) ("[I]n computing an award of **profits** against an infringer of a copyright, there may be an **apportionment**…") (emphasis added); *Abend v. MCA, Inc.*, 863 F.2d 1465, 1480 (9th Cir. 1988) ("**apportioning** profits is not always an easy task […] **profits** should be **apportioned** […] 'no real standard' can govern this **apportionment**…") (emphasis added); *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 454 (2004) (interpreting how "income from the exploitation of songs must be apportioned" in songwriter/publisher contract). In fact, even Scholastic's own brief uses it this way. (Mot. at 24) ("…a dispute over Scholastic **apportioning** royalties to Sony.") (emphasis added)

Scholastic not only ignores this industry usage, but also its colloquial definition. Scholastic argues that it owns 100% of everything under the 2017 Agreement, Authors own 0%, and the 2018 Addendum does not "modify" this. Yet apportionment means dividing something into portions. A 50/50 split is apportionment. But 100/0 is not. 1 <u>Nimmer on Copyright</u> § 3.07 ("an apportioned amount (i.e., less than 100%)").  Confirming that the Parties did not mean what Scholastic contends is ¶7 of the 2017 Agreement, in which the word "Portion" appears four times, in the context of dividing royalty revenues 50/50. The same paragraph apportions the "right to share in revenue" – mirroring the "apportionment of rights" language used in the 2018 Addendum.

Admittedly, "rights" was a poor drafting choice in an agreement also dealing with "copyrights". (As they say, hindsight is apportioned 20/20.) But in the context of the prior agreement, it is evident that Authors' interpretation makes sense, and Scholastic's does not. The sentence simply preserves the existing 50/50 apportionment of the "right to share in revenue".

## IV.    AUTHORS HAVE PLAUSIBLY PLED BREACH OF CONTRACT

### A.  Authors Do Not Attempt to "Re-Write" the 2017 Agreement

Assuming the 2017 Agreement is not rescinded Scholastic breached its implied covenant of good faith and fair dealing by failing to make reasonable efforts to license the Play, notwithstanding Scholastic's insistence that it has "no obligation" to make reasonable efforts – or indeed *any* efforts. (FAC ¶106; Mot. at 20.)

The cases Scholastic cites all involved contracts otherwise supported by ample consideration. In contrast, the sole consideration contemplated by the 2017 Agreement is the potential for Authors to earn licensing revenue– subject to a condition entirely within Scholastic's control. Like the seminal *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1917), Authors' "sole compensation for the grant of an exclusive agency [was] to be one-half of all the profits resulting from [Scholastic's] efforts. Unless [Scholastic] gave [such] efforts, [Authors] could never get anything. Without an implied promise, the transaction cannot have such business 'efficacy, as both parties must have intended".

"New York law may imply into an agreement an obligation that a licensee must use reasonable efforts to exploit the licensed products." *Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 321 (S.D.N.Y. 2020) ("settled law" that courts imply duty on exclusive licensees to exploit with due diligence, "to give meaning and effect to the contract as a whole"). "The reasoning of these decisions is that it would be unfair to place the productiveness of the

licensed property solely within the control of the licensee, thereby putting the licensor at his mercy, without imposing an obligation to exploit upon the licensee." *Id.*

While Scholastic attempts to recast the debate to be about Broadway (Mot. at 20), make no mistake: it is truly arguing that it should have no obligation, *period*. Even "reasonable efforts" is more than Scholastic will accept. If this count is dismissed, Scholastic will undoubtedly view this as permission to lock up the Play and never touch it again.

Contrary to Scholastic's assertions, "the implied covenant of good faith is also applied to contradict an express contractual grant of discretion when necessary to protect an agreement which otherwise would be rendered illusory and unenforceable." *Third Story Music, Inc. v. Waits*, 41 Cal.App.4th 798, 806 (Cal. Ct. App. 1995). In *Seymour Grean & Co. v. Grean*, 274 A.D. 279, 280 (App. Div. 1948), for example, a contract specified a monthly salary to an employee and that he need "devote only such time to the [business] as he in his sole judgment shall deem necessary." The majority held he "was required to render some substantial services and had to act in good faith". The dissent deemed the contract illusory and void. *Neither* would have enforced as written.

Despite Scholastic's arguments about *Moran,* this court has previously clarified that "*Moran* [does] not relieve the court of the need to […] examine the contract as a whole to determine, based on its language, whether the unfettered exercise of discretion would deprive a party of the fruits of the agreement and render a contractual promise illusory." *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC,* 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021). Thus, the holder of an exclusive right "cannot automatically relieve itself of the obligation to exercise that contractual right in good faith by the simple expedient of adding the language 'sole discretion,' if the failure to act in good faith would render the contract illusory." *Id.* When necessary to avoid "depriv[ing] a contracting party of the 'fruits of the contract' – the courts will not hesitate to infer an obligation

to act in good faith." *Id; see also Silony Med. Int'l, AG v. SWK Funding LLC*, No. 23 Civ. 1784 (AT), 2024 WL 708773, at *3 (S.D.N.Y. Feb. 20, 2024) (recognizing same exception).

If this contract has any "fruits", Authors can only receive them through Scholastic's efforts. The court must, therefore, infer an obligation to act in good faith. Otherwise, it must declare the contract illusory.

### B.  The 2017 Agreement Lacks Consideration

Scholastic argues that contracts do not require "mutuality" (Mot. at 22); however, a contract "may be illusory for lack of mutuality of obligation." *Advanced Water Techs.*, 457 F. Supp. 3d at 320.

Scholastic next argues that the elusive consideration was "Scholastic's promise to negotiate in good faith Adaptors' right to produce and sell a cast album and sheet music" (Mot. at 22.) But that cannot constitute consideration. First, as Scholastic knows, "an agreement to agree and to negotiate in the future [...] is unenforceable." *Inside Out Prods., Inc. v. Scholastic Inc.*, No. 90 Civ. 7233 (JSM), 1995 WL 375927, at *3 (S.D.N.Y. June 23, 1995); *May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 264 (1943).

Second, "[i]t is axiomatic that past consideration cannot support the formation of a new contract" *Pennolino v. Cent. Prods. LLC*, No. 22-CV-5051 (LJL), 2023 WL 3383034, at *15 (S.D.N.Y. May 11, 2023), "because the detriment did not induce the promise." *Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 517 (2d Dep't 2021).

Under §201(a) of the Copyright Act, Authors owned the Play and Compositions from the moment of fixation. As the owners, it was their exclusive right to produce and sell a cast album and sheet music (§106). The 2016 Agreement did not have an assignment clause, and thus did not change this. The 2017 Agreement, therefore, *reduced* Authors' rights in this regard – trading a

right they already had for the mere promise to negotiate for that right, in a much more limited

form. Obviously, the mere promise to negotiate for what one already has is not "consideration".

Scholastic's argument about licensing royalties fails for the same reason. Authors already

had the right to license (and earn royalties therefrom) prior to the 2017 Agreement. The 2017

Agreement *reduced* that right.

The question thus remains: what did Authors actually get in the 2017 Agreement that they

did not already have?

### C.  The Lack of Mutuality was Not "Cured"

While there may be circumstances where a lack of mutuality may be "cured" (Mot. at 22),

this is not one of them.

What Scholastic is *really* arguing is that once Scholastic engaged in *any* licensing, its

obligations were met for *all time*. As should be obvious to anyone in the entertainment industry,

that is nonsensical, and could not have been what the Parties intended. Indeed, "[t]he caselaw does

not tolerate 'that one party [will] be placed at the mercy of the other,' **even for just one year**"

*Advanced Water Techs.* (*citing Wood*) (emphasis added) – let alone 35 years. §203(a)(3).

Arguing otherwise, Scholastic cites *Aquavit Pharms., Inc v. U-Bio Med, Inc*, 2020 U.S. Dist.

LEXIS 28639, at *7 (S.D.N.Y. Feb. 19, 2020), which is inapposite, as it does not involve the kind

of continuing obligation that exists here, for which future breach is still possible. Further, it

expressly notes that "[e]ven if Plaintiff had not performed by promoting Defendants' devices, such

an obligation would have been implied". *Id.* at *3 n.7. By contrast, in *Big Cola Corp. v. World

Bottling Co., Ltd.*, 134 F.2d 718, 722 (6th Cir. 1943), a company secured the exclusive right to sell

a brand of cola products in a territory for an indefinite period. Its "only obligation was to keep an

account of amounts sold and pay royalties— if it did sell any. It did not promise to do anything or

22

refrain from doing anything; and it could cancel the contract if it felt it was unprofitable." It argued, as Scholastic does, that any missing mutuality was "cured" because it rendered some performance despite having no obligation to do so. But the "absence of any promise of performance" together with its "reservation of right to cancel" rendered the contract "void for lack of mutuality". *Id.*

Lastly, while Scholastic purports to seek dismissal of Count VI in its entirety, it makes no attempt to address certain allegations (non-payment of Sony royalties, billing failures, etc.)

### D.  The Declaratory Judgment Claim Is Not Time-Barred

Scholastic's argument (Mot. at 21) "misconceives the nature of a statute of limitations; it does not make an agreement that was void at its inception valid by the mere passage of time." *Riverside Syndicate, Inc. v. Munroe*, 10 N.Y.3d 18, 24 (2008). *See Faison v. Lewis*, 25 N.Y.3d 220, 230 (2015); *Liggett v. Lew Realty LLC*, 42 N.Y.3d 415, 422 (2024).

## V.    AUTHORS HAVE PLAUSIBLY PLED A CLAIM FOR MISREPRESENTATION

### A.  The Misrepresentation Claims Are Not Time Barred

Neither misrepresentation claim accrued until all elements, including the reliance injury, arose. *Wen v. New York City Reg'l Ctr.*, LLC, 22 Civ. 7383 (LJL), 2023 WL 6317995 (S.D.N.Y. Sept. 28, 2023). The injury here arose only when Authors relied on Scholastic's misrepresentations to overspend on the Cast Album. FAC ¶¶55-59.  Contrary to Scholastic's argument, Ex. O of the FAC does specify that this was "in 2019".

### B.  Authors Plausibly Allege Reasonable Reliance

Scholastic argues that Authors cannot allege reasonable reliance when the representation is negated by the terms of the contract. Mot. at 23. In fact, there is *nothing* in *any* of the agreements that even hints that first-and-second class rights are held by an unrelated entity, or that production

of the Play is otherwise limited to any particular class, territory, or otherwise. As alleged, Authors were unaware of *any* affiliation with Sony until Scholastic mysteriously withheld royalty payments that Authors later discovered was on Sony's behalf. FAC ¶46-48. Even then, Scholastic failed to communicate that Sony held any rights restricting the Play's reach. It instead explicitly confirmed the opposite – that to the extent it ever was a party, Sony was at that point "*no longer* a party to the GOOSEBUMPS stage musical". FAC ¶¶47-49 (emphasis added). There is only one way to interpret this statement.

To the extent that Scholastic argues that its total lack of any obligations under the 2017 Agreement categorically precludes any misrepresentation-based claim, because Authors could not have reasonably relied on *any* performance, that only furthers the conclusion that the agreement is illusory. New York law may allow lopsided deals (*Matter of Friedman*, 64 A.D.2d 70, 85 (2d Dep't. 1978)), but not deals where only one side must perform.

In any event, "[w]hether Plaintiff's reliance on Defendants' representations was reasonable cannot be resolved as a matter of law on Defendants' motion to dismiss." *Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 578 (S.D.N.Y. 2018).

### C.  Authors Plausibly Allege Scienter

Scholastic misstates the pleading standards for fraudulent and negligent misrepresentation. *See* Mot. at 24-25. In the Second Circuit, on a claim for fraudulent misrepresentation, Rule 9(b) "does not elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility." *Aviles v. S&P Glob., Inc*., 380 F. Supp. 3d 221, 281 (S.D.N.Y. 2019).

As to negligent misrepresentation, "the Second Circuit has not provided a clear answer" as to whether 9(b) applies. *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 141 (S.D.N.Y. 2019). In any event, Authors have met the heightened standard for both.

As alleged, Scholastic told Authors that Sony was no longer a party to the *Goosebumps* musical despite having full knowledge it already had granted or intended to grant first-and-second class rights in the Play to Sony. FAC ¶57, 59. These allegations regarding the timing and nature of Scholastic's negotiations with Sony constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Phx. Cos. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 601 (S.D.N.Y. 2021).

Scholastic's argument that the Parties' cap on Cast Album expenditures undermines Scholastic's conscious misbehavior is futile. First, Scholastic demonstrates its inexperience with the theater industry by confusing a *Broadway* cast album with a *pre-Broadway* cast album. Second, that expenditures were capped is entirely unrelated to Scholastic covertly granting all Broadway rights to an unrelated third-party. In fact, it makes matters worse: Authors expended significant sums above the cap *on their own dime* in reliance on the potential for exploitation of these rights. FAC ¶61. Authors did not expect Scholastic to cover the costs beyond the cap, but did have every right to expect that their expenditures would not be entirely for naught.

### D.  Authors Plausibly Allege a "Special Relationship"

"When a composer assigns copyright title to a publisher in exchange for the payment of royalties, an equitable trust relationship is established". *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984).

Scholastic argues it did not have a special relationship with Authors because the Parties executed a mere "arm's length business transaction". Mot. at 26. Scholastic, unsurprisingly, limits its analysis to a narrow application of the "special relationship" element. Yet even a "sparsely pled" allegation of a special relationship "is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in *Kimmell*.'" *Eternity*

*Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004). Those factors are: "whether the person making the representation held or appeared to hold unique or special expertise" and "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaeffer,* 89 N.Y.2d 257, 263-64 (1996). Here, Authors' claim is hardly "sparsely pled"; Paragraphs 109-13 lay out the special relationship at length.

Authors have pled that Scholastic, as a multi-million-dollar global publisher, held special expertise in the publishing world that was not held by Authors. *Schisgall v. Fairchild Publications*, 207 Misc. 224, 230 (N.Y. Sup. Ct. 1955) ("not necessary to use the magic words of 'fiduciary relationship'"; author/publisher relationship is inherently special). And far from being "arm's length", Scholastic also acted through a mutual agent, Gurman, who did have a fiduciary relationship with Authors. FAC ¶¶110-14. While Scholastic argues that Authors have not provided case law demonstrating that a dual agent can create a relationship of trust between a global publisher and two individuals, neither has Scholastic provided case law to the contrary. This is presumably because having a party act as a dual agent is exceedingly rare, precisely because it provides an opportunity for the party with more leverage over the agent to use that agent to exert its will over the other party.

Scholastic consciously "omitted" telling Authors of Sony's rights, knowing Authors would not have otherwise invested as heavily in the Cast Album. "Courts have previously found that a special relationship existed … where '[t]he defendants' representations to the plaintiff[] . . . clearly evinced awareness that the representations were to be used for the purpose of the investment,' '[t]he plaintiffs allegedly relied on the defendants' representations,' and the

defendants invited reliance.'" *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 348 (S.D.N.Y. 2023).

## VI.    AUTHORS HAVE PLAUSIBLY PLED BREACH OF FIDUCIARY DUTY

Scholastic twists "no fiduciary relationship exists between a music publisher and composer as a matter of law" Mot. at 27 – into the erroneous conclusion that, as a matter of law, such a relationship can *never* exist. But in fact, what these cases say is that one does not *automatically* exist the way it would with, say, a literary agent. They are quick to point out the exceptions for "special circumstances", as certainly exist here.

Authors do not claim that Scholastic owed them a fiduciary duty "as a matter of law." The Parties' fiduciary relationship arose out of specific, peculiar facts that created a "relationship approaching privity" and because the Parties (1) shared the same literary agent for years, (2) were represented, respectively, by this shared agent for the purposes of the Play, (3) negotiated several contracts related to the Play, and (4) were involved in business transactions for several consecutive years. *See Licette Music Corp. v. A.A. Recs., Inc.*, 196 A.D.2d 467 (1st Dep't. 1993) (distributor of children's records breached fiduciary duty to song owner when former used deceptive business practices to avoid royalties); *Universal-MCA Music Publ'g v. Bad Boy Ent., Inc.*, No. 601935/02, 2003 WL 21497318, at *5 (N.Y. Sup. Ct. June 18, 2003) (one person occupying multiple roles transformed ordinary business relationship with songwriters); *Swan* at *5 (prior affiliate of defendant serving as songwriter's attorney may constitute "special circumstances").

Further, Scholastic was entrusted with sole and complete control over generating, collecting, reporting and paying to Authors their apportionment of revenues, had a duty to fully and fairly account, maximize revenues, and avoid self-dealing. *See Scholastic Ent., Inc. v. Fox Ent. Grp., Inc.*, 336 F.3d 982, 984 (9th Cir. 2003) (similar claim against distributor of *Goosebumps* TV

show); *Nelson v. Mills Music, Inc.*, 278 A.D. 311, 312 (App. Div. 1951), *aff'd*, 304 N.Y. 966 (1953) (publisher breached duties to composers despite no-obligation-to-exploit provision).

In any event, because "[c]ourts cannot determine the existence of a fiduciary relationship by recourse to rigid formulas, [a] claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)." *Abraham v. Leigh*, No. 17 Civ. 5429 (KPF), 2019 WL 4256369, at \*4 (S.D.N.Y. Sept. 9, 2019) (citations omitted) (alleging Broadway composer's representative breached duty by drafting and benefitting from unreasonably disadvantageous agreement concerning musical).

Dated:  New York, New York
        May 2, 2025

                                        Respectfully submitted,

                                        **KLARIS LAW, PLLC**

                                        By: /s/ Lacy ("Lance") H. Koonce III

                                            Lacy ("Lance") H. Koonce, III
                                            Gili Karev
                                            Mariella Salazar
                                            Clara Cassan
                                            161 Water Street, Suite 904
                                            New York, NY 10038
                                            (646) 779-4882
                                            Lance.Koonce@klarislaw.com
                                            Gili.Karev@klarislaw.com

                                            *Attorneys for Plaintiffs Danomolous*
                                            *Productions, LLC; Danny Abosch;*
                                            *and John Maclay*

## <u>CERTIFICATION OF WORD COUNT</u>

I, Lacy H. Koonce III, an attorney duly admitted to practice law before the courts of the State of New York, hereby certify that this Memorandum of Law complies with the word count limit set forth in Section III(D) of Your Honor's Individual Practices in Civil Cases and Local Civil Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, because it contains 8741words, excluding the parts exempted by Section III(D) of Your Honor's Individual Practices in Civil Cases and Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this Memorandum.

Dated:   New York, New York
         May 2, 2025

                                        Respectfully submitted,
                                        **KLARIS LAW, PLLC**
                                        By: <u>/s/ Lacy ("Lance") H. Koonce III</u>
                                            Lacy ("Lance") H. Koonce, III
                                            Gili Karev
                                            Mariella Salazar
                                            Clara Cassan
                                            161 Water Street, Suite 904
                                            New York, NY 10038
                                            (646) 779-4882
                                            Lance.Koonce@klarislaw.com
                                            Gili.Karev@klarislaw.com
                                            *Attorneys for Plaintiffs Danomolous*
                                            *Productions, LLC; Danny Abosch;*
                                            *and John Maclay*