UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANOMALOUS PRODUCTIONS, LLC;
DANNY ABOSCH; AND JOHN MACLAY,

                                   Plaintiffs,

                -against-

SCHOLASTIC ENTERTAINMENT INC.; AND
SCHOLASTIC INC.,

                                   Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  __3/30/2026__

24 Civ. 8041 (AT)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

Plaintiffs, Danomalous Productions, LLC, Danny Abosch, and John Maclay (collectively, "Plaintiffs"), bring this action against Defendants, Scholastic Entertainment Inc. and Scholastic Inc. (collectively, "Scholastic"), arising from copyright and contract disputes related to a musical play adaptation of Scholastic's *Goosebumps* book.  *See generally* First Amended Complaint ("FAC"), ECF No. 28.

Plaintiffs seek a declaration that they are the authors of the *Goosebumps* musical play (the "Play") under the Copyright Act (Count I), that they own copyrights in and to certain materials related to the Play's "Cast Album and Sheet Music" (Count III), and that Scholastic has an obligation to exploit the Play (Count X).  *See* FAC ¶¶ 81–83, 94–96, 125–29.  Plaintiffs also allege that Scholastic fraudulently induced them to enter into an agreement in 2017 (the "2017 Agreement") (Count II), *id.* ¶¶ 84–93; breached the 2017 Agreement and its implied covenant of good faith and fair dealing by, *inter alia*, failing to make reasonable efforts to license the Play (Count VI), *id.* ¶¶ 103–07; breached its fiduciary duty for similar reasons (Count IX), *id.* ¶¶ 121–24; and negligently and fraudulently misrepresented Sony Pictures' rights in the Play,

causing Plaintiffs to make investments in a Cast Album that they would not have otherwise made (Counts VII and VIII), *id.* ¶¶ 108–120.

Scholastic moves to dismiss each of these claims under Federal Rule of Civil Procedure 12(b)(6).[1]  *See* Mem., ECF No. 54; Opp., ECF No. 63; Reply, ECF No. 64.  For the reasons stated below, Scholastic's motion is GRANTED in part and DENIED in part.

## BACKGROUND[2]

I.  Factual Background

Scholastic owns *Goosebumps*, a best-selling children's horror novel series.  FAC ¶ 20. "Since the first book was published in 1992, Scholastic has published more than two-hundred books under the *Goosebumps* umbrella," and the brand has expanded to encompass "two television series, a comic book series, a video game, and two feature films."  *Id.*  Plaintiffs are award-winning "seasoned dramatists with over 47 years of collective experience in the theater industry."  *Id.* at ¶ 19.  In December 2015, Plaintiffs' theater agent, Susan Gurman, who was also an agent for Scholastic, introduced Plaintiffs to each other for a new project.  *Id.* ¶¶ 4, 21– 22, 24.  Gurman then told Plaintiffs that Scholastic authorized her to "prepare an agreement for [them] to write and compose a musical play based on *Goosebumps*."  *Id.* ¶ 23.

In the theater industry, it is generally understood that when a company like Scholastic licenses source material like *Goosebumps* to playwrights, the company shall not have any ownership or control over the resulting adaptation of the source material, and the writers of such adaptation shall have sole decision-making authority over its future exploitation.  *See id.* ¶ 26.

---

[1] Scholastic does not move to dismiss Count IV ("Declaratory Judgment as to Trademark Claims"), Count V ("Direct and Secondary Copyright Infringement"), and certain claims included in Count VI ("Breach of Contract"). *See* ECF No. 76 at 1 n.1.

[2] The following facts are taken from the FAC.  The Court takes all well-pleaded facts alleged in the complaint as true, drawing all reasonable inferences in favor of Plaintiffs.  *See Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).

In other words, "work for hire" is not the norm.[3]  When Gurman reached out to Plaintiffs, she noted that Scholastic "insisted on the inclusion of . . . work-for-hire language in its contracts" because it was "company policy."  *Id.* ¶ 31; *see also id.* ¶ 65.  Gurman "facilitated" "several rounds of contract negotiations" between Plaintiffs and Scholastic, during which Plaintiffs successfully negotiated to exempt orchestrations and arrangements from work-for-hire language and to strike language assigning copyright ownership in the Play to Scholastic.  *Id.* ¶¶ 31–35. Additionally, on multiple occasions, Plaintiffs informed Gurman they intended "to exploit first- and/or second-class rights in the Play,"[4] which "Gurman repeatedly represented were unencumbered."  *Id.* at ¶ 35.

Following these negotiations, in March 2016, Plaintiffs entered an agreement to write and develop the Play with two theaters (the "2016 Agreement").  *Id.* ¶¶ 6, 32.  Under this agreement, the two theaters would "co-commission[] the work and co-produc[e] the world premiere productions."  *Id.* ¶¶ 6, 32–34; *see* 2016 Agreement, ECF No. 28-1 at 10–23 (Ex. C). Although Scholastic authorized the Play, it was not a signatory.  *See* FAC ¶¶ 2, 32, 34, 42.

One section of the 2016 Agreement characterizes the Play as a work for hire.  *Id.* ¶ 36; 2016 Agreement § 1(a) ("[T]he Play shall be considered a 'work-for-hire' and 'work-made-for-hire' as such phrases are defined under the copyrights laws of the United States.").  Another, however, suggests that Plaintiffs were authors of the Play.  *See* FAC ¶ 37; 2016 Agreement § 11(c)(iii) (prohibiting the theaters from representing that "authorship of the Play or other materials" is "claimed or held" by anyone other than Plaintiffs).  In April 2016, Plaintiff Danny

---

[3] Under the "work for hire" doctrine, authorship and the resulting copyright belong to an employer or the commissioner of certain works, rather than the employee or creator of the work.  *See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc.*, 380 F.3d 624, 635–36 (2d Cir. 2004).

[4] These terms are understood to include but are not limited to Broadway and Off-Broadway theaters, respectively. *See* Mem. at 4; FAC ¶ 59.

Abosch entered a separate agreement with the theaters (the "2016 Orchestrator Agreement") to explicitly exclude the Play's "[o]rchestrations and arrangements" from a work-for-hire designation.  *See* 2016 Orchestrator Agreement § 3, ECF No. 28-1 at 25–35 (Ex. D); FAC ¶ 38.

Plaintiffs were concerned that because Scholastic did not sign the 2016 Agreement and 2016 Orchestrator Agreement, it would not honor Plaintiffs' various rights reserved under those agreements.  *Id.* ¶ 34.  After expressing this to Gurman, Gurman "confirmed that [Scholastic] would be willing to enter into a contemporaneous side agreement directly with [Plaintiffs] mirroring their rights and obligations in [those agreements] in lieu of being added as a signatory."  *Id.* ¶ 34.  Gurman did not allegedly disclose that Scholastic "understood that it was in fact bound" by the 2016 Agreement.  *Id.*  Over the next year, Plaintiffs "repeatedly asked Gurman about the status of the side agreement."  *Id.* ¶ 39.  She said that it "would be arriving 'soon,'" that "such paperwork would in any event be a mere formality," and that "production should continue as usual."  *Id.* ¶ 39.  Plaintiffs spent a year creating the Play and delivering it to the commissioning theaters and Scholastic.  *Id.* ¶ 40.  The Play received "unanimous praise" and "premiered and ran as scheduled from October to November 2016."  *Id.*

In March 2017, after Plaintiffs "had delivered their end of the bargain," Scholastic provided Plaintiffs a draft agreement—"the 2017 Agreement."  *Id.* ¶ 41; *see* 2017 Agreement, ECF No. 28-1 at 39–50 (Ex. F).  Scholastic asserted that Plaintiffs could not move forward to exploit the Play without signing the 2017 Agreement.  *Id.* ¶ 42.  Based on this, Plaintiffs believed they "were in total reliance on [Scholastic] to exclusively license the Play" and signed the 2017 Agreement.  *Id.* ¶ 44.

The 2017 Agreement states that "the Play was created as and constitutes a[] work-for-hire on behalf of [Scholastic] as such term is defined under the copyright laws of the United

States," and that, accordingly, Scholastic "shall be entitled to all copyright [in and to] the Play (including without limitation the Script, Libretto, Lyrics, Compositions, Arrangements, Orchestrations, and Orchestral Tracks)."[5]  2017 Agreement § 5(a).  It further provides that, to the extent that any portion of the Play "may not qualify as a work-for-hire," Plaintiffs "individually and collectively, hereby grant, transfer, and assign all right, title, and interest in and to the Play to [Scholastic]."  *Id.*  Under the Agreement, Scholastic "shall have the exclusive right . . . to license . . . and exploit the Play."  *Id.* §§ 5(b), 6.  In exchange, Plaintiffs are entitled to a certain share of "net revenue derived from[] any exploitation of the Play," with net revenue defined as "gross revenues received . . .  less any out of pocket third party costs."  *Id.* § 7.

Plaintiffs' first royalty statement allocated 50% of the $33,400 revenue to undefined "[Scholastic] 3rd Party Obligations," leaving $6,900 for Plaintiffs collectively.  *Id.* ¶ 47.  When Plaintiffs confronted Scholastic about this, Scholastic informed them that the unnamed third party was Sony Pictures ("Sony"), which Scholastic claimed was entitled to 50% of "royalties" from the Play.  *Id.*  After much disagreement, by email dated July 18, 2018, Gurman informed Plaintiffs that Scholastic agreed to remove the phrase "third-party expenses . . . from the definition of net proceeds 'since Sony is no longer a party to the GOOSEBUMPS stage musical.'"  FAC ¶ 48; *see* Sony Emails at 2, ECF No. 28-1 at 52–53 (Ex. G).

Believing that the Play was "no longer encumbered by any agreements with Sony," Plaintiffs sought to act on their right to produce a cast album (the "Cast Album") for the Play.  FAC ¶ 50.  In August 2018, Plaintiffs entered into an addendum with Scholastic (the "2018 Addendum"), under which they "would have the right to produce, at their own expense but with

---

[5] The 2017 Agreement does not define these terms in detail.  *See* Opp. at 16.  For example, it defines "the Play" as "musical play"; "script or libretto" as "Script" or "Libretto"; "songs and written lyrics" as "Compositions"; "written orchestrations" as "Orchestrations"; arrangements as "Arrangements"; and orchestral tracks as "Orchestral Tracks." 2017 Agreement at 1, § 5.

the possibility of recoupment from [Scholastic] of up to $50,000, the Cast Album and Sheet Music"[6] and "to 'advertise, market, publicize, and otherwise promote the Cast Album and Sheet Music [by] referencing and using the 'Goosebumps' name, logo, logotype, font, trademark, and service mark owned by Scholastic.'" *Id.*; *see* 2018 Addendum, ECF No. 28-1 at 55–56 (Ex. H). The 2018 Addendum states that all "copyrights in and to the Cast Album and Sheet Music shall be and remain solely-owned by [Plaintiffs] for the life of the copyright in the Cast Album" and that the terms of the Addendum prevail over anything to the contrary in the 2017 Agreement. FAC ¶ 51; *see* 2018 Addendum §§ 3, 13(a), (c). Plaintiffs then registered the Cast Album and Sheet Music's sound recordings, compositions, orchestrations, and other elements, as well as the Cast Album's artwork and synopsis, with the U.S. Copyright Office. *See* FAC ¶¶ 53–54.

Because "a Cast Album is a powerful tool for marketing the corresponding show to potential licensees," Plaintiffs invested approximately $200,000 to produce a high-quality album "as a route to Broadway and Off-Broadway opportunities." *Id.* ¶¶ 55–56. In 2022, however, Scholastic informed Plaintiffs that it had "at some point granted to Sony (and/or agreed to hold back for Sony's benefit) all rights to present a first class or second class production . . . and that [Scholastic] accordingly had no right to pursue, or authorize others to pursue, those licensing opportunities on [Sony's] behalf." *Id.* ¶ 59 (emphasis and internal quotations omitted). Plaintiffs claim that if Gurman had not stated that Sony had "no rights" in the Play, "there is no question that [they] would have limited their spend on the Cast Album to the $50,000 [Scholastic] had committed to reimbursing." *Id.* ¶ 61.

Scholastic has "all but entirely ceased to license the Play . . . , including by refusing to entertain countless requests from foreign markets to license the Play overseas, repeatedly

---

[6] The 2018 Addendum defines "Sheet Music" as "sheet music of original music from the Play" and "Cast Album" as an "original studio sound recording of the original music from the Play." 2018 Addendum § 2(a).

rejecting offers from top-tier theatrical licensing agencies to license the Play, and provid[ing] no independent right to [Plaintiffs] to license the Play themselves, such that [Plaintiffs] have virtually no opportunity to see a return on the fruits of their labor in the Play." *Id.* ¶ 63.[7]

**DISCUSSION**

I.  Legal Standard

   A.  Motion to Dismiss

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth.  *Id*.  On a motion to dismiss, the Court must draw all reasonable inferences in the non-movant's favor.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

II.  Analysis

   A.  Copyright Authorship (Count I)

Plaintiffs seek a declaration that they are the authors of the Play under the Copyright Act, 17 U.S.C. §§ 101 *et seq*.  FAC ¶¶ 81–83.  Scholastic argues that this claim is time-barred.

---

[7] Although not relevant to Scholastic's motion to dismiss, Plaintiffs also allege that Scholastic has "repeatedly failed to accord" credit under §§ 17 and 18 of the 2017 Agreement, failed under § 7 of the 2018 Addendum to attach a Cast Album order form that provides written notice to licensees of the availability of the Cast Album for sale, and "allowed licensees to use copies of the [Cast Album] [a]rtwork, which is solely owned by Abosch." *Id.* ¶ 62.

Mem. at 8–11.  Dismissal on statute of limitations grounds is appropriate "only if 'it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'" *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 150 (2d Cir. 2024) (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)).  An authorship claim accrues "when plain and express repudiation of [authorship] is communicated to the claimant" and is "barred three years from the time of repudiation."  *Horror Inc. v. Miller*, 15 F.4th 232, 257 (2d Cir. 2021) (citation omitted); *see Everly v. Everly*, 958 F.3d 442, 452–53 (6th Cir. 2020).

Scholastic argues that it clearly repudiated Plaintiffs' authorship in 2016 and 2017 because it included work-for-hire language in the 2016 and 2017 Agreements.  *See* Mem. at 8–9.  But, considering other provisions in the parties' agreements, as well as the surrounding circumstances, it is unclear when repudiation occurred.  Despite the work-for-hire language, several provisions in the 2016 and 2017 Agreements are consistent with, and at times, even recognize Plaintiffs' authorship.  For example, one provision in the 2016 Agreement prohibits the commissioning theaters from representing or allowing anyone to represent that "authorship of the Play or other materials" is "held by any person or entity other than [Plaintiffs]."  2016 Agreement § 11(c)(iii).  The Orchestrator Agreement, signed one month later, explicitly states that the Play's orchestrations and arrangements are *not* works for hire.  *See* 2016 Orchestrator Agreement § 3.  And the 2017 Agreement contains a fallback provision recognizing that the Play or any portion thereof "may not [legally] qualify as a work-for-hire."  2017 Agreement § 5(b).  The 2017 Agreement also requires that Scholastic give Plaintiffs the following "billing credit": "Book and Lyrics by John Maclay, Music and Lyrics by Danny Abosch," and "Orchestrations and Arrangements by Danny Abosch."  *Id.* § 17; *see also Swan v. EMI Music Pub. Inc.*, No. 99 Civ. 9693, 2000 WL 1528261, at *3 (S.D.N.Y. Oct. 16, 2000) (holding that

8

designating an author as an "employee for hire" does not necessarily constitute repudiation where the person has also been treated as an author). Plaintiffs further allege that Gurman merely insisted on including the work-for-hire language as standard "company policy," FAC ¶¶ 31, 65–66, and that during the course of this litigation, Scholastic has adopted conflicting positions on Plaintiffs' authorship status, representing at one point, for example, that "Defendants do not and will not dispute that Plaintiffs are the authors of the Play under the Copyright Act." FAC ¶¶ 72–74.

The complaint thus does not establish that Plaintiffs' authorship claim is time-barred, and Plaintiffs are under "no obligation to plead facts . . . negating an affirmative defense." *Michael Grecco Prods.*, 112 F.4th at 154 (emphasis omitted) (citation omitted). Dismissal on this ground is, therefore, improper. *See id.*; *see also Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317–18 (2d Cir. 2013) (holding that a genuine dispute of fact as to when the defendant repudiated the plaintiff's authorship precluded summary judgment).

B. Copyright Ownership (Count III)

Count III seeks a declaratory judgment as to copyright ownership of "the Cast Album and Sheet Music, and all copyrightable elements thereof, including the Compositions, Orchestrations, Arrangements, Sound Recordings, Artwork, and Synopsis." FAC ¶¶ 94–96.

First, Plaintiffs' purported work-for-hire status does not foreclose their ownership claim. *See* Mem. at 11. The Copyright Act "provides that copyright ownership 'vests initially in the author or authors of [a] work.'" *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004) (quoting 17 U.S.C. § 201(a)). "The author of a given work 'is the person who translates an idea into a fixed, tangible expression entitled to copyright protection.'" *Id.* (quoting *Community for Creative Non-Violence ("CCNV") v. Reid*, 490 U.S. 730, 737 (1989));

9

*see* 17 U.S.C. § 102.  "The Act carves out an important exception, however, for 'works made for hire.'"  *CCNV*, 490 U.S. at 737.  "If the work is for hire, 'the employer or other person for whom the work was prepared is considered the author' and owns the copyright."  *Id.* (citing 17 U.S.C. § 201(b)).  "A work for hire can arise through one of two mutually exclusive means," *id.* at 743: either (1) the hired party is an "employee," a determination made based on the "general common law of agency," *id.* at 740–41, or (2) the work "fit[s] within any of the nine categories of 'specially ordered or commissioned' works enumerated in [§ 101(2)]," *id.* at 738.  Courts "focus[] on the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002).  Because Plaintiffs have alleged that they were not Scholastic's employees when they created copyrightable material and that the material does not fit within the nine enumerated categories in § 101(2),[8] the work-for-hire doctrine does not bar their claims.

Second, dismissal is inappropriate because the parties' agreements do not unambiguously establish Scholastic's copyright ownership of the Cast Album, Sheet Music, and related copyrightable elements.  Rather, the 2018 Addendum states that the "copyrights in and to the Cast Album and Sheet Music shall be and remain solely-owned by [Plaintiffs]," *see* 2018 Addendum § 3, and that "in the event of any conflict between the terms of this Addendum and the [2017] Agreement, the terms of the Addendum shall prevail," *id.* § 13.  It is unclear whether a copyright "in and to the Cast Album and Sheet Music" encompasses compositions, orchestrations, or arrangements.  *See generally* 2017 Agreement; 2018 Addendum.  And, in context, the provision that the parties "do not intend to modify, in any manner, the apportionment of rights as set forth in

---

[8] The nine categories are "works specially ordered or commissioned for use" (1) "as a contribution to a collective work"; (2) "as a part of a motion picture or other audiovisual work"; (3) "as a translation"; (4) "as a supplementary work"; (5) "as a compilation"; (6) "as an instructional text"; (7) "as a test"; (8) "as answer material for a test"; (9) or "as an atlas."  *See* 17 U.S.C. § 101(2).

the [2017] Agreement," 2018 Agreement § 3, is ambiguous.  *See, e.g.*, Opp. at 18 ("The parties intended *something* to be 'solely-owned by [Plaintiffs],' but Scholastic struggles to identify what it could be [under its reading]."); *see also id.* (arguing that because the industry usage of "apportionment" relates to revenue-sharing, that provision plausibly relates to Plaintiffs' "right to share in revenue" (quoting 2017 Agreement § 7)).  The Court, therefore, does not dismiss Plaintiffs' copyright ownership claim.  *See Bank of New York Tr., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) ("The Court's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities."); *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 333 (S.D.N.Y. 2010) ("On a motion to dismiss, all ambiguities must be resolved in Plaintiffs' favor.").[9]

C.  Fraudulent Inducement of the 2017 Agreement (Count II)

The Court grants Scholastic's motion to dismiss Plaintiffs' claim of fraudulent inducement.  *See* FAC ¶¶ 84–93.

To state a claim for fraudulent inducement under New York law, a plaintiff must establish "(1) a misrepresentation or a material omission of fact which was false and known to be false by the defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury."  *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)) (internal quotation marks omitted).  Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake."  *Id.*

---

[9] For these reasons, it is unclear when, if at all, Scholastic repudiated Plaintiffs' claim of copyright ownership in the materials at issue, and the Court, therefore, rejects Scholastic's argument that Plaintiffs' copyright ownership claim is clearly time-barred.  *See Michael Grecco Prods.*, 112 F.4th at 150.

11

Plaintiffs argue that, after they expressed concerns that Scholastic was not "bound" by the 2016 Agreement, Gurman, who was acting as both Scholastic's and Plaintiffs' agent, failed to disclose, including in email correspondence in February 2016, that "Scholastic understood that it was, in fact, bound by" the 2016 Agreement. FAC ¶ 34. Instead, Gurman told Plaintiffs that, in lieu of being added as a signatory, Scholastic would enter a separate agreement with Plaintiffs to mirror the 2016 Agreement. *Id.* ¶ 34. In their briefing, Plaintiffs contend that this was fraudulent because Scholastic, through Gurman, made a misrepresentation by omission— that is, Scholastic had a duty to disclose its belief as to whether it was "bound" by the 2016 Agreement and failed to do so. *See* Opp. at 11.

Plaintiffs fail to state a fraud claim because the complaint fails to specify what exactly was concealed and explain why it was fraudulent. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (requiring the complaint under Rule 9(b) to "specify the statements that the plaintiff contends were fraudulent" and "explain why the statements were fraudulent"). New York law provides that a party has a "duty to disclose material facts 'where [that] party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" *904 Tower Apartment LLC v. Mark Hotel LLC*, 853 F. Supp. 2d 386, 398 (S.D.N.Y. 2012) (quoting *Lerner*, 459 F.3d at 292). But Plaintiffs do not explain what it means for Scholastic to have "understood that it was in fact bound" by the 2016 Agreement, *id.* ¶ 34, and the Court finds this allegation overly vague. Plaintiffs also do not identify, in relation to the need for a side agreement, what "superior [factual] knowledge" Scholastic possessed that was "not readily available" to Plaintiffs. *See 904 Tower*, 853 at 398. Nor do Plaintiffs allege what specifically they said to Gurman that reflected "mistaken knowledge," *id.*, and, accordingly, triggered a duty to disclose certain facts. *See, e.g.*, FAC

¶¶ 11 (alleging only that Plaintiffs "harbored a false belief that a new agreement was needed"), 34 (alleging only that Plaintiffs told Gurman they were "uncomfortable entering into a rights deal [in the 2016 Agreement] if Scholastic was not also bound by that agreement").  Therefore, the Court dismisses Plaintiffs' fraudulent inducement claim.

D.  Breach of Contract (Count VI) and Contract Voidness (Count X)

Plaintiffs have plausibly alleged that Scholastic has breached the covenant of good faith and fair dealing.  *See* FAC ¶¶ 57–59.  Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance."  *511 W. 232nd Owners v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).  The implied covenant "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Id.* (citation omitted).

Plaintiffs have stated a claim for breach of the implied covenant in connection with Scholastic's failure to license the Play under the 2017 Agreement.  Scholastic argues that there is no implied covenant because under the express terms of the contract, it has "absolute discretion over whether, and to what extent, to exploit the Play."  Mem. at 20.  The 2017 Agreement states that Scholastic has "the exclusive right" to license or "otherwise exploit the Play." 2017 Agreement §§ 5(a), 5(b), 6.  However, under New York law, even where a "contract contemplates the exercise of discretion," the party with discretion is bound by the implied covenant "not to act arbitrarily or irrationally in exercising that discretion."  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995); *see Southern Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 505 (S.D.N.Y. 2021) ("[A] number of courts have held that, even where a contract permits discretion to a contracting party, that party may not exercise that discretion arbitrarily or irrationally." (collecting cases)).

13

Scholastic argues that *Moran v. Erk*, 11 N.Y.3d 452, 455–59 (2008), which involved an attorney approval contingency in a real estate contract, forecloses Plaintiffs' claim. *See* Mem. at 20–21. But, as other courts in this District have recognized, *Moran* did not involve the surrender of an exclusive license, *see Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1917), nor did it "relieve the [C]ourt of the need to . . . examine the contract as a whole to determine . . . whether the unfettered exercise of discretion would deprive a party of the fruits of the agreement," *Southern Telecom*, 520 F. Supp. 3d at 507. Even under *Moran*, where "it is necessary to read an obligation of good faith in order to avoid rendering a contract promise illusory," the Court "will not hesitate to infer an obligation to act in good faith." *Id.*; *see also id.* ("A licensee granted the exclusive rights to sell the licensor's products, for example, cannot automatically relieve itself of the obligation to exercise that contractual right in good faith by the simple expedient of adding the language 'sole discretion,' if the failure to act in good faith would render the contract illusory.").

That is the case here. Interpreting the 2017 Agreement to impose no obligation on Scholastic to exploit the Play, despite Scholastic having the exclusive right to do so, would "render the contract illusory" and deprive Plaintiffs of the "fruits of the contract." *Id.* "It is a fundamental principle of contract law that a promise is not enforceable unless it is supported by consideration." *O'Mahoney v. Susser*, No. 10 Civ. 4660, 2012 WL 12883586, at *3 (E.D.N.Y. July 23, 2012). "If a promise is 'so insubstantial as to impose no obligation at all on the promisor—who says, in effect, 'I will if I want to'—then that promise may be characterized as an 'illusory' promise, *i.e.*, 'a promise in form but not in substance.'" *Id.* (quoting Farnsworth, Contracts § 2.13 at 75–76 (1990)). If the 2017 Agreement has any "fruits," it is royalties, and because Plaintiffs "can only receive them through Scholastic's efforts," an implied obligation

14

exists. Opp. at 21. Scholastic contends that the 2017 Agreement was supported by "Scholastic's promise to negotiate in good faith [Plaintiffs'] right to produce and sell a cast album and sheet music." Reply at 9. But if Plaintiffs authored the Cast Album and Sheet Music, they legally owned those materials, and the 2017 Agreement only "*reduced* [Plaintiffs'] rights in this regard—trading a right they already had for the mere promise to negotiate for that right, in a much more limited form." Opp. at 21–22. *See John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018) ("Legal ownership of the exclusive rights under a copyright initially vests in the author of the copyrighted work." (citing 17 U.S.C. § 201(a))). Plaintiffs have, therefore, plausibly alleged that Scholastic has an implied obligation to act in good faith in exploiting the play.[10]

Plaintiffs allege that Scholastic has "all but entirely ceased to license the Play," including "by refusing to entertain countless requests from foreign markets to license the Play overseas, repeatedly rejecting offers from top-tier theatrical licensing agencies to license the Play, and provid[ing] [Plaintiffs] no independent right to license the Play themselves." FAC ¶ 63; *see id.* ¶ 106. Plaintiffs have thus stated a claim that Scholastic violated the covenant of good faith and fair dealing in connection with its alleged failure to license the Play under the 2017 Agreement.

Plaintiffs additionally allege that Scholastic breached the covenant of good faith and fair dealing by, for example, (1) failing to pay or account for its conveyance of first- and second-class rights in the Play to Sony, *see* FAC ¶ 104; and (2) "consistently fail[ing] to accord proper credit and billing to Plaintiffs in marketing materials," failing "to attach an album order form to

---

[10] Courts have recognized such an obligation in similar contexts. *See, e.g.*, *Madara v. Apr. Music, Inc.,* No. 83 Civ. 5279, 1985 WL 3830, at *3 (S.D.N.Y. Nov. 14, 1985) (holding that because "the contract [] provides for the payment of money to plaintiffs based on the earnings of the musical compositions," "there is an implied covenant to render the subject-matter of the contract productive," even if the contract imposes no express obligation to exploit); *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 680 (2d Cir. 1983) (implying a "good faith effort to promote [a] book" because interpreting a contract to "allow a publisher to refuse to print or distribute any copies of a book while having exclusive rights to it" would "guarantee[]" an author nothing).

all of its licensing agreements," and otherwise "impeding [Plaintiffs'] ability to exercise their contractual rights," *id.* ¶ 105. Although Scholastic purports to seek dismissal of Count VI in its entirety, *see* Mem. at 1, it does not specifically address these claims, and the Court, therefore, does not dismiss them. *See Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 65 (2d Cir. 1988) (holding that a court may not grant a motion to dismiss on grounds neither raised nor briefed).

Finally, in Count X, Plaintiffs seek, in part, a declaration that the 2017 Agreement is void for lack of consideration. *See* FAC ¶ 129(b). Because the Court infers an implied covenant of good faith and fair dealing in performance of the contract, the 2017 Agreement is not illusory, and the Court dismisses with prejudice Plaintiff's claim that the agreement is void on that basis. *See id.* (seeking a declaration that the contract is void for lack of consideration); *see also Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 457 (S.D.N.Y. 2015) ("Under New York law, courts should avoid a contractual interpretation that renders an agreement illusory and unenforceable for lack of mutual obligation.").

E. Fiduciary Duty (Count IX)

Plaintiffs have not plausibly alleged that Scholastic owes them a fiduciary duty. *See* Mem. at 26. "[A] fiduciary duty exists where one assumes control and responsibility over another, or where one has a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006). "By their nature, arms-length commercial transactions ordinarily do not involve relationships defined by the New York courts as fiduciary"; a fiduciary duty may nonetheless "arise in the context of a commercial transaction upon a requisite showing of trust and confidence." *Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2d Cir. 2008); *see also*

*Faulkner v. Arista Recs. LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009).  Plaintiffs argue that the parties' fiduciary relationship arises out of specific facts, including that "(1) [the parties] shared the same literary agent for years; (2) were represented . . . by this shared agent for the purposes of the Play; (3) negotiated several contracts related to the Play; and (4) were involved in business transactions for several consecutive years," as well as the fact that "Scholastic was entrusted with sole and complete control over generating, collecting, reporting, and paying to [Plaintiffs] their apportionment of revenues."  Opp. at 27.  But "conclusory allegations" of a "long and enduring relationship . . . of trust and confidence," as well as allegations that an entity is "contractually responsible for collecting royalties and passing them on," do not establish a fiduciary duty.  *See Faulker*, 602 F. Supp. 2d at 482; *see also Mellencamp v. Riva Music, Ltd.*, 698 F. Supp. 1154, 1159 (S.D.N.Y. 1988) (holding that "[o]rdinarily, express and implied obligations assumed by a publisher in an exclusive licensing contract are not, as a matter of law, fiduciary duties").  And Plaintiffs have not explained how Gurman's status as a shared agent, without more, establishes the requisite trust and confidence to give rise to a fiduciary duty running from Scholastic to Plaintiffs.  Therefore, the Court dismisses this claim.

F.   Fraudulent and Negligent Misrepresentation (Counts VII and VIII)

Finally, Plaintiffs claim fraudulent and negligent misrepresentation based on Scholastic's statements in 2018 that Sony was "no longer a party" to the Play, its concealment of Sony's first- and second-class theatrical rights in the Play, and Plaintiffs' reliance on these representations and omissions in investing more in the Cast Album than they otherwise would have.  *See* FAC ¶ 61; Sony Emails.  Scholastic has not shown that, as a matter law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.

The Court rejects Scholastic's argument that these causes of action are time-barred on the face of the complaint because it is not clear when the limitations period began to run. *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004) (explaining that defendants bear the burden of establishing when a cause of action accrued); *Michael Grecco Prods.*, 112 F.4th at 148. As Scholastic admits, "the FAC nowhere alleges when [Plaintiffs] first spent" money on recording the Cast Album, *see* Mem. at 26, and it is unclear from the complaint when Plaintiffs discovered or could have discovered with reasonable diligence the alleged fraud. *See Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993) (explaining that a tort cause of action accrues "when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint"); N.Y. C.P.L.R. § 213(8) (providing that a claim based on fraud must be commenced six years from the date the cause of action accrues or two years from the date the fraud was discovered). Therefore, it does not "conclusively appear" from the face of the complaint that Plaintiffs' claim is time-barred, and "the complaint should not be dismissed." *Bano*, 361 F.3d at 710 (citation omitted).

Next, Scholastic argues that Plaintiffs have not plausibly alleged the requisite "special relationship" to state a negligent misrepresentation claim. *See* Mem. at 26. "[L]iability for negligent representation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996). The "fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.*

18

Taken together, Plaintiffs' allegations—that the parties shared an agent in Gurman, that Scholastic possessed exclusive knowledge of third parties' rights in the Play, and that Scholastic knew that Plaintiffs were investing in a Cast Album for high-profile commercial opportunities, *see* FAC ¶¶ 55–56, 109–13; Opp. at 26–27—are sufficient to withstand a motion to dismiss. *See Kimmell*, 89 N.Y.2d at 264 ("Whether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact.").

Scholastic also argues that even if Plaintiffs demonstrate a misrepresentation of fact, they have failed to plausibly allege scienter, as required for their fraud claim. *See* Mem. at 24. "The elements of fraud in New York are '(1) misrepresentation of a material fact; (2) scienter; (3) justifiable reliance; and (4) injury or damages.'" *ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, No. 15 Civ. 70, 2015 WL 5710947, at *10 (S.D.N.Y. Sept. 29, 2015) (citation omitted); *see also Trahan v. Lazar*, 457 F. Supp. 3d 323, 354 (S.D.N.Y. 2020) ("Negligent misrepresentation involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement." (cleaned up)). Although Federal Rule of Civil Procedure 9(b) "demands specificity," "it does not elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility," nor "does it forbid pleading upon information and belief where . . . the circumstances justify pleading on that basis." *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 (2d Cir. 2017).

Plaintiffs' factual allegations are sufficient to withstand a motion to dismiss. Plaintiffs allege that Scholastic, through Gurman, represented via email that Sony was "no longer a party to the [*Goosebumps*] stage musical," even though Scholastic "had in fact at some point granted

to Sony (and/or agreed to 'hold back' for Sony's benefit) *all* rights to present a 'first class or second class production as said terms are understood in the live stage industry (including but not limited to Broadway and Off-Broadway theaters respectively).'" *Id.* ¶ 59 (emphasis in original). Plaintiffs further allege that even though Scholastic had granted Sony full control of these rights, and even though Scholastic knew through Gurman that Plaintiffs were unaware of this key fact, it nonetheless "encouraged" Plaintiffs to create "a high-quality Cast Album" to obtain "high-profile commercial exploitation opportunities." FAC ¶ 55.[11] Accepting these facts as true, and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have plausibly alleged "circumstantial evidence of conscious misbehavior or recklessness." *Phx. Cos. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 601 (S.D.N.Y. 2021).

Finally, as to both claims, Scholastic argues that Plaintiffs have failed to allege reasonable reliance because it was "unreasonable for [Plaintiffs] to infer that [Broadway and Off-Broadway] opportunities were available." Mem. at 23–24. But Plaintiffs allege that Scholastic, through Gurman (who was also Plaintiffs' agent), represented that first- and/or second-class rights in the Play were "unencumbered," *see* FAC ¶¶ 35, 45, and never revised these representations or otherwise indicated that such opportunities would be off the table, *see id.* ¶¶ 45, 55, 61; *see also* Opp. at 23–24 ("[T]here is nothing in any of the agreements that even hints that first-and-second class rights are held by an unrelated entity."). Because reasonable reliance is a fact-specific inquiry, it is "often not decided at the motion to dismiss phase of litigation." *Karsch v. Blink Health Ltd.*, 291 F. Supp. 3d 503, 507 (S.D.N.Y. 2018); *Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 578 (S.D.N.Y. 2018). Where, as here, resolution

---

[11] Plaintiffs also state that in the theater industry, "it is generally understood that . . . the real return on investment [from a Cast Album] comes in the form of box office and licensing revenue." FAC ¶ 56 (emphasis omitted); *see id.* ¶ 55 ("Releasing cast albums for musicals ahead of a high-profile production to generate fanfare and encourage a Broadway run has a long history in theater.").

of the issue "requires further fact-finding," it is "premature to grant the motion." *Legeno v. Corcoran Grp.*, 308 F. App'x 495, 497 (2d Cir. 2009).

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss. The Court GRANTS Defendants' motion to dismiss with respect to Counts II, IX, and X (but only to the extent Plaintiffs seek a declaration that the 2017 Agreement is illusory), and DENIES Defendants' motion with respect to Counts I, III, VI, VII, and VIII. Because amending the complaint would not necessarily be futile as to Counts II and IX, dismissal is without prejudice. *See Panther Partners, Inc. v. Ikanos Commc'ns*, 347 Fed. App'x 617, 622 (2d Cir. 2009). By **April 20, 2026**, Plaintiffs shall file either an amended complaint in accordance with Rule III(H) of the undersigned's Individual Practices in Civil Cases or a letter indicating they intend to rest on the operative complaint filed at ECF No. 28.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 49.

SO ORDERED.

Dated: March 30, 2026
   New York, New York

_____
ANALISA TORRES
United States District Judge

21