# Exhibit A

 Gmail

Danny Abosch <daabosch@gmail.com>

## working at First Stage, Milwaukee

**Susan Gurman** <susan@gurmanagency.com>
To: Danny Abosch <daabosch@gmail.com>

Tue, Dec 1, 2015 at 2:45 PM

I'm not developing a different GOOSEBUMPS for Broadway. Rather, I'm speaking with various parties to see if there's an apetite for the development of a Broadway musical. I hope that's clear.

**Susan Gurman,** *Agent*

Member: Association of Authors Representatives

Signatory: Writers Guild of America East

Susan Gurman Agency LLC  **We have MOVED! Note our new address:**

14 Penn Plaza, Suite 1703, New York, NY 10122-1701

Tel: 212 749 4618

gurmanagency.com



**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Tuesday, December 01, 2015 2:35 PM
**To:** Susan Gurman <susan@gurmanagency.com>
**Subject:** Re: working at First Stage, Milwaukee

Interesting. And you're also developing a different Goosebumps project for Broadway? Or did I misread that?

On Tue, Dec 1, 2015 at 1:49 PM, Susan Gurman <susan@gurmanagency.com> wrote:

> That's great. I'll really pushing to get this to be a musical rather than a play (which is what Oregon Children's wants to create). I think a musical is what will make it fun rather than scarey..

**Susan Gurman,** *Agent*

Member: Association of Authors Representatives

Signatory: Writers Guild of America East

Susan Gurman Agency LLC  **We have MOVED! Note our new address:**

14 Penn Plaza, Suite 1703, New York, NY 10122-1701

Tel: 212 749 4618

gurmanagency.com



**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Tuesday, December 01, 2015 1:40 PM

**To:** Susan Gurman <susan@gurmanagency.com>
**Subject:** Re: working at First Stage, Milwaukee

I'm very familiar with Goosebumps, I LOVED the books growing up!

On Tue, Dec 1, 2015 at 1:35 PM, Susan Gurman <susan@gurmanagency.com> wrote:

> Yes.  GOOSEBUMPS – 400 million books in print.  I rep it on behalf of Scholastic so if it moves forward, I'll negotiate it but not commission it.  I worked hard to get it out there and would also like to see a Broadway show which I'm also working on at the same time. This would be a good try-out at First Stage in Milwaukee.  First Stage is one of the larger children's theatres in the US so this would be a good opportunity to get you back working in your home area of the Midwest.
>
> In a few minutes, I'll introduce you and John together. I think you'll get along well. He's super smart and nice as well.
>
> BTW – I believe Ernie Nolan will reach out to you about a GERONIMO STILTON  show for Emerald City (another non-commissioning situation).  I just cannot issue them a license until I get some further details for the license Italy wants me to include in on-going deals which is probably why you haven't heard from them as yet.
>
> xx

**Susan Gurman,** *Agent*

Member: Association of Authors Representatives

Signatory: Writers Guild of America East

Susan Gurman Agency LLC  **We have MOVED! Note our new address:**

14 Penn Plaza, Suite 1703, New York, NY 10122-1701

Tel: 212 749 4618

gurmanagency.com



**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Tuesday, December 01, 2015 1:19 PM
**To:** Susan Gurman <susan@gurmanagency.com>
**Subject:** Re: working at First Stage, Milwaukee

Hi Susan,

Sure, and thanks for putting my name in the ring. Are you able to share more details about the project?

Danny

On Tue, Dec 1, 2015 at 12:47 PM, Susan Gurman <susan@gurmanagency.com> wrote:

> Danny,
>
> I put your name in the ring as a composer at this wonderful children's theatre company.  I represent the Associate Artistic Director, John Maclay who is a playwright and librettist.  Can I introduce you two via email?  He may have a project for the two of you..
>
> Kindest Regards,
>
> **Susan Gurman,** *Agent*
>
> Member: Association of Authors Representatives

Signatory: Writers Guild of America East

Susan Gurman Agency LLC  **We have MOVED! Note our new address:**

14 Penn Plaza, Suite 1703, New York, NY 10122-1701

Tel: 212 749 4618

gurmanagency.com



--

**Danny Abosch**
Composer | Arranger | Music Educator
http://dannyabosch.com/

--

**Danny Abosch**
Composer | Arranger | Music Educator
http://dannyabosch.com/

--

**Danny Abosch**
Composer | Arranger | Music Educator
http://dannyabosch.com/

# Exhibit B

 **Gmail**

## RE: Contract Review-Danny Abosch

**Danny Abosch** <daabosch@gmail.com>                                      Tue, Sep 9, 2014 at 3:45 PM
To: Susan Gurman <Susan@gurmanagency.com>, "lala17@aol.com" <lala17@aol.com>

---------- Forwarded message ----------
From: **Deborah Murad** <dmurad@dramatistsguild.com>
Date: Tue, Sep 9, 2014 at 12:33 PM
Subject: RE: Contract Review-Danny Abosch
To: "daabosch@gmail.com" <daabosch@gmail.com>


Dear Danny,


I am a bit surprised by this agreement, particularly if it is coming from someone who you claim owes a fiduciary duty to you.


Work-for-hire agreements are not the norm (nor do not truly exist) in the theater industry. This limitation is a function of federal law.  A WFH is valid when (1) the work is created within the scope of your employment (as indicated via tax withholdings, provision of office space and tools, etc.) **or** (2) there is (a) a written contract explicitly calling the work a WFH **and** (b) the work is one of nine categories —atlas, test questions, test answers, text book, supplemental work, compilation, complementary work, audiovisual work, and translation.  You will notice that "playscript" is specifically NOT on that list.


The only other option is a copyright assignment.  In Hollywood, for example, a full script is typically bought for $50,000+, in addition to health and pension benefit payments.  But the theater industry generally—and the Dramatists Guild in particular—does not endorse copyright assignments.  All authors contributing copyrightable material should receive appropriate attribution and revenue arising from the resulting project.


Unfortunately, this agreement explicitly works against these principles.  Specifically, this agreement is asking you to "grant, transfer and assign all right, title and interest" in the Play including the copyright to Atlantyca.


While this point alone may be enough to pause, I would like to make a few more comments:

·    A commission fee is nonrefundable and nonreturnable.  It is not an advance against royalties as indicated in Paragraph 2(a), nor should it be returned if the work is not "approved" as indicated in Paragraph 4.

·    Typically, authors receive 5-8% of the gross weekly box office receipts.

·    Authors have the discretion to make changes to their work and own all approved changes made to their work.

·    Note also that the billing is only secured when the Gurman Agency is licensing the work.


I could go on, but I think I have made my point.  If you have any questions, please do not hesitate to contact me.


In this type of scenario, what I would have expected to see is a Commission Agreement.  If you would like to see a copy of our model agreement, please email Patrick at PShearer@dramatistsguild.com.  Arguably, the most important part of such an agreement will be to clearly secure your right as an author and sole property owner of the work vis-à-vis the commissioning party.  Although you are being provided with underlying materials, the expression of such will be authored and owned by you; you are the owner and will grant the commissioning party an option to present the piece.

Ideally, in addition to the commission agreement, you would also have a collaboration agreement with your co-author and an underlying rights agreement with the owner of the *Geronimo Stilton* series. If the commissioning party had those rights, they could assign them to you.

Very truly yours,

-Deborah

_____
Deborah Murad, Esq.
Director of Business Affairs
Dramatists Guild of America, Inc.
1501 Broadway, Suite 701
New York, New York 10036
tel 212.398.9366 ext 26
fax 212.944.0420
email dmurad@dramatistsguild.com
web www.dramatistsguild.com

*This message and any attached documents contain information from the*

*Dramatists Guild of America, Inc. that may be confidential and/or*

*privileged. If you are not the intended recipient, you may not read, copy,*

*distribute, or use this information. If you have received this transmission*

*in error, please notify the sender immediately by reply e-mail and then*

*delete this message. Additionally, this email may contain information*

*provided as a service to members of the Dramatists Guild and is not legal*

*advice. Legal advice is dependent upon the specific circumstances of each*

*situation. As legal advice must be tailored to the specific circumstances of*

*each case, no information contained in this or other associated*

*correspondence should be used as a substitute for advice of competent*

*counsel. Finally, please be aware that the law varies considerably from*

*jurisdiction to jurisdiction (and between states in the United States), so*

*some information in this correspondence may not be applicable to your*

*jurisdiction.*

---

**From:** Amy Von Vett
**Sent:** Monday, September 08, 2014 9:44 AM
**To:** Deborah Murad
**Subject:** FW: Contract Review-Danny Abosch

Contract Review


Amy VonVett

Executive Assistant to Business Affairs

The Dramatists Guild of America

1501 Broadway, Suite 701

New York, NY 10036

p: 212.398.9366

f: 212-944-0420


**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Sunday, September 07, 2014 3:27 PM
**To:** businessaffairs
**Cc:** lala17@aol.com
**Subject:** Contract Review


Dear Department of Business Affairs,

Please find attached a contract for your review, on behalf of myself and my collaborator Susan DiLallo. We would appreciate your feedback on the terms of this contract in relation to industry standards.

One important note about this contract-- Susan Gurman (The Gurman Agency) is our Agent, but is not acting as our agent for this particular contract, because The Gurman Agency is the party commissioning the work described in the contract. (At least, that is my understanding of the situation.)

Thanks,
Danny


--

**Danny Abosch**
Composer | Arranger | Music Educator
http://dannyabosch.com/



--

**Danny Abosch**
Composer | Arranger | Music Educator
http://dannyabosch.com/

# Exhibit C

**THEATRICAL ADAPTATION AND COMMISSION AGREEMENT**

This Theatrical Adaptation And Commission Agreement ("Agreement") is made as of this 14th day of March 2016 for the working title "Goosebumps the Musical: Phantom of the Auditorium", by and between the following four (4) parties as identified and defined at Roman-numeral items "I" through "V" hereinbelow:

> The Theatres (Producers)
> **I. Oregon Children's Theatre, (Inc.)** ("OCT"), which entity OCT warrants and represents to Adaptors is a 501(c)(3) non-profit corporation having its place of business at "1939 NE Sandy Boulevard, Portland, OR 97232 USA" (such address being the "Oregon Children's Theatre" location; hereinafter, "Theatre Location #1"); and
>
> **II. First Stage (Milwaukee, Inc.)**, ("FS"), which entity FS warrants and represents to Adaptors is a 501(c)(3) non-profit corporation with a place of business at "325 W. Walnut St, Milwaukee WI 53212 USA." The theatrical productions will take place at "929 N. Water St, Milwaukee, WI 53202 USA" (such address being the "Todd Wehr Theatre-Marcus Center For The Performing Arts" location; hereinafter, "Theatre Location #2"), on the one hand; it being understood that OCT and FS are each sometimes hereafter collectively referred to as "Producers" herein; or, in the singular number as the context may require or suggest, as a "Producer" herein, and are each jointly and severally responsible as well as collectively responsible for their obligations and the obligations of Producers herein;

> and,

> The Artists (Adaptors)
> **III. Mr. John Maclay** ("Mr. Maclay"), an adaptor, lyricist, librettist, author, and artist, and an individual with an address at "c/o Gurman Agency LLC, 14 Penn Plaza, Suite 1703, New York, NY 10122-1701 USA"; and
>
> **IV. Mr. Danny Abosch** ("Mr. Abosch"), a composer, arranger, adaptor, musician, lyricist, librettist, author, orchestrator, and artist, and an individual with an address at "c/o Gurman Agency LLC, 14 Penn Plaza, Suite 1703, New York, NY 10122-1701 USA", on the other hand; it being understood that Mr. Abosch and Mr. Maclay are each sometimes hereafter collectively referred to as "Adaptors" herein; or, in the singular number as the context may require or suggest, as an "Adaptor" herein, and are each jointly and severally responsible as well as collectively responsible for their obligations and the obligations of Adaptors herein.

**WHEREAS**, it is further understood and acknowledged that Producers and Adaptors, and SEI are sometimes hereafter collectively referred to as the "Parties" hereto; or, in the singular number as the context may require or suggest, as a "Party" hereto;

**WHEREAS**, Producers entered into, or will enter into, a signed written contract ("SEI Contract") with Scholastic, Inc. d/b/a Scholastic Entertainment ("SEI"), which is or which is to be fully-executed by SEI, OCT, and FS, respectively, setting forth all the provisions and conditions by and under which SEI grants and licenses to Producers and each of them a non-exclusive license and assignable, licensable, and sub-licensable right to adapt the book (the "Book") entitled "GOOSEBUMPS: Phantom of the Auditorium" by R.L. Stine, all rights for which SEI has indicated to Producers are either owned or controlled by SEI, including without limitation the right to adapt the Book for all the purposes contemplated by this Agreement;

**WHEREAS**, Producers, with SEI's full prior knowledge and consent as warranted to Adaptors by Producers, now wish to commission and engage, and hereby do commission and engage Adaptors, and each of them, pursuant to the provisions of Paragraph 1 hereinbelow, to write and develop a musical stage adaptation (the "Play") - comprised of a script or libretto ("Script", or "Libretto"), music ("Music"), and lyrics ("Lyrics");

**WHEREAS**, the Play shall be adapted from the Book, to which Adaptors will add certain original and additional content to be further determined pursuant to their creative and collaborative processes;

**WHEREAS**, the Play shall be written so as to run between approximately sixty (60) minutes in length and seventy-five (75) minutes in length; and

**WHEREAS**, Adaptors wish to write and develop the Play, and hereby accept such commission and engagement;

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt of which are hereby acknowledged by each of the Parties, Producers and Adaptors hereby further agree as follows:

1. **WORK-FOR-HIRE**. The Parties further agree as follows:

(a) <u>Work-For Hire</u>. Adaptors individually and collectively acknowledge and agree that the Play commissioned hereunder is work specifically ordered by and commissioned by Producers for live-stage productions at the following individual  two (2)theatres of each Producer: "Theatre Location #1" and "Theatre Location #2 (collectively, the "Producer Theatres"), subject to the further provisions of this Agreement regarding SEI-Licensed (*see* Paragraph 1A), Producer-Licensed (*see* Subparagraph 8[a]), and Adaptor-Licensed (*see* Subparagraph 8[b]) third-party productions of the Play. Adaptors further acknowledge and agree that the Play shall be considered a "work-for-hire" and "work-made-for-hire" as such phrases are defined under the copyright laws of the United States, it being understood and acknowledged by Adaptors that Producers hereby convey and otherwise transfer any and all of such work-for-hire and work-made-for-hire rights to and for the benefit of Producers' licensor SEI, but subject to the remaining provisions of this Paragraph 1.

(b) <u>Reservation Of Adaptors Rights In Drafts And Discarded Material</u>. Notwithstanding any provision in the foregoing or elsewhere in this Agreement which may be arguably construed or interpreted to the contrary, it is further understood, acknowledged, and agreed by and between the Parties that only approved, final material which actually appears in the Play pursuant to Paragraphs 4 through 6 hereinbelow, shall be deemed to be owned by SEI pursuant to the provisions of Subparagraph 1(a) hereinabove. Any and all prior or other drafts of such material, any discarded material not used in the Play, and any elements and other incidents thereof, shall (to the extent not containing SEI's or Producers' pre-existing intellectual property) instead be and remain the sole property of the Adaptors, and neither Producers nor SEI shall make any claim thereto.

(c) <u>Reservation Of Adaptors Rights In The Event Of Termination</u>. Notwithstanding any provision in the foregoing or elsewhere in this Agreement which may be arguably construed or interpreted to the contrary, it is further understood, acknowledged, and agreed by and between the Parties that the work-for-hire and work-made-for-hire provisions of Subparagraph 1(a) hereinabove shall be deemed and rendered void by any termination of Adaptors or either of them hereunder. In the event of any such termination, all rights, including without limitation all copyrights, in any and all work-product and other materials generated by Adaptors or either of them hereunder, shall (to the extent not containing SEI's or Producers' pre-existing intellectual property) be deemed to fully revert to Adaptors for Adaptors' sole use and benefit, and neither Producers nor SEI shall make any claim thereto.

(d) <u>Reservation Of Adaptors Rights To Credit And Compensation For Ancillary Markets</u>. Notwithstanding any provision in the foregoing or elsewhere in this Agreement which may be arguably construed or interpreted to the contrary, it is further understood, acknowledged, and agreed by and between the Parties that the work-for-hire and work-made-for-hire provisions of Subparagraph 1(a) shall not apply in connection with any exploitation or other use of the Play in any and all allied, ancillary, incidental, residual, derivative, and subsidiary markets of any kind or nature including without limitation film, television, music publishing, broadcast, commercials, print publishing, electronic publishing, Internet, social media, personal appearances, lectures, workshops, schools, camps, theme parks, and other plays (collectively, "Ancillary Markets"), as acknowledged by Adaptors' continuing economic interest therein pursuant to the provisions of Subparagraph 3(b) hereinbelow, and as acknowledged by Adaptors' right to credit in connection with the Ancillary Markets pursuant to Paragraph 7 hereinbelow.

1A. **SEI-LICENSED THEATRES**. Adaptors further acknowledge and agree that SEI, but not Producers, shall have the right at any time to license any or all of SEI's rights in and to the Play pursuant to Paragraph 1 hereinabove for exhibition at any theatre ("SEI-To-Third-Party License", or "SEI-Licensed" performances), but only provided:

(i) <u>It Is Not A Producer Theatre</u>. Such theatre is not one of the above-defined two (2) Producer Theatres in Paragraph 1 hereinabove; and

(ii) <u>It Is Not A Producer-Licensed Theatre</u>. Such theatre is not one of the Producer-Licensed theatres identified by Producers or otherwise pursuant to Subparagraph 8(a) hereinbelow; and

(iii) <u>It Is Not An Adaptor-Licensed Theatre</u>. Such theatre is not one of the Adaptor-Licensed theatres identified by Adaptors pursuant to Subparagraph 8(b) hereinbelow;

and only further provided that SEI first furnishes to Adaptors, so as to be received by Adaptors in advance of the opening performance of the corresponding run of the Play, in each case, a signed written contract for and corresponding to each such SEI-To-Third-Party License whereby and whereunder Adaptors, while not paid an advance for same, are paid, *inter alia,* in all territories, in all media, and in perpetuity, a royalty of no less than Five Percent (5%) of Gross Weekly Box Office Receipts ("GWBOR") as defined at Subparagraph 3(c) hereinbelow, minus only such commissions which are specifically allowed as "Allowable Deductions" from GWBOR pursuant to the provisions of Subparagraph 3(c) hereinbelow, for and with respect to each such proposed SEI-To-Third-Party License exhibition.

2. **LICENSE OF OTHER RIGHTS**. Irrespective of any provision of Paragraph 1 hereinabove which may be arguably construed or interpreted to the contrary, Adaptors hereby license to Producers, and SEI hereby confirms, the right of Producers to produce, present, run, and exhibit the Play at each of the four (4) theatres currently owned and controlled by Producers, but only as follows, it being understood that no other person or entity other than Producers shall be entitled to produce, present, run, and exhibit the Play at these two

(2) sequentially-numbered Theatre Locations (Theatre Location #1 and #2, ) identified immediately hereinbelow:

(a) <u>Oregon Children's Theatre</u>. With regard to the "Oregon Children's Theatre" location at 1939 NE Sandy Boulevard, Portland, OR 97232 USA ("Theatre Location #1"), OCT shall produce and exhibit performances of the Play hereunder beginning October 14, 2016, and running through and including November 20, 2016. Any productions or performances at Theatre Location #1 outside the period of those bracketed calendar dates, if any, shall require separate and additional compensation to Adaptors, which shall include without limitation, as a starting point for negotiation, the contingent compensation therefor payable to Adaptors pursuant to Subparagraph 3(b).

(d) <u>Todd Wehr Theatre - Marcus Center For The Performing Arts</u>. With regard to the "Todd Wehr Theatre-Marcus Center For The Performing Arts" location at 929 N. Water Street, Milwaukee, WI 53202 USA ("Theatre Location #2"), FS shall produce and exhibit performances of the Play hereunder beginning with the first preview on October 13, 2016, then with an opening on October 14, 2016 and running through and including November 13, 2016. Any productions or performances at Theatre Location #4 outside the period of those bracketed calendar dates, if any, shall require separate and additional compensation to Adaptors, which shall include without limitation, as a starting point for negotiation, the contingent compensation therefor payable to Adaptors pursuant to Subparagraph 3(b).

(e) <u>Archival Recording</u>. In addition to and in connection with the foregoing, Adaptors license to Producers the limited permission to create an audio and an audio-visual recording of the Play (collectively, "Archival Recording"), provided that any version of any Archival recording intended to be saved and/or used must be furnished in full to Adaptors for his own archival purposes; and it being further understood that, subject to the foregoing, such Archival Recording shall be used only by Producers, and only and exclusively for the archival purposes, promotional purposes, or grant-making purposes of Producers. Under no circumstances shall Producers, SEI, or any other person or entity cause or allow any use of the Archival Recording for any pecuniary or other commercial purposes whatsoever. In addition to and without limitation to the foregoing, Producers and each of them and SEI each acknowledge, understand, and agree that no more than fifteen (15) minutes of the Play shall ever be made public in the context of the Archival Recording.

3. **<u>PAYMENTS TO ADAPTORS; DELIVERY</u>**. The Parties further agree as follows:

(a) <u>Fixed Compensation To Adaptors</u>. In consideration of and for the creation of and delivery by Adaptors to Producers of a draft of the Script and of the Lyrics ("Script and Lyrics") of and for the Play, as well as revised and final Music of and for the Play - it being understood that any rejection of such materials by Producers if ever occurring shall be accompanied by specific written reasons therefor along with meaningful and repeat opportunities of no less than five (5) consecutive occasions to cure any such claimed deficiency or deficiencies consistent with the provisions of Paragraph 5 hereinbelow - Producers agree to pay Adaptors as follows:

(i) <u>The "First Payment"</u>. The sum of Two Thousand, Five Hundred Dollars (US$2,500) to Adaptors, payable so as to be received in full by each of the Adaptors on or before the date upon which both Adaptors execute this Agreement and furnish it to Producers; it being understood that this First Payment sum shall be non-refundable - and shall neither be recoupable from, nor applicable or "offset-able" against, any royalties or any other payments hereunder; and

(ii) <u>The "Second Payment"</u>. The additional sum of Five Thousand Dollars (US$5,000) to Adaptors, payable so as to be received in full by each of the Adaptors within fifteen (15) calendar days following the earlier of:

(a) <u>Second Draft Delivery Date</u>. The date of delivery by Adaptors to Producers of the Second Draft of the Script and Lyrics, as hereinbelow defined; or

(b) <u>Lead Sheets Delivery Date</u>. The date of delivery by Adaptors to Producers of the "lead sheets" ("Lead Sheets") for the Music.

Notwithstanding anything in the foregoing which may be arguably construed or interpreted to the contrary, however, in no event shall the date upon which Adaptors receive the Second Payment in full, be any later than May 1, 2016, for any reason. This Second Payment sum shall also be deemed non-refundable; but, unlike the First Payment, the Second Payment shall be recoupable from and against future royalties hereunder; and

(iii) <u>The "Third Payment"</u>. The additional sum of Five Thousand Dollars (US$5,000) to Adaptors, payable so as to be received in full by the Adaptors within fifteen (15) calendar days following the earlier of

(a) <u>Rehearsal Draft Delivery Date</u>. The date of delivery by Adaptors to Producers of the Rehearsal Draft, as

3

hereinbelow defined; or

(b) <u>Lyrics Delivery Date</u>. The date of delivery by Adaptors to Producers of the Lyrics, as hereinabove defined; or

(c) <u>Music Delivery Date</u>. The date of delivery by Adaptors to Producers of the Music, as hereinabove defined.

Notwithstanding anything in the foregoing which may be arguably construed or interpreted to the contrary, however, in no event shall the date upon which Adaptors receive the Third Payment in full, be any later than August 1, 2016. This Third Payment sum shall also be deemed non-refundable; but, unlike the First Payment, the Third Payment shall be recoupable from and against future royalties hereunder.

(b) <u>Additional, Contingent Compensation To Adaptors</u>. In addition to and without limitation to the foregoing, and without deduction or offset of any kind or for any reason, Producers each acknowledge, agree, and understand that Adaptors shall also be entitled to, and shall receive in full, additional compensation at the source in the form of royalties ("Royalties On Producer Gross") in the amount of Five Percent (5%) of all Gross Weekly Box Office Receipts ("GWBOR") for and with respect to any and all performances produced, run, presented, or otherwise exhibited pursuant to Paragraph 2 hereinabove; and also and in addition for and with respect to those produced, run, presented, or otherwise exhibited pursuant to Paragraph 8 hereinbelow; and also and in addition for and with respect to the Ancillary Markets as described in Subparagraph 1(d) hereinabove.

(c) <u>Definition Of Gross Weekly Box Office Receipts</u>. For the purposes of this Agreement, "Gross Weekly Box Office Receipts" ("GWBOR") are measured across each and every performance week (calculated as Friday through Thursday), and are defined as all monies, revenues, sums, credits, remuneration, and other consideration of any kind or nature received by Producers or either of them or their affiliates, from or otherwise relating to any and all ticket sales to, of, or for the Play and all other paid performances and other uses of the Play; less <u>only</u> the following actual expenses itemized at Subparagraph 3(c)(i) through 3(c)(vii) directly hereinbelow ("Allowable Deductions"), <u>only</u> to the extent such Allowable Deductions are actually paid by Producer, and <u>only</u> as directly relating to the Play and to no other performance or work:

(i) <u>Admission Taxes</u>. Federal taxes on admission monies, or other admission taxes, paid by Producers;

(ii) <u>Commissions To Credit-Card Companies</u>. Commissions and fees directly relating to third-party American Express credit-card plans or other similar credit-card plans which are actually paid to, or actually retained by, American Express for sales of tickets, and other fees which are actually paid to, or actually retained by, other credit-card companies for sales of tickets, paid by Producers, it being understood that no such Credit-Card Company Commission shall be deductible hereunder in either case beyond the extent of Three Percent (3%) of the credit-card charge upon which the subject commission is calculated;

(iii) <u>Commissions To Other Third-Parties</u>. Commissions and fees actually paid to, or actually retained by, third-parties which are <u>not</u> credit-card companies, in connection with theatre parties, benefit performances, telephone sales, automated ticket distribution, "Remote Box Offices" (for the purposes herein, defined only as "Ticketron" and "Ticket World", but not any ticket-brokers), and group sales, paid by Producers;

(iv) <u>Subscription Fees</u>. Subscription fees actually paid by individual or organizational theatre patrons and ticket-buyers to Producers, provided that no subscription fee relating to any individual ticket excluded from GWBOR calculation by Producers hereunder exceeds Ten Percent (10%) of the individual ticket's price; and further provided that subscription fees in the aggregate as excluded from GWBOR calculation by Producers hereunder shall not exceed Ten Percent (10%) of the ticket-price base upon which such percentage deduction is calculated;

(v) <u>Library Discounts</u>. Library discounts, but only to the extent actually applicable to the Play, and only to the extent actually taken and deducted by Producers from the ticket-price in a manner which is clearly reflected in writing and indicated to the individual patron and ticket-buyer;

(vi) <u>Entertainment Taxes</u>. Entertainment taxes, but only with respect to ticket-sales in a territory wherein entertainment taxes are actually assessed and charged to Producers.

(vii) <u>"Third-Parties"</u>. It is understood, acknowledged, and agreed by Producers hereunder, that the phrases "third-party" and "third-parties" hereunder, refer only to persons or entities that are neither Producers nor SEI on the one hand, nor any "affiliate" of Producers on the other hand as defined in Subparagraph 2(e) hereinbelow.

(d) <u>Limits, And Cap, On Deductions</u>. Further to Subparagraph 3(c) hereinabove, only deductions which directly relate to the Play and no other work may qualify as Allowable Deductions. If the documentation generated in connection with any ticket-

order, on the other hand, does not break-down and expressly specify the portion of a given ticketing fee only attributable to the Play and to no other work, for example, then such ticketing fee shall not *pro rata* or otherwise qualify as an "Allowable Deduction" hereunder, and instead shall be disallowed as a deduction hereunder in its entirety for the purposes of calculation of monies owed Adaptors. Additionally, irrespective of any provision in the foregoing or elsewhere which may be arguably construed or interpreted to the contrary, to the extent that either or both Producers (or, in the case of SEI-Licensed performances, to the extent that SEI, as applicable) seek to take any Allowable Deductions from GWBOR for the purposes of calculating Royalties On Producer Gross for Adaptors hereunder, then:

(i) Actual And Direct Costs. Such deductions shall be limited to the actual and direct out-of-pocket costs actually incurred by the Producer (or, in the case of SEI-Licensed performances, actually incurred by SEI, as applicable) in connection therewith to generate such item of gross revenue from which the deduction is intended to be taken; and

(ii) Cap. In any event, such deductions shall be capped at and limited to the sum of Five Thousand Dollars (US$5,000), total, as a grand total across all runs, all performances, and all accounting periods (and not per run, performance, or accounting period alone), such that Producers (or, in the case of SEI-Licensed performances, SEI, as applicable) shall subtract no more than a grand-total Five Thousand Dollars (US$5,000) against the Five Percent (5%) of GWBOR royalty to which Adaptors are entitled hereunder when calculating any monies due Adaptors under this Agreement.

(e) "Affiliate". For the purposes of the foregoing Subparagraph 3(b), and the foregoing Subparagraph 3(c)(vii), an "affiliate" of either or both of the Producers shall mean any other person or entity related thereto by way of familial relationship, common ownership, or common control, and shall in addition mean any other person or entity with whom the Producer may have a contractual or business agreement or other arrangement which at all relates to the subject matter of this Agreement in any way, including without limitation any officer, director, manager, managing member, controlling person, member, stockholder, shareholder, owner, employee, agent, contractor, vendor, representative, licensee, devisee, legatee, transferee, heir, executor, administrator, trustee, or other form of representative, assignee, delegatee, or transferee.

3A. **ACCOUNTING AND AUDIT**. The Parties further agree as follows:

(a) Routing Of Payments. Further to Paragraph 15 hereinbelow, all payments for Adaptors and either of them hereunder shall be made to "Gurman Agency LLC a/a/f Abosch & Maclay", and mailed to:

> Gurman Agency LLC
> 14 Penn Plaza, Suite 1703
> New York, NY 10122-1701 USA

Together with and accompanying each of the payments, each party comprising Producer - that is, both OCT, and also FS - shall each submit separate written accounting statements ("Accounting Statements") themselves containing further separate, detailed written box office statements signed by, and certified as fully accurate by, the Box Office Manager (or each of the Box Office Managers, if more than one) of each corresponding theatre and each separate location, clearly stating the Box Office Manager's support of the accuracy of the written accounting and other information contained therein. All accounting to Adaptors hereunder shall be on a calendar-monthly basis. All payments and statements hereunder shall be furnished by Producers so as to be received together and in full by Adaptors on no less than a calendar-monthly basis. All final payments and statements hereunder shall be furnished by Producers so as to be received together and in full by Adaptors no later than fourteen (14) calendar days after the last performance presented by each Producer, OCT and FS, in connection with which royalties or other monies are payable to Adaptors. Any failure to submit any payments as required herein so as to be received by Adaptors within the so-required time-parameters shall result in interest automatically accruing and payable to Adaptors hereunder at a simple annual interest rate of Ten Percent (10%), or *pro rata* portion thereof calculated by the number of days late corresponding to each late payment, as may be applicable. Adaptors reserve the right to invoice Producers for such interest, and/or assess such interest as an audit-finding pursuant to the provisions of Subparagraph 3(c) hereinbelow.

(b) Detail Of Accounting Statements. All Accounting Statements shall include and clearly indicate, at minimum, the following information in writing:

(i) All box office reports including all gross charges, from each and every theatre or other venue, signed and certified by the Box Office Manager of each such venue;

(ii) Complete records of all ticket sales, at each and every venue;

(iii) Complete records of all venue receipts, for each and every venue;

(iv) Complete records of each and every venue's own actual box office grosses;

(v) Complete records of all of Producers' receipts relating to each and every venue;

(vi) All "walk-up window statements" relating to each and every venue;

(vii) All "performance reports" relating to each and every venue; and

(viii) All "house-count" numbers relating to each and every venue; and

(ix) Detailed breakdowns of the quantity of tickets purchased at each price-point and price-level.

(c) Audit, Inspection, Review, And Examination Of Records. Adaptors, and/or the representative or representatives of Adaptors, as Adaptors may from time to time elect in their sole discretion, shall have the right to examine and make copies of each individual Producer's books, statements, records, and any other materials directly relating to the sales of tickets for the production of the Play, as well as those of any and all affiliates of Producers. Any such audits will be conducted during normal business hours. Alternatively, Adaptors may elect to request that the same copied material be furnished to Adaptors by mail and electronic mail (e-mail), or express-mail, it being understood that such request if made shall not preclude Adaptors from also and in addition conducting such audit, inspection, review, and/or examination of records hereunder as Adaptors may further determine may be needed or appropriate hereunder. If either Producer or both Producers are found to have under-paid or otherwise under-counted any royalties or other monies payable hereunder or if any other short-fall is discovered to the extent of Five Percent (5%) or more when measured across any accounting period, then Producers shall pay the all audit costs and expenses incurred or expected to be incurred by Adaptors and each of them, as well as, in addition, any and all monies due as indicated by the audit, inspection, review, and/or examination.

3B. **USE CONSTITUTES ACCEPTANCE**. The Parties further agree that, with respect to delivery of any item or materials hereunder, such item or materials shall be deemed satisfactory and fully-accepted by Producers if used by Producers for or in connection with any performance of the Play, or in any advertising, publicity, marketing, or other promotion of the Play.

4. **SCRIPT DEVELOPMENT AND DELIVERY**. The Parties further agree as follows:

(a) Script Drafts. Adaptors agree to write and deliver to Producers:

(i) First Draft. A completed first draft ("First Draft") of the Play, including the First Draft of the Script due on April 1, 2016 and 75% of Music (demos and appropriate lead sheets for young performer auditions and call backs) due on April 15, 2016. 100% of Music (demos and lead sheets) due on or before May 15, 2016, it being understood that the Parties intend the First Draft be used in connection with a workshop currently intended to be scheduled during the second-half of the month of May, 2016, on a date and time intended to be further mutually-agreed by and between Producers and Adaptors; and

(ii) Second Draft. A completed second draft ("Second Draft") of the Play, including the Second Draft of the Script and Lyrics, on or before July 15, 2016;

(iii) Rehearsal Draft. A rehearsal draft ("Rehearsal Draft") of the Play, on or before August 15, 2016;

(iv) Final Script. A final script ("Final Script") of the Play, as staged; as well as a set of lead sheets ("Lead Sheets"), as performed; in each case no later than two (2) weeks after the September 23, 2016 opening performance at Theatre Location #2.

(b) Source Material, And Original Work. Adaptors each represent and warrant that pursuant to the provisions of Paragraph 11 hereinbelow, all Adaptor-Supplied Material will be original to Adaptors, except for:

(i) Source Material. Source material of and from the underlying Book; and

(ii) Licensed Material. Third-party material, if any, which Adaptors have secured permission to utilize in the Play; and

(iii) Public Domain Material. Material in the public domain.

(c) Pre-Approval Edits. Adaptors agree to perform script-editing and rewrites as reasonably requested by Producers through and including the date of the scheduled September 23, 2016 opening of the Play in Theatre Location #2, and for two (2) weeks thereafter. Adaptors shall have the right but not the obligation to perform any further script-writing and rewrites, if any, which

may be requested after the end of such two-week period.

(d) <u>Approvals</u>. All material elements of the Play, including the Libretto, Lyrics, and Music, shall be subject to the mutual approval of Adaptors and Producers. To the extent that Producers are required to involve SEI in the review and approval of such material elements, then Producers shall be responsible for communicating any such SEI input to Adaptors in a timely manner such that it can be included and incorporated in delivery of materials by Adaptors hereunder. Adaptors shall not be responsible for any claimed untimely delivery caused by any failure by Producers to obtain SEI's timely input in a timely manner.

5. **FAILURE TO DELIVER: BREACH, GENERALLY**. The Parties further agree as follows:

(a) <u>Delivery And Cure</u>. If Adaptors fail to make delivery of the Play on or before the respective dates specified therefor in Paragraph 4(a) hereinabove, or if the Play as delivered is not satisfactory to Producers - it being understood that any rejection of such materials by Producers if ever occurring shall be accompanied by specific written reasons therefor along with meaningful and repeat opportunities of no less than five (5) consecutive occurrences to cure any such claimed deficiency or deficiencies - or if Adaptors otherwise fail to comply with the requirements of Paragraph 4 hereinabove, Producers will notify Adaptors of same in writing and thereupon request the consent of Adaptors to any such proposed Modifications, such consent shall not be unreasonably withheld, delayed, or conditioned by Adaptors - meaning, specifically and only, that to the extent Adaptors decline any such proposed consent, Adaptors shall furnish Producers an all-inclusive written list of reasons for declining such proposed consent, accompanied by any curative suggestions which Adaptors may have towards accomplishing the mutually-desired objective of consensus on the issue.

(b) <u>Termination, Breach, And Cure</u>. Neither Adaptor shall be terminated from work hereunder absent cause shown therefor and clearly notified to Adaptors in writing. Subject to the provisions of Paragraph 3(a) and Subparagraph 5(a) hereinabove, no Party shall be deemed in breach of this Agreement unless and until the other Party claiming their breach hereunder furnishes a detailed writing specifying the reasons for the claim of breach, to the Party claimed to be in breach. The Party receiving such notice shall thereupon have a period of time of fifteen (15) calendar days within which to cure such breach and advise the occurrence and manner of such cure to the Party that issued the such breach-notice. In the event that a breach of this Agreement is not cured pursuant to the foregoing provisions, the Parties may avail themselves of their respective rights and remedies at law and in equity pursuant to Paragraph 12 hereinbelow, including without limitation the commencement of proceedings seeking damages and injunctive relief as may be applicable.

6. **APPROVALS.** The Parties further agree as follows:

(a) <u>Post-Approval Edits</u>. Producers shall notify Adaptors in writing of the acceptance and approval by Producers of the Final Script; it being understood, however, that any dated, written request for approval of any item or material furnished hereunder by Adaptors to Producers which is not met with a written notice of disapproval by Producers specifying the reasons therefor within fourteen (14) calendar days of the date of the approval-request, shall be deemed automatically approved hereunder. Subject to the provisions of this Paragraph 6, Producers agree that, following acceptance and approval by Producers of the Final Script, Producers shall not make, consent to be made, suffer, or otherwise allow any addition to, omission to, change to, edit of, alteration of, or modification of (collectively, "Modifications" of) the Libretto, Lyrics, or Music of the Play for purposes of live performances or otherwise,   except, if at all, as may be further mutually-approved and mutually-agreed in writing as between Producers on the one hand, and Adaptors on the other hand, with the prior written consent of each of the respective Adaptors. To the extent that Producers may seek to involve SEI in the review and approval of such additions, omissions, changes, edits, alterations, or modifications, then Producers shall be responsible for communicating any such SEI input to Adaptors in a timely manner. Adaptors shall not be responsible for any claimed untimely delivery caused by any failure by Producers to obtain SEI's timely input in a timely manner. Adaptors acknowledge that if and to the extent Producers request the consent of Adaptors to any such proposed Modifications, such consent shall not be unreasonably withheld, delayed, or conditioned by Adaptors - meaning, specifically and only, that to the extent Adaptors decline any such proposed consent, Adaptors shall furnish Producers an all-inclusive written list of reasons for declining such proposed consent, accompanied by any curative suggestions which Adaptors may have towards accomplishing the mutually-desired objective of consensus on the issue. Producers have indicated to Adaptors that any Modifications, if so made and delivered to Producers, if any, shall automatically become the sole and exclusive property of SEI upon delivery by Adaptors to Producers, free from any liens, encumbrances, or other obligations, pursuant to the provisions of Paragraph 1 hereinabove and the remaining provisions of this Agreement.

(b) <u>Mutual Approval Over Personnel</u>. Adaptors agree that Adaptors and Producers shall have mutual approval over the following, and that Producers shall not unilaterally determine any of the following at any time:

(i) <u>Cast Members</u>. Adaptors and Producers shall have mutual approval over the selection of each cast member

appearing in each production and performance of the Play, and any and all replacements thereof (if any), and all understudies; and

(ii) <u>Music Director</u>. Adaptors and Producers shall have mutual approval over the selection of the Music Director for each production and performance of the Play, and any and all replacements thereof (if any); and

(iii) <u>Production Artwork</u>. Adaptors and Producers shall have mutual approval over the creation and selection of all production artwork of and for the Play. Producers shall have final approval.

With respect to each of the foregoing persons and items referenced in Subparagraph 6(b)(i) through 6(b)(iii) hereinabove, Producers shall e-mail each and both of the Adaptors a written notification of Producers' proposal of any such proposed person or item, to seek the written approval of Adaptors of the proposed choice. Adaptors shall endeavor to respond to all such requests by Producers within seventy-two (72) hours of the receipt by Adaptors of such e-mailed request.

(c) <u>Rehearsals, Previews, And Performances</u>. Producers shall advise Adaptors in advance and in writing of the dates, times, and specific locations of all scheduled and intended rehearsals, previews, and performances of the Play, and shall therein invite Adaptors to be physically present at each such occurrence and event in sufficient time in advance for Adaptors to make arrangements to physically attend. Adaptors shall have the right but not the obligation to attend each such occurrence and event.

(d) <u>Producer Approval Over Design Elements</u>. Producers, and not Adaptors, shall have the exclusive right to approve the following design elements of and concerning the Play: the costumes, the staging, and the sets.

(e) <u>Music And Lead Sheets</u>. With respect to the proposed original music to be used in the Play, Adaptors will provide Producers with a copy of the Music in the form of "lead sheets", and Adaptors understand that it is the intention of Producers to in turn relay these materials to SEI.

6A. **ORCHESTRATIONS; FIRST NEGOTIATION AND LAST REFUSAL**. The Parties further agree as follows:

(a) <u>Orchestrations</u>. In addition to their otherwise-existing economic obligations hereunder, Producers acknowledge, understand, and agree that they must purchase and obtain "orchestrations" in connection with each and every performance of the Play. "Orchestrations" are defined as the adaptation or re-adaptation of existing Music for the purpose of use at any theatres licensed or otherwise referenced herein, or any subsequent theatres, or for any subsequent performances. It is further understood, acknowledged, and agreed by Producers that Orchestrations are not component parts of the material otherwise required to be delivered by Adaptors to Producers hereunder as "Music" or otherwise. Rather, Orchestrations are incremental to, and separate and apart from, the delivery obligations of Adaptors hereunder, and Adaptors may charge and invoice for them separately as there herein-required Orchestrations are requested. Adaptors have advised Producers that Adaptors maintain all Orchestrations and component parts thereof are and contain separate items of copyrightable subject matter separate and apart from the underlying work upon which the Orchestration is or is intended to be predicated, and separately registrable as such by Adaptors or each of them with the U.S. Copyright Office or otherwise. Orchestrations must be further requested as needed by Producers, and as so requested, will require separate compensation to Adaptors additional to the compensation already payable to Adaptors hereunder.

(b) <u>First Negotiation, Last Refusal</u>. Producers each acknowledge and agree that as Producers seek the creation of any Orchestrations, then Producers will first negotiate with Mr. Abosch within an exclusive window of a consecutive thirty (30) calendar days ("Thirty-Day Window") of steady and uninterrupted good faith negotiation towards an appropriate written agreement for the purchase or license of each such Orchestration from Mr. Abosch ("Orchestration License"). If and only if an Orchestration License is not executed within the Thirty-Day Window, then Producers shall be free to negotiate for the purchase or license of Orchestrations from such alternate source ("Third Party Orchestrator") as Producers may elect and notify to Mr. Abosch in writing. If and in the event that Producers thereupon receive a *bona fide* written offer or any other form of offer ("Third-Party Offer") from any proposed Third Party Orchestrator for the proposed Orchestration, then, prior to Producers or either of them making any commitment of any kind to the Third-Party Orchestrator, Producers shall first furnish a true and complete copy of the Third-Party Offer to Mr. Abosch, and accord Mr. Abosch a period of twenty (20) calendar days within which to match the economic provisions of the Third-Party Offer pursuant to the written notice to Producers ("Match Notice"). Upon the issuance by Mr. Abosch to Producers of any Match Notice, if occurring, Mr. Abosch and Producers shall be deemed to have contracted to create the Orchestrations pursuant to the economic provisions of the Match Notice, and Producers shall terminate any further negotiations with the Third-Party Orchestrator therefor.

7. **CREDIT, BILLING, NAME AND LIKENESS**. The Parties further agree as follows:

8

(a) <u>Credit To Adaptors</u>. With the one (1) exception of printed newspaper advertisements of a size of one-quarter (1/4) of a or smaller, each of the Adaptors in all other respects shall receive a legible, textual billing credit in each and every case and in each and every medium wherein the Play is "billed", advertised, publicized, marketed, or otherwise promoted (and additionally in connection with any and all uses of the Play or any elements thereof in any of the Ancillary Markets), including without limitation in the context of any other newspaper advertisements, any "playbills" or other programs, and any publication of the Play as a book. If there are no "playbills" or printed programs in connection with a specific performance or a specific theatre, Producers shall nevertheless still be required to credit Adaptors as provided herein, using such manners and such technologies as will ensure that each theatre-patron will be provided a reasonable opportunity to read and hear the herein-required credit at least one time each prior to or during the performance, whether by way of "house-board", marquee, electronic sign or signage, or verbal announcement to the audience in each case. Without limitation to the foregoing, the written legible, textual billing credit will also be accorded and given to each and both of the Adaptors in and on all programs, "house-boards", marquees, posters, Internet websites, "e-blasts" and other uses, electronic communications, press releases, and all other communications of, for, or regarding the Play which are under the direct or indirect control of the Producers or either of them. The credit accorded to Adaptors hereunder shall read in exactly the following form, on a single line of text in each case:

<div align="center">"Book and Lyrics by John Maclay, Music and Lyrics by Danny Abosch".</div>

Should the Play become published as a book, then this credit will appear on such book's title

(b) <u>Further Specifications Of Credit To Adaptors</u>. The credit accorded to Adaptors pursuant to Subparagraph 7(a) hereinabove ("Adaptors Credit") shall in all cases be in a prominent size, a prominent type and typeface, a prominent font, prominent boldness, and a prominent color. Under no circumstances shall the Adaptors Credit measure to be in a size any less than Fifty Percent (50%) of the title of the Play itself. The Adaptors Credit shall in each case appear in a prominent position relative to the remainder of the content to which the Adaptors Credit relates, and always on a single and separate line not to be shared with any other text, any other credit, or any other element of the production. Additionally, each name of each of the Adaptors will appear directly below the title of the Play, as indicated hereinabove, and always above the name of the Director. No other person or entity shall receive credit on the "playbill" or other program for the Play in a size of font equal to or larger than that of the Adaptors. Each of the Adaptors shall also receive a textual biographical narrative and credit in any "playbill" or other program relating to the Play which is published or distributed under the control of the Producers or either of them (or, in connection with the SEI-Licensed performances, SEI) wherein any other person or entity involved in the production receives such biographical narrative or credit.

(c) <u>Credit To Theatres</u>. Producers shall receive credit in the programs of all theatrical productions of the Play under control of the Adaptors, to read:

<div align="center">"Originally Commissioned by Oregon Children's Theatre,<br>Stan Foote, Artistic Director,<br>and First Stage, Jeff Frank, Artistic Director".</div>

Should the Play become published as a book, then this credit will appear on such book's title        Adaptors will endeavor to accord a comparable credit in the context of any Adaptor-Licensed productions of the Play.

(d) <u>SEI And Credit</u>. In the event that any conduct or activities of Producers fail to adhere to the credit provisions of Subparagraph 7(a), 7(b), or this Subparagraph 7(d), in addition to the other rights and remedies of Adaptors hereunder, Producers shall be fully, jointly, and severally liable and responsible to Adaptors therefor, and shall, *inter alia* and without limitation to the foregoing, work diligently so as to immediately cure any claimed omissions or other defects in credit notified by Adaptors to Producers or to either of them. The foregoing strict credit obligations in favor of Adaptors are of the essence of this Agreement.

(e) <u>Ancillary Markets; Most Favored Nations</u>. Credit must be accorded to both Adaptors in connection with the use of the Play or any portion or element thereof, in any and all of the Ancillary Markets, in a manner no less favorable than the credit accorded to any other person or entity in any such individual case.

8. **FURTHER PROVISIONS ON LICENSING AND ROYALTIES**. The Parties further agree as follows:

(a) <u>Five-Year Term</u>. Adaptors hereby acknowledge the license of the following rights to Producers, in each case for and limited to the period of time which is the five (5) year period of November 20, 2016 through November 19, 2021 ("Licensing Term"):

(i) <u>Oregon and Southwest Washington</u>. Without the further prior written approval of Adaptors, OCT, (and not FS), shall have the exclusive right to use and perform the Play, in the English language only, throughout the state of Oregon, and additionally in Southwestern Washington State, but only pursuant to the requirements in favor of Adaptors

<div align="center">9</div>

contained in Subparagraph 3(b) hereinabove and Subparagraph 8(a)(iii) hereinbelow providing Adaptors additional compensation therefor. For the purposes of the foregoing, "Southwestern Washington State" is limited to the following six (6) counties of Washington State only: Clark County, Cowlitz County, Lewis County, Pacific County, Skamania County, and Wahkiakum County. Subject to the Cast Album and Sheet Music provisions of Paragraph 9 hereinbelow, Adaptors shall not authorize the Play for use on stage or in any other media, configuration, or format during the Licensing Term in the state of Oregon or in Southwestern Washington State, other than in the context of productions or exhibitions of the Script or Play produced by OCT pursuant to this Subparagraph 8(a)(i).

(ii) <u>Wisconsin, and Illinois</u>. Without the further prior written approval of Adaptors, FS, (and not OCT, and not SEI), shall have the exclusive right to use and perform the Play, in the English language only, throughout the state of Wisconsin, and additionally within the fifty (50) mile radius of Theatre Location #2 within the state of Illinois ("The MYAC Area"), but only pursuant to the requirements in favor of Adaptors contained in Subparagraph 3(b) hereinabove and Subparagraph 8(a)(iii) hereinbelow providing Adaptors additional compensation therefor. Subject to the Cast Album and Sheet Music provisions of Paragraph 9 hereinbelow, Adaptors shall not authorize the Play for use on stage or in any other media, configuration, or format during the Licensing Term in Wisconsin or in The MYAC Area, other than in the context of productions or exhibitions of the Script or Play produced by FS pursuant to this Subparagraph 8(a)(ii).

(iii) <u>Subsequent And Additional Advances</u>. With respect to each and every run or other production, presentation, or exhibition of the Play or any portion thereof occurring pursuant to Subparagraphs 8(a)(i) or 8(a)(ii) hereinabove, and at all times subject to the contingent compensation provisions of Subparagraph 3(b) hereinabove, each Producer shall, in addition, pay Adaptors a separate Five Thousand Dollar (US$5,000) advance per production, per run, and per presentation at each theatre (collectively, "Subsequent Advances"), which shall in each such case be due so as to be received in full by each of the Adaptors no later than one hundred eighty (180) calendar days prior to the date of the first performance of such production, run, or presentation at each such corresponding theatre. This guaranteed advance is against the royalty percentage stated in 3(b). All royalties corresponding to each such run shall be due and payable to Adaptors pursuant to Paragraph 3A hereinabove, and all monies relating thereto must in any event be received by Adaptors no later than fourteen (14) calendar days after the last performance of such production.

(b) <u>Adaptors Third-Party Licenses; Written Notification</u>. In addition to the productions of the Play produced or co-produced by either or both Producers pursuant to Paragraph 2 hereinabove, productions of the Play licensed by SEI, and productions of the Play licensed by Adaptors to Producers pursuant to Subparagraph 8(a) hereinabove, Adaptors may also themselves license or cause the licensing of the Play to third-parties ("Adaptors Third-Party Licenses"), in any territory, and in perpetuity, irrespective of any provision of Paragraph 1 hereinabove which may be arguably construed or interpreted to the contrary. With respect to Adaptors Third-Party Licenses, Adaptors, or the agent for the Adaptors ("Adaptors Agent"), will notify Producers of such Adaptors Third-Party Licenses, if, as, and when occurring. Adaptors Agent will thereupon remit Five Percent (5%) to Producers (that is, two-and-one-half percent [2.5%] to each Producer; hereafter, "Producers Share") of Adaptors' Net Box Office Royalties, calculated as monies actually received by Adaptors as theatrical box office royalties directly relating to the Play, but "Net" after Adaptors Agent's commission, payable to Producers upon the receipt by Adaptors, if occurring, of royalties for Adaptors Third-Party Licenses which correspond to that same time-frame. Under no circumstances shall any compensation paid or payable to Mr. Abosch for Orchestrations be included in the calculation of Net Box Office Royalties, for any reason, however. Producers shall receive Producers Share for all such Adaptors Third-Party Licenses of the Play which may be executed during the five (5) year period of November 20, 2016 through November 19, 2021. Any further Adaptors Third-Party Licenses executed after November 19, 2021, if any, shall not be commissionable or otherwise compensable to Producers, SEI, or any other person or entity.

9. **CAST ALBUM AND SHEET MUSIC**. To the extent acknowledged and granted by SEI, Producers acknowledge and agree that Adaptors shall have the exclusive right, but not the obligation, to produce and sell a "Cast Album" of original music from the Play, and additionally, to produce and sell the sheet music of original music from the Play, in all territories, using all means, and in perpetuity. Producers understand, acknowledge, and agree that all revenue and other consideration derived therefrom shall be and remain the sole property of Adaptors, and shall not be commissionable in any respect to Producers, to SEI, or to any other person or entity. In the event that the Cast Album is produced by Adaptors, Producers may purchase copies of the Cast Album from Adaptors or Adaptors Agent at the wholesale price for such Cast Album - or, alternatively, at a formula calculated by Adaptors as "cost plus 10%", if and in the event that Producers notify Adaptors in writing that Producers will give-away copies of such Cast Albums for fund-raising or promotional purposes, and in such event only to the extent of the actual number of copies given away by Producers. Producers shall at all times maintain an adequate quantity and stock of all Cast Albums and Sheet Music for and at each performance of the Play hereunder at each corresponding theatre and venue where any other merchandise is sold, in numbers of no less than fifty (50) copies of each Cast Album and ten (10) copies of the Sheet Music per each such performance.

10. **TRAVEL, AND WORKSHOPS**. Producers and Adaptors anticipate that a minimum of two (2) trips will be required of Adaptors for workshops within the continental United States in connection with the further development of the Play. Adaptors will be expected

to take one (1) such trip in connection with either a two (2) day workshop, or a three (3) day workshop. Adaptors will be expected to take a second such trip in connection with the two (2) week period prior to and including the October 14, 2016 opening date of the show at Theatre Location #1. In addition thereto, Producers will invite Adaptors to Theatre Location #1, Theatre Location #2, and each Producer-Licensed Theatre hereunder in connection with the opening of the Play at each such location, and Adaptors shall have the right, but not the obligation, to attend each such opening. Producers will pay Adaptors in advance for all travel expenses incurred or expected to be incurred by Adaptors in connection with the several aforementioned trips, and Producers shall also pay Adaptors for any other travel expenses which otherwise relate to the development of the Play, including without limitation:

(a) <u>Airfare</u>. Producers will arrange for, at Producers' expense, Adaptors' airfare, for non-stop daytime air travel; and

(b) <u>Ground Transportation</u>. Producers will arrange for, at Producers' expense, Adaptors' ground transportation; and

(c) <u>Lodging</u>. Producers will arrange for, at Producers' expense, private hotel accommodations for each Adaptor; and

(d) *Per Diem*. A *per diem* of Forty-Five Dollars (US$45) for each Adaptor, for all days or portions thereof in which Adaptors are required or expected to travel hereunder.

11. **<u>REPRESENTATIONS, WARRANTIES, AND INDEMNITIES</u>**. The Parties further agree as follows:

(a) <u>Representations And Warranties By Adaptors</u>. Adaptors represent and warrant to Producers individually, jointly, and severally, that, to the best of Adaptors' knowledge:

(i) <u>Originality</u>. Except for materials based on, or adapted from, the Book, all material in the Play furnished by Adaptors ("Adaptor-Supplied Material") shall be original with Adaptors, except for material which is in the public domain.

(ii) <u>Copyright</u>. Adaptors are aware of no reason why SEI cannot claim and seek copyright protection in and to the Play in the United States and Canada, and Adaptors shall make no challenges to such copyright or copyrights during the pendency of this Agreement or thereafter;

(iii) <u>Unlawful Content</u>. The Adaptor-Supplied Material does not and will not contain any obscene matter, or any libelous or other unlawful matter;

(iv) <u>No Infringement</u>. The Adaptor-Supplied Material does not and will not in any way infringe upon the copyright of, or violate the right of privacy, the right of publicity, or any other right of, any person or entity; and

(v) <u>No Injury</u>. The Adaptor-Supplied Material does not and will not contain any instruction or other matter that may cause injury or damage to the Play's audiences or others, giving due regard to the possible effect that the Play will have on young audiences.

(b) <u>Indemnification By Adaptors</u>. Adaptors hereby indemnify and agree to hold harmless Producers, all its officers, employees, distributors, agents and licensees, and all other sellers of the Play from any damage, loss (except loss of profit), or expense (including attorneys' fees) occasioned by any claim, demand, action, or proceeding based upon the breach of any of the foregoing warranties, provided that such claim, demand, action, or proceeding is first reduced to a final and non-appealable judgment. In defending against any such claim, demand, action, or proceeding, Producers shall have the right to select counsel and the right to withhold amounts otherwise payable to Adaptors under this or any other agreement with Adaptors, and to apply such amounts (as required) in satisfaction of the foregoing indemnities. If at any time Producers conclude that any of the foregoing warranties of Adaptors have been breached, Producers shall have the right, without prejudice to the other rights and remedies of Producers, to refrain from or cease development of the Play, to terminate this Agreement, and to recover from Adaptors any amounts paid hereunder. The foregoing warranties and indemnities shall survive the termination of this Agreement.

(c) <u>Representations And Warranties By Producers</u>. Each of the Producers represent and warrant, individually, jointly, and severally, that, to the best of Producers' knowledge:

(i) <u>Rights</u>. Each Producer either owns, or controls, or else has sought and been licensed and granted, or will be licensed and granted, all rights necessary such that Adaptors may utilize and adapt characters, storylines, and all material elements of the Book for the purpose of the musical stage adaptation of the Book contemplated herein.

(ii) <u>Ability To Contract</u>. Producers have all the requisite power and authority to enter into and perform the provisions and conditions of this Agreement;

(iii) <u>No Infringement</u>. The execution, delivery, and performance by Producers of the provisions of this Agreement do not and will not violate any of the provisions or conditions of any contract or other document or arrangement to which the Producers or either of them are a party, or to which the Producers or either of them or their respective assets are bound, and no agreement by any other person or entity is required to be obtained in connection with the execution, delivery, or performance of this Agreement. Furthermore, neither Producer shall permit any person or entity in their employ or otherwise under their direction to represent, imply, or agree, privately or publicly, directly or indirectly, that the Play is a "Joint Work" as defined in the U.S. Copyright Act (17 United States Code) Section 101, or that the authorship of the Play or other materials delivered hereunder is claimed or held by any person or entity other than Adaptors. Producers both understand, acknowledge, and agree that any and all copyright filings and other filings of an intellectual property nature ("I.P. Filings"), in any territory, will identify the full names of both of the Adaptors as the "Authors" of the Play, and shall fairly and accurately cite Adaptors' authorship of the Play. Adaptors shall be entitled to take all lawful and appropriate measures to correct any I.P. Filings made in contravention of the provisions of the foregoing sentence, further to the indemnity provisions contained at Subparagraph 11(d) hereinbelow.

(d) <u>Indemnification By Producers</u>. Producers hereby indemnify and agree to hold harmless each of the Adaptors and all their officers, employees, distributors, agents, and affiliates, from any damage, loss (except loss of profit), or expense (including attorneys' fees) occasioned by any claim, demand, action, or proceeding based upon the breach of any of the foregoing warranties, provided that such claim, demand, action, or proceeding is first reduced to a final and non-appealable judgment. In defending against any such claim, demand, action, or proceeding, Adaptors shall have the right to select counsel and the right to withhold amounts otherwise payable to Producers under this or any other agreement and to apply such amounts (as required) in satisfaction of the foregoing indemnities. If at any time Adaptors conclude that any of the foregoing warranties of Producers have been breached, Adaptors shall have the right, without prejudice to Adaptors' other rights and remedies, to refrain from or cease development of the Play, to terminate this Agreement, to recover from Producers any amounts due hereunder, and to refrain from remitting royalties otherwise due Producers hereunder. The foregoing warranties and indemnities shall survive the termination of this Agreement.

12. **INTERPRETATION**. This Agreement shall be governed by the laws of the State of New York, as applied to contracts executed and to be wholly-performed within the State of New York. The Parties agree that the courts, state and federal, located within the City of New York, New York County (Manhattan), and the State of New York, shall have exclusive jurisdiction of and over any controversy relating to this Agreement, and/or the Play. Any action commenced in connection with the Play and/or this Agreement shall be commenced with the State of New York, the City of New York, and the Borough of Manhattan.

13. **DELEGATION OF OBLIGATIONS, AND ASSIGNMENT OF RIGHTS**. Adaptors may not delegate any of their obligations hereunder, except as may be approved by Producers in advance on a case-by-case basis. Adaptors, however, may assign their respective rights in or relating to this Agreement, including without limitation the right to receive revenue, and the right to issue a letter or letters of direction further directing the identity of the recipient or recipients of any such payments, upon written notice to Producers or SEI as applicable. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective Parties and their heirs, executors, administrators, and assigns.

14. **NO WAIVER; SEVERABILITY**. The waiver of a breach of, or a default under, any provision of this Agreement shall not be deemed a waiver of any subsequent breach or default. No rights shall be deemed waived hereunder except, if occurring, by a writing signed by the Party to be so charged with such waiver. The provisions of this Agreement are severable, and if any provision of this Agreement is held to be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and shall continue in full force and effect.

15. **AGENCY CLAUSE**. Adaptors individually and collectively hereby irrevocably appoint Susan Gurman ("Adaptors Agent"), Gurman Agency, LLC, 14 Penn Plaza, Suite 1703, New York, NY 10122-1701, as the sole and exclusive agent representing Adaptors with respect to the Play. Adaptors hereby authorize and direct Producers (and, in the case of SEI-Licensed performances, authorize and direct SEI) to make and forward all payments due or to become due to Adaptors hereunder, to and in the name of the Agent, and to accept the receipt of the Agent as full evidence and satisfaction of such payments. Except for the productions of the Play identified hereunder, for all other licenses and for consideration of the services rendered and to be rendered by Adaptors Agent, Adaptors hereby agree that the Agent is entitled to receive and retain as its commission Ten Percent (10%) of all such proceeds, including, without limitation, Adaptors' share of proceeds derived from any and all subsidiary and additional rights, except that, with respect to proceeds derived from amateur performances, the Agent's commission shall be Twenty Percent (20%) instead of Ten Percent (10%). For the purposes of the foregoing, "amateur performances" are defined as performances wholly comprised of non-union actors who are either unpaid, or else paid less than One Hundred-Fifty Dollars (US$150) per week. The agency created herein is irrevocable with respect to the Play and survives any termination of the Agreement.

16. **COMPS AND HOUSE SEATS**. Adaptors will receive eight (8) complimentary tickets in total to the official "opening performance" of the Play as well as complimentary party passes to the opening party, if any. Thereafter, Adaptors shall receive one (1) pair of complimentary tickets to each performance which shall be held until forty-eight (48) hours prior to each performance after which the

12

tickets shall be released for sale to the general public.

17. **INCAPACITY**. In the event that one of the Adaptors becomes incapacitated by way of death, disability, illness, or otherwise ("Incapacitated Adaptor") during the pendency of this Agreement in a manner which prevents him from further performance hereunder, then the other Adaptor ("Remaining Adaptor") shall notify Producers accordingly, upon discovery thereof. The Remaining Adaptor shall have the right to finish the work hereunder himself, and/or select a replacement for the Incapacitated Adaptor, after consultation with Producers in connection therewith. The Remaining Adaptor shall also thereupon have the right to exercise any and all approvals on behalf of the Incapacitated Adaptor. Even in the event that an Adaptor may become an Incapacitated Adaptor, that Adaptor's credit shall nevertheless still be accorded pursuant to the foregoing Subparagraph 7(a) and (b), and his rights to receive any compensation or other remuneration hereunder shall be assignable by will, devise, trust, administration, executorship, or otherwise as per Paragraph 13.

18. **ENTIRE AGREEMENT**. This Agreement constitutes the entire understanding of the Parties concerning the subject matter hereof, and may not be modified absent a further writing executed by each of the Parties hereto.

19. **PARAGRAPH HEADINGS**. The paragraph headings and subparagraph headings of this Agreement are for convenience-of-reference purposes only, and are themselves without substantive significance.

**IN WITNESS WHEREOF**, the Parties have signed this Agreement as of the respective dates indicated hereinbelow.

**ACCEPTED AND AGREED**:

**Mr. John Maclay ("Adaptor")**

Sign Name: _John l Maclay_
John I Maclay (Mar 17, 2016)

Date: Mar 17, 2016

**Mr. Danny Abosch ("Adaptor")**

Sign Name: _Danny Abosch_
Danny Abosch (Mar 17, 2016)

Date: Mar 17, 2016

**Oregon Children's Theatre, Inc. ("OCT")**

Print Name: Stan Foote

Sign Name: _Stan Foote_
Stan Foote (Mar 17, 2016)

Title: Artistic Director

Date: Mar 17, 2016

**First Stage, Inc. ("FS")**

Print Name: Betsy Corry

Sign Name: _Betsy Corry_
Betsy Corry (Mar 17, 2016)

Title: Managing Director

Date: Mar 17, 2016

# Exhibit D

**ORCHESTRATOR AND ARRANGER AGREEMENT:**
**LICENSE FOR A SINGLE ORCHESTRATION AND MULTIPLE ARRANGEMENTS**

This Agreement ("Orchestrator And Arranger Agreement"; or, simply, "Agreement") is for the production, delivery, and non-exclusive license of a single Orchestration, or, alternatively, a related set of orchestrations referenced herein as an "Orchestration" in the singular number, and is made as of this 21st day of April, 2016, by and between the following three (3) parties as identified and defined at Roman-numeral items "I", "II", and "III" hereinbelow:

The Theatres (Producer)
I. **Oregon Children's Theatre, (Inc.)** ("OCT"), which entity OCT warrants and represents to Orchestrator is a Section 501(c)(3) non-profit corporation organized and existing in good standing pursuant to the laws of the State of Oregon, and having its place of business at "1939 NE Sandy Boulevard, Portland, OR 97232 USA" (such address being the "Oregon Children's Theatre" location; sometimes hereinafter referred to as Theatre Location #1); and

II. **First Stage (Milwaukee, Inc.)** ("FS"), which entity FS warrants and represents to Adaptors is a Section 501(c)(3) non-profit corporation organized and existing in good standing pursuant to the laws of the State of Wisconsin, and having its place of business at "325 W. Walnut St., Milwaukee, WI 53212 USA", it being understood however that the theatrical productions by FS will instead take place at "929 N. Water St., Milwaukee, WI 53202 USA" (such address being the "Todd Wehr Theatre-Marcus Center For The Performing Arts" location; sometimes hereinafter referred to as "Theatre Location #2); it being further understood that OCT and FS are each sometimes collectively referred to as "Producers" herein, or, alternatively in the singular number to connote both entities, as "Producer" herein, and are each jointly and severally responsible as well as collectively responsible for their obligations and the obligations of Producers herein; on the one hand,

- and, on the other hand -

The Orchestrator (Artist)
III. **Mr. Danny Abosch** (herein, "Artist", or "Orchestrator"), an orchestrator, arranger, composer, adaptor, musician, lyricist, librettist, author, and artist, and an individual with an address at "c/o Gurman Agency LLC, 14 Penn Plaza, Suite 1703, New York, NY 10122-1701 USA".

1. **The Parties**. It is understood that Orchestrator and Producer are sometimes collectively referred to herein as the "Parties" hereto; or, in the singular number as the context may require or suggest, as a "Party" hereto.

2. **Past Delivery Of Music**. The Parties acknowledge that Artist has either previously delivered, or else will deliver in the future, certain music and work-product which may include a libretto, lyrics, "lead sheets", sheet music, a "Piano/Vocal Score", and/or music rendered in other forms, manners, and configurations (collectively, "Delivered Music") to Producer for and in connection with the musical play entitled "**Goosebumps The Musical: Phantom of the Auditorium**" (the "Play"), pursuant to a prior and different written agreement between the Parties *et ano.* dated **March 14, 2016** (the "Prior Music Agreement").

3. **The Required License Of Orchestrations**. In addition to and without limitation to Producer's otherwise-existing economic and other obligations under the Prior Music Agreement, Producer acknowledges, understands, and agrees that Producer must also and in addition license and obtain "Orchestrations" containing arrangements from Orchestrator in connection with each and every performance of the Play intended for exhibition, it being understood that the same paid-for Orchestration may be used for consecutive multiple performances of the Play at the same theatre during a single run of its consecutive performances. However, in the context of each separate theatre, each separate theatre location, and each separate run, Producer must license a new Orchestration of the same Delivered Music from Orchestrator, for separate and additional compensation to Orchestrator in each case. Producer acknowledges, understands, and agrees that, notwithstanding any provision in this Agreement or in the Prior Music which may be arguably construed to the contrary, neither any Orchestration, nor any arrangement or other material contained therein or generated hereunder, shall be considered a "work-for-hire" or "work-made-for-hire". Rather and instead, Orchestrator owns all such orchestrations,

arrangements, and other materials, and is extending this non-exclusive limited license to Producer in connection therewith. If there is any disagreement as to what constitutes an "orchestration", "arrangement", or "single run" of the Play for the purposes of the foregoing, then the Parties will meet and confer either in person or by telephone to review the facts of the matter together in an effort to reach consensus on the issue. If no consensus on the issue can be reached after five (5) hours of dialogue between the Parties, then Orchestrator's written determination issued to Producer shall be final, conclusive, and binding. **4. Definition Of "Orchestrations"; And The Process Of Creation Of Music For Theatre.** The Parties further understand, acknowledge, and agree to the following definitional structure and information:

(A) <u>The Respective Roles</u>. A song or other item of music used in a live-stage theatrical musical production is typically the product of the work of, in sequence, a "composer", an "arranger", and then oftentimes an "orchestrator". Their roles and functions may sometimes overlap. Additionally, in some cases, one person may perform two, or even all three, of those functions. Yet composing, arranging, and orchestrating are separate tasks that generate distinctly separate work-product. Artist's composing is covered by the Prior Music Agreement. Artist's arranging and orchestration work is covered by this Orchestrator And Arranger Agreement.

(B) <u>The Composer</u>. The composer will often, but not always, compose the musical work on a single piano and thereby create a "score" or "piano score", which then by definition also contains an arrangement for piano. The process of so creating a score is known as "scoring". In the context of this Play, composing either was performed, or else is to be performed, under the Prior Music Agreement.

(C) <u>The Arranger</u>. The addition of harmonic, melodic, rhythmic, and/or contrapuntal material to the score thereafter is defined as "arranging". The product thereof is called an "arrangement". The person arranging is known as an "arranger". Even a highly-detailed and "complete" piano score may require that additional arrangements are added to the work before it is performed on stage.

(D) <u>"Orchestrator" Distinguished From "Arranger"</u>. The words "arranger" and "orchestrator" are often used interchangeably in the vernacular, and while their roles often overlap, an individual performing the work of an "arranger" and an "orchestrator", performs separate functions in each of those two cases. Due to the efforts of the composer, and then the arranger (if used), the harmonic, melodic, and rhythmic structures of the piece of music are complete before the work reaches the orchestrator. The arranger will typically arrange a detailed piano/vocal score of the subject composition, to in turn hand it off to the orchestrator. The process of "Orchestration" thereupon involves and requires the addition of elements that were not present in the arrangement, and the scoring of a completed and partially-arranged or wholly-arranged composition (itself typically in the form of a piano score), for any combination of instruments beyond solo piano, whether they be traditional orchestral instruments, jazz combos, rock bands, or synthesized instruments (otherwise known as "synthesizers"). An "Orchestration", defined as a thing rather than as a process, is a separate musical work typically comprised of multiple arrangements of songs, compiled in chronological sequence in order of appearance in the Play, with one or more of the arrangements corresponding to each song contained within the Play. These arrangements will normally be vocal arrangements, dance arrangements, song arrangements, continuity arrangements, and/or incidental music arrangements. In the instant case of this Agreement, the Orchestration which will be delivered to Producer shall contain arrangements, and will be a "track orchestration" intended for synthesized instruments (synthesizers) – that is, a "non-notated" orchestration which itself will not be delivered in written form, but accompanied by a sound recording of a performance of that orchestration on synthesized instruments (synthesizers).

(E) <u>Further Definition Of "Orchestration"</u>. An "Orchestration" is therefore defined herein as the product of the adaptation, re-adaptation, arrangement, augmentation, and other enhancement by Orchestrator of the originally-Delivered Music under the Prior Music Agreement, including if and as applicable additions of material thereto, for the purpose of:

(i) use thereafter by Producer at any theatres licensed or otherwise referenced in the Prior Music Agreement, pursuant to and subject to the further provisions hereof; or

<div align="center">2</div>

(ii) use thereafter by Producer at any subsequent theatres or other locations of any kind or nature pursuant to and subject to the further provisions hereof; or

(iii) use thereafter by Producer for any subsequent performances of any kind or nature pursuant to and subject to the further provisions hereof.

(F) <u>Use Only By Producer</u>. Any use of an Orchestration by a person or entity other than Producer hereunder, shall constitute an unlicensed and infringing use of Orchestrator's Orchestration.

(g) <u>Full Orchestra, Notated Written Orchestral Score</u>. Notwithstanding the strict etymological definition and derivation of the word "orchestration" and its use in the vernacular, the capitalized word "Orchestration" hereunder does not hereunder connote an item of work-product intended for use with live musical instruments or a full "orchestra", nor does it hereunder connote inclusion therein of a notated written orchestral score. Any "Orchestration" rendered hereunder is instead intended for use at a theatre in conjunction with pre-recorded musical tracks of multiple musical parts, multiple instruments, and/or multiple simulated instruments ("Tracks"); and in some cases, in addition, live piano, if further agreed by and between the Parties. To the extent that Producer ever seeks additional orchestrations intended for live musical instruments or full orchestras, or if Producer seeks notated written orchestral scores, then such additional work-product will require a separate and additional agreement between the Parties, and separate and additional compensation to Orchestrator.

5. **"Orchestrations" Distinguished From "Delivered Music"**. Producer further understands, acknowledges, and agrees that Orchestrations and their component arrangements are not component parts of the Delivered Music. Neither Orchestrations nor their component arrangements were required of Artist under the Prior Music Agreement. Rather, Orchestrations (and their component arrangements) are incremental to, and separate and apart from, the Delivered Music. Orchestrations (and their component arrangements) require separate compensation to Orchestrator additional to the compensation already payable to Artist for Delivered Music under the prior Music Agreement. Orchestrator may, and shall, charge and invoice Producer for Orchestrations (and their component arrangements) separately, consistent with the provisions herein.

6. **Appointment As Arranger And Orchestrator**. Producer therefore understands, acknowledges, and agrees that Orchestrator is hereby appointed by Producer as "Arranger" and "Orchestrator" for the herein-referenced performance and performances of the Play, and is hereby contracted as "Arranger" and "Orchestrator" therefor.

7. **Schedule**. Producer has informed Orchestrator, and the Parties understand, as follows:

(A) <u>Rehearsal</u>. Producer's production of the Play begins rehearsal on **September 15, 2016** ("First Date Of Rehearsal").

(B) <u>Tech</u>. Producer's technical rehearsals of the Play begin on **October 1, 2016** ("Tech Rehearsal Commencement Date").

(C) <u>Opening</u>. The opening date of the Play is scheduled to be **October 13, 2016** ("Opening Date").

(D) <u>Closing</u>. The closing date of the Play is scheduled to be **November 20, 2016** ("Closing Date").

(E) <u>Post-Closing</u>. Producer understands, acknowledges, and agrees that any use of any Orchestration hereunder after the Closing Date, will require separate and additional compensation paid to Orchestrator, and may only occur upon Orchestrator's express prior written consent rendered, if at all, on a case-by-case basis.

8. **Orchestrator's Responsibilities**. Orchestrator will arrange and orchestrate the Delivered Music pursuant to the foregoing provisions, and will deliver an Orchestration thereof to Producer further to the provisions of Paragraph 7 hereinabove and Paragraph 9 hereinbelow. In connection therewith, Orchestrator shall do the following:

(A) <u>Arrangements</u>. Orchestrator shall render any and all vocal arrangements, dance arrangements, song arrangements, and incidental music arrangements, as may be needed for the Orchestration, and provide these materials in tangible form to Producer; and

(B) <u>CD</u>. Orchestrator shall copy the Piano/Vocal Score, thereupon create an orchestral compact disc (CD) for the Play (the "Orchestral CD"), and provide the Orchestral CD to Producer, it being understood that Orchestrator may instead elect to provide the files on the Orchestral CD to producer *via* e-mail or other form of electronic transmission; and

(C) <u>Keyboard Player</u>. Orchestrator shall arrange the appropriate passage or passages of the Show's music, for a keyboard player, and provide this arrangement or these arrangements to Producer; and

(D) <u>Rehearsal Vocal Scores</u>. To the extent different from Subparagraph 8.(C) hereinabove, Orchestrator shall create rehearsal vocal scores ("Rehearsal Vocal Scores") for the Play, and provide the Rehearsal Vocal Scores to Producer; and

(E) <u>Sheet Music</u>. To the extent different from Subparagraphs 8.(C) and 8.(D) hereinabove, Orchestrator shall provide Producer with all the sheet music for actors and the creative team of the production of the Play.

9. **Timing Of Delivery**. Orchestrator will deliver the Rehearsal Vocal Scores and the Orchestral CD (or its electronically-transmitted equivalent per Subparagraph 8.[B] hereinabove) to Producer no later than the First Date Of Rehearsal; that is, no later than September 15, 2016. All other materials (including without limitation any Orchestrations based upon any music composed in whole or in part after September 15, 2016 under the Prior Music Agreement, if any) shall be delivered to Producer as those materials become available.

10. **Payment**. In consideration of the foregoing services, Producer will pay Orchestrator a fee of **Five Thousand Dollars (US$5,000)** (the "Fee") in two successive and separate installments, according to the following schedule:

(A) <u>First Payment</u>. Orchestrator shall receive, in full, **Two Thousand Five Hundred Dollars (US$2,500)** on or before the date upon which Orchestrator signs this Agreement, as payment for the Piano/Vocal Score; and

(B) <u>Second Payment</u>. Orchestrator shall receive, in full, an additional **Two Thousand Five Hundred Dollars (US$2,500)** on or before the Opening Date, whether or not the Play actually opens, and irrespective of any other contingency, as payment for the Orchestration. Producer is contracting with Orchestrator hereunder on a "pay or play" basis as that phrase is typically defined in the music, theatre, and entertainment industries.

(C) <u>No "Commission Back" To Producer</u>. Notwithstanding any provision in this Agreement, in the Prior Music Agreement, or in any other agreement which may be arguably construed to the contrary, under no circumstances shall the Fee, any portion thereof, or any other future monies payable to Orchestrator be deemed commissionable for any reason to Producer, either as "subsidiary rights income" or otherwise.

11. **Separate "Copyrightable Subject Matter"**. Orchestrator has advised Producer that all Orchestrations and component parts thereof are, and contain, incremental and separate items of "copyrightable subject matter", as defined in the U.S. Copyright Act pursuant to 17 U.S. Code §102 *et seq.* and the case law decided thereunder. Producer understands, acknowledges, and agrees that this separate copyrightable subject matter which has been or will be created by Orchestrator is and shall continue to be owned by Orchestrator, subsists in Orchestrator's favor separate and apart from the Delivered Music, and subsists in Orchestrator's favor separate and apart from the underlying work ("Underlying Work") upon which the Orchestration is or is intended to be predicated if different. Producer further understands,

4

acknowledges, and agrees that if there is any dispute or other disagreement as to whether or not a particular item is a component of an Orchestration, as opposed to a component of Delivered Music or a component of Underlying Work, then the Parties will meet and confer either in person or by telephone to review the subject materials together in an effort to reach consensus on the issue. If no consensus on the issue can be reached after five (5) hours of dialogue between the Parties, then Orchestrator's written determination issued to Producer shall be final, conclusive, and binding.

12. **Separate Copyright Registrations**. Producer further understands, acknowledges, and agrees that all Orchestrations are and shall be separately registrable as Orchestrations, derivative works, or otherwise, as Orchestrator may elect, by Orchestrator alone in Orchestrator's sole name alone, in Orchestrator's filing or filings with the U.S. Copyright Office (USCO), using Form(s) PA, Form(s) SR, or otherwise, including without limitation copyright filings appurtenant to any original filing for the Underlying Work or Delivered Material which may be or may have been made by Producer or any other person or entity, and all other filings with performance rights organizations and other organizations such as ASCAP, BMI, and HFA, whether based in the United States, or elsewhere (collectively, "Orchestrator I.P. Filings"). Orchestrator is and shall be entitled to identify Orchestrator in his sole name alone, as both sole "Author", and also sole "Copyright Claimant" (or words or phrases to similar effect) of any and all Orchestrations and any and all components thereof, in all Orchestrator I.P. Filings. In effecting Orchestrator I.P. Filings, Orchestrator will, where required, accurately identify and attribute any pre-existing work of or from which any Orchestration is derived or upon which any Orchestration is otherwise predicated, in those cases wherein the form intended to be filed may request same of Orchestrator. Once and after they are filed and have been accepted by the filing authority, whether it be USCO, ASCAP, BMI, HFA, or otherwise, Orchestrator will furnish copies of any and all Orchestrator I.P. Filings to Producer, upon further written request from Producer.

13. **Producer Shall Not File**. Producer shall under no circumstances make any U.S. Copyright Office filings or claims, any other copyright filings or claims in any other manner or in any other territory, any other filings with performance rights organizations or other organizations such as ASCAP, BMI, and HFA whether based in the United States or elsewhere, or any other filings or claims of any intellectual property nature, relating to the Orchestrations or any component of the Orchestrations, or relating to the "Reserved Material" defined in Paragraph 15 hereinbelow. Orchestrator shall be entitled to take all lawful and appropriate measures to correct any filings made in contravention of the provisions of this Paragraph 13, including without limitation written notifications to the filing authority or authorities of the error or errors made, and the commencement of administrative actions and legal proceedings to render the improper filings void.

14. **Textual Copyright Notices**. Producer understands, acknowledges, and agrees that all copies of Orchestrations (and any arrangements contained therein) shall at all times bear the textual written legend of the following copyright notice in Orchestrator's sole name:

<center>All Arrangements & All Orchestrations ©2016 Danny Abosch. All Rights Reserved.</center>

Orchestrator reserves the right to direct changes and updates to this form of textual written copyright notice, including without limitation advancement of the year-date if and when appropriate, upon further written notice to Producer. In the event Producer discovers that the foregoing textual written copyright notice is deleted or otherwise omitted from any copy of any Orchestration (or any arrangement contained therein), then Producer will immediately notify Orchestrator in writing of such occurrence, and Producer shall thereupon: (A) fully correct the material from which the written textual copyright notice was deleted or omitted; and (B) issue further written notice of the correction to Orchestrator accompanied by written proof of the correction. Alternatively, if Orchestrator discovers the deletion or omission of the required textual written copyright notice from any material, then Orchestrator will notify Producer in writing of same and Producer shall thereupon: (C) fully correct the material from which the written textual copyright notice was deleted or omitted; and (D) issue further written notice of the correction to Orchestrator accompanied by written proof of the correction.

15. **Reservation Of Orchestrator Rights In Drafts And Discarded Material**. Notwithstanding any provision in this Agreement which may be arguably construed or interpreted to the contrary, Producer further understands, acknowledges,

<center>5</center>

and agrees that only approved, final material which actually appears in the Play as part of an Orchestration shall be deemed to be licensed by Producer pursuant to the provisions of this Agreement. Orchestrator reserves all rights to any other material ("Reserved Material") for his sole use and benefit. Specifically, any and all prior drafts, other drafts, or other versions of such Orchestration material, any discarded or disregarded Orchestration material not used in the Play, and any portions, elements, and other incidents thereof, shall (to the extent not containing Producer's pre-existing intellectual property if any) instead be and remain the sole property of the Orchestrator, and shall constitute "Reserved Material" hereunder. Producer shall make no claim to any Reserved Material, in any manner or for any reason.

16. **Reservation Of Orchestrator Rights In The Event Of Termination**. Notwithstanding any provision in this Agreement which may be arguably construed or interpreted to the contrary, Producer further understands, acknowledges, and agrees that this non-exclusive license by Orchestrator to Producer of any Orchestration or any portions, elements, or other incidents thereof shall be deemed and rendered void *ab initio* by any termination of Orchestrator's services hereunder, whenever occurring. In the event of any such termination, all rights, including without limitation all licensed rights and all copyrights, in any and all work-product and other materials generated by Orchestrator hereunder, shall be deemed to fully and automatically revert to Orchestrator for Orchestrator's sole use and benefit, irrespective of any prior delivery thereof, and Producer shall not make any claim thereto for any reason or in any manner.

17. **Reservation Of Orchestrator Rights To Credit And Compensation For Ancillary Markets**. All dispositions of other and future rights in the Orchestrations (and any arrangements contained therein) not licensed to Producer herein, are and will instead be owned, controlled, and administered by Orchestrator. Notwithstanding any provision in this Agreement which may be arguably construed or interpreted to the contrary, Producer further understands, acknowledges, and agrees that this non-exclusive license of the Orchestration (and any arrangements contained therein) from Orchestrator to Producer shall not be deemed to have occurred or applied in connection with any exploitation or other use of the Play, if occurring, in any allied, ancillary, incidental, residual, derivative, or subsidiary markets of any kind or nature, including without limitation film, television, music publishing, broadcast, commercials, print publishing, electronic publishing, Internet, social media, personal appearances, lectures, workshops, schools, camps, theme parks, and other plays (collectively, "Ancillary Markets"). All rights relating to Orchestrations (and any arrangements contained therein) in Ancillary Markets are and shall instead be deemed to be fully reserved to Orchestrator. No use of the Orchestrations (or any arrangements contained therein) in Ancillary Markets shall be made by Producer or any other person or entity, absent Orchestrator's express prior written permission rendered, if at all, only on a case-by-case basis, and only if Orchestrator has been separately and additionally compensated in advance of such use at a compensation figure to be first agreed-upon in advance by Orchestrator. Any other use if occurring will be deemed unlicensed, unauthorized, and an infringement of Orchestrator's rights.

18. **Delivery And Cure**. Orchestrator shall deliver the Orchestration to Producer, so as to seek Producer's approval on the delivery of the Orchestration, it being understood that any and all Orchestrations thereafter actually used for the purpose of any performance at any theatre or otherwise, must be mutually-approved as between Producer on the one hand, and Orchestrator on the other hand. Orchestrator may elect to effect delivery of the Orchestration in parts or as a unified whole. Any rejection of an Orchestration by Producer, if ever occurring, shall be accompanied by a clear writing from Producer to Orchestrator indicating each and all of the specific reasons therefor. Producer shall thereupon provide Orchestrator with meaningful repeat opportunities of no less than five (5) consecutive occurrences, to cure any such claimed deficiency or deficiencies. Producer shall respond to each and every attempt at re-delivery pursuant to the requirements and provisions of this Paragraph 18.

19. **Requests For Approval; Approvals**. The Parties further agree as follows:

> (A) <u>Timetable</u>. With respect to any Orchestrator request for Producer's approval hereunder, Orchestrator shall make any such request in writing. Upon Orchestrator's issuance to Producer of any request for approval, Producer shall respond to Orchestrator in a reply writing with a "Yes" or a "No" answer within ninety-six (96) hours of the date and time of the corresponding request. In the event that Producer fails to so respond to Orchestrator within the prescribed time, then the request shall be deemed approved by Producer.

(B) <u>Post-Approval Changes</u>. Once material is approved hereunder, whether pursuant to Paragraph 18 hereinabove or else Subparagraph 19(A) hereinabove, Producer shall not make further requests for edits or changes to any Orchestration or other material delivered hereunder, absent further prior agreement between the Parties, if any, providing for separate and additional compensation to Orchestrator therefor.

20. **Termination**. Subject to the provisions of Paragraph 18 hereinabove, neither Party shall be deemed in breach of this Agreement unless and until the other Party claiming a breach hereunder furnishes a detailed writing ("Breach Notice") specifying the reasons for the claim of breach, to the Party claimed to be in breach. The Party receiving such notice shall thereupon have a period of time of twenty (20) calendar days within which to cure such breach and to advise the occurrence and manner of such cure to the Party that issued the Breach Notice. In the event that a breach of this Agreement is not cured pursuant to the provisions of this Paragraph 20, then the Parties may avail themselves of their respective rights and remedies at law and in equity pursuant to Paragraph 37 hereinbelow, including without limitation the commencement of proceedings seeking damages and injunctive relief as may be applicable.

21. **Bankruptcy**. Either Party ("Non-Bankrupt Party") shall be entitled to terminate this Agreement and all licenses from Orchestrator to Producer herein, upon written notice, in the event that the other party ("Bankrupt Party") shall make or has made any assignment for the benefit of creditors, or files or has filed a petition in bankruptcy, or is adjudged or has been adjudged bankrupt, or becomes or is insolvent, or is or has been placed in the hands of a receiver, or if the equivalent of any such proceedings or events occurs, though known by that or other names or phrases, or if the Bankrupt Party is not permitted or is unable to operate its business in the usual manner, or is not permitted or is unable to provide the Non-Bankrupt Party with assurances satisfactory to the Non-Bankrupt Party that the Bankrupt Party will so operate its business, as debtor-in-possession or its equivalent, or is not permitted, or is unable to otherwise meet its obligations under this Agreement or to provide the Non-Bankrupt Party with assurances satisfactory to the Non-Bankrupt Party that the Bankrupt Party will meet such obligations.

22. **Use Constitutes Acceptance**. In addition to and without limitation to the provisions of Paragraphs 18 and 19 hereinabove, Producer further understands, acknowledges, and agrees that, with respect to delivery of any Orchestration (or any arrangements contained therein) or any portions, elements, or other incidents thereof, such items and materials shall be deemed by Producers to be fully-delivered, fully-complete, fully-satisfactory, and fully-accepted, if used by Producers for or in connection with any performance of the Play, or used in any advertising, publicity, marketing, or other promotion in connection with the Play, or used by Producer or any affiliate of Producer in any other manner whatsoever.

23. **Credit To Orchestrator**. Separate and apart from any other credit to which Orchestrator may be entitled under the Prior Music Agreement or for other work, Orchestrator shall receive a legible, textual billing credit in each and every case and in each and every medium: (A) wherein the Play is "billed", advertised, publicized, marketed, or otherwise promoted (and additionally in connection with any and all uses of the Play or any portions, elements, or other incidents thereof in any of the Ancillary Markets), and (B) wherein which any other artist performing any design function (any lighting designer, costume designer, set designer, sound designer, graphic designer, or other designer) also receives credit; including without limitation in the context of any other newspaper advertisements, any "playbills" or other programs, and any publication of the Play as a book. If there are no "playbills" or printed programs in connection with a specific performance or a specific theatre, Producers shall nevertheless still be required to credit Orchestrator as provided herein, using such manners and such technologies as will ensure that each theatre-patron will be provided a reasonable opportunity to read and hear the herein-required credit at least one time each prior to or during the performance, whether by way of "house-board", marquee, electronic sign or signage, or verbal announcement to the audience in each case. Without limitation to the foregoing, the written legible, textual billing credit will also be accorded and given to Orchestrator in and on all programs, "house-boards", marquees, posters, Internet websites, "e-blasts" and other uses, electronic communications, press releases, and all other communications of, for, or regarding the Play which are under the direct or indirect control of Producer. The credit accorded to Orchestrator hereunder shall read in exactly the following form, on a single line of text in each case:

<div align="center">"Orchestrations and Arrangements by Danny Abosch".</div>

<div align="center">7</div>

Should the Play become published as a book, then this credit will appear on such book's title

24. **Further Specifications Of Credit To Orchestrator**. The credit accorded to Orchestrator pursuant to Paragraph 23 hereinabove ("Orchestrator Credit") shall in all cases be in a prominent size, a prominent type and typeface, a prominent font, prominent boldness, and a prominent color. Under no circumstances shall the Orchestrator Credit measure to be in a size any less than Twenty-Five Percent (25%) of the title of the Play itself. The Orchestrator Credit shall in each case appear in a prominent position relative to the remainder of the content to which the Orchestrator Credit relates, and always on a single and separate line not to be shared with any other text, any other credit, or any other element of the production of the Play. Orchestrator shall also receive a textual biographical narrative and credit in any "playbill" or other program relating to the Play which is published or distributed under the control of Producer or any affiliate of Producer, wherein any other person or entity involved in the production of the Play receives such biographical narrative or credit.

25. **Ancillary Markets, And "Most Favored Nations"**. Credit must be accorded to Orchestrator in connection with the use of the Play or any portions, elements, or other incidents thereof, in any and all of the Ancillary Markets, if occurring pursuant to the provisions of Paragraph 17 hereinabove, in a manner no less favorable than the credit accorded to any other artist performing any design function (any lighting designer, costume designer, set designer, sound designer, graphic designer, or other designer), in any such individual case.

26. **Routing Of Payments**. All payments for Orchestrator hereunder shall be made to "Gurman Agency LLC a/a/f Danny Abosch", and mailed to:

> Gurman Agency LLC
> 14 Penn Plaza, Suite 1703
> New York, NY 10122-1701 USA

27. **Agency Clause**. Orchestrator hereby irrevocably designates Susan Gurman ("Orchestrator Agent"), of Susan Gurman Agency LLC, 14 Penn Plaza, Suite 1703, New York, NY 10122-1701 USA as his sole and exclusive agent in connection with the Orchestration. With the exception of the initial production of the Orchestration which shall be non-commissionable to Orchestrator Agent, and with the exception of the Fee itself which shall also be non-commissionable to Orchestrator Agent, in consideration for services rendered and to be rendered, Orchestrator agrees to pay to and does hereby authorize said agent to receive and retain Ten Percent (10%) of the further gross proceeds (if any) derived by the Orchestrator directly resulting from the Orchestration alone ("Orchestration Proceeds"). However, with respect to Orchestration Proceeds derived from "Amateur Performances", such Orchestrator Agent commission shall be Twenty Percent (20%) instead of Ten Percent (10%). For the purposes of the foregoing, "Amateur Performances" are defined as performances wholly comprised of non-union actors who are either unpaid, or else paid less than Two Hundred Dollars (US$200) per week.

28. **Payment Direction**. With the exception of the initial production of the Orchestration which shall be non-commissionable to Orchestrator Agent, and with the exception of the Fee itself which shall also be non-commissionable to Orchestrator Agent, Orchestrator does hereby authorize and direct Producer to pay all Orchestration Proceeds due or to become due to Orchestrator hereunder to and in the name of said Orchestrator Agent, and to accept the receipt of the said Orchestrator Agent as full evidence and satisfaction of said payment.

29. **Live-Action Only**. Producer shall produce and present the Play only with living actors in the immediate presence of a live audience. The production of the Play shall not be preserved or presented in whole or in part by film, television, videotape, or any other audio-visual devices or technologies now or hereafter devised, such as DVD's, videocassettes, cartridges, or other similar audio-visual devices whereby the Play can be produced and/or projected onto television receivers or otherwise transmitted by television, subject only to the provisions of Paragraph 30 hereinbelow.

30. **Archival Recording**. Notwithstanding anything contained in the foregoing Paragraph 29 to the contrary, upon further written notice (email with receipt is sufficient) to Orchestrator, Producer shall have the right to authorize a film

presentation, live television presentation, or audio-visual recording presentation of segments of the Play of no more than five (5) minutes duration for the purpose of advertising, publicizing, or marketing the Play, provided that Producer shall receive no income from any such authorization, and further provided that Producer first furnishes a copy of all such material to Orchestrator. Additionally, Producer may authorize an archival video-recording of the production of the Play pursuant to the current Actor's Equity Association (AEA) rules and regulations for employment, if and assuming that the Play is an AEA production.

31. Intentionally Omitted.

32. **Representations And Warranties By Producer**. Producer represents and warrants that, to the best of Producer's knowledge:

(A) <u>Rights</u>. Producer owns and controls all rights necessary such that Orchestrator may utilize, adapt, arrange, and orchestrate music hereunder; and

(B) <u>Ability To Contract</u>. Producer has all the requisite power and authority to enter into and perform all the provisions and adhere to all the conditions of this Agreement; and

(C) <u>No Infringement</u>. The execution, delivery, and performance by Producer of the provisions of this Agreement do not and will not violate any of the conditions or other provisions of any contract, agreement, document, or any other arrangement to which Producer or Producer's assets are bound, and no agreement by any other person or entity is required to be obtained in connection with the execution, delivery, or performance of this Agreement. Furthermore, Producer shall not permit any person or entity in Producer's employ, or otherwise under Producer's direction, to represent, imply, or agree, privately or publicly, directly or indirectly, that the Orchestration is a "Joint Work" as defined in the U.S. Copyright Act (17 U.S. Code §102), or that the authorship of the Orchestration or other materials delivered hereunder is claimed or held by any person or entity other than Orchestrator.

33. **Indemnification By Producer**. Producer hereby indemnifies and holds harmless Orchestrator and all of Orchestrator's officers, employees, distributors, agents, and other affiliates, from any damage, loss, or expense (including court costs and attorneys' fees) occasioned by any claim, demand, proceeding, or other action based upon Producer's breach of any of the foregoing warranties. In defending against any such claim, demand, proceeding, or other action, Orchestrator shall have the right to select counsel and the right to withhold amounts otherwise payable to Producer under this or any other agreement (if any) and to apply such amounts (as required) in satisfaction of the foregoing indemnities. If at any time Orchestrator conclude that any of the foregoing warranties of Producers have been breached, Orchestrator shall have the right, without prejudice to Orchestrator's other rights and remedies, upon written notice to Producer, to refrain from or cease work hereunder, to terminate this Agreement, to recover from Producer any amounts due hereunder, and to refrain from remitting any monies otherwise due Producer. The foregoing warranties and indemnities shall survive the termination of this Agreement.

34. **Notices**. All notices required by this Agreement shall be in writing and directed to the Parties at the following addresses *via* internationally-recognized express-mail carrier (that is, either UPS, or FedEx):

> To Orchestrator:
> Danny Abosch
> c/o Gurman Agency LLC
> 14 Penn Plaza, Suite 1703
> New York, NY 10122-1701 USA
>
> To Producer:
> Oregon Children's Theatre, (Inc.)
> 1939 NE Sandy Boulevard
> Portland, OR 97232 USA; and

First Stage (Milwaukee, Inc.)
325 W. Walnut St.
Milwaukee, WI 53212 USA

Either Party may from time to time change its address set forth hereinabove by notifying the other Party of its new address in writing.

35. **No Third-Party Beneficiaries**. This Agreement is between the Parties only. There are no third-party beneficiaries to this Agreement.

36. *Force Majeure*. Orchestrator shall not be liable in damages and Producer shall not have a right to terminate this Agreement for any delay or default in Orchestrator's performance of this Agreement, if such delay or default is caused by conditions beyond Orchestrator's control, including, but not limited to, any so-called *force majeure* events such as acts of God, acts of terrorism against the United States of America (whether domestically or internationally), government restrictions, wars, insurrections, strikes, fire, floods, or work stoppages; provided, however, that if such delay or default shall exceed three (3) calendar months, then Producer may, so long as the delay or default continues, suspend its further performance under this Agreement. Orchestrator shall keep Producer fully informed on an on-going basis concerning the matters causing any such delay or default, and the prospects of cessation of the delay or default.

37. **Choice Of Law And Forum**. This Agreement shall be governed by the laws of the State of New York, as applied to contracts executed and to be wholly-performed within the State of New York. The Parties agree that the courts, state and federal, located within the City of New York, New York County (Manhattan), and the State of New York, shall have exclusive jurisdiction of and over any controversy relating to this Agreement and/or the Orchestration. Any action commenced in connection with the Orchestration and/or this Agreement shall be commenced with the State of New York, the City of New York, and the Borough of Manhattan. Notwithstanding the foregoing, however, Orchestrator may elect to commence any action in an alternate state or using an alternate forum, in any action relating to delivery, credit, copyright infringement, breach of contract, the payment of monies claimed to be owed, or similar claims.

38. **Delegation Of Obligations, And Assignment Of Rights**. Orchestrator may not delegate any of Orchestrator's obligations hereunder, except as may be approved by Producer in advance on a case-by-case basis. Orchestrator, however, may assign Orchestrator's rights in or relating to this Agreement, including without limitation the right to receive revenue, and the right to issue a letter or letters of direction further directing or re-directing the identity of the recipient or recipients of any such payments, upon written notice to Producer. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective Parties and their heirs, executors, administrators, and assigns.

39. **No Waiver**. The waiver of a breach of, or a default under, any provision of this Agreement shall not be deemed a waiver of any subsequent breach or default. No rights shall be deemed waived hereunder except, if occurring, by a writing signed by the Party to be so charged with such waiver.

40. **Severability**. The provisions of this Agreement are severable. If any provision of this Agreement is held to be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and shall continue in full force and effect.

41. **Entire Agreement**. This Agreement constitutes the entire understanding of the Parties concerning the subject matter hereof, and may not be modified absent a further writing executed by each of the Parties hereto.

42. **Counterparts**. This Agreement may be executed in counterparts, which, taken together, shall constitute one agreement, and either Party may execute such Agreement by signing such counterpart.

10

43. **Paragraph And Subparagraph Headings**. The paragraph headings and subparagraph headings of this Agreement are for  convenience-of-reference purposes only, and are themselves without substantive significance.

**IN WITNESS WHEREOF**, the Parties hereto, intending to be legally bound hereby, have each signed this Agreement on the respective dates indicated hereinbelow.

**ACCEPTED AND AGREED**:

**Mr. Danny Abosch ("Orchestrator")**

Sign Name: _Danny Abosch_
Danny Abosch (Apr 26, 2016)

Date: Apr 26, 2016

**Oregon Children's Theatre, Inc. ("OCT")**

Print Name:    **Stan Foot**

Sign Name: _Stan Foote_
Stan Foote (Apr 26, 2016)

Title:    Artistic Director

Date: Apr 26, 2016

**First Stage, Inc. ("FS")**

Print Name:    **Jeff Frank**

Sign Name: _Jeff Frank_
Jeff Frank (Apr 26, 2016)

Title:    Artistic Director

Date: Apr 26, 2016

11

# Exhibit E

 **Gmail**

<div align="right">Danny Abosch &lt;daabosch@gmail.com&gt;</div>

---

## Goosebumps, Scholastic

**Susan Gurman** &lt;susan@gurmanagency.com&gt;                     Thu, Apr 20, 2017 at 5:28 PM
To: Danny Abosch &lt;daabosch@gmail.com&gt;
Cc: John Maclay &lt;jmaclay@firststage.org&gt;

I have been asked to come back with the two or three issues that give you pause (and I make no promises about getting them in the contract) BUT because they want to have this signed asap or idk what will happen.

Can you site two or three issues that, if changed, will allow you to sign the agreement ?

Are they:

1. The language over the cast album? What should it say in terms of negotiating a cast album in good faith at a later date?
2. The credit for First Stage & Oregon?
3. Credit for all uses of the material?

Please advise.

Susan Gurman, Agent

Member: Association of Authors Representatives

Signatory: Writers Guild of America East

Gurman Agency LLC

14 Penn Plaza, Suite 1703, New York, NY 10122-1701

Tel: 212 749 4618

www.gurmanagency.com

Theatre for Youth



# Exhibit F

## Goosebumps Play Adaptor/Composer Agreement

This Agreement made as of ____28th____ day of ____April____, 2017, by and among **Mr. John Maclay** ("Maclay"), an adaptor, lyricist, librettist, author, and artist, and an individual with an address at "c/o Gurman Agency LLC, 14 Penn Plaza, Suite 1703, New York, NY 10122-1701 USA", and **Danomalous Productions, LLC** ("DPLLC"), rendering the services of Mr. Danny Abosch ("Abosch") who is a composer, arranger, adaptor, musician, lyricist, librettist, author, orchestrator, and artist, with an address at "c/o Gurman Agency LLC, 14 Penn Plaza, Suite 1703, New York, NY 10122-1701 USA", (it being understood that DPLLC and Mr. Maclay are each sometimes hereinafter collectively referred to as "Adaptors" or in the singular as the context may require or suggest, as an "Adaptor") and **Scholastic Entertainment Inc.** ("SEI", or, "Scholastic"), a New York corporation, with a principal place of business at "557 Broadway, New York, NY 10012 USA".

**WHEREAS**, it is further understood and acknowledged that Adaptors and Scholastic are sometimes hereinafter collectively referred to as the "Parties"; or, in the singular as the context may require or suggest, as a "Party"; and,

**WHEREAS**, the Adaptors have adapted the book Goosebumps: Phantom of the Auditorium written by R.L. Stine (the "Book") into a musical play (the "Play"); and,

**WHEREAS**, the parties now wish to enter into an agreement which reflects each Party's interest and rights in and to said Play.

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt of which are hereby acknowledged by each of the Parties, Adaptors and Scholastic hereby further agree as follows:

1.  The term of this Agreement ("Term") shall commence on the date above written and continue till the expiration of copyright in the Play.

2.  This Agreement will supersede and replace any prior agreements and/or understandings regarding any and all rights in the Book and/or the Play, as the case may be, and Adaptors agree that the terms of this Agreement will govern their rights in the Play in lieu of any rights, if any, which may have been granted to them pursuant to any agreement that they may have had either individually or collectively with any third party including without limitation any agreement and/or agreements with Oregon Children's Theatre, Inc. ("OCT") and/or First Stage Milwaukee, Inc. ("FS").

3.  The Parties acknowledge that the Play was originally commissioned by OCT and FS for presentation at their respective venues pursuant to an agreement (the "Play License") dated February 14, 2016, among SEI and OCT and FS. Nothing contained herein is meant to retroactively invalidate any exploitation by OCT and FS pursuant to said Play License nor affect any monies received by either of the Adaptors from any arrangement that they may have had with OCT and/or FS for the presentation of the Play by OCT and/or FS.

4.  The Adaptors acknowledge that all rights of any kind or nature in the Book were and are solely vested in SEI and that, subject to the provisions contained in this Agreement, they have no rights of any kind or nature in said Book. They also acknowledge that any right to adapt the Book into a play was on a non-exclusive basis and that, subject to Paragraph 6 below, SEI shall be free at any time to have other adaptors adapt the Book into a play, whether straight, musical or other variation.

5.  The Parties further acknowledge that Maclay has written the script or libretto ("Script" or "Libretto", as applicable) and the lyrics of the Play and that DPLLC, by providing the services of Danny Abosch,

1

pursuant to a valid employment agreement between DPLLC and Abosch, has composed songs and written lyrics ('Compositions') and written orchestrations ("Orchestrations"), arrangements ("Arrangements"), and Orchestral Tracks ("Orchestral Tracks") for the Play. In this connection, the Adaptors, individually and collectively (and DPLLC on behalf of itself and Abosch) agree that the Play is the exclusive property of SEI. Further,

    a. Adaptors, collectively and individually, acknowledge and agree that the Play was created as and constitutes a work work-for-hire on behalf of SEI as such term is defined under the copyright laws of the United States. SEI shall be the sole and unlimited owner thereof and of all rights therein throughout the world forever, and SEI shall be entitled to the copyright therein, including statutory copyright and all renewals, extensions and revivals thereof, in and to the Play (including without limitation the Script, Libretto, Lyrics, Compositions, Arrangements, Orchestrations, and Orchestral Tracks) and all components of the foregoing (the "Rights"). The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights now or hereafter recognized in all territories and jurisdictions throughout the universe in perpetuity in all media, markets and languages and in any manner now known or hereafter devised and shall further include all remake and sequel rights. SEI shall have the sole and absolute right to copyright the Play as copyright author and proprietor thereof and to obtain renewals of such copyright and such other protection as SEI may deem necessary. To the extent that the Play, or any portion thereof, may not qualify as a work-for-hire, Adaptors, individually and collectively, hereby grant, transfer, and assign all right, title, and interest in and to the Play to SEI, including, without limitation, all copyright and any and all other proprietary rights therein, throughout the world and in perpetuity for use in any and all media now known or hereinafter developed. Adaptors, individually and collectively, agree that the rights owned by and/or granted to SEI shall include without limitation any so-called rental or lending rights which may be recognized pursuant to the laws or directives of the European Economic Community and comparable laws of any country or territory, which Adaptors, individually and collectively, hereby waive in favor of, or to the extent not waivable, assigns to SEI, and Adaptors agree that 3.8% of the compensation provided for herein constitutes full, fair and equitable payment of any sums that may hereafter become payable to Adaptors in connection with the exploitation of such rights anywhere in the world. Adaptors further acknowledge and agree that SEI shall own any and all trademark and similar rights relating to the Play. SEI shall have no obligation to exploit the Play, it being understood that the only obligation is for SEI to make the payments and provide for credit to be accorded as set forth under this Agreement. All rights granted or agreed to be granted to SEI shall remain vested whether this Agreement expires in the normal course or is terminated for any reason or no reason.

    b. Without in any way limiting the generality of the foregoing, it is agreed that SEI shall have the exclusive right and may license others to use, license the Play and to publish, record, produce, reproduce, transmit, perform, broadcast, telecast, and/or otherwise exploit the Play, in whole or in part, by any means in any and all media, whether now known or hereafter devised, including without limitation online, broadband and electronic media, and in any property, publication or product of SEI or its affiliates, publicly for profit or otherwise and in any advertising or publicity related to any of the foregoing. Adaptors, collectively and individually, acknowledge and agree that they will not have any right of approval or consultation in connection with SEI's exercise of its rights hereunder. Nothing contained herein shall limit or prevent SEI from preparing and exploiting another adaptation of the Book which adaptation does not include any original material created by Adaptors as part of the Play. To the fullest extent allowable under any applicable law, Adaptors, collectively and individually, hereby irrevocably waive or assign to SEI Adaptors so-called "moral rights" or "droit moral" or any similar law which may now or hereafter be recognized in any country or place (including, without limitation, the so-called right of paternity [droit a la paternite], right of integrity [droit au respect de l'oeuvre], and/or right of publication [droit de divulgation], and agree not to institute, support, maintain or permit any

2

action or proceeding on the ground that the Play in any way constitutes an infringement of any of Adaptors' droit moral or is in any way a defamation or mutilation of the Play or any part thereof or contains unauthorized variations, alteration, modifications, changes or translations thereof. Accordingly, if under any applicable law the above waiver or assignment by Adaptors of "moral rights" or "droit moral" is not effective, then Adaptors, collectively and individually, agree to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

6. Any original material created for the Play by the Adaptors which material was not included in the Play shall belong to Adaptors but only to the extent that same does not incorporate, refer to and/or become associated with any element of the Book. Under no circumstances shall Adaptors whether individually or collectively claim that they have any rights or nature in and/or to the Book. Further, under no circumstances shall Adaptors have the right to license and/or exploit the Play, all such rights remaining in SEI.

7. SEI agrees to share any net revenue derived from the any exploitation of the Play or any portion thereof, in all media, markets and languages and in any manner now known or hereafter devised, between SEI and Adaptors as set forth in this Paragraph 7. Given that it is usual that the Script/Libretto/Compositions (collectively the "Adaptors' Portion") and the Orchestrations/Arrangements/Orchestral Tracks (collectively the "Orchestrator's Portion") are licensed separately, SEI agrees to license them separately. For all exploitations SEI shall share (a) the net revenue from the Adaptors' Portion 50/50 between SEI and the Adaptors and (b) the net revenue from the Orchestrator's Portion 25/75 between SEI and DPLLC. Net revenue ("Net Revenue") shall be defined as gross revenues received and not refundable less any out of pocket third party costs, including without limitation any agency commissions, sales taxes, VAT or similar taxes. Under no circumstances shall Adaptors be entitled to share in any other adaptation of the Book, their right to share in revenue is based solely on the exploitation of the Play.

Terms for exploitation of the Play's Cast Album and Sheet Music will be negotiated in good faith and memorialized in a separate agreement it being understood that Adapters shall solely bear the cost of producing the Cast Album and Sheet Music.

8. "Orchestrations" are defined as and shall be delivered to the applicable licensee at SEI's direction as: an Orchestration which shall contain the Orchestral Tracks and orchestrations/arrangements, and will be a "track orchestration" intended for synthesized instruments (synthesizers) – that is, a "non-notated" orchestration which itself will not be delivered in written form, but accompanied by a sound recording of a performance of that orchestration on synthesized instruments (synthesizers).

9. It is expressly agreed and understood that Adaptors shall at all times act strictly and exclusively as independent contractors and shall not be considered under the provisions of this Agreement or otherwise as having any employee status with SEI, or as being entitled to participate in or receive any benefit under any benefit plan or program made available by SEI to its employees. Adaptors hereby irrevocably waive the right to accrue benefits under any such plan or program even in the event Adaptors are subsequently reclassified by any court or governmental authority as eligible for such participation. Adaptors are not granted any right or authority to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of SEI, or to bind SEI to any agreement, contract or arrangement of any nature. Adaptors shall be solely and entirely responsible for their acts during the performance of this Agreement. Nothing herein shall prevent Adaptors from working for others during the term of this Agreement.

10. Adaptors, individually and collectively, and DPLLC on behalf of Abosch represent and warrant: (i)

3

that each of them has the full power and authority to enter into and perform this Agreement and to grant the rights to SEI in the Play granted herein and that there are and will be no encumbrances, liens, conditions, or restrictions whatsoever upon or affecting the Play; (ii) that no part of the Play has been registered for copyright, published, or otherwise exploited or agreed to be published or otherwise exploited other than as already presented by OCT and FS; (iii) that, except to the extent taken from the Book, all of the results and proceeds of Adaptors' services hereunder, including, without limitation, all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles, and other material, whether in writing or not in writing, created or contributed by the applicable Adaptor is original, has not been published and is not the subject of any litigation or claim that could give rise to litigation, nor will it infringe any copyright, trademark, trade secret, patent, literary, music, dramatic, writer, artistic, civil or other proprietary right, violate any right of privacy, publicity, performance or publication, moral rights of authors or any other common law or statutory rights of any person or entity, violate any contractual, employment, non-disclosure or property right, nor shall the Play or SEI's exploitation thereof constitute a libel or defamation of any person and/or contain material that is inappropriate for, or harmful to, children; (iv) that Adaptors have not entered into any agreement or done anything which would derogate from or conflict with the rights granted to SEI hereunder, nor has either Adaptor assigned any rights in the Play, nor shall Adaptors do any of the foregoing in the future; (v) that no person or entity shall be entitled to any compensation in connection with SEI'S exploitation of the Play, and SEI shall have no obligation to pay any third party for the rights conveyed herein; (vi) that the services hereunder shall be performed only by Adaptors; (vii) that Adaptors will perform the services to the best of their abilities and in a professional manner; and (viii) that Adaptors shall not use the SEI name, trademark and/or logo or any other property of SEI or its affiliates without SEI's prior written consent.   Furthermore, DPLLC represents and warrants that it has a valid enforceable agreement with Abosch under which Abosch is required to perform services for DPLLC, and at the time of this Agreement, DPLLC shall cause Abosch to execute and deliver to SEI an inducement letter in the form attached hereto as Attachment 1.

11. If any claim, action, lawsuit or preceding (each, a "claim") is brought or threatened to be brought against either or both Adaptors alleging facts which, if true, would constitute a breach of any representation, warranty and or covenant made by Adaptors under this Agreement, Adaptors shall immediately notify SEI in accordance with the terms hereof.  Adaptors agree that SEI or its licensee or assign shall have the right to select counsel of its choice and to compromise or settle any such claim. Adaptors, collectively and individually, shall indemnify and hold SEI, its licensees and, assigns, and their related entities, respective affiliates, as well as the directors, officers and employees of each of them, harmless from and against any demand, claim, action, liability or expense (including reasonable and documented attorneys' fees) of any kind whatsoever arising out of, resulting from, or relating to (i) any breach or alleged breach of the foregoing representations and warranties or of any agreement of Adaptor hereunder or (ii) any act or omission of Adaptor in connection with Adaptors' obligations under this Agreement and/or the performance thereof.

12. SEI agrees to notify Adaptors of any claim or action that may give rise to an indemnification obligation on the part of Adaptors under this Agreement.  Adaptors shall have the right to participate in the defense of such a claim through counsel of Adaptors' choice, at Adaptors' expense, provided that SEI shall have the right at all times to maintain control of the conduct of the defense including without limitation any and all decisions related to settlement.  If SEI elects to control such defense, Adaptor agrees to provide SEI with reasonable assistance in connection therewith.

13. SEI represents and warrants that: it has the right to enter into this Agreement and grant the rights herein granted; and, it is incorporated in New York and in good standing.

14. SEI shall indemnify and hold Adaptors, their licensees and, assigns, and their related entities,

4

respective affiliates, as well as the directors, officers and employees of each of them, harmless from and against any demand, claim, action, liability or expense (including reasonable and documented attorneys' fees) of any kind whatsoever arising out of, resulting from, or relating to (i) any breach or alleged breach of the foregoing representations and warranties or of any agreement of SEI hereunder; (ii) any act or omission of SEI in connection with SEI's obligations under this Agreement and/or the performance thereof; and (iii) any claim that the Book violates any right of any kind including but not limited to copyright of any third party.

15. SEI shall furnish Adapters statements as to the Play showing the gross receipts and Net Revenue, concurrently with the furnishing of such statements, pay to Adapters the sums, if any, shown to be due Adapters by such statements. Such statements shall include the description, date, location, and licensee name for each individual use or exploitation of the Play, or any portion thereof. Such reports shall be furnished quarterly forty-five (45) days after the quarter in which SEI received gross receipts. In the event that no gross receipts are generated in a given year, such reports shall thereafter be furnished semi-annually. Each statement (and all items covered thereby) rendered to Adapters shall become final, binding, and incontestable for Adapters two (2) years after the date on which such statement was rendered, unless, prior to the expiration of such two year period, Adapters furnishes SEI written notice of its objection to any such statement specifying in detail its objection and the reason(s) therefor. The foregoing incontestability shall include Adapters' right to commence any legal proceeding or other action based upon or arising out of such a statement and the information contained therein. The inclusion in a statement of any information or items contained in a prior statement shall not re-commence the two (2) year period during which Adapters may contest any such information or item, nor shall it allow Adapters to audit any books for which the time frame to audit has expired or which have been previously audited.

All payments for Adaptors and either of them hereunder shall be made to "Gurman Agency LLC a/a/f Danomalous & Maclay", and mailed to: Gurman Agency LLC 14 Penn Plaza, Suite 1703 New York, NY 10122-1701 USA

16. SEI agrees to keep normal books of account and records (herein called "books") with reference to the Play. Adapters, or their certified public accountants familiar with the theatre industry, shall have the right to examine and make copies of such books, upon reasonable prior notice, at the place where SEI normally keeps such books, during reasonable business hours. Such examination or auditing shall be at Adapters' sole cost and expense and in no event shall any audit commence prior to the expiration of a period of twelve (12) months following the completion of the preceding audit. Additionally, no audit shall take place in the thirty day period following the close of any quarter. Notwithstanding anything to the contrary contained in this Paragraph 16, the right to examine SEI's books, records, or accounts shall be limited to only those books, records or accounts relating specifically to exploitation of the Play in accordance with this Agreement.

17. Scholastic agrees to include as a requirement for any exploitation of the Play, or any portion thereof, the following credit obligation: (a) With the one (1) exception of printed newspaper advertisements of a size of one half (1/2) of a page or smaller, each of the Adaptors in all other respects shall receive a legible, textual billing credit, and, in each and every case and in each and every medium wherein the Play or any portion thereof, is "billed", advertised, publicized, marketed, or otherwise promoted, in all media, markets and languages and in any manner now known or hereafter devised, any "[P]laybills" or other programs, and any publication of the Play as a book, if any. The foregoing materials requiring Adapters credit referred to herein as "Credit Materials". The credit accorded to Adaptors hereunder shall read in exactly the following form, on a single line of text:

"Book and Lyrics by John Maclay, Music and Lyrics by Danny Abosch".

5

-and-

"Orchestrations and Arrangements by Danny Abosch".

-and-

"©2016 Scholastic Entertainment Inc. All Rights Reserved".

Adaptors agree that in the event that any exploitation of the Play occurs in which only the Music and the Lyrics, and not the Libretto, are used, the following credit will suffice in lieu of the above: "Lyrics by Danny Abosch & John Maclay, Music by Danny Abosch"

Should the Play become published as a book, then each of these credits will separately and individually appear on such book's title page.

The foregoing notwithstanding, it is understood and agreed that the author of the Book, R.L. Stine shall receive top billing as the author of the Book upon which the Play is based.

18. Further, Scholastic shall use commercially reasonable efforts to see that the credit accorded to Adaptors pursuant to Paragraph 17 above ("Adaptors Credit") shall in all cases be in a prominent size, a prominent type and typeface, a prominent font, prominent boldness, and a prominent color. Adaptors Credit shall be in a size not less than Fifty Percent (50%) of the title of the Play itself and always on a single and separate line not to be shared with any other text, any other credit, or any other element of the production. Additionally, each name of each of the Adaptors will appear directly below the title of the Play and the name of the author of the Book, as indicated hereinabove, and always above the name of the [D]irector. Each of the Adaptors shall also receive a textual biographical narrative and credit in any "[P]laybill" or other program relating to the Play, if any. It is understood that SEI's sole obligation is to provide a credit clause according credit to Adaptors for any exploitation of the Play or any portion thereof. No casual or inadvertent failure of Scholastic to comply with the credit provisions of this Agreement, and no failure of any other party to comply with such provisions, shall constitute a breach of this Agreement by Scholastic, unless Scholastic does not promptly notify the responsible party in a meaningful effort to remedy the mistake as follows:  promptly after Scholastic's receipt of written notice from Adapters specifying a failure to accord the credit due Adapters as set forth above, Scholastic shall notify the party responsible requiring compliance in any and all prospective Credit Materials uses.

19. Adaptors shall not assign, pledge or encumber its interest in this Agreement or delegate Adaptors' obligations hereunder to any third party.  Any such purported assignment shall be null and void.

20. This Agreement contains the entire understanding between the Parties with respect to the subject matter hereof, and may not be altered, varied, revised or amended except by a written instrument signed by each of them. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be deemed to have been drafted by all parties hereto, since all parties were assisted by their counsel in reviewing and agreeing thereto, and no ambiguity shall be resolved against any party by virtue of its participation in the drafting of this Agreement.

21. The waiver of any breach of any term of this Agreement, which waiver must be in writing, shall not be

6

deemed to constitute waiver of any subsequent breach of the previously waived term or of any other term or condition.

22. Adaptors recognize that in the event of a breach by SEI of its obligations under this Agreement (including, without limitation, breaches of the Agreement arising out of credit obligations, if any), the damage (if any), caused Adaptors thereby is not irreparable or sufficient to entitle them to injunctive or other equitable relief. Adaptors, therefore, agree that their rights and remedies shall be limited to the right, if any, to obtain damages at law and that neither of them shall have the right in such event to terminate or rescind this Agreement or to enjoin or restrain the production, distribution or exploitation of the Play or any rights derived therefrom or ancillary thereto. Neither the expiration of this Agreement nor any other termination thereof shall affect the ownership by SEI of the Play, or alter any of the rights or privileges of SEI, or any warranty, indemnity or undertaking on the part of Adaptors in connection with such rights.

23. In the event Adaptors are in breach of any provision of this Agreement, in addition to any and all other remedies, whether at law, or in equity or otherwise hereunder, which might be available to SEI, Adaptors specifically acknowledge and agree that the services and the results and proceeds thereof, which Adaptors are providing to SEI hereunder are of a unique, unusual, extraordinary and intellectual nature, giving them a peculiar value, such that the injury and damage resulting from any breach by Adaptors cannot be adequately compensated by a remedy at law. Therefore, in addition to any other remedies which SEI might have in the event of Adaptors' breach of this Agreement, SEI shall be entitled, as a matter of right, at SEI's election to injunctive and other equitable relief. All of SEI's rights and remedies under this Agreement shall be cumulative, and none of them shall be in limitation of any other right or remedy available to SEI.

24. Nothing contained herein shall require the commission of any act or the payment of any compensation which is contrary to any law. If there shall exist any conflict between this Agreement and any such law, the latter shall prevail, and the provision or provisions hereof affected shall be curtailed, limited or eliminated to the extent (but only to the extent) necessary to remove such conflict; and as so modified, this Agreement shall continue in full force and effect.

25. Any notice required or permitted to be given under this Agreement shall be in writing and deemed to have been given when delivered personally or sent by registered or certified mail, postage prepaid, return receipt requested, or facsimile (with a printed report confirming successful transmission or a hard copy concurrently sent by any other means permitted hereunder) to the parties at the addresses set forth below or to such other address as a party may subsequently designate by written notice to the other party:

SEI:          Scholastic Entertainment Inc.
              557 Broadway
              New York, NY 10012
Attn:         Gary Hymowitz
Email:        ghymowitz@scholastic.com

With a copy to:
Attn:         Andrea D. Sporer, Senior Vice-President, Business and Legal Affairs
              Scholastic Entertainment Inc.
Email:        asporer@scholastic.com

Adaptors:          To the address first set forth above.

7

26. Adaptors shall execute and deliver to Scholastic any other documents necessary to give efficacy to any of the provisions of this Agreement.

27. This Agreement and all matters related thereto or arising therefrom (including without limitation its validity and interpretation) shall be governed by, construed under and enforced in accordance with the laws of the United States and the State of New York as applied to contracts made in and to be performed entirely in that State.   The state and federal courts located in the State of New York, New York County having subject matter jurisdiction shall have exclusive jurisdiction over any dispute between the parties arising hereunder, and the parties hereby submit to said jurisdiction and venue.

28. Any provisions which by their nature need to survive shall survive termination or expiration of this Agreement.

29. Adaptors individually and collectively hereby irrevocably appoint Susan Gurman ("Adaptors Agent"), Gurman Agency, LLC, 14 Penn Plaza, Suite 1703, New York, NY 10122-1701, as the sole and exclusive agent representing Adaptors with respect to the Play. Adaptors hereby authorize and direct SEI to make and forward all payments due or to become due to Adaptors hereunder, to and in the name of the Agent, and to accept the receipt of the Agent as full evidence and satisfaction of such payments. Except for the productions of the Play identified hereunder, for all other licenses and for consideration of the services rendered and to be rendered by Adaptors Agent, Adaptors hereby agree that the Agent is entitled to receive and retain as its commission Ten Percent (10%) of all such proceeds, including, without limitation, Adaptors' share of proceeds derived from any and all Ancillary Markets, except that, with respect to proceeds derived from amateur performances, the Agent's commission shall be Twenty Percent (20%) instead of Ten Percent (10%). For the purposes of the foregoing, "amateur performances" are defined as performances wholly comprised of non-union actors who are unpaid. The agency created herein is irrevocable with respect to the Play and survives any termination of the Agreement.

**IN WITNESS WHEREOF**, the Parties have signed this Agreement:

**ACCEPTED AND AGREED:**

**Mr. John Maclay ("Adaptor")**
Sign Name: _____
Date: _____4-28-2017_____

**Danomalous Productions, LLC ("Adaptor")**
Print Name: _____
Sign Name: _____
Title: _____
Date: _____

**Scholastic Entertainment Inc. ("SEI", "Scholastic")**
Print Name: _____
Sign Name: _____
Title: ___VP Consumer Products___
Date: _____5/2/17_____

8

26. Adaptors shall execute and deliver to Scholastic any other documents necessary to give efficacy to any of the provisions of this Agreement.

27. This Agreement and all matters related thereto or arising therefrom (including without limitation its validity and interpretation) shall be governed by, construed under and enforced in accordance with the laws of the United States and the State of New York as applied to contracts made in and to be performed entirely in that State. The state and federal courts located in the State of New York, New York County having subject matter jurisdiction shall have exclusive jurisdiction over any dispute between the parties arising hereunder, and the parties hereby submit to said jurisdiction and venue.

28. Any provisions which by their nature need to survive shall survive termination or expiration of this Agreement.

29. Adaptors individually and collectively hereby irrevocably appoint Susan Gurman ("Adaptors Agent"), Gurman Agency, LLC, 14 Penn Plaza, Suite 1703, New York, NY 10122-1701, as the sole and exclusive agent representing Adaptors with respect to the Play. Adaptors hereby authorize and direct SEI to make and forward all payments due or to become due to Adaptors hereunder, to and in the name of the Agent, and to accept the receipt of the Agent as full evidence and satisfaction of such payments. Except for the productions of the Play identified hereunder, for all other licenses and for consideration of the services rendered and to be rendered by Adaptors Agent, Adaptors hereby agree that the Agent is entitled to receive and retain as its commission Ten Percent (10%) of all such proceeds, including, without limitation, Adaptors' share of proceeds derived from any and all Ancillary Markets, except that, with respect to proceeds derived from amateur performances, the Agent's commission shall be Twenty Percent (20%) instead of Ten Percent (10%). For the purposes of the foregoing, "amateur performances" are defined as performances wholly comprised of non-union actors who are unpaid. The agency created herein is irrevocable with respect to the Play and survives any termination of the Agreement.

**IN WITNESS WHEREOF**, the Parties have signed this Agreement:

**ACCEPTED AND AGREED**:

**Mr. John Maclay ("Adaptor")**
Sign Name:  _____
Date:  _____

**Danomalous Productions, LLC ("Adaptor")**
Print Name:  Danny Abosch
Sign Name:  _Danny Abosch_
Title:  Principal
Date:  4/28/2017

**Scholastic Entertainment Inc. ("SEI", "Scholastic")**
Print Name:  _____
Sign Name:  _____
Title:  _____
Date:  _____

8

Intentionally Blank

**Attachment 1**

Scholastic Entertainment Inc.
557 Broadway
New York, NY 10012

Ladies and Gentlemen:

In order to induce Scholastic Entertainment Inc. ("Company"), on the one hand, to enter into a certain Goosebumps Play Adapter/Composer Agreement dated as of ____April 28, 2017____ (the "Agreement") with Danomalous Productions, LLC ("DPLLC"), and Mr. John Maclay, on the other hand, and in consideration of Company's execution and delivery thereof, I hereby represent and warrant that: (i) I am familiar with each term and condition of the Agreement, (ii) DPLLC has all the rights therein granted to Company and the right to grant Company said rights, (iii) I am providing services to DPLLC pursuant to a valid, enforceable agreement between DPLLC and me (the "Employment Agreement"), (iv) I hereby consent and agree to the execution and delivery of said Agreement by DPLLC and agree to render all of the services therein provided to be rendered by me and to be bound by and duly perform and observe each and all of the terms and conditions of said Agreement requiring performance or compliance on the part of me, and (v) I hereby join in all warranties and representations, agreements and indemnities made by DPLLC. To the fullest extent permissible by law, the I hereby irrevocably and unconditionally waive in perpetuity any moral rights, droit moral or "*droit moral*" or any similar law which may now or hereafter be recognized in any country or place (including, without limitation, the so-called right of paternity [*droit a la paternite*], right of integrity [*droit au respect de l'oeuvre*], and/or right of publication [droit divulgation] in the work, product and materials resulting from the services required to be performed under the Agreement (the "Work"), and acknowledge that this waiver may be invoked by all licensees and assignees of Company. I shall not institute, support, maintain or permit any action or proceeding on the ground that any change, deletion, addition or other use of the Work violates such rights or that the Work produced or exploited by Company or Company's successors, licensees or assign in any way constitutes an infringement of any of my droit moral or is in any way a defamation or mutilation of the Work or any part thereof. I agree to execute any further documents required to effectuate the provisions of this paragraph.

I further agree that if DPLLC should be dissolved or should otherwise cease to exist or for any reason whatsoever should fail, be unable, neglect or refuse duly to perform and observe each and all of the terms and conditions of said Agreement requiring performance or compliance on the part of DPLLC, or if the Employment Agreement should expire or terminate during the term of the Agreement, I shall, at the election of Company, be deemed substituted as a direct party to said Agreement in place and stead of DPLLC, and further agree that in the event of a breach or threatened breach of said Agreement by DPLLC or by me, Company shall be entitled to legal and equitable relief by way of injunction or otherwise against DPLLC, or against me, or against both DPLLC and me, in Company's discretion, in any event, without the necessity of first resorting to or exhausting any rights or remedies which it may have against DPLLC; all of the foregoing to be to the same extent and with the same force and effect as if I had agreed to render services to Company.

Without limiting any rights granted to Company in the Agreement, I hereby grant Company the right to use and publish and to permit others to use and publish my name, approved likeness and approved biographical information concerning me solely for advertising and trade purposes in connection with Company's exploitation of the work, product and materials resulting from the services required to be performed under the Agreement. Company shall submit any such likeness and/or biographical information for my reasonable approval and if I do not approve or disapprove any submission within two (2) business days of its receipt thereof, such likeness and/or biographical information shall be deemed approved. Any likeness or biographical information provided by me to Company shall be deemed to be approved.

10

Further, unless I am substituted for DPLLC as a direct party to said Agreement as set forth above, I waive any claim against Company for wages, salary or other compensation of any kind under said Agreement, and I agree that I will look solely to DPLLC for any and all compensation that I may become entitled to receive for services in connection with the Agreement. I acknowledge that such compensation includes full, fair and equitable payment for any and all rental, lending or similar rights in the Work anywhere in the world.

Danny Abosch

11

# Exhibit G

 Gmail

Danny Abosch <daabosch@gmail.com>

---

## GOOSEBUMPS

---

**Susan Gurman** <susan@gurmanagency.com>                     Mon, Jul 16, 2018 at 5:22 PM
To: Danny Abosch <daabosch@gmail.com>
Cc: "sjtheatricals@gmail.com" <sjtheatricals@gmail.com>

This just in from Anthony:  The good news is we just finalized (on Friday) our new agreement with Sony and Sony agreed to carve out this show.

I am working with accounting to determine the next steps.  My Goal is to look at past revenues and figure something out that is fair and reasonable.  In the meantime, I believe all new revenue received is split 50/50 after your commission is deducted.

(I did write back and say that 50:50 should apply to previous payments as well.)

Susan Gurman, *Agent*

Member: Association of Authors Representatives

Signatory: Writers Guild of America East

**Gurman Agency LLC**

14 Penn Plaza, Suite 1703, New York, NY 10122-1701

Tel: 212 749 4618

Gurman Agency

Theatre For Young Audiences



 **Gmail**

Danny Abosch <daabosch@gmail.com>

---

## GOOSEBUMPS

---

**Susan Gurman** <susan@gurmanagency.com>                                      Thu, Jul 19, 2018 at 3:59 PM
To: Danny Abosch <daabosch@gmail.com>
Cc: John Maclay <sjtheatricals@gmail.com>

Just got off the phone with Maggie Shearman. She'll respond to the cast album agreement in a day or two.  She also will ask your attorney to remove the phrase 'third-party' expenses since Sony is no longer a party to the GOOSEBUMPS stage musical.  And they are looking into how to get some of the money back to you. Stay tuned!

Susan Gurman, *Agent*

Member: Association of Authors Representatives

Signatory: Writers Guild of America East

**Gurman Agency LLC**

14 Penn Plaza, Suite 1703, New York, NY 10122-1701

Tel: 212 749 4618

Gurman Agency

Theatre For Young Audiences



# Exhibit H

## Cast Album Addendum to Goosebumps The Musical Master Agreement

Reference is made to the Goosebumps Play Adaptor/Composer Agreement dated April 28th, 2017 (the "**Agreement**") between Mr. John Maclay and Danomalous Productions, LLC ("DPLLC"), for the services of Danny Abosch (collectively, "**Adaptors**"), on the one hand, and Scholastic Entertainment Inc. ("**SEI**", or "**Scholastic**"), on the other, to which this addendum is attached and of which it is made a part ("Addendum"), which Agreement is hereby amended and supplemented as follows:

1.      **Defined Terms.** All terms defined in the Agreement, except as otherwise defined herein, shall have the same meanings where used herein.

2.      **Cast Album, Sheet Music, and Marketing**. (a) Scholastic, for good and fair consideration--receipt of which Scholastic hereby acknowledges hereby grants Adaptors, subject to the limitations and terms contained herein and Adaptors' compliance with the Approval Requirements set forth on Exhibit A, attached hereto and made a part hereof, a license (the "Cast Album License") to the Play and the rights underlying the Play solely for the purpose of Adaptors' production of original studio sound recording of the original music from the Play and sales of copies thereof (including without limitation multiple and different versions thereof, provided such versions are all embodied within the same album, the license being for one full-length album only) in accordance with industry custom in normal retail channels including without limitation on iTunes, Spotify, Pandora, Apple Music, and Google Play ("**Cast Album**" or "**Cast Recording**") throughout the Universe in all media now known or hereafter devised subject to the terms and conditions hereof (the "Cast Album License"). For the first three (3) years starting from the release of the Cast Album, on the one hand, or the first three (3) years starting from six months from the date of the execution of this Agreement, on the other, whichever is earlier; (the "**Exclusive Period**"), the Cast Album License shall be exclusive to Adaptors and Scholastic hereby covenants not to license the Play for the purpose of producing and selling a Cast Album to any third-party; provided however, that the number of days a release is delayed due to the approval stages set forth in Exhibit A shall be added to the "Exclusive Period," upon expiry of the Exclusive Period, the exclusivity of the Cast Album License may be extended upon mutual agreement for two (2) years (the "**Extension Period**"). Upon expiry of the Exclusive Period and, if agreed upon, the Extension Period, the Cast Album License shall be non-exclusive throughout the Universe in all media now known or hereafter devised, for the life of the copyright ("**Addendum Term**") and remain subject to all relevant terms and conditions hereof. Further, Scholastic, for full and fair consideration, receipt of which Scholastic hereby acknowledges, hereby grants Adaptors an exclusive license to produce and sell sheet music of original music from the Play (including without limitation multiple and different versions thereof, in digital and/or print format) ("**Sheet Music**") throughout the Universe in all media now known or hereafter devised for the life of the copyright (the "**Sheet Music License**"). The exclusivity of the Sheet Music License shall last during the Exclusive Period; upon expiry of the Exclusive Period and Extension Period, if any, the Sheet Music License shall be non-exclusive, throughout the Universe in all media now known or hereafter devised for the remainder of the term of the Sheet Music License.

1

ı

Adaptors will be solely responsible for but not obligated to produce and sell the Cast Album and Sheet Music and to bear all costs and expenses related thereto subject to the terms and conditions hereof, including without limitation paragraph 4 of this Addendum, provided, however, in the event Adaptors do not submit to Scholastic for approval (pursuant to Exhibit A attached hereto) the Cast Album within three (3) years of the execution of this Agreement all rights granted in this Addendum shall terminate..

(b)    Subject to the terms and conditions hereof, Scholastic hereby grants Adaptors a non-exclusive license solely to advertise, market, publicize, and otherwise promote the Cast Album and Sheet Music, and to allow others to do so on Adaptors' behalf (solely to advertise, market, publicize and otherwise promote the Cast Album and Sheet Music), by referencing and using the "Goosebumps" name, logo, logotype, font, trademark, and service mark owned by Scholastic, and/or referencing and using the name of the Book and/or the Play as may be elected by Adaptors (collectively the "Marks"), and in each case, in all territories, using all means, during the Addendum Term (the "**Marketing License**"). No casual or inadvertent failure of Adaptors to strictly comply with the terms of the Marketing License, and no failure of any other party to comply with such provisions, shall constitute a material breach of this Addendum by Adaptors provided that Adaptors take commercially practicable actions required by Scholastic to remedy such non-compliance.

(c)    Intentionally deleted.

(d)    Adaptors will keep and maintain complete and accurate records regarding gross receipts, Expenses (defined below), and Net Receipts (defined below), and all source documents including without limitation copies of all related distribution agreements (collectively, "Source Documents") and make all such documents available for inspection by Scholastic in accordance with the terms and conditions hereof including without limitation paragraphs 5 and 6 of this Addendum.

3.    **Copyright Ownership** The copyrights in and to the Cast Album and Sheet Music shall be and remain solely-owned by Adaptors for the life of the copyright in the Cast Album. The parties to this Addendum do not intend to modify, in any manner, the apportionment of rights as set forth in the Agreement with respect to the Book or the Play (as defined therein).

4.    **Revenue Split**. (a)    The parties agree that monies, if any, earned from the sales of the Cast Album and Sheet Music shall be allocated as set forth below, and Scholastic agrees that such allocation shall be in full consideration for all of the rights granted hereunder:
            (i)    For the purposes of this Addendum, "**Net Revenue**" shall mean gross revenue (i.e. lump sum payments but excluding advances and prepayments paid to Adaptors received and not returned by Adaptors or Scholastic in connection with sales of the Cast Album and Sheet Music less Expenses;
            (ii)    For the purposes of this Addendum "**Expenses**" shall mean actual and commercially reasonable expenditures for marketing, manufacturing, distribution and recording costs including but not limited to graphic design, advertising, production of CDs and other media now known or hereafter devised that will embody the Cast Album and/or Sheet Music, studio time, band fees, artist fees, sound engineering costs and other directly

2

related, actual, reasonable, out-of-pocket fees and expenses incurred in connection with the Cast Album or Sheet Music but in no event shall the amount deductible for Expenses incurred for production of the Cast Album or Sheet Music (*i.e.* graphic design, recording costs, studio time, band fees, artist fees, and sound engineering costs) exceed Fifty Thousand Dollars ($50,000.00) and in no event shall the amount deductible for all other Expenses (*i.e.* marketing, manufacturing, distribution, advertising, production of CDs and other media now known or hereafter devised that will embody the Cast Album) incurred after approval by Scholastic exceed twenty percent (20%) of gross revenue per calendar year. Adaptors may recoup all Expenses before paying Scholastic's Share (defined below). Scholastic agrees that the $50,000 cap for the Cast Album production costs can also include expenses for marketing and the like solely in the year of the Cast Album's release.

(b)     Adaptors shall share with Scholastic 25% of "Net Revenue" ("**Scholastic's Share**"). Adaptors acknowledge and agree that with respect to download sales of the Cast Album and Sheet Music, the only permitted returns shall be due to defective downloads.

(c)     In the event that Scholastic receives any monies in connection with the Cast Album or Sheet Music (e.g., mechanical royalties and payments for sync licensing), those monies shall also be allocated as 25% to Scholastic and 75% to Adaptors. Scholastic acknowledges and agrees that Scholastic shall not deduct payments to third party profit participants.

5.     **Statements and Payments**. (a) Adaptors shall furnish statements in the form of Exhibit B, attached hereto and made a part hereof, to Scholastic showing the Net Revenue (including gross receipts and Expenses) for such amounts. Adaptors shall pay to Scholastic the sums, if any, due Scholastic quarterly; within forty-five (45) days of the close of the quarter in which Adaptors received gross receipts. Quarters shall end on the third (3rd), sixth (6th), ninth (9th) and twelfth (12th) month of each calendar year. In the event that less than $5,000.00 in gross receipts are generated in a given year, reports shall thereafter be furnished semi-annually containing statements as to the Cast Album and Sheet Music showing a summary of Net Revenue (including categories of Expenses and gross revenue). Each statement (and all items covered thereby) rendered to Scholastic shall become final, binding, and incontestable by Scholastic two (2) years after the date on which payment or such statement, whichever is applicable, was rendered, unless, prior to the expiration of such two-year period, Scholastic furnishes Adaptors written notice of its objection or request to inspect Adaptors' records to any such statement specifying in detail its objection and the reason(s) therefor. The foregoing incontestability shall include Scholastic's right to commence any legal proceeding or other action based upon or arising out of such a statement and the information contained therein. The inclusion in a statement of any information or items contained in a prior statement shall not re-commence the two (2) year period during which Scholastic may contest any such information or item, nor shall it allow Scholastic to audit any books for which the time frame to audit has expired or which have been previously audited.

(b)     Adaptors will retain 100% of Net Revenue until Adaptors have fully recouped Expenses with respect to the Cast Album and Sheet Music out of amounts that would otherwise constitute Scholastic's Share; and then, out of further Net Revenue, Scholastic will be entitled to Scholastic's Share.

3

(c)   All payments due Scholastic shall be made to "Gurman Agency LLC a/a/f Scholastic Entertainment Inc.", and mailed to: Gurman Agency LLC 14 Penn Plaza, Suite 1703 New York, NY 10122-1701 USA.   All payments due Adaptors and either of them hereunder shall be made to "Gurman Agency LLC a/a/f Danomalous & Maclay", and mailed to: Gurman Agency LLC 14 Penn Plaza, Suite 1703 New York, NY 10122-1701 USA.

6.      **Audit**.  Adaptors shall keep normal books and records in connection with exploitation of rights to the Cast Album and Sheet Music granted hereunder.  From time to time during the Addendum Term and for two (2) years thereafter, upon prior reasonable notice to Adaptors, Scholastic, or its designee, shall have the right to inspect, audit and make copies of the books and records of Adaptors directly relevant to the subject matter of this Addendum.  Adaptors shall cooperate in all respects in the conduct of such inspections or audits. In the event of an error in any accounting in favor of Adaptors of at least five percent (5%) or $500, whichever is greater, in a given year, the cost of such inspection shall be borne by Adaptors, and such underpayment shall be due within fifteen (15) days of Adaptor's receipt of Scholastic's invoice therefor. Any overpayments may be deducted from future payments, but in no event shall Adaptors be entitled to a refund or return of any amounts from Scholastic.

7.      **Scholastic Purchase of Cast Albums/Giveaways/Free Sample**. In the event that the Cast Album is produced by Adaptors, Scholastic may purchase copies of the Cast Album from Adaptors or Adaptors' Agent at the wholesale price for such Cast Album or, alternatively, at a formula calculated by Adaptors as "cost plus 10%", if and in the event that Scholastic notifies Adaptors in writing that Scholastic will distribute give-away copies of such Cast Albums for fund-raising or promotional purposes, and in such event only to the extent of the actual number of give-away copies distributed by Scholastic. Adaptors shall also have the right to distribute give-away copies of the Cast Album (or tracks thereon) for fund-raising or promotional purposes. Upon receipt of notice from Adaptors that the Cast Album is available for purchase, Scholastic shall attach an order form in substantially the same form as the form attached hereto as Exhibit C ("Order Form") which Adaptors reserve the right to amend from time to time to any license agreement it enters into for the Play. In no event shall any licensee of the Play be required to purchase the Cast Album or Sheet Music. In the event that Scholastic itself produces the Play, Scholastic will make Cast Albums and Sheet Music available for sale at each performance of the Play. Scholastic may sell the Cast Album anywhere else that any other merchandise relating to the Play is sold. Adaptors and Scholastic recognize that in the event of a breach by either party of its obligations under this Addendum (including, without limitation, breaches of the Addendum arising out of the Marketing License, if any), the damage (if any), caused either party thereby is not irreparable or sufficient to entitle them to injunctive or other equitable relief.  Both parties, therefore, agree that their rights and remedies shall be limited to the right, if any, to obtain damages at law and that neither of them shall have the right in such event to terminate or rescind this Addendum or to enjoin or restrain the production, distribution or exploitation of the Cast Album, Sheet Music or any rights derived therefrom or ancillary thereto. Neither the expiration of this Agreement nor any other termination thereof shall affect Adaptors' ownership of the Cast Album, or alter any of the rights or privileges of either party, or any warranty, indemnity or undertaking on the part of either party in connection

4

with such rights. Adaptors shall provide one (1) free digital copy each of the released Cast Album and Sheet Music to Scholastic.

8.    **Credit and Notices**. Scholastic, the GOOSEBUMPS brand, and the author of the Book shall receive credit in connection with all uses of the Cast Album and Sheet Music including, without limitation, in all advertising, marketing, in the liner notes for the Cast Album and on the Sheet Music as set forth in Exhibit D, attached hereto and made a part hereof.

9.    **Approvals.** With respect to all approvals required hereunder, Adaptors shall adhere to the approval procedures as outlined in Exhibit A. No casual or inadvertent failure of Adaptors to comply with the credit provisions of this Agreement, and no failure of any other party to comply with such provisions, shall constitute a material breach of this Agreement by Adaptors, provided that (1) Scholastic notifies Adaptors of said non-compliance in writing; (2) Scholastic describes what action Scholastic requires to remedy such non-compliance in writing; and (3) Adaptors take all commercially reasonable action required by Scholastic to remedy such non-compliance.

10.    **Representations/Warranties/Indemnities**. (a)    Adaptors,    individually    and collectively, DPLLC on behalf of Abosch, and Scholastic represent and warrant that each of them: (i) has the full power and authority to enter into and perform this Addendum; (ii) they shall comply with all applicable laws during the Term; and (iii) they shall exercise due care in the performance of all obligations under this Agreement. Furthermore, DPLLC represents and warrants that it has a valid enforceable agreement with Abosch under which Abosch is required to perform services for DPLLC, and at the time of this Addendum.

(b)    Scholastic represents and warrants that it has all right, power and authority to grant the rights herein granted to Adaptors hereunder, provided, however, with respect to trademarks, Scholastic makes no representations and warranties with respect to trademarks rights outside the United States. Accordingly, any exploitation of the Cast Album or Sheet Music outside the United States shall be at Adaptors' sole risk and costs.

(c)    The parties hereto shall indemnify and hold each other, their respective parent, subsidiary and affiliated entities, partners, agents, and attorneys-in-fact, and the officers, directors and employees of all of the foregoing, harmless from and against any and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of the breach of any representation, warranty or undertaking made by a party hereto. The party entitled to indemnification hereunder (the "**Indemnified Party**") shall notify the other party hereto (the "**Indemnifying Party**") in writing of the claim or action to which such indemnification applies. The Indemnifying Party shall undertake the defense of such claim or action and permit the Indemnified Party to participate therein at the Indemnified Party's own expense. The settlement of any such claim or action by the Indemnified Party without the Indemnifying Party's prior written consent shall release the Indemnifying Party from its obligations hereunder with respect to the claim or action so settled. The obligations contained in this Paragraph 10 shall survive the expiration or any termination of this Agreement.

## 11. Force Majeure.

(a)    "Force Majeure" means the occurrence of: (a) an act of war (whether declared or not), hostilities, invasion, act of foreign enemies, terrorism or civil disorder; (b) a strike or

5

strikes or other industrial action or blockade or embargo or any other form of civil disturbance (whether lawful or not), in each case affecting on a general basis the industry related to the affected Services and which is not attributable to any unreasonable action or inaction on the part of the Adaptors or any of its agents, representatives, employees or designees and the settlement of which is beyond the reasonable control of all such persons; (c) discontinuation of electricity supply; or (d) other unforeseeable circumstances beyond the control of the Parties against which it would have been unreasonable for the affected party to take precautions and which the affected party cannot avoid even by using its commercially reasonable efforts, which in each case directly causes either party to be unable to comply with all or a material part of its obligations under this Agreement; Neither Party shall be in breach of its obligations under this Agreement (other than payment obligations) or incur any liability to the other party for any losses or damages of any nature whatsoever incurred or suffered by that other (otherwise than under any express indemnity in this Agreement) if and to the extent that it is prevented from carrying out those obligations by, or such losses or damages are caused by, a Force Majeure except to the extent that the relevant breach of its obligations would have occurred, or the relevant losses or damages would have arisen.

(b)    As soon as reasonably practicable following the date of commencement of a Force Majeure, and within a reasonable time following the date of termination of a Force Majeure, any Party invoking it shall submit to the other Party reasonable proof of the nature of the Force Majeure and of its effect upon the performance of the Party's obligations under this Agreement.

(c) Adaptors shall, and shall procure that its agents, representatives, employees and designees shall, at all times take all reasonable steps within their respective powers to:

(i)    prevent Force Majeure affecting the performance of the obligations under this Agreement;

(ii)    mitigate the effect of any Force Majeure; and

(iii)    comply with its obligations under this Agreement.

The parties shall consult together in relation to the above matters following the occurrence of a Force Majeure.

12.    **Reserved rights.**  All rights not granted to Adaptors herein are as set forth between the parties in the Agreement.

13.    **General.**

(a)    Subject to the limitations herein, Agreement together with this Addendum replaces and supersedes all other conflicting provisions in prior agreements, written or oral with respect to its subject matter.

6

(b)     Except as expressly amended and supplemented hereby, the Agreement remains in full force and effect.

(c)     Subject to the limitations herein, in the event of any conflict between the terms of this Addendum and the terms of the Agreement, the terms of the Addendum shall prevail.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be signed as of ___July 30___, 2018.

**ACCEPTED AND AGREED:**

**Mr. John Maclay ("Adaptor")**
Sign Name:  _AmLM_
Date:  _7/31/18_

**Danomalous Productions, LLC ("Adaptor")**
Print Name:     Danny Abosch
Sign Name:      _Danny Abosch_
Title:          Principal
Date:           7/30/2018

**Scholastic Entertainment Inc. ("SEI", "Scholastic")**
Print Name:     Caitlin Friedman
Sign Name:      _Caitlin Friedman_
Title:          VP, editorial
Date:           7/3/2017

**Accepted and Agreed:**

_Danny Abosch_
Danny Abosch

7

## Exhibit A
## Approvals

I. **Approvals.**

    **A. Cast Album.**   Provided the Cast Album is of the same technical audio quality as the Fancy Nancy cast album ("FNCA"), Adaptors shall only be required to submit final masters of the Cast Album for Scholastic's approval.   If in Scholastic's good faith judgment, such submission is not substantially similar to the audio quality of the FNCA, Adaptors shall make all required technical changes requested by Scholastic.

    **Packaging/Advertising and Marketing.** Provided all packaging of the Cast Album and advertising/marketing materials therefor shall be the same quality as the FNCA, Adaptors shall only be required to submit Final Stage Artwork for Scholastic's approval.   If in Scholastic's good faith judgment, such submission does not equal the quality of the FNCA, and does not accurately represent the Goosebumps brand, Adaptors shall make all required changes in the Final Stage Artwork requested by Scholastic. For the purposes of this section, "Final Stage Artwork" shall mean all logos, graphic design, credit, text, included on cover art for CD jewel cases and in online advertising and marketing; provided however, that Adaptors may make minor changes in the formatting of text upon manufacture and distribution of the Cast Album so long as such changes do not substantially change the approved Final Stage Artwork.

    For the avoidance of doubt, Adaptors may not release the Cast Album or any marketing and advertising therefor, unless Scholastic has approved submissions at the stages set forth above and the Cast Album is consistent with the approved submissions. Scholastic shall not unreasonably withhold approval at any stage set forth above.

    **B. Bundling/Premiums.** Scholastic shall have a right of prior written approval in respect of any "bundling" of the Cast Album or Sheet with another product and/or use of the Cast Album or Sheet Music in connection with co-promotion or as a premium.

II. **Time for Approvals.** With respect to all approvals requested of Scholastic pursuant to this Agreement, if Scholastic does not approve or disapprove any submission in writing within five (5) business days of its receipt thereof, such submission shall be deemed disapproved. Scholastic will use commercially reasonable efforts to notify the Adaptors in writing of approval or disapproval of any submission(s) within five (5) business days after Scholastic's receipt of such, and agrees, in the case of disapproval, to notify the Adaptors in writing of the reasons for disapproval within five (5) business days. Adaptors shall have one (1) year to cure the reason(s) for disapproval noticed by Scholastic and re-submit the Cast Album, packaging/advertising and/or marketing materials to Scholastic for approval and if approved, such submission shall be deemed approved in perpetuity. In no event shall any disapproved submission including, without limitation, the Cast Album be released until Scholastic approves.   Scholastic will use commercially reasonable efforts to notify the Adaptors in writing of approval or disapproval of any re-submission(s) within five (5) business days of Scholastic's receipt of such cure, and agrees, in the case of disapproval, to notify the Adaptors in writing of the reasons for disapproval within five (5) business days. Adaptors shall have the right to re-submit the Cast Album, packaging/advertising and/or marketing materials to Scholastic throughout the Term of this Agreement.

**Exhibit B**

**■SCHOLASTIC**

*Play Adaptors/Composer Portion*
*Goosebumps*
*As of June 30, 2017*
*Statement # 1*
*(Payment reflected on Current Cash Receipts as of 6/30/17)*

| | Distributor | Advance Receipts | Orchestration Fee | Current Cummulative |
|---|---|---|---|---|
| Gross Receipts | Dallas Child Theatre | 6,000.00 | 500.00 | 6,500.00 |
| | Aurora Theatre | 5,000.00 | 450.00 | 5,450.00 |
| | Stepping Stone | 5,000.00 | 450.00 | 5,450.00 |
| | Nantucket Theatre | 2,500.00 | 450.00 | 2,950.00 |
| | Arkansas Arts Theatre | 10,500.00 | - | 10,500.00 |
| | Roanoke Child Theatre | 2,100.00 | 450.00 | 2,550.00 |
| **Total Gross Receipts** | | 31,100.00 | 2,300.00 | 33,400.00 |
| Less: | | | | |
| Comission | | 3,110.00 | 230.00 | 3,340.00 |
| | | | | |
| **Total Expenses** | | 18,660.00 | 1,380.00 | 20,040.00 |
| **Net Receipts** | | 22,440.00 | 920.00 | 13,360.00 |
| % Share to Adaptors | | 50% | 75% | |
| Total Share Due to Adaptors/Orchestrator | | 6,220.00 | 690.00 | 6,910.00 |

Notes:

---

**Exhibit C**

**Goosebumps Cast Album/Sheet Music
Order Form**

Send to:
Danny Abosch
c/o Gurman Agency, LLC
14 Penn Plaza, Suite 1703
New York, NY 10122-1701

| Customer: | Date: |
|-----------|-------|
| Address: | |
| Address: | |
| Phone: | |
| Email: | |

| Quantity | Description | Unit Price | Total |
|----------|-------------|------------|-------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Office Use Only | | Subtotal | |
| | | Shipping & Handling | |
| | | Tax | |
| | | Grand Total | |

**Payment**

| | | | |
|--|--|--|--|
| ☐ | Check | | |
| ☐ | Money Order | | |
| ☐ | Cash | | |
| ☐ | Credit Card | | Visa/MC/Discover/Amex |
| Name | | | |
| Billing Address | | | |
| CC# | | | Expiration: |
| CVC# | | | |

## Exhibit D

**Copyright and Trademark Notice:**
"Recording © 2018 John Maclay and Danny Abosch
Goosebumps ™ & © Scholastic Inc. SCHOLASTIC, GOOSEBUMPS and associated logos are trademarks and/or registered marks of Scholastic Inc.
Based on Goosebumps® Phantom of the Auditorium.    All Rights Reserved."

**Credit Notice:**
"Based on "Goosebumps®: Phantom of the Auditorium" by R.L. Stine, published by Scholastic Inc."

**Short Form Copyright and Trademark Notice for Use due to Space:**
"Recording © John Maclay and Danny Abosch
Goosebumps is a trademark of Scholastic Inc. All rights reserved."

**Short Credit Notice for Use due to Space:**
"Based on the book by R.L. Stine, published by Scholastic"

11

Amendment to Goosebumps The Musical Master Agreement ("Amendment")

Reference is made to the Goosebumps Play Adaptor/Composer Agreement dated April 28th, 2017 between Mr. John Maclay and Danomalous Productions, LLC ("DPLLC"), for the services of Danny Abosch (collectively, "Adaptors"), on the one hand, and Scholastic Entertainment Inc. ("SEI", or "Scholastic"), on the other, and to the addendum thereto signed as of July 30, 2018 (collectively, the "Agreement").

WHEREAS, the Adaptors and SEI wish to amend the Agreement;

WHEREAS, all terms defined in the Agreement, except as otherwise defined herein, shall have the same meanings where used herein.

NOW, THEREFORE, the Adaptors and SEI agree as follows:

1.      The final sentence of paragraph 2(a) of the cast album Addendum is hereby modified and amended by deleting "within three (3) years of the execution of this Agreement" and replacing it with "by May 31, 2022".

2.      Except as amended herein, the Agreement is hereby ratified in all respects and all terms and provisions of the Agreement not explicitly altered herein shall remain in full force and effect.

3.      This Amendment may be executed in one or more counterparts and transmitted by facsimile copy or PDF, each of which when taken together will constitute one and the same agreement, and each of which shall constitute an original copy of this Amendment.

**ACCEPTED AND AGREED:**

**Mr. John Maclay**

_____

**Danomalous Productions, LLC ("Adaptor")**

_____
Name and Title  Danny Abosch, Principal
                5/19/2021

**Scholastic Entertainment Inc.**

_____
Caitlin Friedman, SVP and General Manager

# Exhibit I

 Gmail

Danny Abosch <daabosch@gmail.com>

---

## RE: "Goosebumps The Musical" Cast Album – Submission for Approval - Legal lines

**Kosiewska, Anthony** <AKosiewska@scholastic.com>                    Wed, Oct 20, 2021 at 3:26 PM
To: Danny Abosch <daabosch@gmail.com>
Cc: "Karppi, Lynne" <LKarppi@scholastic.com>, Susan Gurman <susan@gurmanagency.com>, "Butler, Hannah" <HButler@scholastic.com>,
"Baender, Margo" <MBaender@scholastic.com>, "Throop, Jocelyn" <JThroop@scholastic.com>

Hi Danny,

Thank you for the additional information.  I wanted to let you know, our attorney reached out to your attorney in an effort to clear this up.

Until this is cleared-up we cannot approve the packaging/marketing materials for either physical or digital goods or use.  I'm sure our attorneys will resolve this matter soon.  Thank you.

Best,

Anthony


**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube


**SCHOLASTIC**


**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Monday, October 18, 2021 11:46 AM
**To:** Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Cc:** Karppi, Lynne <LKarppi@Scholastic.com>; Susan Gurman <susan@gurmanagency.com>; Butler, Hannah <HButler@Scholastic.com>; Baender, Margo <MBaender@Scholastic.com>; Throop, Jocelyn <JThroop@Scholastic.com>
**Subject:** Re: "Goosebumps The Musical" Cast Album – Submission for Approval - Legal lines

Hi Anthony,

Thank you for your email and for continuing to work to find a solution here.

We are open to removing the "Recording..." line as you suggest.

The placeholder is for the legal line from the record label. It is currently as follows:

*℗ and © 2021 Danny Abosch and John Maclay, under exclusive license to Sh-K-Boom LLC. The Ghostlight logo is a trademark of Sh-K-Boom Records, LLC., 1633 Broadway, New York, NY 10019. All rights reserved.*

We appreciate the suggested edit for the Scholastic line, however, we believe it still overstates the extent of Scholastic's rights. Please see (without limitation) §3 of the Addendum (*"The copyrights in and to the **Cast Album and Sheet Music** shall be and remain **solely-owned** by Adaptors"* (emphasis added)) and §13 (*"in the event of any conflict between the terms of this Addendum and the terms of the Agreement, the terms of the Addendum shall prevail."*) We remain willing to include Scholastic's legal line as set forth in Exhibit D of the Addendum.

Please understand that the whole purpose of including Exhibit D was to avoid an eleventh-hour disagreement such as this. Scholastic's legal team had the opportunity to review this legal line in 2018 and should have raised any issues then. Had they done so, we might have negotiated different terms, or not signed at all. To spring this on us now--after we've spent years of time and money in reliance on this agreement--puts us in an unfair position. We empathize if Scholastic now wishes it had negotiated different terms in 2018, however, we are within our rights to hold to the language we agreed upon, irrespective of the reason. Likewise, if we were requesting changes to the terms, I'm sure Scholastic would not feel obligated to agree.

We could accept any of the following alternatives:

1.   ™ *Scholastic Inc. SCHOLASTIC® and associated logo is a trademark of Scholastic Inc. GOOSEBUMPS® and associated logos are trademarks and/or registered marks of Scholastic Inc. Goosebumps®: Phantom of the Auditorium © Scholastic Inc. All Rights Reserved.*

2.   ™ *Scholastic Inc. SCHOLASTIC® and associated logo is a trademark of Scholastic Inc. GOOSEBUMPS® and associated logos are trademarks and/or registered marks of Scholastic Inc. Based on Goosebumps®: Phantom of the Auditorium, © Scholastic Inc. All Rights Reserved.*

3.   ™ *Scholastic Inc. SCHOLASTIC® and associated logo is a trademark of Scholastic Inc. GOOSEBUMPS® and associated logos are trademarks and/or registered marks of Scholastic Inc. All Rights Reserved.*

4.   *GOOSEBUMPS® and associated logos are trademarks and/or registered marks of Scholastic Inc. All rights reserved.*

5.   *GOOSEBUMPS® is a trademark of Scholastic Inc. All rights reserved.*

If any of the above are preferable to you, please let me know by Thursday. Otherwise, we will move forward with the version we agreed on in Exhibit D.

Thank you for understanding. We continue to value Scholastic's support on this project, and regret that this is causing tension during release month, when we should be celebrating our shared success with this album and focusing all attention on further promoting it.

Thanks and best,

Danny

On Fri, Oct 15, 2021 at 4:51 PM Kosiewska, Anthony <AKosiewska@scholastic.com> wrote:

> Hi Danny,
>
> My legal team reviewed your proposed legal lines for the copyrights in connection with the Goosebumps cast album. Scholastic's understanding of the copyright ownership is as follows:
>
> ·   Recordings – Owned by the adapters
>
> ·    Album art – Owned by the adapters
>
> ·   Compositions – Owned by SEI
>
> The legal lines proposed by you give two separate copyright notices for the recordings – in the first line, where it says "RECORDING © 2021 JOHN MACLAY AND DANNY ABOSCH" and in the last line that reads "(P) & © 2020 THIS IS A PLACEHOLDER…." The P in a circle refers to the copyright in the phonorecord, i.e., the recording. Only one notice is

necessary for the recordings. It's typical to use P in a circle, so despite what is in the cast album addendum, that is what we would suggest.

In addition to the "RECORDING ©", there are two other © notices in the proposed legal lines, one for Scholastic and one for the "PLACEHOLDER". My assumption is that the "PLACEHOLDER" © covers the album art, and that "PLACEHOLDER" will be the adapters' names. We recommend the copyright line for Scholastic be revised to read as follows:

> "TM Scholastic Inc. SCHOLASTIC and associated logo is a trademark of Scholastic Inc. GOOSEBUMPS ® and associated logos are trademarks and/or registered marks of Scholastic Inc. Compositions © Scholastic Entertainment Inc./Scholastic Music (ASCAP). All rights reserved."

Let me know if you have questions.  Thank you.

Best,
Anthony

**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube

**SCHOLASTIC**

**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Thursday, October 7, 2021 2:32 PM
**To:** Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Cc:** Karppi, Lynne <LKarppi@Scholastic.com>; Susan Gurman <susan@gurmanagency.com>; Butler, Hannah <HButler@Scholastic.com>
**Subject:** Re: "Goosebumps The Musical" Cast Album – Submission for Approval

Hi Anthony,

I have uploaded an updated version of the Tray Card for your files, with the ® symbol added to all three Goosebumps logos, as you requested. https://bit.ly/3lhhglg We remain open to other solutions on the legal line, and if you would like to propose one next week, that would be fine, as tomorrow's launch only really concerns the digital version, which does not have a Tray Card.

Do you have any changes to request regarding the Press Release? If you are able to send notes this afternoon, I remain confident that we can address them to your satisfaction.

Thanks,
Danny

On Wed, Oct 6, 2021 at 5:11 PM Kosiewska, Anthony <AKosiewska@scholastic.com> wrote:

> Hi Danny,
>
> I forwarded your email to my legal department for their review.  Thanks for the editable version of the press release, we started the internal review process.  We'll get back to you regarding the legal line after I hear back from my legal.

Best,
Anthony


**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube


**SCHOLASTIC**


**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Wednesday, October 6, 2021 3:58 PM
**To:** Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Cc:** Karppi, Lynne <LKarppi@Scholastic.com>; Susan Gurman <susan@gurmanagency.com>; Butler, Hannah <HButler@Scholastic.com>
**Subject:** Re: "Goosebumps The Musical" Cast Album – Submission for Approval


Hi Anthony,


I checked with my attorney before I emailed you, and he confirmed my understanding of the agreement. I will explain in more detail below, but I first just want to reiterate that it probably doesn't matter in this case, as we are nevertheless happy to share this press release with you for your review, and I am confident that we can accommodate any changes you may wish to request.


Please see how the term "Final Stage Artwork" is defined:


*"For the purposes of this section, "Final Stage Artwork" shall mean all logos, graphic design, credit, text, **included on cover art** for CD jewel cases and in online advertising and marketing; provided however, that Adaptors may make minor changes in the formatting of text upon manufacture and distribution of the Cast Album so long as such changes do not substantially change the approved Final Stage Artwork."* (emphasis added)


In other words, approval is required only when all of the following are true:

1. The element is "logos", "graphic design", "credit", or "text"

AND

2. The element is "included on cover art"

AND

3. The cover art containing the element is a.) "for CD jewel cases", or b.) "in online advertising and marketing".


#3 is because there is both a digital and physical CD version of the album, and it was a possibility that they might have different cover art, as we discussed previously.


Even without the "included on cover art" qualifier, it would still be limited to "online" advertising and marketing.  For example, print marketing would still not be subject to approval. So I am not sure how it is possible to interpret this section such that ALL marketing is subject to approval.

You are correct that marketing is also mentioned here:

*"For the avoidance of doubt, Adaptors may not release the Cast Album or any marketing and advertising therefor, unless Scholastic has approved submissions at the stages set forth above and the Cast Album is consistent with the approved submissions. Scholastic shall not unreasonably withhold approval at any stage set forth above."*

However, this simply prohibits marketing an *unapproved* album. It does not prohibit marketing an *approved* album, and it does not mean that the marketing or advertising *itself* is subject to approval, provided that the Cast Album has been approved, which it has been.

On the copyright notice -- the ownership of the music is not the only issue, as there are also copyrightable elements in the album artwork, liner notes, synopsis, etc. If we did not specify the copyright claimed by Scholastic, it might imply that Scholastic is claiming ownership of those other elements. From my perspective, there is nothing for legal to review here, because legal already reviewed it in 2018 when we signed the addendum. Had they brought the issue up at that time, we might not have signed the addendum, or we might have negotiated different terms. It is not valid to now withhold approval unless we agree to renegotiate the contract. Nothing wrong with asking, but it's not something we're obligated to agree to. I would note that we've accommodated many of your other requests, such as adding Scholastic's logo, which was not a contractual obligation. This is one we have to hold on.

One solution I can propose is that we could instead use the alternate line from Exhibit D, under the heading "Short Form Copyright and Trademark Notice for Use due to Space". Legal has already reviewed this as well, so it should not need to be reviewed again. If this is an agreeable solution, we are happy to make this change. We are also open to other ways of solving this. We certainly want to give Scholastic its due credit -- our concern is simply ensuring that the copyright claim is not ambiguous or overbroad.

I am happy to loop in my attorney if that would be helpful, however, I do not believe that should be necessary, as I am confident we can come to a mutually agreeable outcome here. Once again, all we're asking for is the legal line we both agreed on in the contract, and we're happy to make edits to the press release based on your feedback, provided that we receive it in time. I think that should be agreeable to all parties.

A word document can be downloaded here: https://docs.google.com/document/d/1SSQfr891WO9zl8DDMh6JYzrUfx3elFrn/edit?usp=sharing&ouid=117013025880868551421&rtpof=true&sd=true

Thanks,

Danny

On Wed, Oct 6, 2021 at 2:18 PM Kosiewska, Anthony <AKosiewska@scholastic.com> wrote:

> Hi Danny,
>
> Thanks for the additional information.  I went through our agreements and our approvals go beyond cover art. Below is the approval language for your review.  I've also attached the amendment.
>
> Г.     **Approvals.**
>
> **Exhibit A Approvals**
>
> **A.  Cast Album** .   Provided  the Cast Album  is of the same technical  audio quality as the Fancy Nancy  cast album ("FNCA"), Adaptors shall only be required to submit final masters of the Cast Album for Scholastic's approval. If in  Scholastic's good  faith judgment, such submission  is not substantially similar to the audio quality of the FNCA, Adaptors shall make all required technical changes requested by Scholastic.

**Packaging/Advertising and Marketing.** Provided all packaging of the Cast Album and

advertisi ng/ma rketi ng materials therefor shall be the same quality as the FNCA, Adaptors shall only be required to submit Final Stage Artwork for Scholastic's approval. Ifin Scholastic's good faith judgment, such submission does not equal the quality of the FNCA, and does not accurately represent the Goosebumpsbrand, Adaptors shall make all required changes in the Final Stage Artwork requested by Scholastic. For the purposes of this section, ..Final Stage Artwork" shall mean all logos, graphic design, credit, text, included oncover art for CD jewel cases and in online advertising and marketing; provided however, that Adaptors may

make minor changes in the formatting of text upon manufacture and distribution of the Cast Album so long as such changes do not substantially change the approved Final Stage Artwork.

For the avoidance of doubt, Adaptors may not release the Cast Album or any marketing and advertising therefor, unless Scholastic has approved submissions at the stages set forth above and the Cast Album is consistent with the approved submissions. Scholastic shall not unreasonably withhold approval at any stageset forth above.

**B. Bundling/Premiums .** Scholastic shall have a right of prior written approval in respect of any ·'bundling" ofthe Cast Album or Sheet with another product and/or use of the Cast Album or Sheet Music in connection with co-promotion or as a premium.

Press releases fall under advertising and marketing. We will route your press release through our approval process which includes trade publishing, corporate communications, and legal departments. **Please send an editable version (word doc) as soon as possible so we can start the review process.** We will request a rush, but I am not sure if we will make your Friday date. We will do our best.

It is my understanding that legal lines can evolve over time, that is one of the reasons why we require an approval process. Your legal line which appears above our legal line clarifies and states the copyright and ownership of the music is yours. Our legal lines clarify the ownership of the Goosebumps (and Scholastic) name and trademark. If you feel very strongly about your position on Scholastic's revised legal line, let me know, and I will resubmit it to legal for review.

Thank you for adding the additional R symbols near the Goosebumps logos. To answer your question about adding the symbols, you are right, it is Scholastic's preference. I do not believe there are set rules about the use of TM or R. Some companies don't use it at all with their brands.

I'm looking forward to the album's release and I hope it is very successful! Thanks.

Best,
Anthony

**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube

**SCHOLASTIC**

**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Wednesday, October 6, 2021 8:56 AM
**To:** Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Cc:** Karppi, Lynne <LKarppi@Scholastic.com>; Susan Gurman <susan@gurmanagency.com>; Butler, Hannah <HButler@Scholastic.com>
**Subject:** Re: "Goosebumps The Musical" Cast Album – Submission for Approval

Hi Anthony,

Thanks so much for the expedited approval! Yes, we also feel that the timing is perfect, it being R.L. Stine's birthday and also so close to Halloween. We very much appreciate that you were able to review this so quickly in Lynne's absence.

The plan for Friday is to have our record label, Ghostlight Records, release the first track, "Goosebumps", for digital streaming for customers who pre-order the album. It will be available on the major streaming platforms -- Spotify, Apple Music, etc. Ghostlight's publicist will be sending out a press release to announce this, and the album in general. While I would just note that the approval requirement is specific to "cover art", I am certainly happy to share this press release with you for your input, and we'd be very grateful for any help promoting it through your channels. I am including a draft here--please let me know if you have any feedback. I am also happy to coordinate with Hannah regarding social media strategy.

https://drive.google.com/file/d/1dWG4nzsb2IP8BIONSrpvD6NfzIckZIGz/view?usp=sharing

Regarding the back tray card:

- The "Goosebumps" that starts the legal line was agreed to in Exhibit D of the addendum, and we feel it is necessary as it clarifies that Scholastic's copyright claim is to the Goosebumps source material. (The Cast Album is owned by Adaptors, per paragraph 3.)

- We accept your request to add the ® symbol to the back tray card and both spines. As a general clarification -- is Scholastic's preference to include the symbol for every instance of the Goosebumps logo? Our understanding is that generally it only needs to appear with the first or most prominent mention of a mark (the front cover, in this case). We will go ahead and make the change in this case and send a copy for your files -- I'm mainly seeking guidance for our future knowledge.

Thanks again for all of your help and for accommodating our tight schedule. We've worked tirelessly to make a terrific album which I anticipate will be a great success for the Goosebumps brand and Scholastic as a whole. Let me know if you have any feedback on the press release, and if there's anything else I can provide that might be helpful to your marketing team.

Best,

Danny

On Tue, Oct 5, 2021 at 1:25 PM Kosiewska, Anthony <AKosiewska@scholastic.com> wrote:

Hi Danny,

Thanks for the additional information.  What a great idea to announce on Friday to align with R.L.'s birthday.  By "announce" do you mean that are you sending out a press release, other?  If so, we need to review it.  Hopefully, we can also amplify the announcement and album on our end through our social channels.  With that in mind, can you also send me your release plans and include where the music can be found, etc.?  I'd like to share that info internally, to our external partners, and again to see how we can promote the album through our channels. I'm cc'ing Hannah Butler, Hannah works with our press releases and social media.

Getting back to the submission; with  your deadline, I'll review it in Lynne's absence.  The following are my notes:

**Front Cover**

- approved as submitted.

https://bit.ly/2XPu34U


**Back cover**

- approved with changes.  Please resubmit for our files.

- change legal to: (the word Goosebumps that starts the legal line is not necessary)  Please refer to the use of the two legal lines that were provided earlier (see further down in email chain)

™ & © Scholastic Inc. SCHOLASTIC® and associated logo is a trademark of Scholastic Inc. GOOSEBUMPS® and associated logos are trademarks and/or registered marks of Scholastic Inc. All rights reserved.

- add a ® to the Goosebumps logos, near the top of the letter "s", that appear on the back cover and spines.

- we prefer that the Scholastic logo center float, but accept the layout as submitted.  It makes sense with the overall design

https://bit.ly/3B8o4Hh



Let me know of you have any questions.  Thanks.



Best,
Anthony



**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube


**SCHOLASTIC**


**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Monday, October 4, 2021 12:47 PM
**To:** Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Cc:** Karppi, Lynne <LKarppi@Scholastic.com>; Susan Gurman <susan@gurmanagency.com>
**Subject:** Re: "Goosebumps The Musical" Cast Album – Submission for Approval


Hi Anthony,

We would like to announce on Friday to align with R.L. Stine's birthday. My apologies about the timing. I believe we have followed all of Lynne's instructions for the logo, so I don't anticipate that there would be any issues, but if there are, just let me know and I'm happy to discuss.

Thanks again for your understanding about the quick timeline.

Best,
Danny

On Mon, Oct 4, 2021 at 10:23 AM Kosiewska, Anthony <AKosiewska@scholastic.com> wrote:

Hi Danny,

Thanks for sending this over.  Lynne is on vacation this week.  Is it possible to get back to you next week on this or do you need a reply this week?  Thanks.

Best,
Anthony

**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube

**SCHOLASTIC**

**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Monday, October 4, 2021 7:48 AM
**To:** Karppi, Lynne <LKarppi@Scholastic.com>; Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Cc:** Susan Gurman <susan@gurmanagency.com>
**Subject:** Re: "Goosebumps The Musical" Cast Album – Submission for Approval

Hi Lynne and Anthony,

I hope you had a nice weekend!

Thank you for sending over the Scholastic logo and instructions for use. We have added it to the back tray card as you requested, and I have uploaded a copy for you here: https://bit.ly/3B8o4Hh

The front cover is the image you reviewed previously, with the ® symbol. https://bit.ly/2XPu34U

If you have any questions, please feel free to let me know. I look forward to hearing from you.

Thanks!

Danny

On Mon, Sep 27, 2021 at 4:30 PM Karppi, Lynne <LKarppi@scholastic.com> wrote:

Hi Danny,

Hope you had a great weekend!

Here are our notes for the Physical album along with a link to the Scholastic red bar logo:

- As per Anthony's earlier notes, the ® should appear after the GOOSEBUMPS logo
- Please add a small Scholastic red bar logo to the back of the physical album
- We prefer that the Scholastic red bar logo center-float towards the bottom of the album
- The full legal line can be added beneath the Scholastic logo
- The Scholastic red bar logo can be downloaded here

All best,

Lynne


**Lynne Karppi**

Director Creative Licensing
Scholastic Entertainment
557 Broadway, New York, NY 10012
Lkarppi@scholastic.com
Scholastic.com | YouTube

---

**From:** Danny Abosch <daabosch@gmail.com>
**Sent:** Friday, September 24, 2021 4:54 PM
**To:** Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Cc:** Susan Gurman <susan@gurmanagency.com>; Karppi, Lynne <LKarppi@Scholastic.com>
**Subject:** Re: "Goosebumps The Musical" Cast Album – Submission for Approval


Thanks, Anthony! Very much appreciated. Hope you have a good weekend too.


Danny


On Fri, Sep 24, 2021 at 4:27 PM Kosiewska, Anthony <AKosiewska@scholastic.com> wrote:

> Hi Danny,
>
>
> Thanks for adding the ® symbol near the Goosebumps logo.
>
>
> I'm happy to approve the digital streaming cover.  Approved.  Please send us a visual copy of it for our files when you can.
>
>
> Lynne will pick up with the physical CD art on Monday.  Have a good weekend.
>
>
> Best,
> Anthony
>
>
> **Anthony Kosiewska**
> Sr Director, New Business
> Scholastic Entertainment
> 557 Broadway, New York, NY 10012
> akosiewska@scholastic.com
> Scholastic.com | YouTube
>
>
>
>
>
> **From:** Danny Abosch [mailto:daabosch@gmail.com]
> **Sent:** Friday, September 24, 2021 4:09 PM

**To:** Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Cc:** Susan Gurman <susan@gurmanagency.com>; Karppi, Lynne <LKarppi@Scholastic.com>
**Subject:** Re: "Goosebumps The Musical" Cast Album – Submission for Approval


Hi Anthony,

Thank you, and I'm glad you like the artwork--I'm quite happy with it too!

We have added the ® symbol as you requested. Here's a link to the folder with the revised versions:
https://bit.ly/2XPu34U

We can also add a Scholastic logo to the back tray card once we receive the files from you--not a problem.

Since the digital streaming version has only a front cover and no back, I believe you should now have everything you need to approve that version. If it's possible to do so today, I would really appreciate it, so that we can at least start moving forward with that version. (Even a few days could potentially make a difference with respect to our opportunities for promotion by the streaming platforms.) Approval of the physical CD art can wait until next week, and I'm happy to send you the back tray card design with logo and legal line.

Thanks and best,

Danny



On Fri, Sep 24, 2021 at 1:07 PM Kosiewska, Anthony <AKosiewska@scholastic.com> wrote:

> Hi Danny,
>
>
> Thanks for the additional information.  It helped speed up the review process for all the groups that are involved with doing so.
>
>
> The artwork looks really good.
>
>
> Please make the following changes to the two Album cover designs (CD print version and digital streaming version) and resubmit for review and approval.  Please include back cover design when resubmitting.
>
> - add a ® to the Goosebumps logo, near the top of the letter "s" on both cover designs
>
> - on the back cover, please include a Scholastic red bar logo. The logo artwork and guidelines for use will be sent on Monday. Logo placement needs approval.
>
> - please use the following legal line when the Scholastic logo is present:
>
> ™ & © Scholastic Inc. SCHOLASTIC® and associated logo is a trademark of Scholastic Inc. GOOSEBUMPS® and associated logos are trademarks and/or registered marks of Scholastic Inc. All rights reserved.
>
> - please use the following legal line when the Scholastic logo is NOT present
>
> GOOSEBUMPS® and associated logos are trademarks and/or registered marks of Scholastic Inc. All rights reserved.
>
>
> Thank you.
>
>
> Best,
> Anthony

**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube


■ SCHOLASTIC


**From:** Danny Abosch [mailto:daabosch@gmail.com]
**Sent:** Thursday, September 23, 2021 12:43 PM
**To:** Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Cc:** Susan Gurman <susan@gurmanagency.com>; Karppi, Lynne <LKarppi@Scholastic.com>
**Subject:** Re: "Goosebumps The Musical" Cast Album – Submission for Approval


Hi Anthony,


I'm happy to answer these questions.


-The physical CD version will have a back tray card, which will include talent credits and legal lines. Scholastic's credit will read as follows:


"Based on "GOOSEBUMPS®: PHANTOM OF THE AUDITORIUM" by R.L. STINE, published by SCHOLASTIC INC."


The Copyright and Trademark notice from Exhibit D will also be included.


All of the above would also be included in the liner notes booklet for the physical CD version.


The digital streaming version (on Spotify, Apple Music, etc.) will only have a front cover. Copyright notices are typically handled by displaying them in a separate text field, the placement of which varies from platform to platform. For example, here's how the 2015 Goosebumps film soundtrack appears on iTunes:



-There are two options for the front cover because we are considering using the one with credits for the physical CD, and the one without credits for the digital streaming version. (As shown in the above example, the streaming platforms often display these covers at too small a size for text credits to be readable anyway.) Our hope was that you could approve both versions so that we could have the option of choosing either one, or both.

The cover artwork is by Tim Jacobus, the main original illustrator of the Goosebumps books. The graphic and packaging design is by Michelle Dimuzio, a Senior Designer at SpotCo, one of the leading marketing agencies for Broadway shows.

Thank you, and please let me know if you have any other questions I can answer.

Best,

Danny

On Thu, Sep 23, 2021 at 11:40 AM Kosiewska, Anthony <AKosiewska@scholastic.com> wrote:

Hi Susan,

A couple of questions:

- Is there a back cover?  Where will the talent credits and legal line go?

- There are two options for the front cover.  Is that for us to decide or why are there two designs?

Having some context about the artwork is part of the submission/review process.  Please supply more information about the designs.  Thanks.

Best,
Anthony

**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube



---

**From:** Kosiewska, Anthony
**Sent:** Wednesday, September 22, 2021 5:12 PM
**To:** Susan Gurman <susan@gurmanagency.com>; Throop, Jocelyn <JThroop@Scholastic.com>
**Cc:** Karppi, Lynne <LKarppi@Scholastic.com>; Danny Abosch <daabosch@gmail.com>
**Subject:** RE: "Goosebumps The Musical" Cast Album – Submission for Approval

Thanks Susan.  My blip. It's there.

**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube

---

**From:** Susan Gurman [mailto:susan@gurmanagency.com]
**Sent:** Wednesday, September 22, 2021 4:42 PM
**To:** Kosiewska, Anthony <AKosiewska@Scholastic.com>; Throop, Jocelyn <JThroop@Scholastic.com>
**Cc:** Karppi, Lynne <LKarppi@Scholastic.com>; Danny Abosch <daabosch@gmail.com>
**Subject:** RE: "Goosebumps The Musical" Cast Album – Submission for Approval

Hi Anthony,

If you open the link provided in Danny's letter, one of the files there is the artwork.

Best,

Susan Gurman, *Agent*

 (She, Her, Hers)

Member: Association of Authors Representatives

Signatory: Writers Guild of America East

Gurman Agency LLC

14 Penn Plaza, Suite is 1407

New York, NY 10122-1405

Tel: 212 749 4618

www.gurmanagency.com

Theatre for Youth



---

**From:** Kosiewska, Anthony <AKosiewska@Scholastic.com>
**Sent:** Wednesday, September 22, 2021 4:36 PM
**To:** Susan Gurman <susan@gurmanagency.com>; Throop, Jocelyn <JThroop@Scholastic.com>
**Cc:** Karppi, Lynne <LKarppi@Scholastic.com>; Danny Abosch <daabosch@gmail.com>
**Subject:** RE: "Goosebumps The Musical" Cast Album – Submission for Approval


Hi Susan,


I hope all is well.  Thank you for sending the Goosebumps Cast Album for our review and approval.


As I am working on it, I didn't notice a link or attachment for the album cover artwork in your correspondence. Please send an electronic version of the cover art to Lynne and I for review.  If we receive it by tomorrow morning, we will be able to review it by end of day.  The hardcopy submission  was received yesterday at Scholastic's offices; which are technically not open (Lynne and I work from home); we don't have access to what was sent.


I will review the paperwork with Jocelyn and we will get back to you soon.  If all goes well, we should wrap this up by the end of the week.  Thanks.


Best,
Anthony


**Anthony Kosiewska**
Sr Director, New Business
Scholastic Entertainment
557 Broadway, New York, NY 10012
akosiewska@scholastic.com
Scholastic.com | YouTube




**From:** Susan Gurman [mailto:susan@gurmanagency.com]
**Sent:** Monday, September 20, 2021 11:57 AM
**To:** Throop, Jocelyn <JThroop@Scholastic.com>
**Cc:** Kosiewska, Anthony <AKosiewska@Scholastic.com>; Karppi, Lynne <LKarppi@Scholastic.com>; Danny Abosch <daabosch@gmail.com>
**Subject:** FW: "Goosebumps The Musical" Cast Album – Submission for Approval


Dear Jocelyn,


I hope this email finds you safe and well.  I'm attaching the GOOSEBUMPS Cast Album which is submitted for approval.  Since the project predates you, I have also attached the Amendment to the original GOOSEBUMPS agreement so that you may get caught up to speed.


As you all can imagine, my clients, particularly Danny Abosch, has worked almost the entire COVID period to make what I consider a stunning (just listen!) cast album of which we can all be proud.  That said, the sooner we can get approval for the cast album the better.


Feel free to contact me if you have any questions.


Kind Regards,



Susan Gurman, *Agent*

 (She, Her, Hers)

Member: Association of Authors Representatives

Signatory: Writers Guild of America East

Gurman Agency LLC

14 Penn Plaza,  Suite is 1407

New York, NY 10122-1405

Tel: 212 749 4618

www.gurmanagency.com

Theatre for Youth



--

**Danny Abosch**
Composer/Lyricist, Managing Member/Owner
Danomalous Productions, LLC
https://dannyabosch.com/

--

**Danny Abosch**
Composer/Lyricist, Managing Member/Owner
Danomalous Productions, LLC
https://dannyabosch.com/

--

**Danny Abosch**
Composer/Lyricist, Managing Member/Owner
Danomalous Productions, LLC

https://dannyabosch.com/

--

**Danny Abosch**
Composer/Lyricist, Managing Member/Owner
Danomalous Productions, LLC
https://dannyabosch.com/

--

**Danny Abosch**
Composer/Lyricist, Managing Member/Owner
Danomalous Productions, LLC
https://dannyabosch.com/

--

**Danny Abosch**

Composer/Lyricist, Managing Member/Owner
Danomalous Productions, LLC
https://dannyabosch.com/

--

**Danny Abosch**

Composer/Lyricist, Managing Member/Owner
Danomalous Productions, LLC
https://dannyabosch.com/

--

**Danny Abosch**

Composer/Lyricist, Managing Member/Owner
Danomalous Productions, LLC
https://dannyabosch.com/

--

**Danny Abosch**

Composer/Lyricist, Managing Member/Owner
Danomalous Productions, LLC
https://dannyabosch.com/

**5 attachments**



**image010.png**
188K



**image011.png**
8K



**image012.png**
8K



**image013.jpg**
10K



**image014.png**
8K

# Exhibit J

**Example – Incorrect Credit, Unauthorized Use of Artwork**

**Album Cover (for comparison)**                    **SEI Licensee Advertisement**





# Exhibit K

**Monday, December 30, 2024 at 09:47:40 Central Standard Time**

**Subject:** Copyright Infringement Allegations
**Date:** Wednesday, November 20, 2024 at 10:18:43 AM Central Standard Time
**From:** Cohen, Guy
**To:** Lance Koonce
**CC:** Mariella Salazar, Siegel, Jacklyn, Kukin, William S.

Lance,

The Complaint alleges (and Scholastic denies) that Scholastic has infringed Plaintiffs' copyrights in the "Cast Album Artwork, Sound Recordings, and certain post-2017 Compositions." Complaint ¶¶ 73–74. However, the sole allegation underlying Plaintiffs' infringement claim appears be that Scholastic has "allowed licensees to use copies of the Artwork, which is solely owned by Abosch, without seeking his permission." *Id.* ¶ 59. And the only evidence in the Complaint purporting to support that contention is a flyer or other advertisement from an individual theater, which is attached to the Complaint as Exhibit J. The Complaint does not appear to include any allegations regarding Scholastic's supposed infringement of sound recordings or post-2017 compositions.

Please promptly send us any and all information you possess regarding these alleged infringements. Specifically, which sound recordings and artwork have allegedly been infringed, who used the sound recordings and artwork, and what is the basis for your clients' belief that the sound recordings and artwork (other than Exhibit J) have been used without Plaintiffs' authorization? And which post-2017 compositions have allegedly been infringed, who used these compositions, and what is the basis for your clients' belief that post-2017 compositions have been used without authorization? In particular (but without limitation), are these post-2017 compositions provided in any form as part of the standard materials that licensees receive in connection with licensing the Play?

In order to avoid additional copyright infringement allegations, Scholastic will not continue to license the Play at least until we receive detailed specific information about the alleged infringement. Please get back to me as soon as possible.

All rights reserved.

Best regards,

Guy

**Guy Cohen**

_____

gcohen@dglaw.com
d   212 468 4853
m  917 455 5962

_____

vCard | Bio | LinkedIn | Twitter

**Davis+Gilbert LLP**
1675 Broadway, New York, NY 10019

# Exhibit L

**Tuesday, December 31, 2024 at 10:49:20 Central Standard Time**

| | |
|---|---|
| **Subject:** | RE: Pre-Motion Letter |
| **Date:** | Friday, November 22, 2024 at 4:55:26 PM Central Standard Time |
| **From:** | Cohen, Guy |
| **To:** | Lance Koonce |
| **CC:** | Mariella Salazar, Siegel, Jacklyn, Kukin, William S. |
| **Attachments:** | image004.png, image005.png, image006.png, image007.png |

Lance,

Scholastic does not oppose Plaintiffs' request for leave to amend the Complaint.

Scholastic also prefers not to consent to proceed before the Magistrate Judge, so we would appreciate if you would prepare a joint letter addressing that issue.

My earlier email regarding Plaintiffs' copyright infringement allegations was not intended as a discovery request. As you know, the email requested specific <u>information</u> regarding the alleged infringements so that Scholastic can assess whether further licensing of the Play potentially subjects Scholastic to additional copyright infringement allegations. We do not know which sound recordings have allegedly been infringed. We do not know which of Plaintiff's compositions are post-2017 compositions, let alone whether such compositions are being used without authorization. Please provide the requested information so that Scholastic can ensure that its licensing of the Play does not lead to further allegations of copyright infringement. Scholastic cannot and will not continue to license the Play until it receives the requested information.

Best regards,


Guy


**Guy Cohen**

<u>gcohen@dglaw.com</u>
d   212 468 4853
m  917 455 5962

<u>vCard</u> | <u>Bio</u> | <u>LinkedIn</u> | <u>Twitter</u>

**Davis+Gilbert LLP**
1675 Broadway, New York, NY 10019
<u>dglaw.com</u>

**From:** Lance Koonce <<u>lance.koonce@klarislaw.com</u>>
**Sent:** Thursday, November 21, 2024 3:25 PM
**To:** Cohen, Guy <<u>GCohen@dglaw.com</u>>
**Cc:** Mariella Salazar <<u>mariella.salazar@klarislaw.com</u>>; Siegel, Jacklyn <<u>jsiegel@dglaw.com</u>>; Kukin,

# Exhibit M

**Monday, December 30, 2024 at 10:08:50 Central Standard Time**

| | |
|---|---|
| **Subject:** | RE: Pre-Motion Letter |
| **Date:** | Monday, November 18, 2024 at 11:55:08 AM Central Standard Time |
| **From:** | Cohen, Guy |
| **To:** | Lance Koonce |
| **CC:** | Mariella Salazar, Siegel, Jacklyn, Kukin, William S. |
| **Attachments:** | image003.png, image004.png |

Lance,

In our view, a stipulated judgment with respect to Count I is unnecessary and Defendants will not so stipulate.  Defendants' position on this point is clear.  Defendants do not and will not dispute that Plaintiffs are the authors of the Play under the Copyright Act.  However, the parties always intended for Plaintiffs to transfer the copyright in and to the Play (and each of the Play's components) to Defendants.  As explained in our pre-motion letter, Plaintiffs effected such transfer via the 2016 Agreement.  But even if the transfer in the 2016 Agreement was somehow ineffective, Plaintiffs expressly transferred the copyright in and to the Play to Defendants in the 2017 Agreement.  No such rights were subsequently transferred back to Plaintiffs—in the 2018 Agreement or otherwise.

Guy


**Guy Cohen**

gcohen@dglaw.com
d   212 468 4853
m  917 455 5962

vCard | Bio | LinkedIn | Twitter

**Davis+Gilbert LLP**
1675 Broadway, New York, NY 10019
dglaw.com

**From:** Lance Koonce <lance.koonce@klarislaw.com>
**Sent:** Friday, November 15, 2024 10:28 AM
**To:** Cohen, Guy <GCohen@dglaw.com>
**Cc:** Mariella Salazar <mariella.salazar@klarislaw.com>; Siegel, Jacklyn <jsiegel@dglaw.com>; Kukin, William S. <wkukin@dglaw.com>
**Subject:** RE: Pre-Motion Letter

Guy:

As you know, under the judge's rules our client's response to your pre-motion letter is due on November 18.  I am writing to ask for an extension of our time to respond until November 21; I don't think we need to ask the court for permission to so extend, given that this is just an exchange between the parties. Please let me know if that works for you.

# Exhibit N

**Friday, January 3, 2025 at 14:34:45 Eastern Standard Time**

---

**Subject:**     RE: Pre-Motion Letter
**Date:**        Monday, November 18, 2024 at 5:30:04 PM Eastern Standard Time
**From:**        Cohen, Guy
**To:**          Lance Koonce
**CC:**          Mariella Salazar, Siegel, Jacklyn, Kukin, William S.
**Attachments:** image004.png, image005.png, image006.png

Lance,

We will not agree to a stipulated judgment.  You and I both know what does and does not constitute a "work made for hire" under the Copyright Act.  And to the extent I said that I "thought" Scholastic would take the position that your clients are the authors, it is because I had not yet confirmed that position with Scholastic, and I obviously cannot take positions on my clients' behalf without their approval.  I now have Scholastic's approval, and I am confident that its position will not change.   Accordingly, it is Plaintiffs who, in my view, will be wasting the courts' and parties' resources if they choose to pursue a matter (a) over which there is no actual controversy, and (b) which will have no practical impact until in or around 2051.

Guy

**Guy Cohen**

gcohen@dglaw.com
d   212 468 4853
m  917 455 5962

vCard | Bio | LinkedIn | Twitter

**Davis+Gilbert LLP**
1675 Broadway, New York, NY 10019
dglaw.com

---

**From:** Lance Koonce <lance.koonce@klarislaw.com>
**Sent:** Monday, November 18, 2024 1:13 PM
**To:** Cohen, Guy <GCohen@dglaw.com>
**Cc:** Mariella Salazar <mariella.salazar@klarislaw.com>; Siegel, Jacklyn <jsiegel@dglaw.com>; Kukin, William S. <wkukin@dglaw.com>
**Subject:** RE: Pre-Motion Letter

Guy:

Again, that is not the position Defendants have taken in the past.  Indeed, on our calls even in the past few months you said you *thought* your clients might be taking that position, but you were not willing to commit to same. So if your clients' position on this point is "clear," it is a brand new development.  My question to you is what prevents your clients from taking this position now and then altering it later? If

# Exhibit O

# KLARIS

November 21, 2024

**<u>Via Email (GCohen@dglaw.com)</u>**
Guy Cohen
Davis+Gilbert LLP
1675 Broadway
New York, NY 10019

> **Re:**    <u>***Abosch et al. v. Scholastic Entertainment Inc., et al.*** (No. 24-cv-08041)</u>

Dear Guy:

We respond on behalf of Plaintiffs to your November 11, 2024 letter. We largely disagree with the positions presented, but consistent with Judge Torres' practices and to clarify aspects Defendants appear to misunderstand, Plaintiffs will seek to amend the Complaint as detailed below.

**<u>Count I.</u>** You state there is no actual controversy because "Defendants agree that Abosch and Maclay are the authors of the Play." This is directly contrary to the position Defendants have taken on multiple occasions previously, including in a letter from your firm dated May 1, 2023. Your clients refuse to formally stipulate to this newly-articulated position, without explanation. As such, we believe that Plaintiffs have no alternative but to seek this declaration. *Cf. Already, LLC v. Nike, Inc.*, 568 US 85 (2013). However, we will amend the Complaint to reflect the current facts.

**<u>Count II.</u>** In 2016-17, as alleged in the Complaint, Defendants expressly took the position that they were not bound by the 2016 Agreement between the Authors and Theaters, necessitating the 2017 Agreement. You now argue that our clients were indeed the authors and owners of the Play *ab initio*, but that Authors then transferred ownership to Defendants under the 2016 Agreement. It is hornbook law that a party may not lay claim to the purported benefits of an agreement and simultaneously disclaim being bound by same, thus your position leads inevitably to the conclusion that Defendants made fraudulent misrepresentations to Authors at the time. In any event, the alleged transfer language in the 2016 Agreement is premised on the work-for-hire provision, which, as you now concede, is ineffective. You also argue that the 2017 Agreement contains an alternate assignment provision that saves the failed work-for-hire provision. However, the provisions are asymmetrical and your attempt to import the definition of "Play" from the invalid work-for-hire provision into the assignment provision is unavailing.

Separately, you state that the 2018 Agreement "explicitly limited Plaintiffs' ownership to the sound recording for the cast album and sheet music," but not only is this not "explicit," it is untrue on the face of the agreement. The 2018 Agreement provides a license for Authors to use any aspects of the Play held by Defendants to create sound recordings, but all existing "copyrights in and to the Cast Album and Sheet Music shall be and <u>remain</u> solely-owned by Adaptors" (emphasis added). As our clients never assigned the Compositions to Defendants under the 2017 Agreement, the later agreement did not alter those rights. Alternatively, if somehow Compositions were assigned under an earlier agreement, the "solely-owned" language referring to the Sheet Music and Cast Album in 2018 can only be interpreted as a transfer back of such rights. You further argue

Klaris Law PLLC                                                    Lance.Koonce@KlarisLaw.com
161 Water Street, Ste 904, New York, NY 10038                                (917) 612-5861

# KLARIS

that the ownership clause should be read to substitute "Cast Album" for "sound recording," and that its first sentence is "contradicted by" its second. Even if the plain language was reasonably susceptible to that interpretation (it is not), it is also susceptible to Plaintiffs' interpretation (*see* May 9, 2023 Letter, footnote 8), and thus would (at most) constitute an ambiguity, which cannot be resolved on a Motion to Dismiss. Regardless, Plaintiffs will seek to amend the Complaint in order to render all of the above points clearer.

**Count V.** Your letter only addresses the failure to license, and not the other breaches alleged, such as failure to pay monies owed, failure to accord proper credit, etc. With respect to the former, you invoke the "no obligation to exploit" provision to argue that SEI can never breach the contract by failing to make reasonable efforts to license the Play. As stated in Count IX, this provision is unenforceable on its face. Contrary to your assertion, "the implied covenant of good faith is also applied to contradict an express contractual grant of discretion when necessary to protect an agreement which otherwise would be rendered illusory and unenforceable." *Third Story Music, Inc. v. Waits*, 41 Cal.App.4th 798, 806 (Cal. Ct. App. 1995); *See also S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021). Plaintiffs will amend to clarify that the unenforceability of this provision also supports our clients' breach of contract claims.

**Counts VI and VII.** Contrary to the statements in your letter, Plaintiffs have indeed pleaded a "special relationship" between Plaintiffs and Defendants, as detailed further in Count VIII below. You also argue that Plaintiffs have not pleaded reasonable reliance because the false statements were "unrelated to whether the Play would be performed at Broadway theaters." However, as clearly stated in the Complaint, the false statements were about Sony purportedly having no further control over first- and second-class rights, and the alleged reliance was Plaintiffs' expenditure of monies on a cast album based upon those statements. ¶¶ 84-85, 88. These statements are not "negated by the terms of a contract," because the contract does not give SEI unfettered discretion to refuse all licensing opportunities in first- and second-class venues. Further, Plaintiffs do not attempt to "skirt" the statutes of limitations; the statutes simply do not bar these claims. First, a misrepresentation claim based on the same basic facts as a fraud claim is subject to the six-year limitations period. *Fromer v. Yogel*, 50 F. Supp. 2d 227, 242 (S.D.N.Y. 1999). Second, neither claim accrues until all elements, including reliance injury, arise, *see Wen v. New York City Reg'l Ctr., LLC*, 2023 WL 6317995, at *8 (S.D.N.Y. Sept. 28, 2023), and here that did not occur until Plaintiffs began spending money on the cast album in 2019. Third, even assuming *arguendo* the limitations period might have run on any of these claims, the circumstances here warrant tolling pursuant to the doctrines of equitable estoppel, continuous representation, and fiduciary tolling. Finally, multiple allegations assert that SEI intended to deceive Plaintiffs so that they would expend significant financial resources on a cast album that redounded to SEI's benefit, at no cost to SEI (*e.g.*, ¶¶ 52, 56, 58), but we will seek leave to amend to make the above crystal clear.

**Count VIII.** In the unique situation presented here, Plaintiffs and Defendants were not arms-length actors; the parties' relationship inherently involved trust, given Gurman's dual role and the disparate strength and sophistication of the parties. Plaintiffs placed their trust and confidence in a shared agent believing that their interests would be protected, and Defendants benefited from the dual agency, implicitly accepting Gurman's role as fiduciary for both parties. While Defendants could have ensured Gurman's role in balancing the parties' competing interests, they instead

2 of 3

Klaris Law PLLC                                                                    Lance.Koonce@KlarisLaw.com
161 Water Street, Ste 904, New York, NY 10038                                              (917) 612-5861

# KLARIS

exploited their superior position and undue influence over her to disadvantage Plaintiffs, knowing that Plaintiffs were relying on Gurman's expertise and professed neutrality. Even putting this backdrop aside, Defendants were entrusted with sole and complete control over generating, collecting, reporting and paying to Plaintiffs their share of revenues, such that in addition to their express and implied contractual obligations, Defendants were in a fiduciary relationship with Plaintiffs, with a duty to account fully and fairly to them, to maximize the revenues from exploitation, to avoid self-dealing, and to place the interests of Plaintiffs at least equal to, if not ahead of, their own interests. *See, e.g.*, *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984); *Nolan v. Sam Fox Publishing Company, Inc.*, 499 F.2d 1394, 1400 (2d Cir. 1974); *Schisgall v. Fairchild Publishing,* 207 Misc. 224, 230-31 (N.Y. Sup. Ct. 1955). Although we believe all of the necessary elements are sufficiently pleaded, Plaintiffs will amend to more clearly state those elements, and eliminate any doubt about whether the claims are duplicative.

**Count IX.** First, your argument that this count "should be dismissed under the plain language of the contract" is circular, as this count challenges the very existence of the contract; if there is no contract, there is no "plain language" to interpret. Second, you argue that the 2017 Agreement is not illusory because Plaintiffs received "fixed payments" and "the right to produce and sell a cast album and sheet music." As you know, none of these benefits arise under the 2017 Agreement; the referenced payments were made by the Theaters under the 2016 Agreement and the right to produce and sell a cast album arises under the 2016 Agreement and the Copyright Act. Your argument that Defendants somehow "cured" this absence of mutuality through later licensing, which suggests that once Defendants engaged in *any* licensing, their obligations were met for all time, is unavailing. *See, e.g.*, *Third Story Music, supra.* (language only requiring marketing at party's election illusory but for payment of large guaranteed minimum amount no matter what efforts were undertaken); *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021) . Your reliance on *Aquavit Pharms.* is also misplaced, as footnote 7 expressly supports Plaintiffs' position, and the case does not involve the kind of continuing obligation that exists here, for which future breach is still possible (and is indeed now occurring, per your recent email stating that "Scholastic will not continue to license the Play" until your premature discovery demand is met). Count IX also is not time-barred. First, the primary relief sought is not reformation, but rather a declaration that the "no obligation" language is unenforceable, with any reformation only required to the extent the Court deems it necessary. Second, the argument regarding "rescission" is inapplicable, because only a *voidable* contract can be rescinded. A *void* contract, on the other hand, never existed. In any event, the statute of limitations only began to run when Defendants repudiated their obligation to exploit. Plaintiffs will, however, seek to amend to clarify that they are primarily seeking a declaration that the "no obligation" language is unenforceable or in the alternative that the agreement is void *ab initio*.

This letter is without prejudice to any of our client's rights or remedies, all of which are reserved.

Best Regards,

Lance Koonce

3 of 3

# Exhibit P



Davis+Gilbert LLP
1675 Broadway
New York, NY 10019

212 468 4800
dglaw.com

**Guy R. Cohen**
d 212 468 4853
gcohen@dglaw.com

December 6, 2024

**BY EMAIL**
Lance Koonce, Esq.
Klaris Law, PLLC
161 Water Street, Suite 904
New York, NY 10038
Lance.Koonce@klarislaw.com

   Re: *Danny Abosch et al. v. Scholastic Entertainment Inc., et al.*, No. 24-cv-08041

Dear Lance:

   Pursuant to Section III(B)(ii) of Judge Torres' Individual Practices, we write to supplement our November 11, 2024 letter regarding Defendants' anticipated motion to dismiss. Defendants intend to move to dismiss Counts I and II of the Complaint as barred by the Copyright Act's three-year statute of limitations. To the extent necessary, Defendants hereby withdraw all statements in the November 11 letter regarding Plaintiffs' authorship claim, including without limitation the statements that "there is no 'actual controversy'" as to Count I, that "Abosch and Maclay are the authors of the Play," and that Plaintiffs are "the authors and *original* owners of the Play."

   The Copyright Act provides that all civil actions under its provisions must be commenced "within three years after the claim accrued." 17 U.S.C. § 507(b). "[A]uthorship claims accrue when plain and express repudiation of authorship is communicated to the claimant, and are barred three years from the time of repudiation." *Horror Inc. v. Miller*, 15 F.4th 232, 257 (2d Cir. 2021). The Second Circuit has long held that repudiation of authorship occurs "when the defendant first communicates to the plaintiff that the defendant considers the work to be a work-for-hire." *Charles v. Seinfeld*, 803 F. App'x 550, 552 (2d Cir. 2020); *see also, e.g.*, *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 119 (2d Cir. 2018) ("[A]sserting ownership as a work for hire would effectively repudiate Plaintiffs' claim for the renewal term, as well as for the initial term."); *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317 (2d Cir. 2013) ("[E]xpress assertion of sole authorship or ownership" triggers accrual of an authorship claim).

   Plaintiffs unquestionably received notice that Defendants consider the Play to be a work-for-hire—thus repudiating Plaintiffs' alleged authorship—far beyond the applicable three-year limitations period. The Complaint itself alleges that Plaintiffs received notice as early as December 2015 that "SEI insisted on the inclusion of work-for-hire language in its contracts." Compl. ¶ 30. Further, the 2016 Agreement expressly states that the Play was a work-for-hire for the benefit of SEI. Finally, Defendants again expressly asserted sole authorship of the Play in the 2017 Agreement, which provides that "the Play was created as and constitutes a [ ] work-for-hire on behalf of SEI" and that SEI is the "sole and unlimited owner" of all rights in and to the Play and its components, including renewal rights. Each of these events constitutes repudiation of Plaintiffs' alleged authorship and therefore triggers accrual of Plaintiffs' authorship claim. The



claim is untimely even if the limitations period began to run only with the last of these events—the execution of the 2017 Agreement. *See, e.g.*, *Aday v. Sony Music Entm't, Inc.*, 1997 U.S. Dist. LEXIS 14545, at *11–12 (S.D.N.Y. Sep. 24, 1997) (declaratory judgment claim seeking to invalidate a work-for-hire provision must be brought within three years of when "the contracts containing the allegedly invalid 'work for hire' provisions[ ] were entered into").

Plaintiffs' copyright ownership claim is likewise untimely. Binding Second Circuit precedent confirms that the Copyright Act's three-year statute of limitations applies to claims seeking a declaration of copyright ownership. *See, e.g.*, *Wilson*, 892 F.3d at 118. For the reasons set forth above, Plaintiffs are time-barred from seeking a declaration of ownership based on their alleged authorship of the Play. The only remaining aspect of Plaintiffs' ownership claim turns on Plaintiffs' twisted reading of the 2018 Agreement, which itself is time-barred as that agreement was executed far more than three years before the Complaint was filed. In any event, the plain language of the 2018 Agreement demonstrably contradicts Plaintiffs' interpretation for the reasons set forth in our November 11 letter.

Defendants reserve all rights. We look forward to your response.

Very truly yours,

*/s/ Guy Cohen*

Guy Cohen