UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANOMALOUS PRODUCTION, LLC;
DANNY ABOSCH; and JOHN MACLAY

                Plaintiffs,

v.

SCHOLASTIC ENTERTAINMENT INC.; and
SCHOLASTIC INC.,

                Defendants.

Civil Case No. 1:24-cv-08041

Hon. Analisa Torres

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL DISMISSAL OF THE SECOND AMENDED COMPLAINT**

**Klaris Law**
Lacy ("Lance") H. Koonce, III
161 Water Street, Suite 904
New York NY 10038
(646) 779-4882
Lance.Koonce@klarislaw.com

*Attorneys for Plaintiffs Danomalous
Productions LLC; Danny Abosch; and
John Maclay*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 2

PROCEDURAL HISTORY...................................................................................................... 4

ARGUMENT .......................................................................................................................... 5

    I.     THE COURT SHOULD DENY SCHOLASTIC'S RECONSIDERATION MOTION ON THE IMPLIED COVENANT CLAIM (COUNT VI)................................................... 5

        A.    Legal Standard .................................................................................................. 5

        B.    The Implied Covenant of Good Faith and Fair Dealing Cannot Be Contracted Out...... 6

        C.    The Court's Reasoning Was Sound and is Further Reinforced by 111 West 57th Inv. . 7

    II.    FRAUDULENT INDUCEMENT CLAIM (COUNT II) .................................................... 9

        A.    Plaintiffs Now Plead Affirmative Misrepresentations of Fact..................................... 10

        B.    Scholastic's Challenges to the Pleading Sufficiency of Count II Cannot be Sustained 11

            1.    Plaintiffs Sufficiently Plead Falsity ............................................................ 11

            2.    Scholastic Ratified the 2016 Agreement.................................................... 14

            3.    Plaintiffs Sufficiently Plead Scienter ......................................................... 20

            4.    Plaintiffs Sufficiently Plead Reasonable Reliance..................................... 23

            5.    The Fraudulent Inducement Claim is Timely .............................................. 25

    III.    DECLARATORY JUDGMENT (COUNT X)............................................................. 27

        A.    The Court's Prior Dismissal was Expressly Narrow .................................................. 28

        B.    The 2017 Agreement is Not Supported By Consideration .......................................... 29

        C.    Subsequent Performance Cannot Cure a Void Contract............................................ 32

        D.    Count X is Timely.................................................................................................... 34

        E.    Plaintiffs Can Obtain Meaningful and Appropriate Relief.......................................... 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*111 W. 57th Inv. LLC*,
   No. 41 (N.Y. May 28, 2026) ....................................................................................... 6, 7, 8, 9, 33

*212 Inv. Corp. v. Kaplan*,
   44 A.D.3d 332 (1st Dep't. 2007) ............................................................................................ 27

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*,
   888 F. Supp. 2d 431 (S.D.N.Y. 2012) ..................................................................................... 20

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
   25 N.Y.3d 1043 (2015) ............................................................................................................ 13

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*,
   145 F.3d 543 (2d Cir. 1998) ................................................................................................... 32

*Albritton v. Fredella*,
   No. 22-CV-4512 (JGK), 2023 WL 2057997 (S.D.N.Y. Feb. 16, 2023) ................................ 5, 6

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982) ................................................................................................................ 22

*Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*,
   70 A.D.3d 423 (1st Dep't. 2010) ............................................................................................ 31

*Argent Acquisitions, LLC v. First Church of Religious Sci.*,
   118 A.D.3d 441 (1st Dep't. 2014) .......................................................................................... 33

Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co.,
   145 F.4th 257 (2d Cir. 2025) .................................................................................................. 35

*Baisden v. I'm Ready Prods., Inc.*,
   693 F.3d 491 (5th Cir. 2012) .................................................................................................. 36

*Bd. of Managers of Soundings Condo. v. Foerster*,
   138 A.D.3d 160 (1st Dep't. 2016) .......................................................................................... 20

*Belkin v. Belkin*,
   40 Misc. 2d 984 (Sup. Ct. 1963) ............................................................................................ 25

*Bennett v. Judson*,
   21 N.Y. 238 (N.Y. 1860) ......................................................................................................... 17

*Berry v. Am. Cent. Ins. Co. of St. Louis*,
132 N.Y. 49 (1892) ...................................................................................................... 23

*Big Cola Corp. v. World Bottling Co., Ltd.*,
134 F.2d 718 (6th Cir. 1943) ....................................................................................... 34

*Black v. Chittenden*,
69 N.Y.2d 665 (1986) .................................................................................................. 25

*Brown v. Cara*,
420 F.3d 148 (2d Cir. 2005) ........................................................................................ 29

*Busher v. Barry*,
No. 20-3587-CV, 2021 WL 5071871 (2d Cir. Nov. 2, 2021) ...................................... 35

*Cambridge Investments LLC v Prophecy Asset Mgt., LP*,
188 AD3d 521 [1st Dept 2020] ..................................................................................... 7

*CBI Cap. LLC v. Mullen*,
No. 19 CIV. 5219 (AT), 2020 WL 4016018 (S.D.N.Y. July 16, 2020) ...................... 30

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ........................................................................................ 33

*Cordaro v. AdvantageCare Physicians, P.C.*,
208 A.D.3d 1090 (1st Dep't. 2022) ............................................................................. 19

*Dalton v. Educational Testing Service*,
87 N.Y.2d 384 (1995) ................................................................................................ 6, 8

*Day v. Fortune Hi-Tech Mktg., Inc.*,
536 F. App'x 600 (6th Cir. 2013) ................................................................................ 34

*DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*,
15 N.Y.3d 147 (2010) .................................................................................................. 13

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
12 N.Y.3d 553 (2009) .................................................................................................. 10

*Faison v. Lewis*,
25 N.Y.3d 220 (2015) .................................................................................................. 35

*Ferring B.V. v. Allergan, Inc.*,
2013 WL 4082930 (S.D.N.Y. Aug. 7, 2013) ............................................................ 5, 27

*Goncalves v. Regent Int'l Hotels, Ltd.*,
  58 N.Y.2d 206 (1983) ........................................................................... 30

*Goodstein Const. Corp. v. City of New York*,
  80 N.Y.2d 366 (1992) ...................................................................... 32, 34

*Gould v. Bd. of Educ. of Sewanhaka Cent. High Sch. Dist.*,
  81 N.Y.2d 446 (1993) ........................................................................... 31

*Greenland Asset Mgt. Co. v MicroCloud Hologram, Inc.*,
  244 AD3d 528 [1st Dept 2025] ............................................................... 7

*Grossman v. Schenker*,
  206 N.Y. 466 (1912) ............................................................................. 34

*Harriss v. Tams*,
  258 N.Y. 229 (1932) ............................................................................. 16

*Haviland v. Willets*,
  141 N.Y. 35 (1894) ............................................................................... 24

*IDT Corp. v. Tyco Group, S.A.R.L.*,
  13 N.Y.3d 209 (2009) ........................................................................... 31

*Jack Kelly Partners LLC v. Zegelstein*,
  140 A.D.3d 79 (1st Dep't. 2016)............................................................ 20

*Jgk Indus., LLC v. Hayes NY Bus., LLC*,
  145 A.D.3d 979 (2016) ......................................................................... 10

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
  52 N.Y.2d 105 (1981) ........................................................................... 30

*Kassab v. Kassab*,
  137 A.D.3d 1135 (2d Dep't 2016) ......................................................... 35

*Kirschner v. KPMG LLP*,
  15 N.Y.3d 446 (2010) ............................................... 12, 14, 15, 21, 30

*Krys v. Aaron (In re Refco Inc. Sec. Litig.)*,
  890 F. Supp. 2d 332 (S.D.N.Y. 2012)..................................................... 12

*Latallo Establissement v. Morgan Guar. Tr. Co. of New York*,
  155 A.D.2d 214 (1st Dep't. 1990)...................................................... 16, 17

*Liggett v. Lew Realty LLC*,
   42 N.Y.3d 415 (2024) .............................................................................................. 35

*Matter of Est. of George*,
   194 A.D.3d 1290 (3rd Dep't. 2021) ......................................................................... 27

*Mayer v. Dean*,
   115 N.Y. 556 (1889) ................................................................................................. 17

*McFarland v. Salerno*,
   40 A.D.3d 514 (1st Dep't. 2007) .............................................................................. 24

*Merrill v. Hyman*,
   No. 22-2971-CV, 2024 WL 191807 (2d Cir. Jan. 18, 2024) .................................... 37

*Meyer v. Seidel*,
   89 F.4th 117 (2d Cir. 2023) ...................................................................................... 26

*Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland*,
   835 F.2d 32 (2d Cir. 1987) ....................................................................................... 16

*Moran v. Erk*,
   11 NY3d 452 (2008) ......................................................................................... 6, 7, 8

*Murphy v. Inst. of Int'l Educ.*,
   32 F.4th 146 (2d Cir. 2022) ...................................................................................... 32

*Nat Nal Serv. Stations v. Wolf*,
   304 N.Y. 332 (1952) ................................................................................................. 34

*Nat'l Bank of N. Am. v. Chu*,
   47 N.Y.2d 946 (1979) ............................................................................................... 24

*National Conversion Corp. v. Cedar Building Corp.*,
   23 N.Y.2d 621 (1969) ............................................................................................... 19

*New York State Workers' Comp. Bd. v. Consol. Risk Servs., Inc.*,
   125 A.D.3d 1250 (3rd Dep't. 2015) ......................................................................... 27

*Newburger v. Am. Sur. Co.*,
   242 N.Y. 134 (1926) ................................................................................................. 13

*Pimpinello v. Swift & Co.*,
   253 N.Y. 159 (1930) ................................................................................................. 24

v

*Premium Mortg. Corp. v. Equifax, Inc.*,
  583 F.3d 103 (2d Cir. 2009)......................................................................................20

*President Contain Grp.*,
  467 F. Supp. 3d ........................................................................................................12

*Rafter v. Liddle*,
  288 F. App'x 768 (2d Cir. 2008)...............................................................................33

*Ricketts v. Pennsylvania R. Co.*,
  153 F.2d 757 (2d Cir. 1946)......................................................................................24

*Riverside Syndicate, Inc. v. Munroe*,
  10 N.Y.3d 18 (2008) .................................................................................................34

*Rocky River Dev. Co. v. German-Am. Brewing Co.*,
  193 A.D. 197 (4th Dep't. 1920) ................................................................................18

*Rubin v. Dairymen's League Co-op. Ass'n*,
  284 N.Y. 32 (1940) ...................................................................................................34

*Sargiss v. Magarelli*,
  12 N.Y.3d 527 (2009) ..........................................................................................25, 27

*Schrock v. Learning Curve Int'l, Inc.*,
  586 F.3d 513 (7th Cir. 2009)......................................................................................37

*Sheridan Drive-In, Inc. v. State*,
  16 A.D.2d 400 (4th Dep't. 1962) ..............................................................................24

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995)..........................................................................................5

*Singh v. City of N.Y.*,
  40 N.Y.3d 138 (2023) .................................................................................................8

*Southern Telecom Inc. v. ThreeSixty Brands Grp., LLC*,
  520 F. Supp. 3d 497 (S.D.N.Y. 2021).........................................................................8

*Spinelli v. NFL*,
  903 F.3d 185 (2d Cir. 2018).......................................................................................37

*Teachers Insurance & Annuity Ass'n v. Tribune Co.*,
  670 F. Supp. 491 (S.D.N.Y. 1987).............................................................................29

*The Island Def Jam Music Grp.*,
No. 02 CIV. 6644 (VM), 2003 WL 1858151 (S.D.N.Y. Apr. 9, 2003) .................................. 13

*Third Story Music, Inc. v Waits*,
41 Cal App 4th 798 (1995) ............................................................................................ 34, 35

*Tr. Funding Assoc., LLC v Capital One Equip. Fin.,*
*Co.*, 149 AD3d 23 [1st Dept 2017] ...................................................................................... 7

*Wood v. Lucy, Lady Duff-Gordon*,
222 N.Y. 88 (1917) ...................................................................................................... 8, 33

*Young v. New York State Elec. & Gas Corp.*,
184 Misc. 1013 (Sup. Ct. 1945) ........................................................................................ 19

## Statutes

17 U.S.C § 103 ................................................................................................................... 36

17 U.S.C. § 106(2) ............................................................................................................. 37

17 U.S.C. § 102(a) ............................................................................................................. 30

28 U.S.C. § 2202 ............................................................................................................... 38

## Rules

C.P.L.R. 3005 ..................................................................................................................... 20

N.Y. C.P.L.R. § 213(8) ...................................................................................................... 25

## Other Authorities

*Restatement (Second) of Contracts* § 163 ......................................................................... 33

*Restatement (Second) of Contracts* § 152 ......................................................................... 31

*Restatement (Second) of Contracts* § 170 ......................................................................... 20

*Restatement (Third) of Agency* § 4.01 ......................................................................... 15, 18

*Restatement (Third) of Agency* § 5.03 ............................................................................... 12

*Restatement (Third) Of Agency* § 6.01 ............................................................................. 14

*Restatement (Third) of Agency* § 7.08 .......................................................................................... 19

*Restatement (Third) of Agency* § 8.03 .......................................................................................... 25

Plaintiffs Danomalous Productions, LLC, Danny Abosch, and John Maclay ("Plaintiffs" or "Authors") respectfully submit this brief in opposition to the motion of Scholastic Entertainment Inc. and Scholastic Inc. ("Defendants" or "Scholastic") for partial dismissal of Plaintiffs' Second Amended Complaint ("SAC") (ECF No. 99), which incorporates by reference Scholastic's pending motion for reconsideration (ECF No. 84).

## PRELIMINARY STATEMENT

This is a dispute born of hubris. Scholastic is a publishing giant with over a century of history in that industry, and a roster of important authors and intellectual property. However, roughly a decade ago, it did not know live theater. When it decided to venture into that unfamiliar industry, it brought with it unrealistic expectations and assumptions, and has attempted to bully its way to results to which it believes it is entitled, putting aside law and logic as inconveniences.

As a result, when it enlisted Authors through its agent Susan Gurman to create a musical play based on its GOOSEBUMPS property, it expected an unconscionable agreement far outside the norms of theatrical contracts and then failed to obtain those desired terms, neglected to exercise oversight of its agent even as she misled Authors, and delayed fixing the mess it and its agent had made. Then, faced with an undesirable result, it refused to give an inch to rectify things, insisting instead on coercing its original, subjective, unrealistic expectations on Authors through fraud. At every turn, Scholastic has felt entitled to appropriate others' work product for itself, and has asked to be paid for the privilege, without suffering any detriment or committing itself to anything in return. And it has refused every reasonable opportunity to compromise.

Scholastic continues to refuse to budge, even after largely losing its first motion to dismiss, now burdening the Court with a frivolous motion for reconsideration that is entirely undermined by intervening Court of Appeals case law that it fails even to cite in its papers and that precludes

1

Scholastic's implied covenant argument and validates the Court's original ruling. It also brings a second motion to dismiss that virtually ignores Authors' amended allegations and recycles old arguments, while raising supposed pleading challenges to elements of Authors' claims based on disputed facts. The motions also raise new arguments improperly, attempt to introduce facts and documents outside of the pleadings, and blur the standard of review on each motion. All of these stratagems fail to disguise the fact that Scholastic's motions have no merit.

## BACKGROUND

For over a century, "[t]he playwright's undisputed ownership of his play, legally and artistically… has been the bedrock constant around which all theater-making has been organized."[1] The Dramatists Guild's Bill of Rights is explicit: authors "do not assign… their copyrights, nor do they ever engage in work-for-hire.'" *Id.* Scholastic, a publishing giant new to live theater, assumed it could "create a Play ***only*** on the condition that [it] would own and control the Play" — a "common practice for owners of valuable media properties" in *other* industries. (MTD at 2).

"But theater is different."[2]

This was the context in which, in December 2015, Plaintiffs' theatre agent, Susan Gurman — serving simultaneously as the Authors' agent and Scholastic's representative, while assuring Authors she could fairly advocate for both sides — proposed a new Goosebumps musical (SAC ¶¶ 22-24). Scholastic insisted on "work-for-hire" language as non-negotiable "company policy," though all parties knew it was legally ineffective for dramatic works. (SAC ¶ 31). Authors balked, but Gurman waved away their concerns and assured them that they retained the non-exclusive right to independently license the Play. (SAC ¶¶ 6, 31). Theon March 17, 2016 (the "2016

---

[1] Matthew T. Bodie, *Lessons from the Dramatists Guild for the Platform Economy U. Chi. Legal F.* Vol. 2017, Article 2.

[2] Carol M. Kaplan, *Once More unto the Breach*, 16 Vanderbilt J. Ent. & Tech. L. 297 (2020).

Agreement"), preserved Authors' copyright ownership of the Play and gave them the right to license the Play to third parties in any territory. (SAC ¶ 34).

Scholastic's account of the 2016 discussions conspicuously omits that Gurman, acting as Scholastic's agent, authorized creation of the Play, and negotiated and drafted material portions of the 2016 Agreement on Scholastic's behalf. Scholastic's own executive, Gary Hymowitz, admitted at deposition that Gurman "acted as our agent" and "negotiated the terms on both sides." (SAC ¶¶ 101-102). That dual agent then repeatedly assured Authors on Scholastic's behalf that the rights Authors had secured in the 2016 Agreement — including the non-exclusive right to independently license the Play — would be preserved, and that a "side agreement" between Scholastic and Authors to memorialize those terms was forthcoming.

Scholastic never disclosed that in May 2016 it had secretly signed a separate agreement with the Theaters that directly conflicted with the 2016 Agreement. (SAC ¶¶ 37, 106). Scholastic then spent the ensuing months laying the groundwork to coerce Authors into a far less favorable arrangement. In October 2016 — while the world premiere productions were still running — a Scholastic employee signaled the company's intent to rewrite the deal, telling Gurman that "[e]verything created based on Goosebumps should be owned by Scholastic." Rather than disclose this to Authors, Scholastic withheld it until 2017, well after the premiere had concluded. (SAC ¶ 46).

Gurman, meanwhile, made affirmative misrepresentations to prevent Authors from exercising their existing rights. In November 2016, she told Authors that "without the adapter agreement finished, signed, we just can't market it" — a false statement. Authors already held a non-exclusive right to license the Play under the 2016 Agreement and needed no further permission to do so. (SAC ¶ 47).

In March 2017 — well after Authors delivered their work —Scholastic presented a draft agreement and immediately demanded quick execution under threat. The draft effectively rewrote the 2016 Agreement: it inserted an assignment clause, eliminated Authors' licensing rights, and granted Scholastic the "exclusive right" but "no obligation" to exploit the Play in its sole discretion. (SAC ¶¶ 50-51, 53). The resulting 2017 Agreement purported to require Authors to acknowledge that the Play was created as a work-for-hire "on behalf of SEI," and that, "to the extent" it did not so qualify, Authors "grant, transfer, and assign all right, title, and interest in and to the Play to SEI." As a last-minute deferral, the parties added language stating that Cast Album and Sheet Music exploitation would be "negotiated in good faith and memorialized in a separate agreement." (SAC ¶ 58).

Had Authors known the truth — that they could already license their Play under the 2016 Agreement without any further agreements with Scholastic — they would never have signed the 2017 Agreement, surrendering crucial rights and receiving nothing in return. (SAC ¶ 104). Scholastic's concealment of its binding obligations only became apparent after this lawsuit commenced, when Scholastic — claiming for the first time in November 2024 that the 2016 Agreement "transferred all rights to Defendants" — finally acknowledged it was bound by that agreement. (SAC ¶¶ 85, 108).

Since then, Scholastic has all but ceased licensing the Play, refused to entertain countless requests from foreign markets, repeatedly rejected offers from top-tier theatrical licensing agencies, and denied Authors any independent right to license the Play themselves. (SAC ¶ 77).

## PROCEDURAL HISTORY

The Court previously granted Scholastic's motion to dismiss the fraudulent inducement claim (Count II) for failure to "specify what exactly was concealed and explain why it was

4

fraudulent" and for failure to allege with sufficient specificity the "superior factual knowledge" Scholastic possessed. (ECF No. 82 ("MTD Order") at 12.) The Court denied Scholastic's motion to dismiss the implied covenant claim (Count VI), finding that interpreting the 2017 Agreement to impose no obligation on Scholastic, despite Scholastic having the exclusive right to exploit the Play, would "render the contract illusory" and deprive Authors of the "fruits of the contract." *Id.* at 14.

As to the declaratory judgment claim (Count X), the Court dismissed only the narrow alternative ground – Count X(b) – seeking a declaration that the 2017 Agreement was "illusory," given that the Court found an implied covenant of good faith and fair dealing, rendering the contract non-illusory. *Id.* at 16. The primary declaratory judgment request – Count X(a), seeking a declaration that Scholastic has an ongoing implied obligation to exploit the Play – was not dismissed. Authors have conditionally repleaded Count X(b) in the SAC; it remains dismissed unless the Court grants reconsideration on Count VI, which would eliminate the predicate for that dismissal. Scholastic's motion treats Count X as dismissed in its entirety, mischaracterizing the prior ruling.

## ARGUMENT

I. **THE COURT SHOULD DENY SCHOLASTIC'S RECONSIDERATION MOTION ON THE IMPLIED COVENANT CLAIM (COUNT VI)**

### A. Legal Standard

"[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked . . . that might reasonably be expected to alter the conclusion reached by the court." *Albritton v. Fredella*, No. 22-CV-4512 (JGK), 2023 WL 2057997, at *2 (S.D.N.Y. Feb. 16, 2023) (*citing Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)); *Ferring B.V. v. Allergan, Inc.*, 2013 WL 4082930, at *1 (S.D.N.Y. Aug. 7,

2013) (reconsideration "is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources"). It is not "an opportunity for making new arguments that could have been previously advanced." *Albritton*, 2023 WL 2057997, at *2 (citation omitted).

Defendants cannot point to any overlooked controlling law that would alter the conclusion reached by the Court in the MTD Order. As discussed below, it is Defendants that have overlooked controlling law.

### B. The Implied Covenant of Good Faith and Fair Dealing Cannot Be Contracted Out

Scholastic argued in its opening MTD brief (ECF No. 54), reply MTD brief (ECF No. 64), and now on reconsideration that the implied covenant claim "must be dismissed because the Agreement expressly permits Scholastic to exercise complete discretion over whether to exploit the Play." To do so, it cites *Moran v. Erk*, 11 NY 3d 452 (2008) and several other First Department cases it claims this Court "overlooked." (Recon. Br. at 5). Scholastic has always misinterpreted *Moran*, and at most, these cases represented the minority view under New York law.

To the extent there *was* any tension in case law, it has now been expressly resolved. The Court of Appeals in *111 West 57th Inv. LLC v. 111 W57 Mezz Inv. LLC, No. 41* (N.Y. May 28, 2026) (attached as **Exhibit 1**) ("*111 West 57th*"), in accord with the prevailing Appellate Division view, held that "a party's 'sole discretion' with respect to a right does not exculpate that party from complying with the implied covenant with respect to that right." *Id*. at 10. Even "[w]here [a] contract contemplates the exercise of discretion," the implied covenant "includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id*. (citing *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (1995)). Scholastic makes absolutely no mention of this on-point,

6

controlling, recent decision which fully governs here, and Scholastic's motion should be rejected on this basis alone.

The Court of Appeals explicitly rejected the minority view cases Scholastic cites as if still good law:

> [The lower court's] decision relied on First Department cases that are in tension not only with other First Department decisions, but also with the general consensus among the other Departments, which instead hold a party cannot exercise discretion in a way that frustrates another party's rights under the contract (compare *Tr. Funding Assoc., LLC v Capital One Equip. Fin. Co.*, 149 AD3d 23, 29 [1st Dept 2017] ["Where a contract allows one party to terminate the contract in its sole discretion and for any reason whatsoever, the covenant of good faith and fair dealing cannot serve to negate that provision" (internal quotation marks omitted)] and *Cambridge Investments LLC v Prophecy Asset Mgt., LP*, 188 AD3d 521, 522 [1st Dept 2020] ["Defendant cannot breach the covenant of good faith and fair dealing if the contract gives it sole and complete discretion"]; with *Greenland Asset Mgt. Co. v MicroCloud Hologram, Inc.*, 244 AD3d 528, 529 [1st Dept 2025] ["Even assuming that defendant had some discretion under the contract to refuse plaintiff's request as unreasonable, even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement" (internal quotation marks omitted)].

*Id*. at 9. As noted by the dissent, the court also implicitly held that *Moran* cannot be read to reject the application of the implied covenant (as *Scholastic* would have it). *Id.* at 7 n.2.

Notably, all of Scholastic's principal cases were before this Court on the prior motion. The Court's Order simply rejected the line of authority they represent, in line with the majority view now validated by the Court of Appeals. That is adjudication, not oversight. The Court did not overlook this argument; it rejected it.

### C. The Court's Reasoning Was Sound and is Further Reinforced by 111 West 57th Inv.

Even putting aside *111 West 57th*, this Court properly applied the principle, grounded in New York law, that a party "cannot automatically relieve itself of the obligation to exercise [a] contractual right in good faith by the simple expedient of adding the language 'sole discretion,' if the failure to act in good faith would render the contract illusory." (MTD Order at 7 (citing

7

*Southern Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021)).

First, even where a "contract contemplates the exercise of discretion," the party with discretion is bound by the implied covenant "not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (1995). The Court of Appeals has now reaffirmed and strengthened *Dalton* — this doctrine is "even more important 'where a contract contemplates the exercise of discretion,'" "because more discretion affords a wider range of actions able to destroy the parties' bargain." *111 West 57th*, at 11.

Second, as this Court explained, *Moran v. Erk* is in any event distinguishable because it "did not involve the surrender of an exclusive license," *see Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1917), or "relieve the Court of the need to examine the contract as a whole to determine whether the unfettered exercise of discretion would deprive a party of the fruits of the agreement," S*outhern Telecom Inc.*, 520 F. Supp. 3d at 507 (S.D.N.Y. 2021). (MTD Order at 14). Likewise, the contract in *Singh v. City of N.Y.,* 40 N.Y.3d 138 (2023) was supported by other consideration; overriding an express term was thus unnecessary to avoid illusoriness.

Third, the Court correctly reasoned that if the 2017 Agreement has any "fruits," it is royalties, and because Plaintiffs "can only receive them through Scholastic's efforts," an implied obligation exists. (MTD Order at 14-15).

Fourth, Scholastic's contention that the 2017 Agreement was supported by a "promise to negotiate in good faith [Plaintiff's] right to produce and sell a cast album and sheet music" was rejected by the Court because in fact, "the 2017 Agreement only "*reduced* [Plaintiffs'] rights in this regard—trading a right they already had for the mere promise to negotiate for that right, in a much more limited form." (*Id.* at 15). Scholastic reserved "no obligation to exploit the Play" and

8

simultaneously required that Adaptors relinquish any independent right to exploit it. A construction that permits Scholastic to permanently suppress the Play — while Plaintiffs have no recourse — would deprive Adaptors of the only possible benefit of the bargain. Finding an implied obligation to act in good faith does not "negate" the express provision — it gives the express provision operative meaning by requiring that Scholastic's discretion be exercised in a manner consistent with the agreement's fundamental purpose. This is the function of the implied covenant and is precisely in line with *111 West 57th*.

Finally, the Court previously denied Scholastic's original motion to dismiss in part because Scholastic failed to address several specific breach allegations. (MTD Order at 14-15). Scholastic once again has failed to address these specific surviving allegations of breach of the implied covenant for (1) failing to pay or account for its conveyance of first- and second-class rights in the Play to Sony, (SAC ¶ 120); and (2) "consistently fail[ing] to accord proper credit and billing to Plaintiffs in marketing materials," failing "to attach an album order form to all of its licensing agreements," and otherwise "impeding [Plaintiffs'] ability to exercise their contractual rights." (SAC ¶ 121). Authors also allege that Scholastic has "refus[ed] to entertain countless requests from foreign markets to license the Play overseas, repeatedly reject[ed] offers from top-tier theatrical licensing agencies to license the Play, and provid[ed] no independent right to [Plaintiffs] to license the Play themselves." (SAC ¶ 77).  These allegations continue to state a claim.

## II.    FRAUDULENT INDUCEMENT CLAIM (COUNT II)

Scholastic's motion fails on Count II. Because Plaintiffs seek rescission, proof of scienter is not required at all – and in any event, Authors have plausibly alleged it. On the merits, the SAC now expressly pleads additional affirmative misrepresentations of fact with particularity as to

speaker, date, and content. Scholastic's challenges to falsity, scienter, and reliance present factual disputes, and its timeliness arguments fare no better.

### A.  Plaintiffs Now Plead Affirmative Misrepresentations of Fact

A claim for fraudulent inducement based on affirmative misrepresentations requires a plaintiff to plead the following elements: (i) a false representation of a material fact (ii) made with knowledge of its falsity, (iii) intent to induce reliance and (iv) justifiable reliance by the plaintiff, and (v) damages proximately caused by the reliance. *Jgk Indus., LLC v. Hayes NY Bus., LLC*, 145 A.D.3d 979, 980 (2016) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009)).

Here, the Court dismissed Count II without prejudice, concluding that Plaintiffs had failed to sufficiently plead an inducement by omission claim because, the Court found, they did not specify what was concealed or why the omission was fraudulent; what it meant for Scholastic to have "understood it was bound" by the 2016 Agreement; the superior factual knowledge on the part of Scholastic not readily available to Plaintiffs; and what Plaintiffs said that reflected mistaken knowledge that would trigger a duty to disclose.

With the benefit of fact [3] Plaintiffs now expressly plead *affirmative* misrepresentations of fact by Scholastic that induced Plaintiffs to enter the 2017 Agreement and give up key rights for no consideration. The SAC expressly identifies specific misrepresentations of fact made by Gurman on behalf of Scholastic including:

> "there will need to be a side agreement with adaptors" (SAC ¶¶ 38, 99);
>
> "without the adapter agreement finished, signed, we just can't market it" (SAC ¶¶ 47, 99).

---

[3] In their Opposition to the original MTD, Plaintiffs noted that "[a]lthough Plaintiffs noted that "[a]lthough Authors believe some of Gurman's statements constituted affirmative misrepresentations, they focus here on her omission of key facts." (ECF No. 63, at 11).

The SAC alleges that each affirmative statement declaring that a new agreement was necessary was false at the time it was made because Scholastic was already bound by the 2016 Agreement through its agent's control over its negotiation and drafting, its imputed knowledge of its terms, and its ratification by acceptance of the benefits it conferred. (SAC ¶ 99). Plaintiffs also expressly allege that the intent of these misrepresentations was to induce Plaintiffs to enter into that new agreement and forego significant legal rights (SAC ¶¶ 99, 105), and that Plaintiffs justifiably relied on those misrepresentations and signed the 2017 Agreement, (SAC ¶ 106), and were damaged thereby. (SAC ¶ 109). These allegations readily meet Plaintiffs' pleading burden.

As noted, the deficiencies that the Court identified in Plaintiffs' initial pleading all went to the elements of the fraudulent inducement claim relating to fraud by omission. Although Scholastic does not direct its current motion at the fraud by omission aspects of Plaintiffs' claim, Plaintiffs have made amendments to Count II in the SAC to address the gaps identified by the Court as to those aspects as well. (SAC ¶¶ 35-39; 46-47; 49-52; 54; 57; 99-104; 106-07).

### B. Scholastic's Challenges to the Pleading Sufficiency of Count II Cannot be Sustained

The current procedural posture is somewhat unusual as fact discovery is virtually complete, yet Scholastic's motion is nominally directed to the sufficiency of the pleadings as to the elements of falsity, scienter and reliance. However, Scholastic's arguments veer immediately into factual disputes.

### 1. Plaintiffs Sufficiently Plead Falsity

Scholastic argues that the affirmative misrepresentations by its agent Gurman, set forth above, were not false because "SEI was *not* bound by the 2016 Agreement." (ECF No. 99 Motion to Dismiss ("MTD") at 8). Scholastic's arguments rely transparently on issues of fact; the SAC clearly alleges that Scholastic was indeed bound by that agreement. (SAC ¶¶ 8, 39, 46, 54, 85, 87,

11

99, 105, 106, 108). Scholastic goes on to say that it did not "negotiate the 2016 Agreement, was not a party to it, and did not even see it pre-execution." (MTD at 8). Scholastic does not cite the pleadings for these factual conclusions, presumably because the SAC instead alleges that Scholastic *was* "deeply involved in negotiating" the 2016 Agreement (SAC ¶ 39), was a "[p]arty" to it (SAC Ex. C, ECF 86-1 at 11), did see it pre-execution (SAC ¶¶ 103, 51), and did claim benefits thereunder (SAC ¶ 85).

Notably, Scholastic also made these same arguments on its original motion to dismiss. (ECF No. 54 at 17). The Court did not take up Scholastic's request to dismiss the original pleading on these grounds, and it need not do so here in response to Scholastic's reheated argument. However, out of an abundance of caution, Plaintiffs respond to those expanded arguments here.

As noted, Scholastic argues it had no knowledge of the 2016 Agreement before its execution and cannot be contractually bound to terms to which it never manifested assent. This is demonstrably untrue. First, because Scholastic's "own agent, Susan Gurman, was aware of the agreement's terms, and was deeply involved in negotiating them" (SAC ¶39), Scholastic was likewise aware – it is hornbook law that "notice of a fact that an agent knows or has reason to know is imputed to the principal." *Restatement (Third) of Agency* § 5.03. *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010). Second, when Gurman "relayed that SEI did not intend to sign the commissioning agreement" (SAC ¶32)[4], she also relayed that Scholastic intended to enter a "side agreement" (SAC ¶38). While Scholastic now tries to make much of its "refusal" to "sign" the main agreement (which it also claims it didn't yet know about), this was simply a statement about *which* agreement it would "sign" (the side agreement, not the main agreement.) Far from

---

[4] Scholastic's brief incorrectly quotes SAC ¶ 32 as saying "SEI did not intend to be a party" (MTD at 9). That quotation does not appear in the SAC.

12

demonstrating an absence of assent, it was in fact a *manifestation* of assent to the deal and its terms. *See TVT Recs. v. The Island Def Jam Music Grp.*, No. 02 CIV. 6644 (VM), 2003 WL 1858151, at *2 (S.D.N.Y. Apr. 9, 2003) (assurances from agent that principal consented to side agreement was sufficient to bind principal to main agreement).

Third, "signing" an agreement and being "bound" by one are distinct legal concepts, and the law recognizes many circumstances in which a non-signatory may be bound. *Newburger v. Am. Sur. Co.*, 242 N.Y. 134, 143 (1926) ("It was not necessary that both parties should sign the contract to make it an agreement in writing. If a person has accepted a written agreement and has acted upon it he is bound by it, although he may not have set his hand to the document"); Gurman's statement that Scholastic wasn't "sign[ing]" it spoke only to the former.

The 2016 Agreement contained an express warranty of "SEI's full prior knowledge and consent" to the agreement's terms, (ECF 86-1 at 11), demonstrating that the parties understood Scholastic to be assenting to and bound by the arrangement they were memorializing. "[W]here a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry." *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (2010). This is so even where there is "no written agreement between plaintiff and defendant in which a 'prophylactic provision' could have been inserted." *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 25 N.Y.3d 1043, 1045 (2015).

Eliminating any further doubt about the parties' understandings, the 2016 Agreement expressly stated, "it is further understood and acknowledged that Producers and Adaptors, **and SEI** are sometimes hereafter collectively referred to as **the "Parties"** hereto; or, in the singular number as the context may require or suggest, as **a "Party"** hereto." (ECF 86-1 at 11 (emphasis added)).

13

The agreement, containing this language, was sent out for e-signature by Scholastic's agent, Susan Gurman (SAC ¶102), and signed by both theaters – which Scholastic admits it "authorized." (MTD at 4).

Scholastic's argument that "mere knowledge of contractual terms doesn't objectively manifest assent to be bound" (MTD at 10) might be stronger if Plaintiffs were arguing that Scholastic assumed obligations simply by being informed of the agreement after the fact. But Plaintiffs theory is far more substantial: Scholastic, through Gurman, actively participated in negotiating and shaping the 2016 Agreement's terms, inserted certain mandatory requirements into the agreement (e.g., work-for-hire language), struck other provisions (e.g., standard credit language) that it found unacceptable, and notably negotiated for itself a highly unusual right to non-exclusively license the resulting play (a right normally exclusive to the Authors, per standard theater industry practice). The very existence of such language is inexplicable, if this was merely a ploy by Authors to (in Scholastic's words) "bind an unconsenting third party." (MTD at 9).

"When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, [the] principal and the third party are parties to the contract." *Restatement (Third) Of Agency* § 6.01. Through its agent Gurman, Scholastic had full imputed knowledge of exactly what Authors were promised in order to secure their participation. *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010) ("Agency law presumes imputation even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud"). An entity that directs its agent to actively shape a contract's terms cannot later disclaim being bound by the result.

## 2. Scholastic Ratified the 2016 Agreement

An agent's "authority" can be "actual" or "apparent" – either one will bind the principal. Here, Gurman had actual authority; Scholastic admits it "communicated through Gurman." (MTD

14

at 11.) But it argues that "any appearance of authority" was "negated" by "Scholastic's own conduct" because when its agent repeatedly delivered communications to Authors about what Scholastic would and wouldn't sign, Authors somehow should have understood this as an indication that Gurman *lacked* authority to speak for Scholastic. This turns agency law on its head. *Kirschner*, 15 N.Y.3d, at 468 ("principals, rather than third parties, are best-suited to police their chosen agents"). This baffling argument is unnecessary to resolve, because whether or not Gurman had apparent authority, Scholastic's "knowing acceptance of the benefit[s] of [the] transaction ratifie[d] the act of entering into the transaction." *Restatement (Third) of Agency § 4.01* cmt. d (AM. L. INST. 2007). Ratification is effective "even though [the principal] also manifests dissent to becoming bound by the act's legal consequences" and "even when the third party knew that the agent lacked authority." *Id.*

To avoid this inevitable conclusion, Scholastic argues that it could not have ratified the agreement, because its "first act upon receiving a copy of the 2016 Agreement in March 2017 was to draft the 2017 Agreement that 'effectively re-wrote the terms of the 2016 Agreement'" (MTD at 14.) This is a 180-degree flip from the position it argued previously: "The parties' 2016 understandings are documented in an April 2017 contract." (ECF No. 54 at 7). But its self-serving rewrite of the agreement was hardly its "first act"; to the contrary, the SAC alleges that Scholastic had "actual" knowledge of the 2016 Agreement's material terms by October 11, 2016 — including the ownership provisions that were the central subject of the October 2016 internal communications — and that notwithstanding this knowledge, Scholastic elected to retain the benefits of the transaction rather than offer to rescind the arrangement or make restitution. (SAC ¶ 101). Principals who "retain or demand the fruits of a contract obtained by unauthorized representations of an agent, 'stand in the same position as if they had made the representation or

15

authorized it to be made.'" *Harriss v. Tams*, 258 N.Y. 229, 237 (1932). Thus, even if the contract was unauthorized at inception, Scholastic became bound when it "refuse[d] to relinquish an advantage [it] gained through an unauthorized misrepresentation of [its] agent." *Id.* at 237.

Scholastic argues the only benefits it received were "the Play and its premiere," and that it was entitled to such benefits through its own theater contract, rather than through the 2016 Agreement. (MTD at 14). Neither claim withstands scrutiny. First, "the Play and its premiere" were not the "only" benefits: Scholastic also received (and retained) a valuable and highly unusual non-exclusive right to license the Play under the 2016 Agreement, and collected substantial licensing royalties, all of which flow from that Agreement. Second, Scholastic cannot claim independent entitlement to the Authors' work through a theater contract it actively concealed from them. Having learned what the Authors had been promised (by Gurman on Scholastic's behalf) in exchange for creating the Play, Scholastic was obligated to either rescind the entire arrangement and make full restitution, or accept its terms as negotiated. But Scholastic tried to have it both ways with an unacceptable third option: acting as a principal who "elect[ed] to ratify only that portion advantageous to its interests". *Latallo Establissement v. Morgan Guar. Tr. Co. of New York*, 155 A.D.2d 214, 218 (1st Dep't. 1990).

Scholastic's further contention that the SAC "alleges no affirmative acts demonstrating Scholastic's adoption of the 2016 Agreement's terms" (MTD at 14) misreads the applicable doctrine. Ratification may be "implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence or where the effect of the contract depends upon future events." *Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland*, 835 F.2d 32, 36 (2d Cir. 1987) (internal citations omitted). In any event, the SAC alleges affirmative conduct: Scholastic retained the fruits of Authors' efforts

16

while using its control over Gurman to renege on the promises she made to procure those fruits. (SAC ¶¶ 46, 52-55). Scholastic could have spoken up in October 2016, while the show was still running and Authors still retained some bargaining power. Instead, Scholastic waited until the Authors would have no choice – then completed the shakedown by exploiting the Authors' mistaken understanding of their rights to extract what Scholastic failed to bargain for in the first instance.

Scholastic's supposed "repudiation" argument fares no better, as it ignores the requirement of restitution. (MTD at 14). A principal who discovers its agent's unauthorized conduct "may no doubt rescind, when he discovers the fraud, on the terms of making complete restitution," but he *cannot* "enjoy the fruits of the bargain without adopting all the instrumentalities employed by the agent in bringing it to a consummation," nor "claim immunity on the ground that the fraud was committed by his agent and not by himself." *Bennett v. Judson*, 21 N.Y. 238, 239-240 (N.Y. 1860). Scholastic not only never offered complete restitution, it offered Authors nothing, while insisting they re-execute the arrangement on terms that further stripped their rights. That is selective retention, which the law abhors: a principal "must either ratify or repudiate the *entire* transaction and cannot elect to ratify only that portion advantageous to its interests." *Latallo Establissement v. Morgan Guar. Tr. Co. of New York*, 155 A.D.2d 214, 218 (1st Dep't. 1990) (emphasis added); *Mayer v. Dean*, 115 N.Y. 556, 561 (1889). Demanding all the benefits of the fraud hardly defeats a ratification claim.

While Scholastic wishes to quibble about the precise date it gained "full knowledge of the material facts", even *now* Scholastic makes no offer to rescind or make full restitution. Whether it knew all the facts in 2016 is ultimately "of little consequence. Eventually it did know, and,

17

knowing, chose to assume the right to retain the results of the transaction." *Rocky River Dev. Co. v. German-Am. Brewing Co.*, 193 A.D. 197, 202 (4th Dep't. 1920).

Scholastic's own litigation conduct underscores the point that it ratified, and never repudiated, the 2016 Agreement. A principal ratifies an unauthorized act "by taking a position in litigation that is warranted only by consent to be bound by the act," *Restatement (Third) of Agency* § 4.01 cmt. h (AM. L. INST. 2007) – and in November 2024, Scholastic's counsel for the first time asserted that the 2016 Agreement was valid and binding on all parties. (SAC ¶ 108). It did so specifically to argue (incorrectly) that Authors had "transferred all rights to Defendants" in 2016. (SAC ¶¶ 85-87). Having invoked the 2016 Agreement as binding when that served its purposes, Scholastic cannot now disclaim the obligations that agreement imposed.

Scholastic then argues that its cherry-picked documents, relating to the misrepresentations alleged in (SAC ¶¶ 38, 47), do not support Plaintiffs' claims. (MTD at 13-4). However, Scholastic's framing of the events is inaccurate. First**,** the February 24, 2016, email was not an isolated event; it was part of an ongoing course of conduct in which Gurman, on Scholastic's behalf, repeatedly assured Authors that a separate direct agreement with Scholastic was legally necessary, beginning before the 2016 Agreement was signed and continuing through the signing of the 2017 Agreement more than a year later. (SAC ¶¶ 38, 45, 47, 49-50, 54). The fraudulent inducement claim does not stand or fall on a single email; it rests on a sustained pattern of material misrepresentation running from February 2016, continuing through November 2016, and culminating in the improper "pressure" Scholastic "brought to bear" in April 2017 (SAC ¶57), all directed toward the same end: perpetuating the false belief that Authors' existing rights were legally insufficient and that they needed to enter an entirely new agreement on Scholastic's terms. Second, the misrepresentation was effective: Gurman's statement that Authors "can't market it"

18

without the adapter agreement — made in November 2016, well after the 2016 Agreement was executed — was a direct, affirmative, false statement of existing fact at a time when Authors unambiguously already had licensing rights under the signed 2016 Agreement. That second misrepresentation alone, which cannot be dismissed on pre-contractual grounds, is sufficient to support the claim.

Scholastic's secondary argument is that these statements were nonactionable opinion. (MTD at 16-7). However, the misrepresentation at issue is not merely the abstract legal conclusion that Scholastic was "bound" by a contract. The SAC alleges that Gurman made concrete, factual representations: first, that a new direct agreement with Scholastic was legally necessary before the Play could be licensed; and second, that without such a signed adapter agreement, Authors "just can't market" the Play. These were representations about an observable state of affairs — specifically, what Authors could and could not do with the rights they had already been granted — and not merely legal opinions about how a court might construe whether Scholastic was contractually bound. Furthermore, Gurman was the parties' shared agent, who actively undertook to advise Authors on what was and was not legally possible, and on whose advice Authors were entitled to rely precisely because she held the position of trust they accorded her. *See Cordaro v. AdvantageCare Physicians, P.C.*, 208 A.D.3d 1090, 1092 (1st Dep't. 2022) (principal "is entitled to rely on the agent's representations and [its] complete, undivided loyalty.")

New York case law also recognizes that where a speaker uses an ostensible legal statement to misrepresent underlying facts, actionable fraud lies. *National Conversion Corp. v. Cedar Building Corp.*, 23 N.Y.2d 621, 628-29 (1969); *Young v. New York State Elec. & Gas Corp.*, 184 Misc. 1013, 1016 (Sup. Ct. 1945), aff'd, 270 A.D. 794 (4th Dep't. 1946). *See Restatement (Third) of Agency* § 7.08 cmt. b (AM. L. INST. 2007) ("A person who fraudulently makes a

19

misrepresentation of fact, opinion, intention or law to induce another person to act or refrain from acting in reliance upon the misrepresentation is subject to liability"); *Restatement (Second) of Contracts*, § 170 cmt. a ("A statement as to a matter of law is subject to the same rules as are other assertions. Such a statement may or may not be one of opinion."); C.P.L.R. 3005 ("relief shall not be denied merely because the mistake is one of law rather than one of fact.").[5]

### 3. Plaintiffs Sufficiently Plead Scienter

Scholastic erroneously argues that the SAC's allegations supporting scienter rest solely on an unexplained "internal understanding" that Scholastic was bound. (MTD at 19; and SAC ¶ 101). As a threshold matter, when the remedy sought is rescission, as it is here (SAC ¶ 1 and Request for Relief), "proof of scienter is not necessary and even an innocent misrepresentation is sufficient." *Jack Kelly Partners LLC v. Zegelstein*, 140 A.D.3d 79, 85 (1st Dep't. 2016), *lv dismissed* 28 N.Y.3d 1103 (2016). Fraud sufficient to support rescission "requires only a misrepresentation that induces a party to enter into a contract resulting in some detriment, and unlike a cause of action in damages on the same ground, proof of scienter and pecuniary loss is not needed." *Bd. of Managers of Soundings Condo. v. Foerster*, 138 A.D.3d 160, 164 (1st Dep't. 2016).

Further, Scholastic misreads both the SAC and Rule 9(b). Rule 9(b) requires that the circumstances of fraud be pled with particularity, while scienter may be alleged generally. *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). As explained, the SAC satisfies the particularity requirement by identifying the specific speaker (Gurman), specific dates

---

[5] Despite Scholastic's arguments to the contrary, "*Mandarin Trading* stands only for the proposition that certain types of opinion which amount to 'puffery' are not actionable in fraud." *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 456 n.132 (S.D.N.Y. 2012).

(February 24, 2016 and November 16, 2016), and specific false content of each statement (that a new, direct agreement with Scholastic was legally necessary before Authors could market the Play, when Scholastic was chargeable with the knowledge that it was already bound by the 2016 Agreement). (SAC ¶ 104).

Scholastic's scienter analysis rests entirely on the trick of treating "actual" knowledge as the only type of knowledge, ignoring "imputed" knowledge – which it openly discounts as a "theory" (MTD at 21), rather than a fundamental doctrine of agency law. Scholastic repeatedly draws an artificial distinction between Gurman and individuals "at Scholastic" (MTD at 19), as if there is any meaningful difference, and as if the latter category is the only one that matters. But Scholastic is a corporation, and corporations "must act solely through the instrumentality of their officers or other duly authorized agents" and thus is "responsible for the acts of its authorized agents even if particular acts were unauthorized." *Kirschner*, 15 N.Y.3d, at 465 (citations omitted). It is hardly unfair that "[t]he risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent. After all, the principal is generally better suited than a third party to control the agent's conduct." *Id.* Were it otherwise, Scholastic "could avoid liability by ensuring that it remained ignorant of its agents' conduct." *Id.* at 573.

Thus, although Scholastic argues that Plaintiffs failed to sufficiently plead "a minimal factual basis for their conclusory allegations of scienter" (MTD at 19), this is demonstrably false. The SAC pleads compelling circumstantial facts that, taken together, support a strong inference of fraudulent intent, which is more than enough to meet Plaintiffs' burden.

First, Gary Hymowitz admitted that Gurman "negotiated the terms on both sides" and that he personally asked her to draft a deal memo as part of Scholastic's standard business affairs process. (SAC ¶¶ 101-02). Second, in March 2016, Gurman negotiated and executed the 2016

21

Agreement, and her knowledge is imputed to Scholastic. (SAC ¶¶ 40-2). Third, in May 2016, Scholastic entered a secretly conflicting agreement with the Theaters, which Scholastic expressly refused to disclose to Authors. (SAC ¶¶ 37, 106). Fourth, in October 2016, Scholastic's internal email communications reveal that it consciously realized that its ownership rights under the 2016 Agreement were not as it hoped (SAC ¶ 46), yet rather than repudiate *immediately*, Scholastic chose not to take action while the world premiere was running. Fifth, Gurman's November 2016 email, telling Mr. Maclay that "without the adapter agreement finished, signed, we just can't market" the Play, was made at a time when Authors *already had* the right to market the Play under the 2016 Agreement. (SAC ¶ 99). That statement was not merely inaccurate; it was directly contrary to legal rights Authors had already secured – and made to Gurman's client, Mr. Maclay, who had no attorney and relied entirely on Gurman for advice. Sixth, Scholastic affirmatively refused to allow Authors to see Scholastic's own agreement with the commissioning theaters — the very document that would have allowed Authors to independently assess their rights and discover that Scholastic had executed a conflicting agreement. (SAC ¶ 36). The deliberate concealment of this agreement defies innocent explanation; indeed, Scholastic actually should have *wanted* to put the Authors on notice of its supposedly "crucial" terms. Finally, Scholastic's own litigation position — adopted in November 2024 — acknowledged that the 2016 Agreement was "valid and binding" on the parties, at a time that Scholastic sought to use this position to claim that Authors already had "transferred all rights to Defendants" in 2016 (SAC ¶¶ 85-87, 108) – yet still continued to conceal the theater agreement until well into 2025, when it apparently decided there was an advantage to be gained by filing it in court to paint a misleading picture of its context (and without *any* mention of Scholastic's decade-long concealment). This 2024 acknowledgment

22

by Scholastic confirms that it understood the agreement was binding — rendering its agent's contemporaneous, contrary representations to Authors knowingly false.

Finally, Scholastic attempts to discredit *Berry v. Am. Cent. Ins. Co. of St. Louis*, 132 N.Y. 49, 54 (1892) because it is a "134-year-old case" and "says nothing about whether a non-signatory can involuntarily be bound to a contract it refused to sign." (MTD at 18**).** The fact that *Berry* has been a staple of New York law for over a century is hardly a mark *against* it. And Scholastic's argument deliberately misses the point. *Berry* was cited primarily for the proposition that an agent's innocent misrepresentation about the legal effect of a document can be fraudulent as to the principal, particularly where that principal has superior knowledge of the law affecting its industry. Indeed, the parallels are striking: Scholastic "must be presumed to have known" that it was bound by the 2016 Agreement (*Berry,* 132 N.Y. at 54), and "by falsely representing that under the law applicable to the case the [agreement] was void, when in fact it was valid, it induced [Authors] to rely upon the superior knowledge that it possessed upon the subject and to surrender to it his [Play]." *Id.*

### 4. Plaintiffs Sufficiently Plead Reasonable Reliance

Scholastic makes numerous speculative assertions about what Abosch's former counsel may have advised in the context of an attorney-client relationship,[6] notwithstanding that such conclusions are not found in the SAC. These improper assertions are also irrelevant. The SAC readily acknowledges that "Authors were the ones who had initially been pushing for another agreement with SEI because of their mistaken belief that one was needed" (¶52), and it is of no

---

[6] SEI also misleadingly states that *both* Authors had counsel in *both* 2016 and 2017 (MTD at 20; ECF No. 91 at 4), which Authors rebutted in their pre-motion letter (ECF No. 93). To set the record straight:  Abosch did have counsel in 2016, but not at the relevant time in 2017. Maclay never had counsel in either year.

23

moment whether or not Abosch's attorney had the same mistaken belief. *See Pimpinello v. Swift & Co.,* 253 N.Y. 159, 165–66 (1930) ("The signer, duped by her own attorney, was not precluded, by her execution of the document, from showing that its terms had not been assented to by her, either on the ground that the attorney was her agent or upon the ground that she had been negligent in relying upon his statement of its contents.") Scholastic seems to be arguing that if Authors or Abosch's counsel concluded in February 2016 that they needed "contractual privity" with Scholastic, it would follow that they cannot have relied on Gurman's subsequent representations. (MTD at 16, 20). But countless cases involve the scenario of "a mistake of law on one side, and either positive fraud on the other, or inequitable, unfair, and deceptive conduct, which tends to confirm the mistake and cancel the truth." *Haviland v. Willets*, 141 N.Y. 35, 50–51 (1894). *See Ricketts v. Pennsylvania R. Co.*, 153 F.2d 757 (2d Cir. 1946) (L. Hand, J.); *Nat'l Bank of N. Am. v. Chu*, 47 N.Y.2d 946 (1979); *Sheridan Drive-In, Inc. v. State*, 16 A.D.2d 400, 405 (4th Dep't. 1962); *McFarland v. Salerno*, 40 A.D.3d 514, 515 (1st Dep't. 2007)

As the SAC alleges, "although Authors were the ones who had initially been pushing for another agreement with SEI because of their mistaken belief that one was needed, by March 2017 — once SEI had actually put pen to paper and begun redrafting the side agreement — it was SEI that began demanding execution of such an agreement." (SAC ¶ 52). By November 2016, it was *Gurman*, not Authors, who wanted an agreement "finished" before any licensing could take place. (MTD at 16). By the critical juncture in April 2017, neither Author had an attorney; just an agent who, despite her fiduciary duty, was exerting "pressure" on the Authors, and "aggressively" telling Maclay he "needed to get Danny to sign the contract." (SAC ¶ 57). Gurman — and her most important client, Scholastic — both stood to benefit from this transaction (itself a "redo" of one she previously bungled). Thus, no matter where the mistake originated in 2016, by 2017, it was

24

clearly Scholastic with the motive and opportunity to exploit it to exert its will over the weaker counterparty, through its effectively-captive agent, and take by coercion what it might otherwise have had to pay for. *See Restatement (Third) of Agency* § 8.03 cmt. b (2007) ("a principal's knowledge that its agent acts as or on behalf of an adverse party does not convert the relationship between principal and agent into an arm's-length relationship.")

Scholastic's second argument, that Authors had access to the same relevant facts, overlooks that the fraud could not have been avoided through the "exercise of ordinary intelligence." Rather, it required the highly-specialized intelligence of an attorney, which at least one Author did not have in 2016 (and which neither had at the relevant time in 2017).

In any event, "whether plaintiffs could have discovered the truth [] through the 'exercise of ordinary intelligence' [presents] questions of fact mandating the denial" of Scholastic's motion. *Black v. Chittenden*, 69 N.Y.2d 665, 669 (1986).

### 5. The Fraudulent Inducement Claim is Timely

Scholastic argues the statute of limitations has closed on the fraudulent inducement claim. (MTD at 20-21). However, the limitations period for fraud does not begin to run until the plaintiff "discovered the fraud or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). "Generally, knowledge of the fraudulent act is required." *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009). "Where it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts." *Id.*

The relevant question is therefore not when the 2017 Agreement was signed, but when Authors discovered — or with reasonable diligence could have discovered — that Gurman's representations about that agreement and Authors' existing right to license were fraudulent. The

25

SAC specifically alleges that the fraud was not discovered until November 11, 2024, when Scholastic's litigation counsel for the first time asserted that the 2016 Agreement was "valid and binding" on the parties. (SAC ¶ 108).

Scholastic then argues that Plaintiffs' own theories foreclose the discovery rule because by arguing that Gurman's knowledge is imputed to Scholastic and that Scholastic ratified the 2016 Agreement, this suggests that Plaintiffs must have known all relevant facts in 2016. Yet Scholastic's efforts to frame the constrained (and distorted) facts available to Authors in 2016, none of which went to the key issue of Scholastic's knowledge, as somehow amounting to "discovery," are unavailing.

Nor could it have been discovered earlier with reasonable diligence. *See infra* at II.B.3. Scholastic conflates the facts necessary to establish a legal theory with the facts necessary to give rise to actual or constructive knowledge of fraud. (MTD at 22). Authors knew in 2016 that Gurman had represented both sides and that Scholastic had accepted benefits from the productions. Again, what they did not know — and had no means of discovering — was that Scholastic understood that it was legally bound by the 2016 Agreement, while claiming otherwise. Scholastic's systematic concealment of that internal understanding, and its active refusal to allow Authors to inspect the theater agreement that would have allowed an independent assessment, is precisely the kind of fraudulent concealment that the discovery rule is designed to address.

By affirmatively blocking Authors' access to the underlying theater agreement, Scholastic denied Authors any means of discovering its understanding of their rights, or the existence of a conflicting agreement until after it was too late. A defendant cannot create a fraudulent concealment through systematic suppression of information and then invoke the statute of

26

limitations against the party it deceived on the ground that ordinary diligence should have revealed what the defendant deliberately hid.[7] *Sargiss*, 12 N.Y.3d at 532.

## III.    DECLARATORY JUDGMENT (COUNT X)

The Court held previously that "[i]nterpreting the 2017 Agreement to impose no obligation on Scholastic to exploit the Play, despite Scholastic having the exclusive right to do so, would 'render the contract illusory.'" (MTD Order at 15). It then found that the implied covenant provided the necessary obligation.  Authors did not alter Count X in their SAC, and do not seek to reassert the portion of that cause of action previously dismissed by the Court, *unless* the Court were to grant Scholastic's reconsideration motion as to the implied covenant.

Nevertheless, Scholastic attempts a second bite at the apple, seeking again to dismiss the portion of Count X which the Court previously declined to dismiss. In their pre-motion letter, Authors noted that as to Count X, Scholastic's opening letter "improperly advance[d] arguments that appear for the first time in their Second Letter, refer[red] to matters outside the pleadings, 'repeat[ed] "arguments already briefed, considered and decided,"' and 'advance[d] new facts, issues or arguments not previously presented' (*Ferring B.V. v. Allergan, Inc.*, 2013 WL 4082930 at *1 (S.D.N.Y. Aug. 7, 2013)) — all without citing any 'controlling decisions' that were 'overlooked.'" (ECF No. 93, at 3). Scholastic has entirely ignored these concerns, and doubles down on its partially recycled arguments to dismiss the remainder of Count X.

---

[7] Count II is also timely because even the six-year period was "tolled" under New York's "fiduciary tolling" and "continuous representation" doctrines. The "fiduciary tolling" rule "acts as a toll of the limitations period for *all* misconduct committed by the fiduciary prior to repudiation of its obligation or termination of the relationship." *New York State Workers' Comp. Bd. v. Consol. Risk Servs., Inc.*, 125 A.D.3d 1250, 1253 (3rd Dep't. 2015). Because Authors "were entitled to assume that [Gurman] would perform [her fiduciary] responsibilities", they were not required to sue before she openly repudiated that role in 2025. *Matter of Est. of George*, 194 A.D.3d 1290, 1293–94 (3rd Dep't. 2021). The "continuous representation" doctrine reflects that "a client cannot reasonably be expected to assess the quality of the professional service while it is in progress". *212 Inv. Corp. v. Kaplan*, 44 A.D.3d 332, 334 (1st Dep't. 2007).

### A. The Court's Prior Dismissal was Expressly Narrow

In the original pleading, Plaintiffs sought two declarations pursuant to Count X:

> a. SEI has an ongoing duty, for the life of the copyright, to use reasonable, good faith efforts to exploit the Play for Authors' benefit, in accordance with industry custom and practice, and, further, that any language to the contrary is unenforceable.
>
> b. In the alternative, Plaintiffs hereby request a declaration of this Court that the 2017 Agreement is illusory for lack of mutuality, and therefore void *ab initio.* The terms of the 2016 Agreement shall control and be binding on both parties unless and until the parties mutually agree, in a signed writing, to enter into a new agreement.

As noted, the Court found that an illusory construction could be avoided by inferring that "an implied obligation exists." (*Id*. at 16). Recognizing that these two grounds are mutually exclusive and were pled in the alternative, the Court dismissed the alternative ground while leaving the primary extant. The Court carefully limited the partial dismissal of Count X to that narrow issue. (MTD Order at 21) Therefore, only Count X(b) was dismissed.

Scholastic now asks the Court to revisit its finding of an implied covenant of good faith and fair dealing. For all the reasons previously discussed, that gambit should not succeed. Assuming it does not, Count X(b) remains dismissed and there is no live request for a declaration that the 2017 Agreement is illusory. Only if the Court were to accept Scholastic's arguments on the implied covenant claim would the analytical predicate for dismissal of Count X(b) disappear.[8]

Tacitly recognizing that moving for reconsideration of the implied covenant claim necessarily undermines the continuing dismissal of Count X(b), Scholastic pivots and raises an argument already made in its previous motion (ECF No. 54 at 22): That language in the 2017

---

[8] To the extent the Court views repleading as technically requiring leave under Rule 15(a)(2), Plaintiffs respectfully request such leave be granted contingent on the reconsideration motion, as the repleading of Count X(b) is directly linked to the live reconsideration motion, is not futile, and causes no prejudice to Scholastic.

Agreement regarding future negotiations over exploitation of the Play's Cast Album and Sheet Music supplies consideration for the otherwise illusory contract. Scholastic also now argues, incorrectly, that the 2017 Agreement constituted a "Type II" binding agreement and thus has valid consideration.[9]

### B.  The 2017 Agreement is Not Supported By Consideration

Scholastic contends the 2017 Agreement is not illusory because a lone sentence in Paragraph 7, which provides that "[t]erms for exploitation of the Play's Cast Album and Sheet Music will be negotiated in good faith and memorialized in a separate agreement," makes the 2017 Agreement a binding "Type II" preliminary agreement under the framework of *Teachers Insurance & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987) and *Brown v. Cara*, 420 F.3d 148 (2d Cir. 2005). Scholastic points to no case law – because there is none – for the proposition that the presence of a purported Type II provision about future negotiations within an otherwise entirely illusory contract converts the agreement, *ipso facto*, into an enforceable agreement. And the Cast Album provision demonstrably was not the centerpiece of the extensive 2017 Agreement — the facts show it was a last-minute deferral of an unresolved issue precisely to allow Scholastic, the more powerful party, to avoid making any real commitment.

This Court has already recognized the illusory nature of the 2017 Agreement, absent application of the implied covenant. As Authors explained in opposition to Scholastic's first motion to dismiss, the 2017 Agreement otherwise lacked any consideration and represented a net reduction, not an addition, to Authors' rights. (ECF No. 63 at 21-22). Crucially, the future negotiations language related to rights Authors already held under §201(a) of the Copyright Act,

---

[9] Nothing about Count X has been altered in the SAC, and thus Scholastic's motion to dismiss Count X, which largely rehashes old arguments, should be treated as a motion for reconsideration, and subject to that "strict" standard of a motion for reconsideration.

a fact unchanged by the 2016 Agreement (which lacked an assignment clause). Because copyright "vests initially in the author," the Authors owned the Play from the moment it was "fixed in any tangible medium of expression." 17 U.S.C. § 102(a). As the owners, it was their exclusive right to create and sell a Cast Album and Sheet Music. Thus, the Court correctly recognized, "the 2017 Agreement only 'reduced [Plaintiffs'] rights in this regard—trading a right they already had for the mere promise to negotiate for that right, in a much more limited form." (MTD Order at 15).

Scholastic's arguments about *Spinelli* do not change this analysis. *See* MTD at 27 (discussed below). But it is telling that Scholastic focuses on what the t*heaters* could authorize, while conspicuously avoiding what *Scholastic's own agent* could authorize. *See Kirschner*, 15 N.Y.3d, at 465 ("A corporation must [be] responsible for the acts of its authorized agents even if particular acts were unauthorized.")

Scholastic's new argument (which it notably failed to raise in its reconsideration motion) that the future negotiation language was a "binding" "Type II" agreement to agree cannot alter this dynamic. No matter how many five-factor frameworks Scholastic proffers, the inquiry fails at the threshold: the mere promise to negotiate for what one already has cannot constitute "consideration." *Goncalves v. Regent Int'l Hotels, Ltd.*, 58 N.Y.2d 206, 220 (1983).

Even if the Court needed to reach Scholastic's argument, Scholastic's attempt to shoehorn the Paragraph 7 language into the Type I/II framework fails. To begin with, agreements to agree are generally treated as unenforceable under New York law. *See, e.g., CBI Cap. LLC v. Mullen*, No. 19 CIV. 5219 (AT), 2020 WL 4016018, at *5 (S.D.N.Y. July 16, 2020) (Torres, J.); *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109–10 (1981). While federal courts have developed analytical approaches for fact patterns where a preliminary agreement might rise to the level of enforceability, the Type I/Type II rubric has been rejected as "rigid" by the NY

Court of Appeals, *see Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 427 (1st Dep't. 2010) (citing *IDT Corp. v. Tyco Group, S.A.R.L.*, 13 N.Y.3d 209, 213 n. 2 (2009)).

Even assuming this framework is applicable, Scholastic's superficial march through the five factors often applied in this context to conveniently find that the 2017 Agreement is a Type II agreement is misleading and wrong. Although the 2017 Agreement contemplates that a "separate agreement" will be "negotiated in good faith," Authors' "intent" in this regard was entirely based on their belief, caused by Scholastic's fraud, that they needed to enter the 2017 Agreement, undermining the possibility of a true meeting of the minds on this point. Even absent fraud, "a contract entered into under a mutual mistake of fact is voidable and subject to rescission … The idea is that the agreement as expressed, in some material respect, does not represent the 'meeting of the minds' of the parties." *Gould v. Bd. of Educ. of Sewanhaka Cent. High Sch. Dist.*, 81 N.Y.2d 446, 453 (1993). Given Scholastic's statement that "Scholastic shared the same understanding that a new agreement was needed" (MTD at 18), Scholastic has essentially admitted a "mutual mistake." *See Restatement (Second) of Contracts*, § 152. Thus, whether the parties truly exhibited an intent to be bound, in the context of these negotiations, is an open question of fact under the first two factors of the Type II analysis.

The third factor that courts examine is whether the putative agreement to agree leaves open terms. Scholastic offers the understatement of the year, conceding that Paragraph 7 "leaves open certain terms" (MTD at 25) – here, *all* economically meaningful terms were left open. Scholastic's partial performance argument under factor four also holds no water because here, the performance was exploitation of the Cast Album and Sheet Music, which did not occur in whole or part during 2017-2018. Further, Scholastic's negotiation of the addendum can hardly be called "good faith"; it delayed more than 14 months (SAC ¶64), often wouldn't return phone calls, fraudulently

31

misrepresented its other contract obligations (*see* Count VIII), attempted to hold approvals hostage for the album release to coerce a renegotiation of text it approved years earlier, and now threatens multiple copyright and trademark counterclaims over the very rights it granted. If the supposed benefit of that bargain was a "good faith" negotiation, Authors did not receive it. Thus, factor four does not point in Scholastic's favor.

"It can hardly be supposed that by subscribing to these exclusive negotiating agreements, the [Authors] envisioned that they were then exposing [themselves] to liability of catastrophic proportions when the other party was assuming no risk whatsoever." *Goodstein Const. Corp. v. City of New York*, 80 N.Y.2d 366, 375 (1992). "It is simply not conceivable that the [Authors] could have contemplated that in entering into the exclusive negotiating agreements they were subjecting [themselves] to such an unfair and one-sided allocation of the risks." *Id.* "To hold otherwise [] would lead to the irrational conclusion" that the Authors "provided a guarantee that if for any reason the [negotiations failed], [Scholastic] would still receive all the hoped for [] benefits from the [ownership of the Play] it anticipated to receive upon the completion of the [negotiations]. According to [Scholastic's] version of the facts, [Scholastic] was to realize all of its anticipated gains with or without the [Cast Album]. Clearly, such a result is illogical and without any basis whatsoever in the record." *Id.*

### C. Subsequent Performance Cannot Cure a Void Contract

In a final attempt to identify consideration, Scholastic makes misleading claims about royalties purportedly paid to Authors.[10] Even if the Court could consider these unsupported

---

[10] Scholastic misleadingly cites Plaintiffs' pre-motion letter for the proposition that "Adaptors 'received an average of $6,166 in annual royalties over approximately 9 years'". (MTD at 26.) The quoted sentence *actually* said: "Defendants improperly allege, based on uncited sources outside the pleadings, that each Author received an average of $6,166 in annual royalties over approximately 9 years." (ECF No. 93 at 4). Despite that conduct being labeled "improper," Scholastic has not only repeated it on this motion, but has gone even further — attempting to

assertions, it would not rescue Scholastic's flawed argument that subsequent performance cures any consideration deficiency. First, if the 2017 Agreement was void *ab initio*, subsequent performance cannot cure the original formation defect — a void contract cannot be ratified. *Restatement (Second) of Contracts* § 163. Under Scholastic's reading, it is allowed to either or market the Play or refrain from all marketing, a "textbook example of an illusory promise." *Third Story Music, Inc. v Waits*, 41 Cal App 4th 798, 808 (1995). *See 111 W. 57th* (Garcia, J., dissenting in part) (*citing Third Story Music* for the "relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement"). The contract in *Third Story Music* was savable because it provided a 5-figure "guaranteed minimum amount no matter what efforts were undertaken" by the music company. No such provision exists here.

Scholastic's argument boils down to an assertion that once Scholastic engaged in any licensing, its obligations were met ever. Scholastic's argument implicitly requires that any amount of royalties – one dollar or one million – would likewise be "consideration", and that the parties intended to leave this apparently-unimportant detail to Scholastic's sole, future discretion. Obviously, they did not. *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1917) ("We are not to suppose that one party was to be placed at the mercy of the other."). Without it, the agreement is too indefinite to enforce. *Argent Acquisitions, LLC v. First Church of Religious Sci.*, 118 A.D.3d 441, 445 (1st Dep't. 2014).

---

misleadingly put those words in *Plaintiffs'* mouths. Plaintiffs again dispute these figures, which are not found in the SAC and are apparently drawn from SEI's own uncited materials outside the pleadings. The Court should not consider them on this motion, especially as SEI has not even attached them. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Rafter v. Liddle*, 288 F. App'x 768, 769 (2d Cir. 2008) (Motions for reconsideration "are not vehicles for taking a second bite at the apple, ... and [the court] [should] not consider facts not in the record to be facts that the court overlooked.")

33

Scholastic's argument "confuses performance of the terms with an obligation to perform under the contract. That Defendant voluntarily continued to [perform] is irrelevant; the question is whether it had a legally binding obligation to continue to do so." *Day v. Fortune Hi-Tech Mktg., Inc.*, 536 F. App'x 600, 604–05 (6th Cir. 2013) ("subsequent performance cannot excuse a want of consideration");

Arguing otherwise, Scholastic relies heavily on an unpublished district court case concerning the enforceability of a forum selection clause ancillary to a trademark dispute (MTD at 26) which cites a line of cases about *unilateral* promises becoming binding upon performance. *See Grossman v. Schenker*, 206 N.Y. 466, 468 (1912); *Rubin v. Dairymen's League Co-op. Ass'n*, 284 N.Y. 32, 37 (1940). In contrast, the 2017 Agreement was clearly intended to be *bilateral*. This doctrine is thus not applicable here. *See Nat Nal Serv. Stations v. Wolf,* 304 N.Y. 332, 340 (1952); *Big Cola Corp. v. World Bottling Co., Ltd.*, 134 F.2d 718 (6th Cir. 1943). Even where it applies, it is generally limited to the time period in which performance actually occurred. In *Rubin*, for example, an agent was entitled to a commission for sales it actually made, but could not require the other party to continue the contract longer than it wished.

Finally, Scholastic's new theories (Recon. 11n.4) about finding consideration in "commercially reasonable efforts" to accord credit (for the very exploitations it now seeks to preclude) fail by their own logic. Credit, like royalties, depends on a condition *entirely within Scholastic's control* – the very licensing it seeks the right to refrain from.

### D.  Count X is Timely

Scholastic improperly raises the same argument made and rejected on the prior motion. This argument "misconceives the nature of a statute of limitations; it does not make an agreement that was void at its inception valid by the mere passage of time." *Riverside Syndicate, Inc. v. Munroe*, 10 N.Y.3d 18, 24 (2008). *See Faison v. Lewis*, 25 N.Y.3d 220, 230 (2015); *Liggett v. Lew*

*Realty LLC*, 42 N.Y.3d 415, 422 (2024). New York's highest court has spoken decisively on this point, and none of Scholastic's citations change the result.

*Busher v. Barry*, No. 20-3587-CV, 2021 WL 5071871 (2d Cir. Nov. 2, 2021) is an unpublished federal summary order, which is not precedent on an issue of New York state law. *Kassab v. Kassab*, 137 A.D.3d 1135 (2d Dep't 2016) is a 2016 Appellate Division decision, which cannot overrule a Court of Appeals decision. The Court of Appeals has also reaffirmed *Riverside* as recently as 2024. *Liggett*, 42 N.Y.3d at 422. To the extent *Kassab* was ever precedential, it should be considered invalid in light of *Liggett*. Scholastic's attempt to draw a distinction, between agreements void by statute or by failure of consideration, falls flat. Both are fatal formation defects preventing a contract from coming into existence. Neither can be saved by the mere passage of time. "[A] statute of limitations cannot validate what is void at its inception". *Faison*, 25 N.Y.3d, at 230.

Finally, the Court should also reject Scholastic's statute of limitations argument because it "would plausibly allow anyone to assert a frivolous claim of copyright ownership and later invoke the statute of limitations against the true author." *Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co.*, 145 F.4th 257, 277 n.17 (2d Cir. 2025) (finding such an argument "objectively unreasonable").

### E.  Plaintiffs Can Obtain Meaningful and Appropriate Relief

Scholastic argues that even if the Court declares the 2017 Agreement void, the terms cannot revert to the 2016 Agreement because the Theaters lacked the rights they purported to the grant to Plaintiffs in the 2016 Agreement. The Court can reject this argument simply on the basis that Scholastic's argument rests on a conclusory *factual* statement that "the Theaters purported to grant rights to Adaptors that the Theaters could not validly convey," which is far from a settled matter in the pleadings, and moreover, misstates Author's position. What rights Scholastic and the

35

Theaters may have held respectively, and what rights were conveyed to Authors by which party and at what time, clearly remain disputed fact issues.

Regardless, even this conclusory fact statement mischaracterizes the allegations in the SAC. Authors allege that Scholastic authorized the creation of the Play by Authors through Gurman (*not* the Theaters), and that as Scholastic's agent, Gurman assented to the 2016 Agreement on Scholastic's behalf. Because Scholastic authorized Authors to create the Play, Authors obtained copyright ownership in their original expression created thereafter by operation of law. *See* 17 U.S.C § 103. Because Authors' derivative works were authorized by Scholastic, and there was no valid work for hire or assignment language in the 2016 Agreement, the Authors held ownership in the works *ab initio*.[11] To the extent that Scholastic asserts that Authors claim to have received rights in the Play, Cast Album or Sheet Music themselves from the *theaters* (rather than by statute), this would be nonsensical, as the Theaters did not author any works.

*Spinelli v. NFL,* 903 F.3d 185 (2d Cir. 2018), cited by Scholastic in multiple capacities in its motion, is inapposite and cannot carry the water that Scholastic asks of it. Scholastic's argument is essentially that the terms of Scholastic's "License Agreement" with the Theaters should be enforceable on the Authors, by virtue of Scholastic's assumption that Authors' rights derive only from the Theaters, and even though Scholastic *concealed* that agreement from the Authors and strenuously denies that the 2016 Agreement established privity. Ironically, *Spinelli* is Scholastic's attempt to "bind an unconsenting third party" "by contractual terms it never saw" even though "[t]here can be no meeting of the minds if one party lacks notice" (MTD at 9, 2, 10).

---

[11] To the extent any further license was needed to authorize Authors' creation of the works, it was inferable from the circumstances as alleged in the SAC. *See Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491 (5th Cir. 2012) ("totality of the parties' conduct" supported finding that novelist granted stage play adaptors an "implied nonexclusive license" to sell DVDs of play based on novel).

The problem is that Scholastic's fundamental assumption is wrong. Again, Authors do not argue that their copyright interests flowed directly from the Theaters, but rather that they arose by law after Authors were authorized by Scholastic's own agent to create derivative works based on Goosebumps.

Scholastic admits it authorized the Play's creation, and contrary to Scholastic's suggestion, "there is nothing in the Copyright Act requiring the author of a derivative work to obtain permission to copyright his work from the owner of the copyright in the underlying work. To the contrary, the Act provides that copyright in a derivative work, like copyright in any other work, arises by operation of law once the author's original expression is fixed in a tangible medium." *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 523 (7th Cir. 2009). Thus, the Authors' exclusive right to prepare derivative works based upon their Play (17 U.S.C. § 106(2)) was "not something [they] received as consideration [for their] services. Rather, [they] obtained those rights by virtue of federal copyright law because [they] created the lyrics." *Merrill v. Hyman*, No. 22-2971-CV, 2024 WL 191807, at *3 (2d Cir. Jan. 18, 2024).

Scholastic's argument also depends on obscuring the actual timeline. Indeed, to the extent *Spinelli* is relevant at all, it should be read as limiting the "License Agreement" by the *Authors'* agreement, signed two months earlier – *not* the other way around.

Scholastic, remarkably, now seems to argue not just that it wasn't bound by the 2016 Agreement between Authors and the theaters, but that if the 2017 Agreement is void, the 2016 Agreement is essentially void as well as to any key terms. The missing link in this reflexive effort to avoid responsibility for its acts is its own agent's central role in arranging all of these agreements, and failing to exercise oversight to ensure she acted in accordance with Scholastic's wishes. In any event, the Court need not delve into these contested fact issues on this motion.

Further, Scholastic's argument is simply premature on a motion to dismiss because the theoretical unavailability of a specific remedy (even if true) does not require dismissal of the claim for declaratory relief at the pleading stage; the Court has broad equitable discretion to fashion appropriate relief upon finding a contract void. 28 U.S.C. § 2202. Dismissal is inappropriate if the only question is which among several available remedies the Court should award.

Dated: New York, New York

     June 25, 2026

By: /s/ Lacy H. ("Lance") Koonce, III

Klaris Law
Lacy ("Lance") H. Koonce, III
161 Water Street, Suite 904
New York NY 10038
(646) 779-4882
Lance.Koonce@klarislaw.com

*Attorneys for Plaintiffs Danomalous
Productions LLC; Danny Abosch; and
John Maclay*

38

## CERTIFICATION OF WORD COUNT

I, Lance Koonce, an attorney duly admitted to practice law before the courts of the State of New York, hereby certify that this Memorandum of Law complies with the increased word count limit granted to Plaintiffs in the Court's Order (ECF No. 103), because it contains 12,217 words, excluding the parts exempted by Section III(D) of the Court's Individual Practices in Civil Cases and Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this Memorandum.

Dated: New York, New York
      June 25, 2026

By: /s/ Lacy H. ("Lance") Koonce, III

Klaris Law
Lacy ("Lance") H. Koonce, III
161 Water Street, Suite 904
New York NY 10038
(646) 779-4882
Lance.Koonce@klarislaw.com

*Attorneys for Plaintiffs Danomalous
Productions LLC; Danny Abosch; and
John Maclay*

39